# EXHIBIT 17

PAGE 287Z * RCVD AT 8/4/2015 4:58:09 PM [Central Daylight Time] * SVR:PWGSARSGFFAX03/1 * DNIS:1 * CSID:4808807 9031 * DURATION (mm-ss):06-30

AmGen (Cheney)000098

08-04-'15 14:58 FROM- Adelman German   4808807-9031   T-363 P0026/0027 F-839

# CYNTHIA CHENEY
## LITIGATION CASES/BILLING - 7/1/06 - 6/30/07

| FILE OPEN DATE | MATTER TYPE | LAST DATE OF CVC TIME | BILLING 7/06 | BILLING 8/06 | BILLING 9/06 | BILLING 10/06 | BILLING 11/06 | BILLING 12/06 | BILLING 1/07 | BILLING 2/07 | BILLING 3/07 | BILLING 4/07 | BILLING 5/07 | BILLING 6/07 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/20/02 | Lit | 11/30/07 | 0 | 0 | 0.3 | 0 | 1.1 | 0 | 0 | 0 | 0 | 12.3 | 0.8 | 0.7 |
| 12/1/03 | Lit | 7/18/05 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5/7/04 | Lit | 12/21/06 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8/13/04 | Lit | 8/19/06 | 0 | 0.1 | 0 | 0 | 0 | 0 | 0 | 0.2 | 0 | 0 | 0 | 0 |
| 9/15/04 | Gen | 2/26/07 | 1.2 | 0.3 | 1.1 | 0.6 | 2.2 | 1.1 | 0 | 0 | 2.6 | 0 | 0 | 0 |
| 10/11/04 | Lit | 1/25/07 | 3.3 | 11.6 | 21.4 | 3.1 | 6.5 | 1.1 | 0.4 | 1.7 | 0 | 7.6 | 12.4 | 0 |
| 10/19/04 | Lit | 11/12/07 | 0.1 | 0.4 | 0 | 0.1 | 3 | 2.5 | 8.1 | 0 | 0 | 0 | 0 | 3.2 |
| 3/23/05 | Lit | 7/21/06 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.2 | 0.2 | 0 |
| 6/13/05 | Lit | 11/29/12 | 0 | 1.3 | 0.9 | 1.1 | 0.7 | 0.2 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7/14/05 | Lit | 7/19/06 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7/18/05 | Lit | 7/21/06 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7/26/05 | Lit | 12/7/06 | 1.3 | 2.3 | 5.2 | 5.2 | 19.9 | 0.3 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8/28/05 | Lit | 7/20/06 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 9/1/05 | Lit | 7/20/06 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 9/6/05 | Gen | 3/27/07 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.3 | 3.4 | 0.4 | 0 |
| 9/15/05 | Lit | 7/22/06 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.3 | 2.6 | 0 | 0 | 0 |
| 10/7/05 | Lit | 1/31/08 | 0.6 | 2 | 0.6 | 0.8 | 10.2 | 4.2 | 4.2 | 13.2 | 0 | 0 | 0 | 2 |
| 10/10/05 | Lit | 9/19/06 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10/27/05 | Gen | 12/31/06 | 0.3 | 3.8 | 0.8 | 5.1 | 14.3 | 2.9 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11/23/05 | Lit | 8/19/06 | 0 | 0.1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1/6/06 | Gen | 7/19/06 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3/8/06 | Lit | 7/14/06 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3/8/06 | Lit | 7/11/06 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3/22/06 | Lit | 7/17/06 | 0.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3.7 | 9.9 | 8.3 |
| 3/22/06 | Lit | 7/14/06 | 0.1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4/13/06 | Lit | 11/30/07 | 0.5 | 2.8 | 0.6 | 6.7 | 2.5 | 4.7 | 30.2 | 7 | 0.6 | 0 | 0 | 0 |
| 4/27/06 | Gen | 12/21/06 | 0 | 0 | 0 | 0.6 | 2.2 | 3.7 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5/31/06 | Lit | 2/9/11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1.1 | 9 | 12.5 | 22.9 |

EXHIBIT NO. 4
C. CHENEY
5-3-2018
HALEY DAWN WESTRA, RPR, CRR

PAGE 27/27 · RCVD AT 6/4/2015 4:59:09 PM [Central Daylight Time] · SVR-PWGSASRSFAX05/1 · DNIS:7157/4382 · CSID:480607 9031 · DURATION (mm-ss):00-30

Amban (Cheney)/000099

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/2/05 | Gen | 8/3/05 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6/30/06 | Lit | 7/10/06 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8/9/06 | Gen | 2/8/07 | 0 | 0 | 0 | 2.8 | 12.2 | 2.2 | 1.4 | 0.6 | 0 | 0 | 0 | 0 |
| 9/28/06 | Lit | 1/24/07 | 0 | 0 | 0.4 | 1.6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11/13/06 | Gen | 2/19/07 | 0 | 0 | 1 | 0 | 3.3 | 0.1 | 0 | 0.5 | 0 | 0 | 0 | 0 |
| 11/15/06 | Gen | 12/20/06 | 0 | 0 | 0 | 0 | 0 | 0.6 | 0 | 0 | 0 | 0 | 0 | 1.2 |
| 1/17/07 | Lit | 11/30/07 | 0 | 0 | 0 | 0 | 0 | 0 | 0.7 | 0 | 0 | 1.6 | 1.7 | 2.7 |
| 2/13/07 | Lit | 9/1/09 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.5 | 2.4 | 4.4 | 1.7 | 0 |
| 2/16/07 | Lit | 2/15/07? | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.5 | 0 | 0 | 0 | 0 |
| 3/2/07 | Pro Bono | 1/22/10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8.6 | 0 | 0.1 | 0.1 | 0.2 |
| 3/2/07 | Gen | 3/20/08 | 0 | 0 | 0 | 0 | 0 | 0 | 1.8 | 0 | 2.4 | 1.8 | 0 | 0 |
| | **TOTALS** | | 7.6 | 24.7 | 32.3 | 27.7 | 78.1 | 23.6 | 46.8 | 32.8 | 12 | 43.9 | 39.6 | 41.2 |

** 2/28/07 Pelvic reconstruction surgery

# EXHIBIT 18

SOCIAL SECURITY ADMINISTRATION                    Form Approved  OBM No. 0960-0681

## FUNCTION REPORT – ADULT
How your illnesses, injuries, or conditions limit your activities

For SSA Use Only
Do not write in this box



RQID:LAZ00070P7Y00                      SITE:S03 DR:S
SSN:526940923 DOCTYPE:0075 RF:D CS:5dd0

## SECTION A – GENERAL INFORMATION

**1. NAME OF DISABLED PERSON (Last, Middle, First)**
CHENEY , CYNTHIA

**2. SOCIAL SECURITY NUMBER**
SSN:          Case Number: 1341003

**3. YOUR DAYTIME TELEPHONE NUMBER** (If there is no telephone number where you can be reached, please give us a daytime number where we can leave a message for you.)

(602) 989 2346      ✓ Your Number ___ Message Number ___ None
Area code    Phone Number

**4. a. Where do you live?** (Check One)

___ House      ✓ Apartment      ___ Boarding House      ___ Nursing Home

___ Shelter      ___ Group Home      ___ Other (What) _____

b. With whom do you live? (Check one.)

✓ Alone      ___ With Family      ___ With Friends

___ Other (Describe relationship) _____

## SECTION B – INFORMATION ABOUT YOUR ILLNESSES, INJURIES, OR CONDITIONS

5. How do your illnesses, injuries, or conditions limit your ability to work?

Interferon treatment destroyed All insulin-producing cells in pancreas 2000. I have brittle Type 1 diabetes. Frequent low blood sugars leave me nauseous, exhausted, mentally slow. I have crippling fatigue on days where I have severe highs and lows in blood sugar. Stresses of work aggravate both blood sugar problems and degenerative discs, neck & low back

## SECTION C – INFORMATION ABOUT DAILY ACTIVITIES

6. Describe what you do from the time you wake up until going to bed. If I have had erratic blood sugars or back or neck pain overnight, I try to sleep in or nap in afternoon. On the few days I work each month, it takes all the energy I have and I go to bed when it's over. I am slowly settling in and unpacking boxes in new apartment. I check and adjust friend over my insulin pump at least every hour. I visit (over)

7. Do you take care of anyone else such as a wife/husband, children, grandchildren, ✓ Yes ▢
parents, friend, other?

If "Yes," for whom do you care, and what do you do for them? I keep my former law partner and friend company a couple of hours almost every day. He is disabled with MS & severe bipolar and is very reclusive.

8. Do you take care of pets or other animals?                                    ✓ Yes __No

If "YES," what do you do for them? feed, scoop boxes, pet and entertain them.

9. Does anyone help you care for other people or animals?                         ✓ Yes __No

If "YES," who helps, and what do they do to help? My law partner's brother lives with him and does all the heavy lifting in terms of cooking, chores, yard work & shopping. I am NOT primary caregiver. My adult son (over)

10. What were you able to do before your illnesses, injuries, or conditions that you can't do now? I have had a vigorous, successful law practice since 1984. I cannot practice law any more due to physical limitations and cognitive

11. Do the illnesses, injuries, or conditions affect your sleep?       ✗ Yes __No   slowing (over)

If "YES," how? blood sugars moving up or down wakes me & makes it difficult to get back to sleep. Neck & back

pain also frequently kept me awake but that is less frequent now that I am only working 1 or 2 days each month.

CHENEY - SSA - 000180

p. 2 (continued)

9. My adult son comes to my apartment to carry in cat food, cat litter, and to carry out my garbage which includes used cat litter.

10. For the first several years after my pancreas injury, I tried to power through and pretend the diabetes made no difference. By 2004 however the frequent low sugars (and over-compensated high sugars) took a toll. I was frequently confused & exhausted and began to make mistakes I never would have made in the 20 years prior. In 2005, I tried to litigate part-time on my doctor's advice but I still made mistakes. By 2006, I realized I couldn't work like I had before, because I couldn't bring to bear the same strength, memory, intelligence & endurance to I'd had before. The days I forced myself, I paid for for days afterward, with erratic blood sugars & frequent urosepsis. I have tried since 2008 to build a mediation practice to replace litigation but my physical & mental abilities vary day to day & are frequently inadequate.

CHENEY - SSA - 000181

p. 2 (continued)

10. (continued)

The physical problems include degenerative disc disease in my neck & low back, exacerbated by stress, and litigation and mediation are high stress situations by their very nature. I also have arthritis in my hands & feet and recurring tendonitis in my wrists & shoulders which is helped by anti-inflammatory medication Sitting and standing aggravate my neck & back problems & lying on my side curled up is the only comfortable position when those problems flare up. As I have worked less and less however, I have fewer episodes of neck & back pain

CHENEY - SSA - 000182

12. PERSONAL CARE (Check here ✓ if NO PROBLEM with personal care.)

a. Explain how your illnesses, injuries, or conditions affect your ability to:

Dress _____

Bathe _____

Care for hair _____

Shave _____

Feed self _____

Use the toilet _____

Other? _____

b. Do you need any special reminders to take care of personal
needs and grooming?                                      ___ Yes  ✓ No

If "YES," what types of help or reminders are needed? _____

_____

c. Do you need help or reminders taking medicine?          ✓ Yes ___ No

If "YES," what kind of help do you need? _I have memory problems,_
_especially after hypoglycemic episodes,_
_so I use a pillbox and my insulin pump)_
_to keep track of medications._

13. MEALS

a. Do you prepare your own meals?                          ✓ Yes ___ No

If "YES," what kind of food do you prepare? (For example, sandwiches, frozen dinners, or complete
meals with several courses.) _very simple meals, don't have_
_stamina for full meals like I used to,_

How often do you prepare food or meals? (For example, daily, weekly, monthly.) _My husband & my law partner's brother frequently cook dinner for me._
_breakfast & lunch daily,_
_dinner once a week,_

How long does it take you? _1 hour or less, but more_
_if I wash up and cook—_

Any changes in cooking habits since the illness, injuries, or conditions began? _Rare._
_Yes: Fatigue is a major factor in_
_why I cook so much less now._

b. If "No," explain why you cannot or do not prepare meals. _But I can still_
_scramble eggs or make grilled_
_cheese or bake chicken._

CHENEY - SSA - 000183

**14. HOUSE AND YARD WORK**

a. List household chores, both indoors and outdoors, that you are able to do. (For example, cleaning, laundry, household repairs, ironing, mowing, etc.) I moved into a small apartment last July which is much easier to take care of. No pool or yard work. I can't do heavier housework like

b. How much time does it take you, and how often do you do each of these things? I do small loads of laundry. beds or and carry in small bags of groceries. vacuuming or my neck & back flare up

c. Do you need help or encouragement doing these things?        X Yes __No

If "YES," what help is needed? I have a cleaning lady for my apartment and HOA for all yard work.

d. If you don't do house or yard work, explain why not. My degenerative disc problems in neck & back make lifting, bending, and pushing or pulling more then 5-10 pounds painful

**15. GETTING AROUND**

a. How often do you go outside? daily

If you don't go outside at all, explain why not.

b. When going out, how do you travel? (Check all that apply.)

✓ Walk    ✓ Drive a car    ✓ Ride in a car    __ Ride a bicycle

__ Use public transportation    __ Other (Explain)

c. When going out, can you go out alone?        ✓ Yes __No

If "NO," explain why you can't go out alone.

d. Do you drive?        ✓ Yes __No

If you don't drive, explain why not. I just have to be careful not to twist or flex my neck too far & to get out and rest every hour on longer drives, for my back. Six hours a day

**16. SHOPPING** driving (to Calif.). is my maximum.

a. If you do any shopping, do you shop: (Check all that apply)

✓ In Stores    __ By phone    __ By mail    ✓ By computer

b. Describe what you shop for. groceries, Kitty supplies, prescriptions, household goods

c. How often do you shop and how long does it take? several times a week. So I don't have to carry much or be on my feet more than an hour. I have learned to stop at first sign of pain & go home.

CHENEY-SSA-000184

## 17. MONEY

a. Are you able to:

Pay bills          ✓ Yes ___ No          Handle a savings account     ✓ Yes ___ No

Count change       ✓ Yes ___ No          Use a checkbook/money orders  ✓ Yes ___ No

Explain all "NO" answers. ___ N/A _____

_____

b. Has your ability to handle money changed since the illness,     ___ Yes ✓ No
injuries, or conditions began?

If "YES," explain how the ability to handle money has changed. _I have asked
my husband to take over doing our taxes_

## 18. HOBBIES AND INTEREST _because the illness was hard
on me and my memory is so poor._

a. What are you hobbies and interests? (For example, reading, watching TV, sewing, playing
sports, etc. _I read several books a week &
love to watch movies with family & friends._

_I am a social person & enjoy chats & visits w/_
b. How often and how well do you do these things? _family & friends._
_I try to do some mild exercise
every day, like walking to zumba music
or yin yoga._

c. Describe any changes in these activities since the illness, injuries or conditions began.
_I used to love the gym & lifting weights
& aerobics but my disc disease makes
those impossible. I love travel too but_

## 19. SOCIAL ACTIVITIES _airplanes are hard on my neck, back_

a. Do you spend time with others? (In person, on the phone, on the computer, etc.) ✓ Yes ___ No
_& blood sugars_
_Frequently_ If "YES," describe the kinds of things you do with others. _who is very
I visit with my low partner_ _depressed & we go to movies or watch sports on TV._

How often do you do these things? _I see my kids several
times a week & talk on the phone w/ girlfriends often._

b. List the places you go on a regular basis. (For example, church, community center, sports events,
social groups, etc.) _I go to my old law firm once a
week but don't have an office there any
more. I go out to eat often & movies X1 each week._

Do you need to be reminded to go places? _On time!_     ✓ Yes ___ No

How often do you go and how much do you take part? _I use an iPhone
calendar due to memory problems_

Do you need someone to accompany you?     ___ Yes ✓ No

Form SSA-3373-BK (12-2009) ef (04-2010) Destroy prior editions    CASE NUMBER: 1341003                    Page 5

c. Do you have any problems getting along with family, friends, neighbors, or others?          ___ Yes  ✓No

If "YES," explain. *Only a few Clients I alienated by making mistakes on litigation & mediation matters.*

d. Describe any changes in social activities since the illnesses, injuries, or conditions began.

*I don't have the stamina for business development activities or Bar functions anymore. I rarely socialize*

## SECTION D – INFORMATION ABOUT ABILITIES

*w/ Clients or lawyers anymore*

20.  a. Check any of the following items that your illnesses, injuries, or conditions affect:

- ✓ Lifting
- ✓ Walking
- ___ Stair Climbing
- ✓ Understanding
- ✓ Squatting
- ✓ Sitting
- ___ Seeing
- ___ Following Instructions
- ✓ Bending
- ___ Kneeling
- ✓ Memory
- ✓ Using Hands
- ✓ Standing
- ___ Talking
- ✓ Completing Tasks
- ___ Getting Along With Others
- ___ Reaching
- ___ Hearing
- ✓ Concentration

Please explain how your illnesses, injuries, or conditions affect each of the items you checked. (For example, you can only lift (how many pounds), or you can only walk (how far))

*The physical problems with back & neck limit sitting, standing, travel. & Stress that causes muscles to shorten & tighten. The erratic blood sugars & frequent hypoglycemia have clouded my cognition & memory.*

b. Are you:   ✓ Right Handed?   ___ Left Handed?

c. How far can you walk before needing to stop and rest? *2 blmin.*

If you have to rest, how long before you can resume walking? *5-10 min.*

*But depends on the day: on bad days, I limp & can walk less. On good days, I can go farther.*

f. For how long can you pay attention? *Depends on blood sugars.*

c. Do you finish what you start? (For example, a conversation, chores, reading, watching a movie) *usually*   ___ Yes  ✓ No

f. How well do you follow written instructions? (For example, a recipe) *most days, for something simple like an easy recipe, I'm very good. With more complex instructions, on bad blood sugar days, only so-so.*

g. How well do you follow spoken instructions? *I'm pretty good w/ spoken instructions unless memory needed for details*

CHENEY - SSA - 000186

h. How well do you get along with authority figures? (For example, police, bosses, landlords or teachers) _no problems. I'm good at mediating disputes)._

i. Have you ever been fired or laid off from a job because of problems getting ___ Yes ✓No along with other people?

If "YES," please explain. _N/A_

If "YES," please give name of employer. _N/A_

j. How well do you handle stress? _at this point in my life, poorly. I am totally insulin dependent & Stress wreaks havoc w/ my blood sugars._

k. How well do you handle changes in routine? _not like before, due Stress also tightens to brittle blood sugars. the muscles along gotta eat, exercise, medicate redule: neck & spine & grinds discs on to nerves._

l. Have you noticed any unusual behavior or fears? ___ Yes ___ No

If "YES," please explain. _I used to be fearless. Now I cry when I think about dying alone of a low blood sugar in a public restroom somewhere._

21. Do you use any of the following? (Check all that apply.)

_My new insulin pump is helping, however._

___ Crutches        ___ Cane          ___ Hearing Aid

___ Walker          ___ Brace/Splint  ✓ Glasses/Contact Lenses

___ Wheelchair      ___ Artificial Limb  ___ Artificial Voice Box

___ Other (Explain) _____

Which of these were prescribed by a doctor? _Contacts & glasses_

When was it prescribed? _life-long_

When do you need to use these aids? _always_

CHENEY - SSA - 000187

22. Do you currently take any medicines for your illnesses, injuries, or conditions?    ✓Yes __No
If "YES," do any of your medicines cause side effects?    ✓Yes __No

If "YES," please explain. (Do not list all of the medioines that you take. List only the medicines that Cause side effects.)

| NAME OF MEDICINE | SIDE EFFECTS YOU HAVE |
|---|---|
| insulin, metformin | hypoglycemia |
| etodolac. | Kidney toxicity |
| Statin drugs | liver inflammation |
| | (cleared now) by |
| | change to a |
| | different statin, |
| | Crestor |

**SECTION E – REMARKS**

Use this section for any added information you did not show in earlier parts of this form. When you are done with this section (or if you didn't have anything to add), be sure to complete the fields at the bottom of this page.

I have tried to keep working and tried to work through my deteriorating physical & mental conditions. On some days, I perform at an acceptable level & I try to work a few days every month. On other days, though, I cannot work at all, and the number of those days has become the majority of time & it's no longer in the best interests of my own health to keep forcing myself.

CHENEY - SSA - 000188

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

| Name of person completing this form (Please print) | Date (month, day, year) |
|---|---|
| Cynthia Cheney | Feb. 22, 2013 |
| Address (Number and Street) | Email address (optional) |
| 100 E. Fillmore #226 | cvc921@gmail.com |
| City | State / Zip Code |
| Phoenix | AZ / 85004 |

Form SSA-3373-BK (12-2009) ef (04-2010) Destroy prior editions   CASE NUMBER: 1341003                     Page 8

CHENEY - SSA - 000189

# EXHIBIT 19



Medical
REVIEW Stream
by **Concentra**

May 29, 2015

Health Direct, Inc.

Fax: 860-321-3538

*Regarding:*
Patient:            Cynthia Cheney
Injury Date:        12/15/2006
Claim Number:       995923002
Reference Number: 599141

Per the initial request a medical opinion review regarding medical services for the referenced patient,
Cynthia Cheney, has been completed.

**Review Type: Peer Review**
**State of Jurisdiction:** Arizona

Patient name: Cynthia Cheney
Date of birth: 09/21/1950
Issue(s) to be analyzed:
Request 1. The Attending Provider Statement indicates the claimant has difficulty thinking/walking
during periods of low blood sugar. Please advise if these restrictions are supported by available
medical records. If the claimant's restrictions and limitations from work on a full-time basis are
supported by the medical evidence in the file, please advise on what medical evidence (i.e. exam
findings, medical records) this determination is based. Please be specific.
Request 2. The claimant is stating she is unable to work as a trial attorney since 1/1/2007. Please
advise if the medical records available support this. Note that based on provider records, the claimant
reports she has been working in some capacity. If disability is supported for broken periods of time
rather than the whole time, outline specific periods in which impairment is supported if not covered
the whole time.
Request 3. Please comment whether improvement is expected.

Date of injury: 12/15/2006
Requester name: Joan Bailey, MD
Phone #: (602) 258-9955

Medical records reviewed
226 pages of medical and administrative records were reviewed including:
08/11/2014, Progress Note, Ann Bolar, NP-CDE.
09/10/2014, Exam Report, Illegible Signature.
06/18/2014, Case Home Visit, Jacinta Riggs, RN BSN.
04/24/2014, Progress Note, Joan Bailey, MD.
01/06/2014, Progress Note, Ann Bolar, NP-CDE.
09/19/2013, Progress Note, Ann Bolar, NP-CDE.
07/10/2013, Clinical Note, Yvonne Riba, PA-C.
07/03/2013, Radiology Report, John Millstein, MD.
06/20/2013, Progress Report, Joan Bailey, MD.
03/07/2013, Progress Note, Debra Bayham, PA-C.
01/03/2013, Progress Note, Debra Bayham, PA-C.
11/08/2012, Clinical Note, Irving Rollingher, MD.
10/25/2012, Progress Note, Debra Bayham, PA-C.
07/27/2012, Clinical Note, Debra Bayham, PA-C.
07/24/2012, Lab Report, Quest Diagnostics.
05/02/2012, Lab Report, Quest Diagnostics.
03/23/2012, Lab Report, Quest Diagnostics.
02/13/2012, Lab Report, Quest Diagnostics.
05/23/2012, Clinical Note, Brad Nigbur, PA-C.
02/13/2012, Clinical Note, Yvonne Riba, PA-C.
02/13/2012, Lab Report, Quest Diagnostics
02/13/2012, Lab Report, Quest Diagnostics.
08/18/2011, Lab Report, Quest Diagnostics.
04/05/2011, Lab Report, Quest Diagnostics.
02/14/2011, Clinical Note, Debra Bayham, PA-C.
01/11/2010, Chemistry Report, Illegible Signature.
12/28/2010, Chemistry Report, Illegible Signature.
12/15/2010, Clinical Note, Barbara McCollum, MD.
12/28/2010, Radiology Report, Harvin Howard.
12/28/210, Clinical Note, Yvonne Riba, PA-C.
02/25/2010, Clinical Note, Yvonne Riba, PA-C.
02/25/2010, Lab Report, Illegible Signature.
02/26/2010, Report of Consultation, Mark Kuo, MD.
01/21/2010, Chemistry Report, Illegible Signature.
01/14/2010, Clinical Note, Yvonne Riba, PA-C.
11/11/2010, Clinical Note, Yvonne Riba, PA-C
11/11/2010, Chemistry Report, Illegible Signature.
12/16/2008, Clinical Note, Irving Rollingher, MD.
12/10/2008, Report of Consultation, Terry Reeves, MD.
12/07/2008, Laboratory Report, Illegible Signature.
11/25/2008, Laboratory Report, Illegible Signature.
11/23/2008, Laboratory Report, Sonora Quest Laboratories.

10/16/2008, Laboratory Report, Sonora Quest Laboratories.
10/02/2008, Clinical Note, Irving Rollingher, MD.
11/07/2007, Orthopedic Consultation, Gustavo Armendariz, MD.
10/10/2007, Presurigcal Examination, Gianni Moshero, PA-C.
10/22/2007, Orthopedic Clinic Note, Gianni Moshero, PA-C.
10/12/2007, Orthopedic Clinic Note, Gustavo Armendariz, MD.
10/12/2007, Operative Report, Gustavo Armendariz, MD.
02/15/2007, Progress Note, Felipe Videla, MD.
02/15/2007, Clinical Note, Felipe Videla, MD.
02/13/2007, Laboratory Report, Sonara Quest Laboratories.
02/09/2007, Clinical Note, Illegible Signature.
02/28/2007, Operative Report, Felipe Videla, MD.
03/01/2007, History Report, Felipe Videla, MD.
02/09/2007, Preop Consultation, Irving Rollingher, MD.
01/10/2007, Valley Urogynocology Report, No Signature.
12/18/2006, Clinical Note, Felipe Videla, MD.
11/01/2006, Orthopedic Clinical Note, Thomas Carter, MD.
06/23/2006, Laboratory Report, Sonara Quest Laboratories.
05/09/2006, Clinical Note, Illegible Signature.
05/09/2006, Clinical Note, Irving Rollingher, MD.

**Request 1. The Attending Provider Statement indicates the claimant has difficulty thinking/walking during periods of low blood sugar. Please advise if these restrictions are supported by available medical records. If the claimant's restrictions and limitations from work on a full-time basis are supported by the medical evidence in the file, please advise on what medical evidence (i.e. exam findings, medical records) this determination is based. Please be specific.**
**Determination: The available medical records do not support the restrictions.**
**Principal Reason(s) for Determination: The clinical record submitted for review indicates that the patient's occupation is a light physical demand level and there is no indication that the patient has any visual or sensory impairment.**

### Reviewer's Comments
The clinical information submitted for review fails to meet the evidence based guidelines for the requested service. The patient is a 64-year-old female with a date of injury of 12/15/2006 with an unknown mechanism of injury. The patient's current medications include Apirda, metformin, SymlinPen, macrodantin, Etodolac, Estrace, Vagifem, vitamin D3, calcium, Crestor and Bayer aspirin. Surgical history includes a Monarc sling, anterior repair, posterior colpoperineorrhaphy, external anal spincteroplasty dated 02/28/2007. The patient also underwent a right fifth toe manipulation under anesthesia with percutaneous pinning dated 10/12/2007. There were no diagnostic studies submitted for review. Other treatments include the use of lab work, medications, an insulin pump, and diabetic teaching. The most recent clinical note submitted for review dated 08/11/2014 indicates the patient was seen for a followup visit regarding her diabetes and to review lab results. The patient's current A1C level was noted at 7.2%. The patient had a high deductible, and ran out of her Symlin medication, and saw a significant change in her blood sugars. The clinical record indicates that the patient recognized higher blood sugars with travel. The clinical records indicated that her A1C level is the lowest as it has been, without having severe low blood sugars. The clinical records indicate that the patient was not currently exercising, but was actively counting carbohydrates to ensure healthy eating. Case home visit 06/18/2014 indicated that the patient was reportedly too disabled to work full time in 2007, but has continued to work very part time in order to pay for her health insurance. The clinical records indicated

that the patient did not use any assisted devices, but needed help lifting due to her back issues. The clinical note indicated that the patient had no obvious difficulties with language skills, or thought process. The clinical records also indicated that the patient performs her own personal care, performs her house cleaning chores, and still has an active driver's license. Based on the clinical documentation submitted for review, and the Official Disability Guidelines, the restrictions are not supported by available medical records. According to the Official Disability Guidelines on diabetes, given that the patient has no indications of comorbities, the patient was able to return to work after 0-2 days. With hospitalization, the patient should be able to return to work in 5-7 days given that she has a clerical/modified occupation. According to the clinical documentation submitted for review, the patient was previously a trial attorney which is a light PDL. The clinical documentation shows no indication that the patient's disease has progressed to cause significant deficits. The documentation also indicates that working as a trial attorney does not require continuous physical exertion, working in extreme temperature or moist areas, working at unprotected heights, and working in isolated areas alone. The clinical documentation submitted for review indicated that the patient's latest A1C level in 08/2014 was the lowest it had been. A case home visit dated 06/11/2014 indicated that the patient was able to function enough to perform her own activities of daily living, and was still able to drive regularly. Furthermore, the clinical record submitted for review indicated that the patient worked part time, and would vacation and travel occasionally. The clinical documentation shows no indication that the patient has severe limitations that would support restrictions from work since 2007. Given all the above, the restrictions defined in the medical records are not supported.

Criteria used in analysis
Official Disability Guidelines (ODG), Treatment Index, 11th Edition (web), 2014, Diabetes, Return to work
Return-To-Work Guidelines:
Symptoms under control: 0 days
Medical treatment without hospitalization: 0-2 days
With hospitalization, clerical/modified work: 5-7 days
With hospitalization, manual work: 10-14 days
Depression comorbidity, multiply by: 2
Hypertension comorbidity, multiply by: 2
Obesity comorbidity (BMI >= 30), multiply by: 2.4


**Request 2. The claimant is stating she is unable to work as a trial attorney since 1/1/2007. Please advise if the medical records available support this. Note that based on provider records, the claimant reports she has been working in some capacity. If disability is supported for broken periods of time rather than the whole time, outline specific periods in which impairment is supported if not covered the whole time.**
**Determination:** The medical records do not support that the claimant is unable to work as a trial attorney.
**Principal Reason(s) for Determination:** The clinical documentation submitted for review shows no indication that the patient is severely limited to perform a light physical demand level.


Reviewer's Comments
The clinical information submitted for review fails to meet the evidence based guidelines for the requested service. The patient is a 64-year-old female with a date of injury of 12/15/2006 with an unknown mechanism of injury. The patient's current medications include Apirda, metformin, SymlinPen, macrodantin, Etodolac, Estrace, Vagifem, vitamin D3, calcium, Crestor and Bayer aspirin. Surgical history includes a Monarc sling, anterior repair, posterior colpoperineorrhaphy, external anal spincteroplasty dated 02/28/2007. The patient also underwent a right fifth toe manipulation under anesthesia with percutaneous pinning dated 10/12/2007. There were no diagnostic studies submitted for review. Other treatments include the use of lab work, medications, an insulin pump, and diabetic teaching. The most recent clinical note submitted for review

dated 08/11/2014 indicates the patient was seen for a followup visit regarding her diabetes and to review lab results. The patient's current A1C level was noted at 7.2%. The patient had a high deductible, and ran out of her Symlin medication, and saw a significant change in her blood sugars. The clinical record indicates that the patient recognized higher blood sugars with travel. The clinical records indicated that her A1C level is the lowest as it has been, without having severe low blood sugars. The clinical records indicate that the patient was not currently exercising, but was actively counting carbohydrates to ensure healthy eating. Case home visit 06/18/2014 indicated that the patient was reportedly too disabled to work full time in 2007, but has continued to work very part time in order to pay for her health insurance. The clinical records indicated that the patient did not use any assisted devices, but needed help lifting due to her back issues. The clinical note indicated that the patient had no obvious difficulties with language skills, or thought process. The clinical records also indicated that the patient performs her own personal care, performs her house cleaning chores, and still has an active driver's license. Based on the clinical documentation submitted for review and the Official Disability Guidelines, this request is not supported. According to the clinical documentation submitted for review, working as a trial attorney requires a light physical demand level. The clinical documentation submitted for review shows no indication that the patient is severely limited, and cannot perform a light physical demand level. The documentation indicates that the patient currently performs her own activities of daily living and drives regularly. In addition, the clinical records indicate that the patient has worked part time, and has traveled occasionally. The most recent clinical note submitted for review dated 08/11/2014 indicates that the patient's A1C levels are the lowest they have been. The clinical records show no indication that the patient is severely limited and has any impairments to her vision or senses. Given all of the above, this request is not supported.

**Criteria used in analysis**
Official Disability Guidelines (ODG), Treatment Index, 11th Edition (web), 2014, Diabetes, Return to work
Return-To-Work Guidelines:
Symptoms under control: 0 days
Medical treatment without hospitalization: 0-2 days
With hospitalization, clerical/modified work: 5-7 days
With hospitalization, manual work: 10-14 days
Depression comorbidity, multiply by: 2
Hypertension comorbidity, multiply by: 2
Obesity comorbidity (BMI >= 30), multiply by: 2.4

**Request 3. Please comment whether improvement is expected.**
**Determination:** Although diabetes mellitus is a chronic condition, outcomes are favorable with good regulation of blood glucose levels and compliance with the recommended self-care regimen.
**Principal Reason(s) for Determination:** The clinical records submitted for review indicated that the patient currently has an A1C level that is the lowest that it has been. There is no indication that the patient has severe limitations, or has any out complications that will adversely affect the outcome.

**Reviewer's Comments**
The clinical information submitted for review fails to meet the evidence based guidelines for the requested service. The patient is a 64-year-old female with a date of injury of 12/15/2006 with an unknown mechanism of injury. The patient's current medications include Apidra, metformin, SymlinPen, macrodantin, Etodolac, Estrace, Vagifem, vitamin D3, calcium, Crestor and Bayer aspirin. Surgical history includes a Monarc sling, anterior repair, posterior colpoperineorrhaphy, external anal spincteroplasty dated 02/28/2007. The patient also underwent a right fifth toe manipulation under anesthesia with percutaneous pinning dated 10/12/2007. There were no diagnostic studies submitted for review. Other treatments include the use of lab work, medications, an insulin pump, and diabetic teaching. The most recent clinical note submitted for review

dated 08/11/2014 indicates the patient was seen for a followup visit regarding her diabetes and to review lab results. The patient's current A1C level was noted at 7.2%. The patient had a high deductible, and ran out of her Symlin medication, and saw a significant change in her blood sugars. The clinical record indicates that the patient recognized higher blood sugars with travel. The clinical records indicated that her A1C level is the lowest as it has been, without having severe low blood sugars. The clinical records indicate that the patient was not currently exercising, but was actively counting carbohydrates to ensure healthy eating. Case home visit 06/18/2014 indicated that the patient was reportedly too disabled to work full time in 2007, but has continued to work very part time in order to pay for her health insurance. The clinical records indicated that the patient did not use any assisted devices, but needed help lifting due to her back issues. The clinical note indicated that the patient had no obvious difficulties with language skills, or thought process. The clinical records also indicated that the patient performs her own personal care, performs her house cleaning chores, and still has an active driver's license. Based on the clinical documentation submitted for review, and the MG Guidelines regarding diabetes, improvement can be expected. According to the MG Guidelines regarding diabetes, although diabetes is a chronic condition with no known cure. The condition can be effectively managed with the regulation of blood glucose levels and compliance with the recommended self-care regimen. The guidelines also indicate that exercise and weight loss make the body more sensitive to the action of insulin and thereby help to control blood glucose levels. The most recent clinical note submitted for review indicated that the patient was not currently exercising, but was carb counting to improve healthy eating. There is no indication within the clinical documentation that the patient cannot undergo an exercise program to help control blood glucose levels. In addition, there was no indication that the patient has any complications that will adversely affect the outcome. Given all of the above, improvement can be expected if the patient regulates her blood glucose levels and complies with the recommended self-care regimen.

### Criteria used in analysis
ODG does not adequately address the prognosis of diabetes

### MG Guidelines/diabetes
Prognosis
Exercise and weight loss make the body more sensitive to the action of insulin and thereby help to control blood glucose levels. Outcomes are favorable with good regulation of blood glucose levels and compliance with the recommended self-care regimen. The development of complications will adversely affect outcome. Diabetes-related blindness, kidney disease, and amputation can result in permanent disability. Although type 2 diabetes is a chronic, progressive condition with no known cure, the condition usually can be effectively managed with patient education and regular, appropriate medical care.

### Peer Reviewer Name/Credentials
Name/Credentials: Geetha Soodini, M.D.
Specialty: Board Certified Endocrinologist
State License: 59025 GA

### Attestation
This certifies that the peer reviewer named above has the appropriate certifications, education, training, and experience to perform this clinical review

### Contact Information
Peer to Peer contact attempt 1: 05/15/2015 03:17 PM, Central, 602-258-9955, Outbound Call, Unsuccessful, Left Voicemail Message, Left contact information (512-754-7777)
Peer to Peer contact attempt 2: 05/27/2015 01:47 PM, Central, 602-258-9955, Outbound Call, Unsuccessful, Left Message With Office Staff (Tracy Left contact information (512-754-7777)),
Peer to Peer contact attempt 3: 05/27/2015 01:49 PM, Central, 480-949-9047, Outbound Call, Unsuccessful,

Left Message With Office Staff (Receptionist states patient has not been seen in 3 years), *Peer Reviewer Signature:*

*Goodini*

The purpose of this physician advisor review is to determine if the requested medical treatment appears to be medically reasonable and appropriate. Review recommendations are based on information supplied by the treating provider. Medical ReviewStream by Concentra expresses no legal opinion with this recommendation regarding the liability of any party for any treatment rendered. It is the responsibility of the Insurance Company to provide the requestor with all state mandated regulatory language regarding the appeal process.

AmGen (Cheney)000072

# EXHIBIT 20

08-19-ᵇ15 10:01 FROM- Adelman German          480607-9031          T-395  P0003/0005 F-910

The United States Life Insurance
Company in the City of New York
New York, New York

# TRIAL ATTORNEY QUESTIONNAIRE

1. Please list each state that has admitted you for the practice of law and the date of admission.
   Arizona - October 1984

2. Please list the number of days you spent in trial for the period of 1/1/2006 to 1/1/2007,.
   broken down by month.          None

3. Please list the number of days you spent in trial for the period of 1/1/2007 to 1/1/2008,
   broken down by month.          None

4. Please list the number of days you spent in trial for the period of 1/1/2008 to 1/1/2009,
   broken down by month          None

5. Please list the number of days you spent in trial for the period of 1/1/2009 to 1/1/2010,
   broken down by month          None

6. Please list the number of days you spent in trial for the period of 1/1/2010 to 1/1/2011,
   broken down by month          None

7. Please list the number of days you spent in trial for the period of 1/1/2011 to 1/1/2012,
   broken down by month          None

AmGen (Cheney)000102

The United States Life Insurance
Company in the City of New York
New York, New York

8. Please list the number of days you spent in trial for the period of 1/1/2012 to 1/1/2013, broken down by month_____ None

9. Please list the number of days you spent in trial for the period of 1/1/2014 to 1/1/2014, broken down by month_____ None

10. Please list the number of days you spent in trial for the period of 1/1/2014 to 1/1/2015, broken down by month_____ None

11. For the period of 1/1/2006 to 1/1/2007, how many trials did you conduct?
   a. As lead counsel? _____ None

   b. As assistant counsel? _____ None

12. For the period of 1/1/2007 to 1/1/2008, how many trials did you conduct?
   a. As lead counsel? _____ None

   b. As assistant counsel? _____ None

13. For the period of 1/1/2008 to 1/1/2009, how many trials did you conduct?
   a. As lead counsel? _____ None

   b. As assistant counsel? _____ None

14. For the period of 1/1/2009 to 1/1/2010, how many trials did you conduct?
   a. As lead counsel? _____ None

   b. As assistant counsel? _____ None

15. For the period of 1/1/2010 to 1/1/2011, how many trials did you conduct?
   a. As lead counsel? _____ None

   b. As assistant counsel? _____ None

AmGen (Cheney)000103

06-19-´15 10:01 FROM- Adelman German          480607-9031          T-395  P0005/0005 F-910

The United States Life Insurance
Company in the City of New York
New York, New York

16. For the period of 1/1/2011 to 1/1/2012, how many trials did you conduct?
   a. As lead counsel? _____ None

   b. As assistant counsel? _____ None

17. For the period of 1/1/2012 to 1/1/2013, how many trials did you conduct?
   a. As lead counsel? _____ None

   b. As assistant counsel? _____ None

18. For the period of 1/1/2013 to 1/1/2014, how many trials did you conduct?
   a. As lead counsel? _____ None

   b. As assistant counsel? _____ None

19. For the period of 1/1/2014 to 1/1/2015, how many trials did you conduct?
   a. As lead counsel? _____ None

   b. As assistant counsel? _____ None

20. Please set forth the captions of the cases that you have tried for the period of 1/1/2006
   through the present. Please include the case number for each, the date(s) of the trial, and
   the court in which the trail was conducted (please use a separate page if necessary) _____
   None – not applicable

_____     _____
        Date                          Signature

                                  Cynthia V. Cheney
                                   Print Name

6/19/15

AmGen (Cheney)000104

# EXHIBIT 21

The United States Life Insurance
Company in the City of New York
New York, New York

Benefit Solutions Connecticut Claim Center
P.O Box M
Beattyville, KY 41311

July 22, 2015

Steve German
Adelman German, PLC
8245 N. 85th Way
Scottsdale, AZ 85258

RE:   Your Client: Cynthia Cheney
      American Bar Endowment Sponsored Disability Income Plan
      Policy Number: G164156 / Claim Number: 95923
      Certificate Number: 00982616
      Underwritten by: The United States Life Insurance Company in the City of New York

Dear Attorney German:

We are writing to advise you that we have completed our review of Ms. Cheney's claim under the
above referenced certificate and are unable to approve her request for benefits. Based on a review
of all information submitted to date, we have determined that Ms. Cheney does not meet the policy
requirements under the above mentioned policy.

The following information was used in making this determination:
- Employees Statement dated January 17, 2014 and attached statement
- Attending Physician's Statement dated January 6, 2014 indicating Ms. Cheney is capable of
  working in a sedentary capacity
- Medical records from Dr. Irving Rollinger (PCP) covering October 2, 2008 through August 11,
  2014
- Medical records from Dr. Bailey, Debbie Bayham PA-C and Ann Bolar NP of Midtown
  Endocrine Associates (Endocrinology) covering February 14, 2011 through April 14, 2014
- Medical records from Dr Haber and Dr. Amedariz at The Orthopedic Clinic Association
  (Orthopedics) covering November 1, 2006 through May 23, 2012
- Medical records from Dr. Felipe Videla (Urogynecology) covering December 1, 2006 through
  May 14, 2014
- Peer file review from Dr. Geetha Soodini, MD (Board Certified Endocrinologist) dated May 29,
  2015
- April 9, 2014 letter from you advising that Ms. Cheney's last trial ended on December 14, 2006

Distributing products issued by:
American General Life Insurance Company*, The United States Life Insurance Company in the City of New York, and National Union Fire Insurance Company of Pittsburgh, Pa.
*This company does not solicit business in New York.

AmGen (Cheney)000108

The United States Life Insurance
Company in the City of New York
New York, New York

and indicating this is specifically her claimed disability start date
- Trial Attorney Questionnaire dated June 19, 2015 reporting that Ms. Cheney has not spent any days in trial as lead or assistant counsel since January 1, 2006
- Litigation billings spreadsheets covering July 2006 through July 2007
- Interview on June 17, 2014 with Attorney German, Ms. Cheney, Jacinta Riggs RN of Coventry Healthcare, Kate Milheiro and Jeffrey Moore of AIG
- Declaration of Gary A. Fadell dated May 8, 2015

By way of claim forms dated January 17, 2014, we were informed that Ms. Cheney was claiming disability as of (before) December 2006 and that she last worked December 2006. In response to our request for clarification on this date, we received your letter dated April 9, 2014 advising Ms. Cheney is specifically claiming disability as of December 14, 2006, the date her last trial ended. In a subsequent letter dated June 4, 2015, you provided Declarations indicating Ms. Cheney's was prevented from working as a trial lawyer starting no later than January 2007. Accordingly, we have been reviewing Ms. Cheney's claim using a claimed disability date of December 15, 2006 as this is the day after her last day in trial.

As you are aware, Ms. Cheney's policy has a 90-day Waiting Period during which she must be Totally Disabled in order to qualify for benefits. Using December 15, 2006 as the claimed date of disability, benefits would become effective March 15, 2007. However, we find there is insufficient information to support that Ms. Cheney was Totally Disabled through and beyond her policy's 90-day Waiting Period.

Ms. Cheney's Policy states, in part:

"ACTIVE WORK or ACTIVELY AT WORK means that a person performs each duty of his job for full pay. This must be done at the person's or his employer's place of business or any place to which such business requires the person to travel."

"FULL TIME means:
- for a member, active work on a regular work schedule required of the member's job or occupation. This is to include his specialty in the practice of law."

"TOTAL DISABILITY means:

- during the waiting period and next 60 months, the complete inability of the member to perform the material duties of his regular job to include his specialty in the practice of law; "specialty in the practice of law" means the specialty in the practice of law which the member was performing on the day before total disability began.
- after such 60 months, the complete inability of the member to perform the material duties of any gainful job for which he is reasonably fit by training, education or experience.

The total disability must be a result of an injury or sickness. To be considered totally disabled, A member must also be under the regular care of a physician."

"WAITING PERIOD means a period of consecutive days of total disability for which no benefit is payable. The duration of the waiting period is shown in the Schedule of Benefits. The waiting

AmGen (Cheney)000109

The United States Life Insurance
Company in the City of New York
New York, New York

period begins on the first day of total disability occurring after the effective date of the insured
person's insurance."

Using December 15, 2006 as the date of claimed disability, we attempted to verify that Ms.
Cheney has been completely unable to perform the duties of her occupation as required by the
definition of Total Disability. To do this, we have broken down our review to reflect
OCCUPATIONAL and MEDICAL components.

**OCCUPATIONAL**

You and Ms. Cheney have advised that she worked as a trial attorney prior to her disability and
that she worked her last trial December 14, 2006. Below is a summation of the documentation
submitted and reviewed to date:

> ➤ By way of the Trial Attorney Questionnaire dated June 19, 2015, Ms. Cheney reported
> that she did not spend any days in trial for the period of January 1, 2006 to January 1
> 2007. Ms. Cheney also documented that she did not conduct any trials as lead or
> assistant counsel over the same time period.

> ➤ We asked for the captions of all cases tried since January 1, 2006 to which Ms. Cheney
> responded "None-not applicable".

> ➤ The litigation billings spreadsheet provided indicates that she continued to work in some
> capacity through July 2007 and you advised in your letter dated June 4, 2015 that she
> continued to work three to ten hours a week at that time.

> ➤ The Declaration from Gary Fadell dated May 8, 2015 indicates she has not tried a
> lawsuit since October 2005 and that Ms. Cheney transferred the handling of her cases in
> 2006 to him. While she did not try cases, he stated Ms. Cheney continued to work
> assisting Mr. Fadell with his cases, including preparing clients for deposition or trial. He
> also notes that she is currently working within limited abilities.

> ➤ In the onsite/telephone interview on June 17, 2014, we were advised that Ms. Cheney's
> last trial was in 2005 and that she started mediations in 2008.

> ➤ We were also advised during the onsite/telephone interview on June 17, 2014 that she
> worked in 2009 and 2010 and reported no formal work restrictions; currently conducting
> six mediations per week, each not lasting more than four hours and that Ms. Cheney
> took six to eight depositions per year.

While you and your client have provided statements that Ms. Cheney was a Trial Attorney prior
to December 15, 2006, we have not received any objective information (such as specific duties
performed on a daily basis) to verify this. This information may include, but is not limited to,
percent of time in research, mediations, court room, taking depositions and client meetings.

Additionally we were advised that Ms. Cheney conducted mediations from 2008 through 2012,
however there is no objective information indicating whether mediations were performed prior
to December 14, 2006.

The United States Life Insurance
Company in the City of New York
New York, New York

As this information is has not been submitted, we are unable to determine if the duties performed after Ms. Cheney claimed date of disability of December 15, 2006 were or were not within the scope of her occupational duties performed as a trial attorney prior to December 15, 2006.

## MEDICAL

On an Attending Physician's Statement from Ann Bolar, NP dated January 6, 2014, it is reported that she had been unable to work because of disability since July 1, 2012 and that she had a Class 4 – moderate impairment of functional capacity capable of clerical/administrative (sedentary) work. The diagnosis listed on this form is Type 1 Diabetes with severe hypoglycemia. We have reviewed medical records from Dr. Rollingher (PCP), Dr. Bailey, Debbie Bayham PA-C and Ann Bolar, NP (Endocrine), Dr. Harris (Rheumatology), Dr. Videla (Urogynecology), Dr. White (Neurosurgeon), Dr. Armendariz (Orthopedics), Dr. Haber (Orthopedics), and Dr. Carter (Orthopedics) to ascertain her current restrictions and limitations and level of impairment for the period of December 15, 2006 through present.

Ms. Cheney's file was referred to our medical department for review. It was the opinion of our Nurse Case Manager that the inability to work full time due to diabetes with labile blood sugars is unclear as Ms. Cheney has been working in some capacity and has not continued treatment on regular basis since the date of claimed disability. With insulin pump placement on December 1, 2012, one would expect improvement of symptoms with fewer large blood sugar swings and hypoglycemic episodes. With the February 28, 2007 pelvic reconstruction surgery, one would anticipate an inability to work in even a sedentary position for 6-8 weeks post-operatively (February 28, 2007 to April 24, 2007). With percutaneous pinning right 5th toe on October 12, 2007, return to work should be expected within two weeks (by October 26, 2007).

To confirm whether the medical evidence supports any restrictions or limitations to Ms. Cheney's activity, a peer review of her file was conducted by Dr. Geetha Soodini, MD (Endocrinologist) who reviewed all medical information available. Dr. Soodini found that the available medical records fail to identify any objective examination abnormalities to warrant the need for any job/activity restrictions. It is Dr. Soodini's opinion that she is capable of resuming work as a trial attorney as of December 15, 2006 as she continued to work in a part time capacity and notes that her Diabetic condition can be effectively managed with the regulation of blood glucose levels and compliance with the recommended self-care regimen. There is no indication that Ms. Cheney could not undergo an exercise program and no indication that she has any complications that would adversely affect the outcome. Additionally, since her insulin pump placement on December 1, 2012, her blood glucose levels are expected to stabilize and it is noted that her A1C level of 7.2% on August 11, 2014 is the lowest it has been.

To clarify, Dr. Soodini attempted to consult telephonically with a provider at the office of Dr. Bailey, Debbie Bayham PA-C and Ann Bolar, NP on May 15, 2015 and May 27, 2015 and with Dr. Rollingher's office on May 27, 2015. However, Dr. Soodini was unable to connect with Ms. Cheney's providers.

AmGen (Cheney)000111

The United States Life Insurance
Company in the City of New York
New York, New York

We acknowledge as well that Ms. Cheney has reported a diagnosis of Degenerative Disc Disease
however we have not received medical records in regards to this condition.

As such, based on our medical review of the claim file, we find that the available clinical
findings do not support a level of impairment that would prevent Ms. Cheney from performing
the job duties of an attorney from December 15, 2006 to the present.

Attorney German, at this time we find we have insufficient information to objectively document
Ms. Cheney's specific occupational duties before and after December 15, 2006. Additionally,
while we have received medical records showing treatment for various conditions, the available
records do not support a complete inability to work as an attorney through and beyond the
policy's 90 day Waiting Period. Therefore, Ms. Cheney is not eligible for disability benefits at
this time and we must deny her claim for LTD benefits.

Should Ms. Cheney elect to appeal this decision please do so in writing within 180 days
following receipt of this letter. If she decides to pursue this course, we will review the matter
again, and notify her of our decision no later than 45 days following the receipt of her written
request. Should we need additional time beyond the 45 days, she will be notified in writing,
outlining the reason for the required extension prior to the expiration of the initial 45 days.
Appeals should be mailed to: Benefit Solutions, P.O. Box M, Beattyville, KY 41311

Along with her letter of appeal, please forward any additional information she wishes to submit
for our review, including but not limited to the following:

- Additional medical documentation, diagnostic testing, and lab results to support Total Disability
  from December 15, 2006 to present
- Documentation verifying Ms. Cheney's occupational duties prior to December 15, 2006
- Documentation verifying Ms. Cheney's occupational duties after December 15, 2006

Lastly, nothing in the letter should be construed as waiver of this Company's rights and defenses
under the above mentioned policy and/or certificate and all of these rights and defenses are reserved
to the Company whether or not specifically mentioned herein.

Attorney German, hopefully this has been explained to your satisfaction. However, should you have
any questions concerning your claim or, if we can be of further service to you, please do not hesitate
to contact us at toll free 1-800-458-9355 or my direct line 860-507-2866.

Sincerely,

*Kate Milheiro*

Kate Milheiro
Sr. LTD Case Manager
Benefit Solutions Connecticut Claim Center

AmGen (Cheney)000112

# EXHIBIT 22

01-15-²16 13:02 FROM- Adelman German          480607-9031          T-187 P0002/0003 F-174



## ADELMAN GERMAN, PLC

*A Law Firm*

January 15, 2016

**VIA FACSIMILE AND U.S. MAIL**

Kate Milheiro
Long Term Disability Case Manager
Benefit Solutions Connecticut Claim Center
P.O. Box M
Beattyville, KY 41311

RE:   Our Client: Cynthia Cheney
      American Bar Endowment Sponsored Disability Income Plan
      Certificate Number: 00982616
      Group Policy Number: G164156 – Claim Number: 95923
      Underwritten by:   The United States Life Insurance Company
                         in the City of New York

Dear Ms. Milheiro:

We previously wrote to you on August 13, 2015 to request a litigation hold. We detailed the deficiencies of your review of Ms. Cheney's claim, and why we felt your investigation was neither fair, thorough or prompt. Prior to the adverse determination, we went to great length to gather independent statements from those who knew Ms. Cheney from a professional standpoint. These were people that hired Ms. Cheney as their attorney, and saw firsthand that her disabling condition prevented her from working as a trial lawyer. They witnessed her efforts to continue to work, and saw her succumb to her illnesses.

In our August 13, 2015 letter, we questioned why you did not consider the statements presented.

We expected that since then you would have undertaken a thorough, fair and prompt investigation by speaking to witnesses, gathering additional information, and making an informed, unbiased claims determination. We provided you their information, their observations, and their conclusions. We have not heard anything from you or from any other representative of your company since then — radio silence. We continue to question why you refused to accept the independent declarations as part of your claims' decision, and why you gave their statements no weight. It seems clear from everything that a results based investigation was undertaken in order to reach an adverse determination. Stated different, Ms.

<div style="writing-mode: vertical">8245 N. 85ᵗʰ Way, Scottsdale, Arizona 85258</div>

 480.607.9166

 480.607.9031

 Firm@AdelmanGerman.com

{AG:00301090.DOCX}

AmGen (Cheney)000130

01-15-'16 13:03 FROM- Adelman German          480607-9031          T-187  P0003/0003 F-174

Kate Milheiro
January 15, 2016
Page 2

Cheney's claim was earmarked for a denial and everything that followed was done to achieve that result.

For all the reasons set forth in our August 13, 2015 letter to you, which is incorporated herein, and for other reasons included in the many prior letters to you, also incorporated herein, we ask that you accept this letter as Ms. Cheney's formal appeal. We ask that the adverse determination be overturned and that her claim be honored and benefits paid without further delay.

Very truly yours,

Steve German, Esq.
For the Firm

{AG:00301090.DOCX}

AmGen (Cheney)000131

# EXHIBIT 23

Summary of telephone call with Atty. Steve German at the pre-scheduled call time of 1:00 p.m. Eastern Time on 5/4/2016: Called Mr. German to discuss my completed review of his appeal of the denial determination previously set forth by Kate Milhiero of AIG. Advised Mr. German that my review did not identify support for R&L's consistent with TD dating back to the claimed dates of disability ranging from 2005-2007. Explained that I did identify some information that may assist in documenting any pre and post disability occupational activities, but since the medical records, as well as an RN and physician peer review of same, do not support R&Ls consistent with TD, I did not want to req. additional documentation regarding the occupational issues as the medical test for total disability is not supported. Mr. German suggested that Ms. Milhiero's basis for denial was due to an assessment that clmnt's own occupation was not documented as that of a trial attorney and that a change in occupation to being a mediator was not supported and he further asserted that I am now suggesting that the occupational documentation is not being questioned but only the medical documentation....I clarified that I still have questions regarding occupational activity and that additional info and a forensic financial review may assist in clarifying same as well as identifying any time period when occupational duties changed, but that I additionally do not find support for R&L's consistent with TD necessitating any occupational change. Mr. German suggested that if there is documentation that she changed occupations regardless of why, that should be enough to support eligibility for benefits, but I explained that specific to disability insurance benefits, the reason someone changes occupations does need to be based on L&Rs resulting from a medical condition that precludes them from working.    Mr. German additionally suggested that we do not have the right to ignore what an insured tells us or what coworkers and others tell us about a condition and he expressed concern that the declarations submitted on clmnt's behalf were ignored by Ms.Milhiero – advised that I do not believe the declarations were ignored, but reassured him that I did give the declarations weight in my appeal review, however they contradict the documentation on file and I am unable to base a claim determination solely on statements/declarations as documentation is also needed to support same. Mr. German advised that he intends to litigate this matter and noted that he believes there has been bad faith in the handling of this claim and he urged me to find it within myself not to affirm the claim denial...explained that I must base my determination on the documentation submitted. The call was concluded. L. Beck 5/4/2016

AmGen (Cheney)000135

# EXHIBIT 24

The United States Life Insurance
Company in the City of New York
New York, New York

Benefit Solutions Connecticut Claim Center
P.O Box M
Beattyville, KY 41311

May 24, 2016

Adelman German, PLC
8245 N. 85th Way
Scottsdale, AZ 85258
Attention: Steve German, Esq.

Re: Policy Number: G164156
    Claim Number: 95923
    Claimant: Cynthia Cheney

Dear Attorney German:

We are writing to you regarding Ms. Cheney's claim for Disability benefits under the above-referenced policy with The
United States Life Insurance Company. We have completed our review of your appeal and have determined that we must
maintain the determination set forth in Ms. Milhiero's letter to you, dated 7/22/2015.

The policy outlines the following regarding when benefits are payable:

*DISABILITY BENEFITS*
*If an insured member becomes totally disabled and continues to be so disabled past the waiting period, United States Life
will pay to him the benefits described below.*

*The waiting period is shown in the Schedule of Benefits.*

*MONTHLY BENEFITS*
*The total disability benefit will begin to accrue on the day after the waiting period ends.*
*The total or partial disability benefit will be paid in the amount shown in the Schedule of Benefits.*

*WAITING PERIOD means a period of consecutive days of total disability for which no benefit is payable. The duration of
the waiting period is shown in the Schedule of Benefits. The waiting period begins on the first day of total disability
occurring after the effective date of the member's insurance.*

*MONTHLY BENEFITS PAYABLE FOR PARTIAL DISABILITY*
*If an insured person becomes partially disabled within 31 days after a period of total disability for which monthly benefits
are payable, United States Life will pay the monthly benefit shown in the Schedule of Benefits. This monthly benefit will
be paid while partial disability continues, up to the maximum benefit period shown in the Schedule of Benefits.*

Ms. Cheney's Schedule of Benefits provides a 90 day Waiting Period. Additionally, the policy provides the following
definitions:

*TOTAL DISABILITY means*

- *during the waiting period and next 60 months, the complete inability of the member to perform the material duties
  of his regular job to include his specialty in the practice of law; 'specialty in the practice of law' means the
  specialty in the practice of law which the member was performing on the day before total disability began.*

Distributing products issued by:
American General Life Insurance Company*, The United States Life Insurance Company in the City of New York, and National Union Fire Insurance Company of Pittsburgh, Pa.
*This company does not solicit business in New York.

AmGen (Cheney)000136

The United States Life Insurance
Company in the City of New York
New York, New York

- *after such 60 months, the complete inability of the member to perform the material duties of any gainful job for which he is reasonably fit by training, education or experience.*

*The total disability must be a result of an injury or sickness. To be considered totally disabled, a member must also be under the regular care of a physician.*

*PARTIAL DISABILITY means:*

*that a member is not able to perform the material duties of his regular job to include his specialty in the practice of law but he is able to perform:*
- *at least one of these duties on a part-time basis, or*
- *at least one, but not all, of these duties on a full-time basis.*

*"Specialty in the practice of law" means the specialty in the practice of law which the member was performing on the day before total disability began.*

*The partial disability must be a result of the injury or sickness that caused the total disability.*

Additionally, the Policy states the following:

*FILING A CLAIM:*

*To file a claim, follow these steps:*

*Step 1:*
*A claimant should send a written notice of claim to United States Life within 20 days of a loss. No special form is required to do this. The notice need only identify the claimant and the Policyholder.*

*Step 2:*
*When United States Life receives the notice, it will send proof of claim form to the claimant.*

*Step 3: the claimant should receive the proof of claim form within 15 days of the date United States Life receive the notice of claim. If the form is received within such time, it should be complete, as instructed, by all persons required to do so. Additional proof, if required should be attached to the form.*

*If the form is not received within such time, the claimant may provide written proof of claim to Untied Stated Life on any reasonable form. Such proof must state the date the injury or sickness began and the nature and extent of the loss.*

*Step 4:*
*Proof of claim must be sent to United States Life within 30 days after the waiting period (see Schedule of Benefits). United States Life may require more proof as often as needed to verify disability.*

*If a notice or proof is sent later than the times shown above, United States Life will not deny or reduce a claim if the notice or proof was sent as soon as possible.*

Our records indicate that your office submitted a claim on behalf of Ms. Cheney, received in our office on 1/27/2014. In your correspondence, dated 1/7/2014, you shared that Ms. Cheney tried her last case in December 2006 and was given no choice at that time other than to sop working as a trial attorney because her condition(s) prevented her from physically and cognitively trying complex cases.  You further noted that Ms. Cheney returned to her firm in early 2007 following pelvic reconstruction to wind down her litigation practice over the remainder of the year.  Additionally you indicated that, after giving up her litigation practice all together, she started working as a mediator in 2008, subsequently giving up that work as well, though you noted that Ms. Cheney remains a name partner of Fadell, Cheney & Burt, but does not maintain an office and is part of the firm in name only.

On the Insured's Statement, signed by Ms. Cheney on 1/27/2014, she indicated a date last worked and a date total disability commenced of December 2006.  In an attachment, Ms. Cheney described the nature of her illness as *type 1 diabetic now 13 years* and *degenerative disc disease, with arthritis and tendonitis.*

AmGen (Cheney)000137

The United States Life Insurance
Company in the City of New York
New York, New York

On an Attending Physician's Statement submitted with the claim, signed by Ann Bolar, N.P., on 1/6/2014, she noted that symptoms first appeared and the patient was first unable to work as of 7/1/2012. The diagnosis listed was Type 1 Diabetes. Ms. Bolar documented Ms. Cheney's first visit as 2/14/2011 with treatment frequency noted to be every three months.

In a letter to our office, dated 4/9/2014, you clarified that Ms. Cheney was specifically claiming Total Disability as of 12/14/2006 to coincide with the date her last trial ended. You additionally shared that the reason Ms. Cheney did not provide timely notice of claim was because *she did not went to admit that there was anything she cannot do, or overcome...and was too proud to think of herself as disabled.*

In a letter, dated 12/18/2006, from Dr. Videla to Dr. Williams, it was noted that Ms. Cheney presented for evaluation of vaginal problems with a perineal defect dating back to a 4th degree laceration after her first pregnancy. Dr. Videla documented that Ms. Cheney was interested in pursuing surgical management. According to the initial visit medical history completed by Ms. Cheney on 12/18/2006, she reported a history of Type 1 diabetes as well an intentional 40 pound weight loss. In response to the inquiry regarding other doctors she had seen in the past 5 years, Ms. Cheney noted that she was followed by her primary care physician, her gynecologist and also so a physician for shoulder pain/tendonitis.

In a letter to from Dr. Rollingher to Dr. Videla, dated 2/9/2007, Ms. Cheney's presentation for general medical review and preoperative clearance was documented. Dr. Rollingher noted that Ms. Cheney was *a delightful fit and active 55 year old attorney. She has type 1 diabetes but is in great shape and has lost almost forty pounds in the past year with a diet and exercise program.* Dr. Rollingher further documented that *although she has no overt target organ damage from her diabetes, it is somewhat labile and frequently runs between 70 and 300. She has excellent control when she is at home and on weekends, but unfortunately runs high during the week while at work so as to prevent what are reasonably frequent episodes of hypoglycemia. She recognizes them quickly and describes them with the onset of sweats, shakiness and anxiety. They respond quickly to carbohydrates and she usually treats them with dairy products.* Dr. Rollingher's impression was fit type 1 diabetic with labile blood sugars. Comorbidities included a folliculitis, a history of hepatitis C, cervical degenerative arthritis and degenerative disc disease. Additional records from Dr. Videla confirm that Ms. Cheney underwent a Monarch sling and anterior repair, a posterior colpoperinerrhaphy and external anal sphincteroplasty on 2/28/2007 and was discharged on 3/1/2007.

On 10/10/2007, Ms. Cheney completed an initial Outpatient Visit and Consultation form for the Orthopedic Clinic Association.  On that form, Ms. Cheney reported a displaced fracture of the right 5th toe and type 1 diabetes.  Dr. Moshero documented that Ms. Cheney currently works as a lawyer in litigation and enjoys swimming, skiing and yoga. Dr. Moshero assesses a displaced fracture of the right fifth metatarsal and plans for surgical correction were discussed. Additional notes confirm that Ms. Cheney underwent closed reduction and percutaneous pinning of the right foot 5th toe fracture. At her first post-operative visit on 10/22/2007, Ms. Cheney reported feeling good and was weight bearing as tolerated.

On 4/23/2012, Ms. Cheney was evaluated at the Orthopedic Clinic Association for a complaint of right thumb joint clicks and sticks.  Ms. Cheney noted additionally noted symptoms of chronic UTI, tendonitis, seasonal allergies and weight gain.   Ms. Cheney reported her current work status as "light duty" and noted her job title to be mediator/attorney.

On 11/1/2006, Ms. Cheney completed a Patient Questionnaire for The Orthopedic Clinic Association and responded "very good" to the inquiry regarding her general health.  Ms. Cheney presented that date for pain in her right knee and both shoulders.  Dr. Carter documented that Ms. Cheney had started to work with a trainer and her knee had been having anterior discomfort which Ms. Cheney was treating with a modification of activities. On exam, Dr. Carter noted that visual inspection did not show any frank abnormalities of the knee or shoulder.  Range of motion was not impaired and she had very mild impingement signs.  In the right knee, Dr. Carter noted slight patella crepitus, but her range-of-motion was not impaired, nor were hip or ankle movements.  Dr. Carter recommended a modification of activities and a work-out regiment.  Ms. Cheney was instructed to let Dr. Carter know if she wishes to pursue physical therapy.

An office note from Town Center Medical Group – Dr. Rollingher, dated 5/6/2006, documented that Ms. Cheney presented for an annual updated physical, with chief complaints of Type 1 diabetes, constipation and general medical review.  Dr. Rollingher noted Ms. Cheney's report that she had been working on a part-time basis since the summer of 2005 since she had presented with difficult to control and labile diabetes with frequent hypoglycemia and severe post reaction cognitive

The United States Life Insurance
Company in the City of New York
New York, New York

difficulties as well as profound fatigue and a lot of work related stress. Dr. Rollingher noted that they recommended at that time that she reduce her workload and spend less time in the office.

In a letter, dated 5/23/2012, to Dr. Rollingher, Dr. Haber documented his evaluation of Ms. Cheney for consultation for a right thumb trigger digit. Dr. Haber noted that Ms. Cheney's medical history was significant for Type 1 diabetes, hepatitis C, and kidney infections. He further noted that Ms. Cheney takes insulin for her diabetes, is an attorney and enjoys swimming and walking. On exam, Dr. Haber assessed a right thumb trigger digit and administered an injection.

On 11/8/2012, Ms. Cheney presented to Dr. Rollingher with disability paperwork, diabetes, chronic conditions and arthalgias. Ms. Cheney noted that her moderate symptoms began twelve years prior. She stated that she stopped litigation in 2006 due to difficulties with blood sugar, went on to mediation but has become increasing difficult associated with labile blood sugars and fatigue. Ms. Cheney additionally reported osteoarthritic changes in both hands with a history of shoulder and knee tendonitis and degenerative disc disease, relieved by exercise, massage and yoga. Ms. Cheney noted her symptoms were worse in certain positions or on airplanes and also symptomatic sitting for prolonged periods as in court.

On 12/16/2008, Ms. Cheney reported doing well apart from glucose control, her weight was stable, vision and hearing were unchanged and she had no signs of arthritis. Dr. Rollinger's assessment was Diabetes Type 1, controlled, degenerative disc disease and hyperlipidemia.

During an evaluation with Yvonne Riba, PA on 1/11/2010, Ms. Cheney presented with complaints of fever, chills, sweats, fatigue, loss of appetite, abdominal pain, nausea, vomiting and flank pain. Ms. Riba documented that Ms. .Cheney was not at goal with her diabetes, had never had intensive diabetes insulin treatment education and had no knowledge of carbohydrate counseling. Ms. Riba suggested a referral for endocrinology evaluation. During a follow up evaluation with Ms. Riba on 1/14/2010, Ms. Cheney noted an improvement in flank pain and reported feeling better. Ms. Cheney declined intensive diabetic education due to her financial situation and also declined to keep a written blood sugar log with diet notations because she reported being too stressed to do so. Ms. Cheney also noted that she planned to discuss disability status with her primary care physician because her erratic blood sugar was making it difficult for her to work due to the stresses of her job.

During an additional evaluation with Ms. Riba on 7/3/2013, Ms. Cheney was evaluated for cough and bronchitis and she noted that she was very happy with her diabetes control on the pump and on 7/10/2013, Ms. Cheney presented for cough/flu symptoms, she was assessed with bronchitis, cough, diabetes, reactive airway disease, though she reported feeling "on the mend" and was encouraged to return to the office within 48-72 hours if no significant improvement or to seek medical care if not fully resolved in one week.

According to records from Dr. Bailey's office, Ms. Cheney was evaluated on 2/14/2011 for Diabetes. On 8/22/2011, Ms. Cheney reported that she had been non-compliant wither diet, had increases stress with a new job and noted that, when traveling she was eating liberally. As of 7/27/2012, Debra Bayham, PA, discussed an insulin pump and suggested Ms. Cheney attend an August class for diabetes education, she stressed the importance of regular exercise, low carb, low glycemic carbs, high lean protein, and portion control. Ms. Cheney reported working part time with erratic blood sugars on work days. As of 1/3/2013, Ms. Cheney was evaluated for follow up of diabetes, new on insulin pump. On 3/7/2013, Ms. Cheney presented for evaluation with Debra Bayham, PA, and she was noted to have been on an insulin pump since 12/12.

On 6/20/2013, Ms. Cheney was seen by Dr. Bailey for follow up and noted that she had to return to work recently so her "BG's have been higher in the last 6 weeks". During a 9/19/2013 evaluation with Ann Bolar, NP, Ms. Cheney was evaluated for follow up of Diabetes and she noted that her blood sugars were more variable when on vacation. On 1/6/2014, Ms. Cheney was evaluated by Ann Bolar, NP for Diabetes and medication refills. As of 4/24/2014, Ms. Cheney reported to Dr. Bailey that she had retired, but was helping her old boss again and felt that the stress was causing her sugars to go awry. Ms. Cheney additionally reported that if she can control her routine/daily environment she does well and she was glad she decided to retire.

During a 6/17/2014 interview, Ms. Cheney reported having been too disabled to work full-time in 2007, but noted that she had continued to work very part-time in order to pay for health insurance. She shared that Dr. Rollingher suggested cutting back at work as far back as 1997, Dr. White recommended no lifting, and Dr. Bailey recommended decreased work load for better control of diabetes, however no formal work restrictions were provided. Ms. Cheney noted that her current work involved 6 mediations per week as well as 6-8 depositions per year.

AmGen (Cheney)000139

The United States Life Insurance
Company in the City of New York
New York, New York

To assist us in assessing the available medical records to determine any restrictions or limitations, we requested review of same by a nurse case manager.   In her assessment, dated 5/4/2015, Karen Ungaro, R.N. indicated that Ms. Cheney's inability to work due to diabetes with labile blood sugars was not clear as she had continued to work in some capacity and had not continued treatment on a regular basis since the claimed date of disability.  Specific to Ms. Cheney's pelvic reconstruction surgery, Ms. Ungaro noted that limitations would have been present for a maximum of 6-8 weeks post operatively and for approximately two weeks post percutaneous pinning of the right 5th toe on 10/26/2007.  We additionally requested a medical peer review of the available records with a board certified endocrinologist.  In his report, dated 5/29/2015, Dr. Soodini opined that the clinical record submitted for review does not show any indication that the patient is severely limited to perform a light physical demand level as is required by a trial attorney.

Additionally, as outlined in Ms. Milhiero's 7/22/2015 letter to you, the available information does not clearly document Ms. Cheney's occupational duties and specific changes therein pre and post the various claimed onset dates of Total Disability dating back to 2005.   As above, according to Ms. Cheney, Dr. Rollingher suggested as far back as 1997 that she cut back at work and Dr. Bailey recommended a decreased work load for better control of diabetes.  As detailed in the medical records, on 5/6/2006, Dr. Rollingher noted that Ms. Cheney had been working on a part-time basis since the summer of 2005 due to symptoms associated with difficult to control diabetes and recommendation that she reduce her workload and spend less time in the office.  These indications, as well as a review of the medical records as detailed above, suggest that Ms. Cheney may have been Partially Disabled (*not able to perform the material duties of his regular job to include his specialty in the practice of law but he is able to perform at least one of these duties on a part-time basis, or at least one, but not all, of these duties on a full-time basis*), however we are unable to identify a period exceeding 90 days (the length of Ms. Cheney's elected Waiting Period) where, due to an injury or sickness, she was Totally Disabled (*completely unable* to perform the material duties of her regular job) either as a Trial Attorney or Mediator.   The policy specifies that the Waiting Period *means a period of consecutive days of total disability* that must be met before benefits can be paid.   The policy additionally outlines that any period of Partial Disability must be preceded by a period of Total Disability for which monthly benefits are payable. According to the policy terms, we are unable to consider any period of Partial Disability towards the satisfaction of the Waiting Period.  As a result, we must maintain the decision to deny Ms. Cheney's claim for benefits as she did not have a period of Total Disability that exceeded the required Waiting Period that must be met for consideration of benefit payments.

Nothing in this letter should be construed as a waiver of any of United States Life Insurance Company's rights and defenses under the above captioned policy and/or certificate and all rights and defenses are reserved to the Company whether or not specifically mentioned herein.

Please feel free to contact me directly if you have any questions regarding this matter.

Sincerely,

*Laura Beck*

Appeals Specialist
AIG Benefit Solutions
860-507-2887

# EXHIBIT 25

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Cynthia Cheney, an individual, | ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | Case No. 2:17-cv-00004-DGC |
| The United States Life Insurance Company In The City of New York, a foreign insurance company; American General Life Insurance Company, doing business as AIG Benefit Solutions Connecticut Claim Center, a foreign business entity; Does 1-10; Roes 1-10, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

### _DEPOSITION OF CYNTHIA CHENEY_

Volume 1

Scottsdale, Arizona
January 25, 2018
9:14 a.m.

**_Prepared for_:**

THE COURT

(Original)

**_Prepared by:_**
Herder & Associates
SHELLEY E.D. PEARCE, RPR
Certified Reporter
Certificate Number 50301



1                       I N D E X

2   EXAMINATION:                                          PAGE

3   Cynthia Cheney

4       BY MR. MATURA                                        4

5

6                       ---oOo---

7

8

9                     E X H I B I T S

10

    NUMBER                                               PAGE
11
    Exhibit 1     United States Life Insurance Company   159
12                Long Term Disability Policy
                  (Am Gen (Cheney) 001118 - 001147)
13

14                      ---oOo---

15

16

17

18

19

20

21

22

23

24

25

1              DEPOSITION OF CYNTHIA CHENEY, VOLUME 1,

2    taken at 9:14 a.m. on Thursday, January 25, 2018, at the

3    Law Offices of Barrett & Matura, P.C., 8925 East Pima

4    Center Parkway, Suite 100, Scottsdale, Arizona, before

5    SHELLEY E.D. PEARCE, RPR, Arizona Certified Reporter,

6    Certification No. 50301, in and for the County of

7    Maricopa, State of Arizona, pursuant to the Rules of Civil

8    Procedure.

9

10   For the Plaintiff:

11           ADELMAN GERMAN, P.L.C.
             Steven J. German, Esq.
12           8245 North 85th Way
             Scottsdale, Arizona 85258
13
     For the Defendants:
14
             BARRETT & MATURA, P.C.
15           Jeffrey C. Matura, Esq.
             8925 East Pima Center Parkway
16           Suite 100
             Scottsdale, Arizona 85258
17

18

19

20

21

22

23

24

25

4

```
 1                        CYNTHIA CHENEY,
 2    a witness herein, having been first duly sworn by the
 3    Certified Reporter to speak the truth and nothing but the
 4    truth, was examined and testified as follows:
 5
 6                          EXAMINATION
 7    BY MR. MATURA:
 8        Q.    Good morning, ma'am.
 9        A.    Good morning.
10        Q.    Can you just give us your full name, please.
11        A.    It's Cynthia V, as in "Victor," Cheney,
12    C-h-e-n-e-y.
13        Q.    What does the V stand for?
14        A.    van Rensselaer.
15        Q.    That's an interesting middle name.  Where does
16    that come from?
17        A.    It was an old, old family name on my father's
18    side.
19        Q.    Can you spell it for me?
20        A.    Maybe.  van, with a small "v"; Rensselaer,
21    R-e-n-s-s-e-l-a-e-r.
22        Q.    All right.  Thank you.
23              We know you were a lawyer for many years.
24    You've probably taken, I assume, hundreds of depositions;
25    is that a fair assumption?
```

09:14:18 (line 10)
09:14:30 (line 15)
09:14:38 (line 20)
09:14:57 (line 25)

```
 1        A.    That's fair.
 2        Q.    Okay.  The only thing I'm going to tell you,
 3   since you're here as a witness today, instead of a lawyer,
 4   is that if you want to take a break at any point in time,
 5   please just let me know.  I, frankly, don't care how many
 6   breaks we take, whether it's one or a lot more than one.
 7   It doesn't matter to me.  We will generally break about
 8   once an hour, just to clear our mind and stretch our legs,
 9   but if for whatever reason you want to take a break more
10   frequently than that, just say so; and, as long as you've
11   answered the pending question, we'll take a break.  Is
12   that fair?
13        A.    Thank you.
14        Q.    Your birthday is September 21, 1950; is that
15   correct?
16        A.    Yes, sir.
17        Q.    Okay.  Are you on any medication?
18        A.    Yes.
19        Q.    Can you tell me what medications you're taking?
20        A.    I take Apidra insulin, a fast-acting insulin.  I
21   take that via an insulin pump.
22        Q.    Okay.  What else?
23        A.    I take metformin.
24        Q.    Met?
25        A.    Metformin.
```

6

```
            1    Q.    Okay.

            2    A.    Do you want the dosages or just the drugs

            3  themselves?

            4    Q.    Give me the drugs for now.

09:16:17    5    A.    Okay.  I take Losartan.  I take Crestor.  These

            6  are oral medications.  I take Prolia by injection.  I take

            7  SYMLIN, with a y, by injection when I can afford it.  I

            8  take vitamin D3 and calcium for osteoporosis.  I take a

            9  prescription only B vitamin for neuropathy.  I think I got

09:17:20   10  them all.

           11    Q.    Okay.  If you remember any more, just let me

           12  know.

           13    A.    I will.

           14    Q.    I'm going to ask you some questions about these.

09:17:26   15    A.    Let me ask you.  Did you put Crestor on that

           16  list?

           17    Q.    You did.

           18    A.    Then I think I've got them all.

           19    Q.    Thank you.

09:17:35   20          I have a few follow-up on some of these

           21  medications.  Apidra by insulin pump as needed?

           22    A.    It's, approximately, 40 units a day.

           23    Q.    Okay.

           24    A.    30 to 40 units a day.

09:17:48   25    Q.    At what interval?  Does it vary?
```

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
|          | 1  | A.    I take about half of it as a basal dose that       |
|          | 2  | drips in tiny amounts 24 hours a day, and then I take the |
|          | 3  | other half by bolus when I eat carbohydrates.            |
|          | 4  | Q.    How long have you been taking Apidra by insulin     |
| 09:18:21 | 5  | pump?                                                    |
|          | 6  | A.    I would say about five years, estimated.           |
|          | 7  | Q.    That's fair.                                        |
|          | 8  | Metformin, if I can read my handwriting                  |
|          | 9  | correctly, that medication --                            |
| 09:18:36 | 10 | A.    Yes.                                                |
|          | 11 | Q.    -- what do you take that for?                       |
|          | 12 | A.    That assists in the uptake up insulin into the     |
|          | 13 | body's cells.                                            |
|          | 14 | Q.    How often do you take that?                         |
| 09:18:47 | 15 | A.    I take it twice a day.                              |
|          | 16 | Q.    At what dosage?                                     |
|          | 17 | A.    1000 milligrams.                                    |
|          | 18 | Q.    Did you start taking that medication at the same    |
|          | 19 | time you started the Apidra?                              |
| 09:19:03 | 20 | A.    No, I've taken that medication from the time of     |
|          | 21 | my diagnosis of diabetes.                                 |
|          | 22 | Q.    Which was when?                                     |
|          | 23 | A.    1999.                                               |
|          | 24 | Q.    Locartan [phonetic]?                                |
| 09:19:23 | 25 | A.    Losartan with an "s."                               |

HERDER & ASSOCIATES   (480)481-0649

|          | 1  | Q.    With an "s."  Losartan, you take that for what? |
|          | 2  | A.    I take that to -- I do not have hypertension, |
|          | 3  | but I take that to keep my blood pressure on the lower end |
|          | 4  | of normal, as a stroke preventive and kidney protection. |
| 09:19:42 | 5  | Q.    How often do you take it? |
|          | 6  | A.    Once a day. |
|          | 7  | Q.    What's the dosage? |
|          | 8  | A.    50 milligrams. |
|          | 9  | Q.    How long have you taken that, your best |
| 09:19:51 | 10 | estimation? |
|          | 11 | A.    I believe about two years. |
|          | 12 | Q.    And Crestor, you take that for what reason? |
|          | 13 | A.    I take that to lower my blood lipids, and I've |
|          | 14 | taken that since I would say early 2000s. |
| 09:20:18 | 15 | Q.    How often do you take it? |
|          | 16 | A.    Once a day. |
|          | 17 | Q.    Do you know what your dosage is? |
|          | 18 | A.    10 milligrams. |
|          | 19 | Q.    You said you take Prolia by injection? |
| 09:20:30 | 20 | A.    Yes. |
|          | 21 | Q.    What do you take that for? |
|          | 22 | A.    Osteoporosis. |
|          | 23 | Q.    How often? |
|          | 24 | A.    Twice a year. |
| 09:20:37 | 25 | Q.    Administered by a medical professional? |

9

```
          1     A.    Yes.

          2     Q.    Do you recall when you started that treatment

          3   program?

          4     A.    A little under a year ago.

09:20:57  5     Q.    How many treatments of Prolia have you had?

          6     A.    Only two.

          7     Q.    You mentioned SYMLIN by injection?

          8     A.    Yes.

          9     Q.    Is that also for osteoporosis?

09:21:08  10    A.    No.

          11    Q.    What is that for?

          12    A.    SYMLIN is another pancreatic enzyme that my

          13  pancreas does not make.  It's, actually, a synthetic

          14  amylin, and it lowers the speed at which your body absorbs

09:21:32  15  glucose.  Its purpose is to reduce the number of spikes in

          16  my blood sugar.

          17    Q.    How often do you take that by injection?

          18    A.    I take that with meals when I can afford it, but

          19  it is not covered by my insurance, and it's very

09:21:46  20  expensive.

          21    Q.    How expensive is it?

          22    A.    As I recall, to fill the prescription for

          23  60 days was about $2,800.

          24    Q.    $2,800 for a 60-day supply?

09:22:00  25    A.    Yes.
```

```
          1    Q.    And you said you take it -- if you have it, you
          2  would take it with meals?
          3    A.    Correct.
          4    Q.    By injection?
09:22:10  5    A.    Yes.
          6    Q.    Injecting yourself?
          7    A.    Yes.
          8    Q.    And have you done that?  Have you taken this
          9  medication?
09:22:16 10    A.    Oh, yes, before I was Medicare age, I had
         11  insurance that covered it, and I used it very regularly,
         12  but once I hit Medicare age and my coverage has changed, I
         13  had to go without.
         14    Q.    When did you hit Medicare age?
09:22:32 15    A.    Two-and-a half years ago.
         16    Q.    Okay.  So have you taken SYMLIN in the last
         17  two-and-a-half years?
         18    A.    I had a little left over.
         19    Q.    You haven't purchased any new SYMLIN since you
09:22:46 20  turned 65?
         21    A.    I don't think I did, not at that price, I
         22  wouldn't have.
         23    Q.    Am I correct you had Humana Health insurance
         24  prior to going on Medicare?
09:23:03 25    A.    I think that's right.
```

|         |    |                                                              |
|---------|----|--------------------------------------------------------------|
|         | 1  | Q.   Okay.  Do you recall -- and we can look at the          |
|         | 2  | records a little bit later.  I believe I recall seeing a     |
|         | 3  | Humana -- a copy of a Humana health card that you            |
|         | 4  | submitted with some of your documentation.  Do you recall    |
| 09:23:17 | 5 | being covered by any other health carrier?  Go ahead.        |

        6   A.   I remember our law firm going through a couple
        7   of carriers.  I know, at one point in time, we had United.
        8   Q.   Okay.
        9   A.   But I think what you said is correct.  Our most
09:23:33 10   recent one before I became eligible for Medicare, I think,
       11   was Humana.
       12   Q.   Just to make sure I understand, if you purchase
       13   SYMLIN to take, you mentioned you take it when you would
       14   eat.  Would it be three times a day, then, that you would
09:23:59 15   take that medication, or what's the recommended usage?
       16   A.   It depends on how much carbohydrate I'm planning
       17   to eat in a particular meal.  If it's a low carbohydrate
       18   meal, I might skip it.
       19   Q.   Okay.
09:24:12 20   A.   But if it's going to be a higher carbohydrate
       21   meal, Italian food, I would be sure and take it in advance
       22   to make sure that my blood sugars didn't spike quite so
       23   high.
       24   Q.   You mentioned vitamin D3 and calcium,
09:24:28 25   over-the-counter pills?

```
          1    A.    Yes.

          2    Q.    And do you take those every day?

          3    A.    I do.

          4    Q.    Once a day?

09:24:33  5    A.    Yes -- no, I'm sorry.  I take the calcium twice

          6    a day at Dr. Cummings' instruction.

          7    Q.    So you take a calcium pill twice a day and

          8    vitamin D3 once a day?

          9    A.    Yes.

09:24:44  10   Q.    And then you also mentioned vitamin B.  Is that

          11   an over-the-counter pill?

          12   A.    It is not.

          13   Q.    Okay.  What do you take for vitamin B?

          14   A.    It's called METANX.  It's spelled M-E-T-A-N-X,

09:24:58  15   and I take that by prescription from Dr. Joan Bailey.

          16   Q.    How often do you take it?

          17   A.    I take that twice day, per her instruction.

          18   Q.    Do you know what the dosage is?

          19   A.    I do not.

09:25:14  20   Q.    How long have you been taking that, to your best

          21   recollection?

          22   A.    Some years.

          23   Q.    Okay.  Have you -- I'm not sure how to ask this

          24   question, because the -- well, anyway, have any of these

09:25:41  25   medications, have you noticed impacting your memory?  The
```

|          |    |                                                             |
|----------|----|-------------------------------------------------------------|
|          | 1  | reason I ask, and maybe I don't know how to ask is, I had   |
|          | 2  | someone say, Well, if it did, how I would know?  But        |
|          | 3  | putting that aside, have you experienced memory loss        |
|          | 4  | associated with any of these medications?                   |
| 09:25:58 | 5  | A.    I have experienced memory loss, but I could not       |
|          | 6  | tell you how much of it is from medication and how much of  |
|          | 7  | it is from other factors.                                   |
|          | 8  | Q.    Okay.  Fair enough.                                   |
|          | 9  | Have any of the doctors who have prescribed                 |
| 09:26:12 | 10 | these medications or that you're seeing, who are            |
|          | 11 | evaluating the medications that you're taking, expressed    |
|          | 12 | to you that any of these medications could have an impact   |
|          | 13 | on your memory?                                             |
|          | 14 | A.    Only insofar as insulin may affect me to make my      |
| 09:26:33 | 15 | sugars too high or too low, my memory for those periods of  |
|          | 16 | time and the recovery period, all diabetics, not just me,   |
|          | 17 | would have some difficulty with memory, particularly with   |
|          | 18 | very low sugars, of exactly what happened during that       |
|          | 19 | period of time.                                             |
| 09:26:58 | 20 | Q.    It sounds to me that you've experienced memory        |
|          | 21 | loss.                                                       |
|          | 22 | A.    I think that's fair.                                  |
|          | 23 | Q.    Okay.  Describe that for me.  What do you mean        |
|          | 24 | when you say you've experienced memory loss?                |
| 09:27:12 | 25 | A.    Well, the memory loss I first noticed was in my       |

|          | 1  | work.  As you know, as a litigator, you have to be able to |
|----------|----|------------------------------------------------------------|

```
              1   work.  As you know, as a litigator, you have to be able to

              2   hang onto a lot of detail; and, in my particular

              3   specialty, I need to know all the details of a patient's

              4   medical records, prior depositions, pleadings, rulings of

   09:27:37   5   the Court, and -- and it's always been an advantage to me

              6   that I have a really good memory and, if it was in a

              7   medical record, I remembered, and I realized that I was

              8   just not as sharp as I used to be.

              9        Q.   When did you first experience this?

   09:27:56  10        A.   I would say it was gradual, so I first noticed

             11   it, certainly, by mid 2000 -- the odds, maybe 2004, '05.

             12        Q.   Was there a particular event that occurred that

             13   made you aware of the fact that your memory was not as

             14   good as it used to be during this time frame, or was it

   09:28:26  15   more gradual?

             16        A.   It was more gradual, although there were certain

             17   flubs that I made that caught my attention.

             18        Q.   So mid 2000s, 2004/2005 time frame, you noticed,

             19   as you described it, a flub in your memory?

   09:28:45  20        A.   Yes.

             21        Q.   What do you mean by that?  Was that the ability

             22   to recall details of a particular case, a pleading, a

             23   court ruling, all of these above?

             24        A.   Usually, it was the details of the case itself,

   09:28:56  25   the expert testimony, the details in a medical record.
```

```
 1   '04 -- I'm thinking now, '04, it became very distinct to
 2   me.
 3        Q.   Why do you say that?
 4        A.   'Cause I had a great big trial.
 5        Q.   In 2004?
 6        A.   It was very difficult.
 7        Q.   And what happened with respect to memory loss in
 8   2004 that sticks out to you?
 9        A.   Not being able to remember the facts of the
10   case.
11        Q.   During the trial?
12        A.   Yeah.
13        Q.   Before a judge and jury?
14        A.   Yeah.
15        Q.   In Maricopa County?
16        A.   Yes.
17        Q.   Do you remember your client's name?
18        A.   Life Care Centers of America.
19        Q.   Do you know the plaintiff's name?
20        A.   Johnson.
21        Q.   Last name Johnson, man or woman?
22        A.   The decedent was a woman.  The statutory
23   plaintiff was a gentleman.  See, I have got a good memory
24   for this part.
25        Q.   Was this a wrongful death case?
```

```
         1    A.    It was an elder abuse.
         2    Q.    Elder abuse, okay.
         3          Do you remember the judge?
         4    A.    Yes, Judge Ana Baca.
09:30:09 5    Q.    And something happened during -- was it a
         6 mult-day trial?  Was it a big trial?
         7    A.    It was several months.
         8    Q.    Several months long.  Okay.  So substantial
         9 trial.  I had a two-month trial two years ago.  I think
09:30:23 10 I'm still recovering from it.  So I can appreciate how
        11 difficult a several month trial is.
        12          But something happened during that several-month
        13 trial where you realized that your memory was not the
        14 same?
09:30:35 15   A.    It was not so much that one thing happened.  It
        16 was that it was a struggle in a way it had not been before
        17 for me to get through my examinations and
        18 cross-examinations.  I would not think that it showed to a
        19 jury, and I did have someone trying the case with me who
09:30:56 20 was a tremendous help.
        21    Q.    Someone in your firm?
        22    A.    Yes.
        23    Q.    Okay.  Did you -- after that trial ended, did
        24 you seek medical -- sorry.  Strike that.
09:31:11 25          Did you go to the doctor about the memory loss
```

                   1    that you experienced during the trial?
                   2         A.    I had been talking to my primary care physician,
                   3    Dr. Rollinger, for some period of time, saying, I'm not as
                   4    super good at memory as I used to be, and he had told me
09:31:26           5    it was normal aging.
                   6         Q.    Okay.  Let me back up a few steps, if you don't
                   7    mind.  Do you own your house where you live?  Are you
                   8    renting?
                   9         A.    I rent where I am.
09:31:47          10         Q.    Okay.  What's your address where you live?
                  11         A.    100 East Fillmore, No. 226, 85004.
                  12         Q.    Is that Phoenix?
                  13         A.    Yes.
                  14         Q.    How long have you lived there?
09:32:08          15         A.    2012.
                  16         Q.    Where did you live before?
                  17         A.    I was housesitting for my brother in Tempe for
                  18    about six months.
                  19         Q.    How about before that?
09:32:26          20         A.    I was living in a rental on Heatherbrae in
                  21    Phoenix for a little under two years.
                  22         Q.    When was the last time you owned a house?
                  23         A.    Well, my husband and I own a house that he lives
                  24    in --
09:32:47          25         Q.    Okay.

|          |    |     |                                                              |
|----------|----|-----|--------------------------------------------------------------|
|          | 1  | A.  | -- at 1714 East Culver.                                      |
|          | 2  | Q.  | So let me back up.  What's your husband's name?              |
|          | 3  | A.  | Gregg Temple.                                                |
|          | 4  | Q.  | How long have you been married?                              |
| 09:32:59 | 5  | A.  | Since 1984.                                                  |
|          | 6  | Q.  | I saw somewhere that you guys have children?                 |
|          | 7  | A.  | We do.                                                       |
|          | 8  | Q.  | Three?                                                       |
|          | 9  | A.  | Two.                                                         |
| 09:33:05 | 10 | Q.  | Okay.                                                        |

11    A.   I have a third.  So that's right.  I have a
12   third of my own.
13    Q.   Can you just give me the age range of the three
14   children?

09:33:15   15    A.   My daughter, Tanya, is about to turn 49.  My
16   daughter, Meryl, M-e-r-y-l, is 32; and my son Ross is 30.
17    Q.   Okay.  And which one is your child that's not
18   with your current husband?
19    A.   Tanya, 49.

09:33:42   20    Q.   Now, you said that your husband owns a home at
21   1714 East Culver?
22    A.   He and I own the home at 1714 East Culver.
23    Q.   But you don't live there?
24    A.   Correct.  We live separately.

09:33:55   25    Q.   Okay.  How long has that been that you've lived

|  |  |  |
|---|---|---|
| | 1 | separately? |
| | 2 | A.   Since 2010. |
| | 3 | Q.   Do you own any other homes? |
| | 4 | A.   Yes, we own a townhome in Flagstaff, a second |
| 09:34:21 | 5 | home, but we have it rented. |
| | 6 | Q.   How long have you owned that home? |
| | 7 | A.   Since '05. |
| | 8 | Q.   That's owned by both you and your husband? |
| | 9 | A.   Yes. |
| 09:34:33 | 10 | Q.   Do the two of you or you, individually, own any |
| | 11 | other real property? |
| | 12 | A.   We sold the big family home about two years ago. |
| | 13 | Q.   Where was the family home located? |
| | 14 | A.   5507 East Calle del Paisano out in Arcadia.   We |
| 09:34:54 | 15 | lived there since 1985. |
| | 16 | Q.   That's where your kids grew up? |
| | 17 | A.   Yes. |
| | 18 | Q.   Okay.  You said two years ago, you sold it, |
| | 19 | approximately? |
| 09:35:07 | 20 | A.   Approximately.  Might have been three. |
| | 21 | Q.   Okay.  So if we trace this back a little bit and |
| | 22 | we go to 2007, in terms of your living situation, in 2007, |
| | 23 | if I understand what you're saying, based upon the dates |
| | 24 | you've given me, you were still living at what you called |
| 09:35:32 | 25 | your big family home in Arcadia? |

| | |
|---|---|
| 1 | A.    Yes. |
| 2 | Q.    And then you lived in that home, if we use 2007 |
| 3 | as our starting point, if you don't mind, ma'am, 2007, you |
| 4 | were in the Arcadia home.  At what point in time did you |
| 09:35:49   5 | move out of the Arcadia after 2007? |
| 6 | A.    I believe it was January, could have been |
| 7 | February, 2010. |
| 8 | Q.    And where did you move then? |
| 9 | A.    The rental on Heatherbrae -- |
| 09:36:02   10 | Q.    Okay. |
| 11 | A.    -- near 24th Street. |
| 12 | Q.    The rental on Heatherbrae.  And then you were |
| 13 | there, and then after that, you moved in -- housesitting |
| 14 | for your brother for about six months; and, then, 2012, |
| 09:36:15   15 | you moved to the current apartment or townhouse, the |
| 16 | rental that you have currently on East Fillmore? |
| 17 | A.    Yes. |
| 18 | Q.    Did your husband live with you when you went to |
| 19 | the rental on Heatherbrae? |
| 09:36:33   20 | A.    No. |
| 21 | Q.    Okay.  So have you lived alone since 2010? |
| 22 | A.    Yes, except that my son lives in the townhouse |
| 23 | with me now. |
| 24 | Q.    How long has your son lived with you? |
| 09:36:55   25 | A.    Year and a half. |

```
 1      Q.    And which son is that?
 2      A.    I only have one.
 3      Q.    I'm sorry.  I apologize.  I was going to say.
 4   You only have one son, so I'm assuming it's your one son?
 5      A.    My one son.
 6      Q.    Do any of your children live in Arizona?
 7      A.    Yes, my son who lives --
 8      Q.    I'm sorry.  Of course, your son who lives with
 9   you.  I apologize.
10      A.    With me, and my daughter has an apartment down
11   in Tempe.
12      Q.    Which daughter?
13      A.    Meryl, M-e-r-y-l.
14      Q.    Where does your other daughter live?
15      A.    She lives in Grand Rapids, Minnesota.
16      Q.    Do you have any other family that lives in town?
17   Siblings, any relatives?  Just describe for me the other
18   family that lives in town.
19      A.    I have my brother, David, and his wife, Carol,
20   and his two children live here.  I have my brother, John,
21   and his fiancée, Jo, and his three -- three of his four
22   children live here.  I have a great niece and a great
23   nephew, who are tiny children, who live here.  My two --
24   did we get those two?  I think that's it for blood
25   relatives.
```

09:37:05 — line 5
09:37:21 — line 10
09:37:35 — line 15
09:38:03 — line 20
09:38:42 — line 25

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
|          | 1  | Q.    Fair enough.  Thank you.                           |
|          | 2  |       Have you ever been a party in a lawsuit before?    |
|          | 3  | A.    I have.                                            |
|          | 4  | Q.    Tell me about that.                                |
| 09:38:53 | 5  | A.    I am currently a party in a lawsuit over a         |
|          | 6  | rear-end collision.                                      |
|          | 7  | Q.    Are you a plaintiff or a defendant?                |
|          | 8  | A.    I'm a plaintiff.                                    |
|          | 9  | Q.    Okay.  Better than being defendant, I guess, if    |
| 09:39:06 | 10 | you had to choose.                                       |
|          | 11 | A.    Yeah.                                               |
|          | 12 | Q.    What happened with that?  When did that happen?    |
|          | 13 | A.    I was rear-ended out on the I-10 in May of 2016,   |
|          | 14 | and I tried to settle the case with State Farm and I     |
| 09:39:22 | 15 | failed.  So now I'm in litigation with them.             |
|          | 16 | Q.    Were you representing yourself, or did you have    |
|          | 17 | a lawyer?                                                 |
|          | 18 | A.    No, Gregg Temple was representing me.              |
|          | 19 | Q.    This was a car accident.  You were rear-ended in   |
| 09:39:37 | 20 | May 2016.  Did you sustain any personal injuries?        |
|          | 21 | A.    I did.                                              |
|          | 22 | Q.    Tell me about that.                                |
|          | 23 | A.    I had the expected soft tissue injuries, plus a    |
|          | 24 | concussion, for which I received treatment at the Banner |
| 09:39:51 | 25 | Concussion Center for four months.                       |

```
         1    Q.    Were you taken by ambulance from the accident to
         2   the hospital?
         3    A.    No.
         4    Q.    What soft tissue injury did you experience?
09:40:09 5    A.    Oh, I took a good bang to my left side, very
         6   sore neck, very sore low back.  I had degenerative disc
         7   disease, so it aggravated that pretty badly.
         8    Q.    And who diagnosed you with a concussion; do you
         9   know?
09:40:45 10   A.    I went to Banner Good Sam Emergency Department.
         11   Q.    Immediately following the accident?
         12   A.    No.  First, I went to urgent care, and the
         13  urgent care doctor said, If your symptoms don't subside,
         14  the symptoms of the dizziness and lack of balance, nausea,
09:41:05 15  motion sickness, she said, If those don't resolve, I want
         16  you to go over to Banner Emergency, if they did not
         17  resolve.  So on the third day after the accident, I went
         18  to Banner Good Sam, and the emergency department referred
         19  me to the Concussion Center, and so I would say the
09:41:28 20  Concussion Center actually diagnosed me.
         21   Q.    Are you still treating at the Concussion Center?
         22   A.    No, I'm released from care.
         23   Q.    How long was that care?
         24   A.    Four months.
09:41:38 25   Q.    You said that earlier.  I apologize.
```

1          And how frequently did you seek treatment there

2     for that four-month period?

3          A.     They sent me to concussion physical therapy,

4     concussion rehab.

09:41:48   5          Q.     And what was that -- what was that like?

6          A.     It addressed, primarily, my balance and

7     dizziness.  They have exercises, then, that I would also

8     do at home.

9          Q.     Did you go to a -- well, let me start over.

09:42:06   10         The concussion therapy that they had you partake

11    in, was that at a different location than the Concussion

12    Center?

13         A.     It was across the street at Banner's PT

14    department.

09:42:18   15         Q.     Okay.  Do you know who treated you, who did the

16    physical therapy?

17         A.     Oh, the name of the nice therapist?

18         Q.     Do you have any recollection?

19         A.     One was Chelsey.  I remember her, 'cause she was

09:42:31   20    pregnant.

21         Q.     All right.

22         A.     But, I'm sorry, I would not remember.

23         Q.     No problem.

24         Okay.  The four-month treatment for concussion

09:42:39   25    ended when?

```
              1      A.      September.

              2      Q.      Of 2016?

              3      A.      Yes, I hope that's right.

              4      Q.      'Cause the accident was May of 2016.  Does that
09:42:52      5   make sense to you, then, it would be September?

              6      A.      I think that's right.

              7      Q.      We can figure that out.

              8              Okay.  Are you still receiving treatment for any

              9   of the injuries that you suffered in this car accident?
09:43:12     10      A.      No.

             11      Q.      So the soft tissue soreness in your neck and

             12   back has been resolved?

             13      A.      Yes.

             14      Q.      Do you treat with your primary care physician
09:43:23     15   for -- with respect to those injuries, or did you have to

             16   see specialist or ...

             17      A.      Best I can recall, I saw my glaucoma doctor,

             18   because my eyes hurt after the accident.  My eyes hurt so

             19   bad, and so I saw my glaucoma doctor, Dr. Batiste, and he
09:43:54     20   said there had been no change to my eyes, that it was just

             21   muscle soreness from the impact.  And I saw my

             22   rheumatologist because of the headaches and neck pain, and

             23   he told me to continue with my anti-inflammatories and

             24   gave me Robaxin for breakthrough pain, a muscle relaxant.
09:44:22     25      Q.      Where does Dr. Batiste work?  What's the name of
```

```
 1  his clinic or practice; do you know?
 2      A.    I thought it was Arizona Glaucoma, but he has
 3  closed his practice and left Arizona.
 4      Q.    Where was his practice located?
 5      A.    Way the heck out on Pleasant Valley -- Lake
 6  Pleasant, Lake Pleasant Road.
 7      Q.    Far northwest corner of the Valley?
 8      A.    Way far.
 9      Q.    Okay.  And you treated with Dr. Batiste for
10  glaucoma?
11      A.    Yes a couple of years.
12      Q.    For a couple of years?
13            Was the last time you saw him, then, with
14  respect to the May 2016 car accident?
15      A.    No, I saw him regularly to monitor the glaucoma,
16  and I last saw him in June, and I need to find a new
17  glaucoma specialist.
18      Q.    That was my next question.  Have you found
19  someone new yet?
20      A.    I need to find someone new.
21      Q.    The car accident, what was the individual's name
22  who hit you, if you remember?  The defendant, I guess, in
23  your lawsuit.
24      A.    I'm sorry.  I have no idea.
25      Q.    Do you know if there was a police report
```

09:44:37 (line 5)
09:44:58 (line 10)
09:45:06 (line 15)
09:45:20 (line 20)
09:45:31 (line 25)

1    generated?

2         A.    I know there was a police report.

3         Q.    How fast was the driver going; do you remember?

4         A.    As I recall, it was 60.

09:45:40    5         Q.    Were you stopped?

6         A.    I was stopped.  It was a slow down there at the

7    51/10/202, and he was driving a big Toyota, and he hit a

8    Cadillac, and that rammed the Cadillac into my little

9    Lexus.

09:45:59    10        Q.    Okay.

11        A.    Totaled my little Lexus.

12        Q.    Any other lawsuits in which you've been a party?

13        A.    Yes.

14        Q.    What else?

09:46:31    15        A.    In the early '80s, I was the -- let me call it

16   class representative, even though it was not a class

17   action lawsuit.  The ACLU asked me to be the sample

18   plaintiff in a suit against DPS for the roadblocks --

19   "roadblocks," isn't that the term of art? -- that they

09:47:15    20   started doing where they set up roadblocks, and everybody

21   had to go through the roadblock regardless if you had

22   shown any signs of --

23        Q.    Impairment?  Yes.

24        A.    -- impairment.  And the ACLU wanted me to be

09:47:33    25   their sample plaintiff, because I had a home in

|          |    |                                                           |
|----------|----|-----------------------------------------------------------|
|          | 1  | Christopher Creek.  So I drove through -- and that was    |
|          | 2  | where one of the big roadblocks was, because they were    |
|          | 3  | trying to keep the people coming drunk from the lake.  So |
|          | 4  | I was, in fact, a plaintiff in that lawsuit.              |
| 09:47:49 | 5  | Q.    How did that resolve?                               |
|          | 6  | A.    I believe that DPS won.                             |
|          | 7  | Q.    That DPS won?                                       |
|          | 8  | A.    Yeah.                                               |
|          | 9  | Q.    Okay.  How about a defendant in a lawsuit?  Have    |
| 09:48:02 | 10 | you ever been a defendant?                                |
|          | 11 | A.    I had a couple of divorces.  Do those count?        |
|          | 12 | Q.    Okay.                                               |
|          | 13 | A.    I only had one divorce.                             |
|          | 14 | Q.    I was going to ask you.  How many times have you    |
| 09:48:22 | 15 | been divorced?                                            |
|          | 16 | A.    I had one divorce, and then was in the process      |
|          | 17 | of a second divorce when that husband was killed, so that |
|          | 18 | divorce was never finalized.                              |
|          | 19 | Q.    Are you still legally married to your current       |
| 09:48:35 | 20 | husband?                                                  |
|          | 21 | A.    Yes, Gregg.                                         |
|          | 22 | Q.    Gregg?                                              |
|          | 23 | A.    Yes.                                                |
|          | 24 | Q.    Okay.  I was just curious if you've been sued --    |
| 09:48:49 | 25 | let me ask you.  You know, sometimes lawyers get sued for |

```
 1   malpractice, whether it's legitimate or not.  Have you
 2   ever been sued for malpractice?
 3       A.    Never.  It's possible that when my daughter
 4   wrecked her Volvo and we owned the car, we may have been
 5   named in that lawsuit.
 6       Q.    That would have been quite a while ago?
 7       A.    Oh, yes, she was a high school senior.
 8       Q.    Okay.  Well, if you think of any others, just --
 9       A.    I can't think of any others.
10       Q.    Okay.
11       A.    I can't think of any others.
12       Q.    You went to both law school and have a degree in
13   nursing?
14       A.    Yes, and I have one in zoology.
15       Q.    You have one in zoology?  Where do you have your
16   zoology degree from?
17       A.    Oregon State University, Corvella.
18       Q.    When?
19       A.    '75, maybe '76.
20       Q.    Did you work as a zoologist or in some position
21   that was related to your zoology degree?
22       A.    No.  Well -- no.
23       Q.    Okay.  When did you get your nursing degree?
24       A.    I don't want you to think I didn't work between
25   the time I --
```

09:49:06  5
09:49:23  10
09:49:33  15
09:49:56  20
09:50:20  25

|   | 1 | Q. | I know.  It was a bad question I asked.  I saw |

1 Q.   I know.  It was a bad question I asked.  I saw
2 you were struggling with the answer.  I didn't to mean to
3 suggest you weren't working.  So let me -- what I'm
4 wondering is, did you -- what does someone do with a
09:50:34    5 zoology degree?
6 A.   I was pre-med.
7 Q.   Pre-med.  Okay.  Thank you.
8      But you didn't go to medical school?
9 A.   I did not.
09:50:44   10 Q.   But your thought process was to get a zoology
11 degree and go to medical school --
12 A.   Correct.
13 Q.   -- and see where that took you?
14      Okay.  But, instead, did you get your nursing
09:50:55   15 degree?
16 A.   I did.
17 Q.   And from where and what year?
18 A.   University of Arizona School of Nursing, 1979.
19 Q.   And so, then, am I correct that your thought
09:51:08   20 process, then, was to get your nursing degree and to go
21 into the field of nursing?
22 A.   By the time I got my nursing degree, I already
23 had my eyes set on law.
24 Q.   Did you ever work as a registered nurse?
09:51:22   25 A.   I did.

| | | |
|---|---|---|
| | 1 | Q.    Where and what did you do? |
| | 2 | A.    I worked at Maricopa County Hospital from 1982 |
| | 3 | through 1984 in the newborn nursery. |
| | 4 | Q.    Did you work anywhere else as a nurse? |
| 09:51:42 | 5 | A.    I don't think so. |
| | 6 | Q.    What year did you go to law school -- or never |
| | 7 | mind. |
| | 8 | What year did you graduate from law school? |
| | 9 | A.    1984. |
| 09:51:50 | 10 | Q.    So you worked as a nurse to get you through law |
| | 11 | school -- |
| | 12 | A.    Correct. |
| | 13 | Q.    -- is that fair? |
| | 14 | Where did you go to law school? |
| 09:51:57 | 15 | A.    Arizona State University. |
| | 16 | Q.    Do you have any other degrees besides the three |
| | 17 | we've spoken about that you've obtained, zoology, nursing, |
| | 18 | law? |
| | 19 | A.    I was once a notary public. |
| 09:52:21 | 20 | Q.    Okay.  After graduating from law school in 1984, |
| | 21 | did you begin working as a lawyer? |
| | 22 | A.    I was a clerk at the Court of Appeals for |
| | 23 | one year. |
| | 24 | Q.    Okay.  And, then, after that, you did you go |
| 09:52:41 | 25 | into private practice? |

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | A.     Yes.                                               |
|       | 2  | Q.     And you worked in Arizona for your entire         |
|       | 3  | career?                                                  |
|       | 4  | A.     Yes.                                               |
| 09:52:48 | 5 | Q.     Were you ever licensed in any other state?       |
|       | 6  | A.     No.                                                |
|       | 7  | Q.     What year did you start -- well, let's do it      |
|       | 8  | this way.  The name of your firm that you last worked at |
|       | 9  | is called what?                                          |
| 09:53:10 | 10 | A.     Fadell, Cheney & Burt.                           |
|       | 11 | MR. GERMAN:  Hey, Jeff, if you're going into a           |
|       | 12 | new area, why don't we take a five-minute break?         |
|       | 13 | MR. MATURA:  Fine with me.  You bet.                     |
|       | 14 | (Recess taken from 9:53 to 10:07 a.m.)                   |
| 10:07:09 | 15 | BY MR. MATURA:                                          |
|       | 16 | Q.     All right.  Ms. Cheney, we just took a little     |
|       | 17 | break there so that we can get resettled.  Are you okay to |
|       | 18 | continue?                                                |
|       | 19 | A.     I am, sir, thanks.                                 |
| 10:07:20 | 20 | Q.     We're going to move into helping me better       |
|       | 21 | understand where you worked as a lawyer.  And you formed a |
|       | 22 | law firm called Fadell, Cheney & Burt?                   |
|       | 23 | A.     Yes.                                               |
|       | 24 | Q.     When did you form that firm?                      |
| 10:07:37 | 25 | A.     The official date would be January 1, 1997.      |

1    Q.    Did you work anywhere else between 1997 and
2  today as an attorney, other than at that firm?  And,
3  again, my question is as an attorney.

4    A.    As an attorney, that narrows it down.  The only
10:08:00  5  other legal work as an attorney that I did that didn't
6  come through the firm was for my brother, John, who is a
7  real estate -- was a real estate developer, and I wrote
8  some CC&Rs for him, and I helped him file to get a water
9  district, but that was right before the big crash, and the
10:08:29  10  development failed, and his land was lost to the bank.  So
11  that was the end of that.

12    Q.    That was rough for a lot of people.

13    A.    I did some volunteer things, some pro bono kinds
14  of things, but I would have said those were still for the
10:08:44  15  firm.

16    Q.    The work for your brother, John, what year was
17  that?  You said before the crash.  What does that mean?

18    A.    I think it was.

19    Q.    I think the crash, perhaps, was 2008, roughly?
10:08:55  20    A.    I think it was.  I think it was '08.  He had the
21  worst time possible.

22    Q.    So just so I can understand, your brother was a
23  real estate developer here in Arizona?

24    A.    Yes.

10:09:09  25    Q.    And he called up you, his sister, the lawyer,

|   |   |
|---|---|
| 1 | and said, Can you help me with some CC&Rs, for a |
| 2 | development that he was developing? |
| 3 | A.    Yes. |
| 4 | Q.    And what was the -- if you remember, the name of |
| 5 | his development or where it was located? |
| 6 | A.    Oh, I remember where it was located.  It's a |
| 7 | piece of land that was owned by my two brothers and me, |
| 8 | Christopher Creek, Arizona, and I think the project was |
| 9 | called The Village. |
| 10 | Q.    How much land was it? |
| 11 | A.    Twenty-seven and a half acres. |
| 12 | Q.    And you did draft the CC&Rs for him? |
| 13 | A.    Yes. |
| 14 | Q.    Was that something that you had experience doing |
| 15 | or you taught -- you know, sometimes us lawyers, we just |
| 16 | figure it out.  Is that one of the situations where you |
| 17 | just figured it out, or had you done it before? |
| 18 | A.    Absolutely no experience. |
| 19 | Q.    Yeah, okay.  But you figured it out? |
| 20 | A.    I found a set for another development and ... |
| 21 | Q.    And copied as much as you could and made changes |
| 22 | as you saw fit, I assume, right? |
| 23 | A.    Exactly. |
| 24 | Q.    It's what we lawyers do all the time.  We steal |
| 25 | stuff. |

Timestamps: 10:09:28 (line 5), 10:09:48 (line 10), 10:10:04 (line 15), 10:10:15 (line 20), 10:10:28 (line 25)

|   |   |
|---|---|
| | 1 |
| | 2 |

1    A.    For family.

2    Q.    For family, we'll steal just about everything.

3  And I completely get it.  I get calls from family, and

4  they ask me to do crazy stuff, and you figure it out.  As

10:10:37   5  a lawyer, you figure it out.  Is that pretty much what

6  happened for you?

7          MR. GERMAN:   Form.

8          THE WITNESS:   Yes.

9  BY MR. MATURA:

10:10:42  10    Q.    Now, were the CC&Rs recorded; do you know?

11    A.    I don't remember.

12    Q.    Were they -- when they left your -- well, strike

13  that.  In your opinion as the lawyer working on it, did

14  you complete the drafting of the CC&Rs?

10:11:01  15    A.    I drafted the CC&Rs, and I then I gave them to

16  my non-lawyer brother to finalize as he saw fit.

17    Q.    This work would have occurred some point in time

18  during 2008?

19    A.    Best guess.

10:11:16  20    Q.    And so if I wanted to know, more specifically,

21  when you completed those CC&Rs for your brother, how --

22  how could I figure that out?  In other words, do you

23  have -- I guess I could ask your brother, but short of

24  that, do we -- do you have access to -- can you send them

10:11:47  25  by email?  Would they be in an email somewhere?  Are they

|    |    |
|----|----|
|  1 | in a file cabinet somewhere?  If I asked you to give me a |
|  2 | more specific date of when you did that work, how would |
|  3 | you go about doing that, if at all? |
|  4 |     A.   Because the property was lost to the bank, |
| 10:12:01   5 | because there was such total failure involved, I didn't |
|  6 | retain any records, and I'm certain John didn't, but I |
|  7 | will ask my brother, John, if he can remember, and I will |
|  8 | tell Steven and have him give me that information. |
|  9 |     Q.   I appreciate that.  I'll just follow up with |
| 10:12:25  10 | your attorney on that issue. |
| 11 |         Was the property foreclosed in 2008; do you |
| 12 | remember? |
| 13 |     A.   I couldn't give you the dates of the |
| 14 | foreclosure, but I think it was gone by '09. |
| 10:12:42  15 |     Q.   Do you remember, ma'am, the time frame between |
| 16 | you finishing the CC&Rs and the foreclosure?  Were they |
| 17 | close in time, distant in time?  Do you have any |
| 18 | recollection? |
| 19 |     A.   I don't think so. |
| 10:12:52  20 |     Q.   Okay. |
| 21 |     A.   Which is now making me think -- |
| 22 |     Q.   We can look it up. |
| 23 |     A.   Yeah, I don't remember. |
| 24 |     Q.   Okay.  You also -- sorry.  You said you also |
| 10:13:05  25 | helped your brother with -- did you create or obtain |

|  |  |  |
|---|---|---|
|  | 1 | approval to become a water district for this property? |
|  | 2 | A.   So the property, he wanted to have a well that |
|  | 3 | just serviced the 27 acres and the homes that were to be |
|  | 4 | on it, and there were some forms to file with the county, |
| 10:13:28 | 5 | and I do believe I helped him with those forms. |
|  | 6 | Q.   Would that have been 2008 as well? |
|  | 7 | A.   I think so.  Could have been '09. |
|  | 8 | Q.   Is it fair for me to say, ma'am, it would have |
|  | 9 | been before the property was lost in foreclosure?  Would |
| 10:13:49 | 10 | that make sense to you? |
|  | 11 | A.   It was certainly before the property was lost in |
|  | 12 | foreclosure. |
|  | 13 | Q.   Okay. |
|  | 14 | A.   But I think it's now later than I'm telling you. |
| 10:14:00 | 15 | I'm now thinking more like '09 -- |
|  | 16 | Q.   That the -- |
|  | 17 | A.   -- or even '10. |
|  | 18 | Q.   That what?  That the CC&Rs were drafted or that |
|  | 19 | the well -- |
| 10:14:08 | 20 | A.   Either of those. |
|  | 21 | Q.   Or both? |
|  | 22 | A.   I shouldn't guess. |
|  | 23 | Q.   That's okay.  I know you're doing your best to |
|  | 24 | give me your best recollection.  That's all I ask for, and |
| 10:14:18 | 25 | we will -- I will work separately with your attorney, |

```
 1  Steve, to perhaps be able to nail down that time frame a
 2  little bit better.  I understand you said it's somewhere
 3  2008, 2009, 2010 time frame.  Okay.  Is that right?
 4      A.   I think that's right.
 5      Q.   And --
 6      A.   It was -- excuse me.
 7      Q.   Go ahead.
 8      A.   It was such a tiny little project, that it just
 9  doesn't stick in my mind very well.
10      Q.   To help your brother with the wells, was that --
11  you mentioned it was submitting forms with Gila County?
12      A.   Yes.
13      Q.   Is that, like, an application to establish a
14  water district for those 27 acres, or do you recall more
15  specifically what the forms were?
16      A.   Honestly, I don't.
17      Q.   Okay.  Do you know what the result of those
18  forms was?  Was it approved by the county?  Declined?
19      A.   I recall that it was approved.  I do recall that
20  my brother attended and conducted the hearing, 'cause I
21  was too sick that day.
22      Q.   The hearing on the approval of the application
23  for the water district?
24      A.   Yes.
25      Q.   Did you attend any other hearings or meetings
```

10:14:37
10:14:46
10:14:59
10:15:15
10:15:27

        1   with the appropriate board at Gila County for that water
        2   district?
        3       A.   No.
        4       Q.   Participate in any phone calls?  Do you remember
10:15:39 5   any follow-up questions from Gila County?
        6       A.   Just some forms and that John had to handle the
        7   hearing.
        8       Q.   Did you participate in any meetings with any
        9   local or county representatives related to the CC&Rs?
10:15:55 10      A.   No, I just copied them from another development.
       11       Q.   Prospective homeowners, did you ever meet with
       12   them?
       13       A.   Eventually.  Oh, The Village at Christopher
       14   Creek project, which I think was its name, the bank took
10:16:23 15  the property and we never built anything.  The land was
       16   gone.  But there had been some little cabins on that
       17   property that we moved and sold, and I met those buyers,
       18   but those were little cabins.
       19       Q.   That you and your siblings owned?
10:16:45 20      A.   Yes.
       21       Q.   That you sold to third-party home buyers?
       22       A.   Yes.  And those are the prospective -- not
       23   prospective, but buyers that I had met.
       24       Q.   Was that -- how does that fit in -- are they
10:17:05 25  part of The Village at Christopher Creek or a separate

```
 1   transaction?

 2       A.    Totally separate.

 3       Q.    I'm with you.

 4       A.    And those were the CC&Rs I wrote.  They weren't

 5   for The Village.  They were for this little group of eight

 6   cabins.

 7       Q.    Located on the same property as where The

 8   Village --

 9       A.    No, nearby property.

10       Q.    Okay.  So as we talk this through, you're having

11   better recollection of what happened.  Let me just make

12   sure I understand.

13            The CC&Rs -- well, strike that.

14            You and your siblings owned two parcels of

15   property?

16       A.    Yes.

17       Q.    Okay.  One was the The Village at Christopher

18   Creek?

19       A.    Yes.

20       Q.    And how much -- was that the 27 acres?

21       A.    Yes.

22       Q.    You owned a separate parcel, I think you said,

23   across the street or next door?

24       A.    Yes.

25       Q.    How much acreage there?
```

10:17:13
10:17:22
10:17:35
10:17:40
10:17:47

|   |   |   |
|---|---|---|
| | 1 | A.   Maybe two. |
| | 2 | Q.   Maybe two.  Okay. |
| | 3 | And on those two acres, there were some cabins? |
| | 4 | A.   Yes. |
| 10:17:56 | 5 | Q.   And you and your siblings decided to sell those |
| | 6 | cabins? |
| | 7 | A.   Yes. |
| | 8 | Q.   And, as part of that process, you drafted CC&Rs? |
| | 9 | A.   Yes. |
| 10:18:08 | 10 | Q.   Is the time frame still the same?  Is it |
| | 11 | 2008/2009 time frame that we talked about earlier? |
| | 12 | A.   Yes. |
| | 13 | Q.   Okay. |
| | 14 | A.   '09 -- it's '09. |
| 10:18:19 | 15 | Q.   Okay.  You're sure it's '09? |
| | 16 | A.   I'm not sure. |
| | 17 | Q.   Okay. |
| | 18 | A.   But it's closer to '09 than it is to '08. |
| | 19 | Q.   Fair enough. |
| 10:18:31 | 20 | 2009, you and your siblings are going to sell |
| | 21 | these cabins to third-party purchasers and, as part of |
| | 22 | that process, you, the lawyer in the family, draft the |
| | 23 | CC&Rs? |
| | 24 | A.   Yes. |
| 10:18:44 | 25 | Q.   Okay.  And the homes did sell? |

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | A.    They did.                                              |
|          | 2  | Q.    And that property was not lost to foreclosure?        |
|          | 3  | A.    It was not.                                           |
|          | 4  | Q.    All right.  Now --                                    |
| 10:19:01 | 5  | A.    And it might have been five acres.                    |
|          | 6  | Q.    All right.  Any other legal work that you             |
|          | 7  | performed for your family after 2007 through today?         |
|          | 8  | A.    Other than the occasional phone call that we all      |
|          | 9  | take about divorce or bankruptcy, I can't think of any.     |
| 10:19:43 | 10 | Q.    What about family members asking to help with         |
|          | 11 | estate planning, wills, trusts?                             |
|          | 12 | A.    Oh, no, nothing.                                       |
|          | 13 | Q.    Okay.  They asked you, but you say no?  I'm            |
|          | 14 | kidding.                                                     |
| 10:19:56 | 15 |        Okay.  What about any legal work performed for       |
|          | 16 | what we'll call "friends" or "acquaintances" since 2007 to  |
|          | 17 | the present?                                                 |
|          | 18 | A.    The only other work I've done is not as a             |
|          | 19 | lawyer.  I have done some nurse consulting, and I don't     |
| 10:20:22 | 20 | know if you're interested in that, but your questions have  |
|          | 21 | all referred to as a lawyer.                                |
|          | 22 | Q.    Yes.  Let's keep talking about as a lawyer, and       |
|          | 23 | we'll come back to nurse consulting.                        |
|          | 24 | A.    Okay.                                                  |
| 10:20:33 | 25 | Q.    But, as a lawyer, since 2007, any work that           |

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
|          | 1  | you've -- legal work that you've performed for -- what I'm |
|          | 2  | getting at is someone other than your family, 'case we |
|          | 3  | talked about that, and other than a client of the firm, |
|          | 4  | whatever is in the middle, whether it's friends,       |
| 10:20:51 | 5  | acquaintances, neighbors, you know, however you might  |
|          | 6  | describe someone, anything you can think of?           |
|          | 7  | A.   I cannot think of anything else.                  |
|          | 8  | Q.   Okay.  Now, volunteer and pro bono work, you      |
|          | 9  | mentioned that earlier.                                |
| 10:21:20 | 10 | A.   Yes.                                              |
|          | 11 | Q.   Have you done what you consider to be volunteer   |
|          | 12 | or pro bono work since 2007?                           |
|          | 13 | A.   Yes.                                              |
|          | 14 | Q.   Tell me about that.                               |
| 10:21:26 | 15 | A.   The most hours I have spent on pro bono work are  |
|          | 16 | at the Arizona Legal Center.                           |
|          | 17 | Q.   What do you do there?                             |
|          | 18 | A.   The law students, staff, the Arizona Legal        |
|          | 19 | Center, and I'm one of the volunteer lawyers who comes in |
| 10:21:49 | 20 | and sits with them as they take in the phone calls or meet |
|          | 21 | with the walk-ins to support them in the triage work they |
|          | 22 | do there.                                              |
|          | 23 | Q.   What type of phone calls or walk-ins do they      |
|          | 24 | typically get?  What are the issues, or does it vary?  |
| 10:22:10 | 25 | A.   Mostly, the law about which I know nothing.       |

|  | 1 | Q. So the issues they deal with are quite varied? |
|  | 2 | A. Yes. It's immigration, it's family, it's |
|  | 3 | criminal, it's veteran's law, it's landlord/tenant, all |
|  | 4 | sorts of things. Fortunately, you don't have to know much |
| 10:22:31 | 5 | law to do this volunteering. I'm there, primarily, to |
|  | 6 | help them with their interviewing skills. |
|  | 7 | Q. So when did you start volunteering at the |
|  | 8 | Arizona Legal Center? |
|  | 9 | A. About two years ago. |
| 10:22:43 | 10 | MR. GERMAN: Jeff, this is an incubator at ASU |
|  | 11 | Law School that they started. Right? |
|  | 12 | THE WITNESS: Yeah, shortly after they opened, I |
|  | 13 | started. I was one of their first volunteers. |
|  | 14 | BY MR. MATURA: |
| 10:22:54 | 15 | Q. So about 2015 is when you started; does that |
|  | 16 | sound right? |
|  | 17 | A. It was January, so it might have been '16. I |
|  | 18 | think they opened in September 2015, and I started in |
|  | 19 | January of 2016. |
| 10:23:05 | 20 | MR. GERMAN: Yeah. |
|  | 21 | BY MR. MATURA: |
|  | 22 | Q. Okay. I'm not familiar with the program, but it |
|  | 23 | sounds like a good -- |
|  | 24 | A. It has two co-directors, and those co-directors |
| 10:23:15 | 25 | are there to provide the actual legal opinions and advice |

```
          1   for the students, because they have very broad knowledge,
          2   and Victoria Ames is one director and Michelle Feeney is
          3   the other.
          4       Q.    How often do you volunteer?
10:23:34  5       A.    About twice a month.
          6       Q.    For a full day or a few hours?
          7       A.    Two hours at a time.
          8       Q.    Okay.  So I just want to make sure I understand
          9   what you do when you volunteer.  You walk into the center,
10:23:47 10   and is there a row of law students with phones in front of
         11   them?
         12       A.    Exactly.
         13       Q.    And a place to meet with someone privately, if
         14   necessary, I assume?
10:23:57 15       A.    We don't let them do it privately, because they
         16   are not lawyers.  They must leave the door open.
         17       Q.    Is there some office or conference room that
         18   someone can use?
         19       A.    Yes.
10:24:07 20       Q.    And you walk in, and you're there for two hours,
         21   and what are you doing?  What --
         22       A.    I'm sitting with students who are answering the
         23   phone and listening to them talk on the phone, and they
         24   then will put the caller on hold, and we will talk about
10:24:25 25   issue spotting and how to approach those issues in the
```

```
 1  interview, how to get the information that's needed in
 2  order to then send the caller off in the right direction.
 3  They provide no legal representation there.  They don't
 4  take on clients.
 5      Q.   They're not lawyers, right?
 6      A.   They're not lawyers.  This is meant entirely to
 7  be, like, a triage for callers who don't have the
 8  resources or the investment in the professional world to
 9  know where to go.
10      Q.   So where are the students sending these people?
11  Where do they triage them to?
12      A.   There are a number of clinics, then, that the
13  Arizona Legal Center conducts.  They do family law clinics
14  on Friday where they bring in a real family law lawyer,
15  and then the family law callers all come in and, as a
16  group, they get real advice from real family law lawyers.
17  We have a mental health clinic.  We have a veterans'
18  clinic.  We have an immigration clinic that's very popular
19  that a lot of people sit in on that one.  I don't staff
20  those, obviously.
21      Q.   Right.
22           Are you listening in on the call?
23      A.   Sometimes.  Sometimes I just listen to my
24  student's side, but if we can, we try to put them on the
25  speaker so I can hear the other side.
```

10:24:43
10:24:59
10:25:16
10:25:37
10:25:48

1   Q.   And, then, I think you said the student will put

2   the person on hold, and that's when the two of you, you

3   and the student, will talk about the issues.  If it's an

4   immigration issue, an landlord/tenant issue, do you tell

10:26:00   5   the student, Hey, you want to find out information on this

6   topic or make sure you ask them this question or, you

7   know, is that -- is that the interaction that you're

8   having?

9   A.   My style is a little different.  My style is to

10:26:12   10   ask them what their plan is for the rest of the phone

11   call, and to -- unless I have a couple of good hints for

12   them, I just let them handle it.

13   Q.   Okay.

14   A.   But they are being supervised.  There have been

10:26:28   15   a couple of occasions where I have had to stop the whole

16   process and say, We are in over our heads.  We are going

17   to go to the director with this problem.  That's what I'm,

18   primarily, there for, is to spot when we're in bad -- some

19   kind of situation.  For instance, immediate danger.

10:26:52   20   Q.   Okay.

21   A.   Potential suicide.  There was one where a union

22   pension plan was involved, and my head started to spin and

23   I said, Let's not even collect any more information.

24   Let's take this in to the director, and let the director

10:27:17   25   manage it, because it sounded like a securities fraud to

1  me.

2      Q.   Okay.  So you identify that as -- well, you

3  know, a complex issue that's beyond the scope of a student

4  phone call?

10:27:29   5      A.   It's beyond my scope --

6      Q.   Yeah, okay.

7      A.   -- let alone the student.

8      Q.   So in cases of danger to the person or someone

9  else, potential criminal conduct, or just complexity of

10:27:45  10  issue is something that will flag it in your mind to take

11  it to the director; is that fair?

12      A.   Yes.

13      Q.   Okay.  Any other volunteer or pro bono work that

14  you've undertaken since 2007?

10:28:09  15      A.   Nothing that comes to my mind right now.

16  Whatever it was, it would have been very small, 'cause I

17  can't think of anything.

18      Q.   Am I correct that -- well, actually strike that.

19          We'll come back to that, because I don't want to

10:28:24  20  go too much farther without talking about the nurse

21  consulting work that you do.  So let's discuss that

22  briefly.

23          Tell me what you do for nurse consulting and how

24  long you've done it.

10:28:38  25      A.   I have done a little nurse consulting for the

```
              1    way huge law firm of Gregg H. Temple when he has had cases
              2    that require some knowledge of medicine and -- and he pays
              3    me for it.
              4         Q.    That was going to be my next question.
   10:28:56   5               What -- tell me the frequency, you know.
              6         A.    Infrequent.
              7         Q.    Do you know how many cases, for example, he's
              8    brought you in on using you as a nurse consultant?  Is it
              9    one or two?  Is it 10, or you can't remember?
   10:29:11   10        A.    I don't think Gregg's ever had 10 cases, so it
              11   is minimal.  There was one case many years ago that
              12   involved mental health issues, psychiatric issues, and I
              13   remember I did a fair amount of educating him on
              14   psychiatric issues.
   10:29:37   15        Q.    Do you -- as part of the nurse consulting, do
              16   you review medical records?
              17        A.    No.  Oh, I might have looked at a couple, but
              18   no.
              19        Q.    So what -- what -- then what do you do as a
   10:29:50   20   nurse consultant?  Are you just educating Gregg?
              21        A.    Yes.
              22        Q.    Because some medical issue has arisen in one of
              23   his cases?
              24        A.    Yes.
   10:29:59   25        Q.    Do you review any of the documents of the case
```

 1  that you recall, whether it be records, pleadings,
 2  deposition transcripts?
 3     A.    I might have briefly but, mostly, I hear his
 4  understanding of where he is, and then I straighten him
10:30:17  5  out.
 6     Q.    And the consulting or advice or comments that
 7  you're providing are intended to do what?  Is it to
 8  clarify a medical question or what?  I'm not sure I fully
 9  understand what -- what you provide, what service you're
10:30:37  10  providing.
11     A.    Gregg's practice involves disability carriers
12  and, frequently, his clients have medical issues that he
13  does not understand.  He has no medical training or
14  background at all.  He was a music major in undergraduate.
10:30:58  15  And so to make him a better representative for his client,
16  he wants to understand what they have, what causes it,
17  what the prognosis is, what the treatment is, and I can
18  supply that for him, usually, off the top of my head.
19     Q.    Okay.  When's the last time you provided this
10:31:22  20  service to Gregg, to the best of your recollection?
21     A.    Years.
22     Q.    And can you give me any fair estimate of how
23  many times he's asked for this assistance from you since
24  2007?  So over the last 10, 11 years.
10:31:39  25     A.    You mean for more than one hour at a time?

```
            1     Q.    Yes.   I'm just trying to get a sense of how
            2   frequently does this happen?  Is it once a year?  Once a
            3   month?  Once every two years?
            4     A.    Once a year would be at the top of the usage.
10:31:59    5   Other than that big case, which was many years ago.
            6     Q.    And for that big case, your involvement was more
            7   frequent; is that what you're saying?
            8     A.    There were bigger issues.  There was more to
            9   educate him on.
10:32:11   10     Q.    And that bigger case, as you've described it, do
           11   you remember, was it still just you speaking to Gregg and
           12   educating him, or did you get to the documents in that
           13   case?
           14     A.    I did not do documents, that I can recall.
10:32:25   15     Q.    Did you do medical chronologies ever?
           16     A.    No, nothing like real nursing consulting where
           17   they do -- they do lots of medical research and do
           18   chronologies, put together summaries, I never prepared
           19   anything like that.
10:32:39   20     Q.    Do you consult with anyone else besides Gregg?
           21     A.    No.
           22     Q.    When he pays you, does he just write a check to
           23   your name, or do you have a separate entity that you use?
           24     A.    I don't recall.
10:32:58   25     Q.    Okay.  Do you have any entities that you've
```

```
          1   created that you do business under in any capacity?
          2       A.    Other than the family real estate, no.
          3       Q.    When you and your siblings were holding that
          4   property, you had it in, what, an L.L.C. or some --
10:33:16  5       A.    Something.
          6       Q.    -- entity?
          7       A.    Oh, and Fadel, Cheney & Burt.
          8       Q.    Oh, sure.
          9       A.    But he said other anything ...
10:33:24 10       Q.    Certainly, your law firm.
         11             But when you do this nurse consulting work for
         12   your -- for Gregg, he's not paying Fadell, Cheney & Burt?
         13       A.    No, he pays me individually.
         14       Q.    Okay.
10:33:38 15       A.    And my partner, Gary, is aware of that.  That's
         16   not something that I kept from him.
         17       Q.    Okay.  Fadell, Cheney & Burt, it's fair for me
         18   to characterize that as a medical malpractice defense
         19   firm?
10:34:01 20       A.    Yes.
         21       Q.    Is that the work that the firm did when it
         22   formed in 1997?
         23       A.    Yes.
         24       Q.    Did -- well, let's talk about you.
10:34:11 25             In 1997, when you started Fadell, Cheney & Burt,
```

|   |   |
|---|---|
| 1 | did you only do medical malpractice defense work, or did |
| 2 | you have clients outside of that field? |
| 3 | A.     I also represented nurses in disciplinary |
| 4 | actions in front of the board.  I also represented |
| 10:34:34  5 | physicians in disciplinary actions in front of the board. |
| 6 | I also did some representation of the medical executive |
| 7 | committees at hospitals on peer review matters, and I |
| 8 | don't know if you would categorize that as outside the |
| 9 | field of medical malpractice. |
| 10:35:03  10 | Q.     Okay.  So you're a medical malpractice defense |
| 11 | attorney who litigates lawsuits brought against licensed |
| 12 | medical providers? |
| 13 | A.     Yes. |
| 14 | Q.     And for that part of your job, you'd be engaged |
| 10:35:23  15 | in litigation work, right? |
| 16 | A.     Yes. |
| 17 | Q.     And everything that is involved with litigation |
| 18 | work? |
| 19 | A.     Full scope of litigation work. |
| 10:35:29  20 | Q.     From complaint through appeal? |
| 21 | A.     Correct. |
| 22 | Q.     And we'll talk about that in a little bit more |
| 23 | detail later, but what I understand what you're telling me |
| 24 | is that, in addition to litigation work, you also handle |
| 10:35:42  25 | disciplinary actions to the extent that's different than |

```
 1   litigation, but for the sake of our conversation, you also
 2   handle representation of nurses and physicians before
 3   disciplinary boards?
 4       A.   Correct.  Excuse me.  Most commonly because they
 5   were also defendants in the litigation.
 6       Q.   They, typically, go hand in hand, right?
 7       A.   Correct.
 8       Q.   If a plaintiff is willing to hire a lawyer and
 9   file a lawsuit, it perhaps goes hand in hand they are
10   going to file a complaint with the licensing board as
11   well; is that what you're saying?
12       A.   That's right.
13       Q.   And, then, you mentioned that you represent
14   medical executive committees on peer-review matters?
15       A.   Yes.
16       Q.   Describe that a little bit more for me.
17       A.   In the peer-review process that hospitals are
18   obligated to do, occasionally -- they have a set of
19   procedural rules that allow the doctor to put on her side
20   of the story, and then allow the disciplinary committee,
21   the medical executive committee to put on their side of
22   the story, and that can go to a hearing.
23            For some period of time, I was the attorney
24   representing med exec in those hearings for a number of
25   hospitals.  So it's still a form of litigation.  It's
```

10:35:57 (line 5)
10:36:08 (line 10)
10:36:20 (line 15)
10:36:42 (line 20)
10:37:02 (line 25)

|          |    |
|----------|----|
|          | 1  | preparing witnesses, it's doing examinations, and |
|          | 2  | cross-examinations, and making argument to the deciding |
|          | 3  | body, but it's not in the court system.  It's in the |
|          | 4  | private regulatory system of the hospital. |
| 10:37:22 | 5  | Q.    Would the deciding body in those regulatory |

1   preparing witnesses, it's doing examinations, and

2   cross-examinations, and making argument to the deciding

3   body, but it's not in the court system.  It's in the

4   private regulatory system of the hospital.

10:37:22   5   Q.    Would the deciding body in those regulatory

6   systems be a mix of administrators and physicians and

7   public, or is it not as standard as that?  Do you know

8   what I'm saying?

9   A.    You know, I don't remember there being public

10:37:42   10   members like there are on the disciplinary boards for the

11   State.  I only remember there being physicians, maybe an

12   administrator, but they had to look for people that were

13   neutral.

14   Q.    All right.  So, in addition to the work that

10:38:06   15   you've described here, did you also represent clients in

16   what we'll call general, you know, litigation disputes

17   unrelated to the medical field?

18   A.    Very few.  I did -- the one that springs to mind

19   is, I did a case for some friends related to payment for

10:38:37   20   participating in a sustainable environment alternative

21   energy symposium they put on, and they didn't get paid.

22   It was a small matter.

23   Q.    Do you have clients -- repeat clients who would

24   send you business that are not related to the medical

10:39:01   25   field?

1    A.    No.   Elder abuse, do you want to talk about
2  that?
3    Q.    Please, 'cause you mentioned that a few times,
4  and I left it off my list.   Describe for me your elder
10:39:10   5  abuse work.
6    A.    Elder abuse work, primarily, for nursing homes
7  but, occasionally, for group homes or subacute facilities
8  is separate from medical malpractice because it's
9  statutory, and I developed a fairly large practice in that
10:39:31   10  area.   So, technically, that is not medical malpractice
11  anymore but, obviously, the work is the same.
12    Q.    You're litigating claims against nursing homes
13  and other licensed professionals in the elder abuse
14  context?
10:39:47   15    A.    Correct.   And it's still highly medical, and it
16  requires a very high degree of medical knowledge to do.
17    Q.    So your -- your client base, if you will, for
18  the medical malpractice work, was it insurance companies
19  who insure licensed professionals or direct representation
10:40:17   20  of licensed professionals or entities or both?   Can you
21  describe that for me?
22    A.    Both.
23    Q.    Okay.   Break that down, if you can, a little bit
24  for me.
10:40:25   25    A.    Some of the hospitals that I worked for over the

|          |    |                                                            |
|----------|----|------------------------------------------------------------|
|          | 1  | years did have insurance policies.  I think Farmers        |
|          | 2  | Insurance, Truck Insurance Exchange was a big client of    |
|          | 3  | mine when I first opened my firm and also when I was back  |
|          | 4  | at the Broening firm.  They insured a lot of rural         |
| 10:40:45 | 5  | hospitals.                                                 |

Q.   Do you consider Farmers Insurance to be one of your clients?

A.   Yes, as well though hospitals.  It was, actually, a subdivision of Farmers called Truck Insurance Exchange.

I represented, over the years, hospitals who were self-insured for a primary layer of some millions and then had an excess insurer.  I represented a hospital system that had a captive insurance, so they were kind of insured, but they were really self-insured, kind of a hybrid.

Q.   Okay.

A.   And, then, some who had nothing, but a very -- some whose primary layer was $120 million.

Q.   Is the same true for direct representation of the medical professionals themselves?  In other words, would you represent a doctor directly as opposed to as a -- you know, a referral or a relationship through an insurance company?

A.   Both.  I did have a couple of doctors who had no

```
            1   years did have insurance policies.  I think Farmers
            2   Insurance, Truck Insurance Exchange was a big client of
            3   mine when I first opened my firm and also when I was back
            4   at the Broening firm.  They insured a lot of rural
10:40:45    5   hospitals.
            6       Q.   Do you consider Farmers Insurance to be one of
            7   your clients?
            8       A.   Yes, as well though hospitals.  It was,
            9   actually, a subdivision of Farmers called Truck Insurance
10:40:55   10   Exchange.
           11           I represented, over the years, hospitals who
           12   were self-insured for a primary layer of some millions and
           13   then had an excess insurer.  I represented a hospital
           14   system that had a captive insurance, so they were kind of
10:41:20   15   insured, but they were really self-insured, kind of a
           16   hybrid.
           17       Q.   Okay.
           18       A.   And, then, some who had nothing, but a very --
           19   some whose primary layer was $120 million.
10:41:34   20       Q.   Is the same true for direct representation of
           21   the medical professionals themselves?  In other words,
           22   would you represent a doctor directly as opposed to as
           23   a -- you know, a referral or a relationship through an
           24   insurance company?
10:41:52   25       A.   Both.  I did have a couple of doctors who had no
```

1    insurance, and so I represented them directly without
2    benefit of insurance.
3        Q.    So can you -- can you just give me a list of
4    what you would consider to be your primary clients when
10:42:11    5    you were at Fadell, Cheney & Burt when you guys started
6    and you moved through the years?  I'm not expecting you to
7    give me every client you ever represented, but just your
8    gut about who your primary clients were.
9        A.    When we first opened the firm, my major clients
10:42:29   10    were Truck Insurance Exchange and a group of hospitals
11    whose ownership was in flux that included St. Luke's
12    Hospital, Mesa General Hospital, Community Hospital, Tempe
13    St. Luke's Hospital, and I don't remember exactly who the
14    owners were.  That was originally the St. Luke's System,
10:42:59   15    then I believe they were owned by IA System, and then I
16    believe they were owned by Tenet [ck], and I'm not sure
17    who owns them now.
18            Later, in the time of Fadell, Cheney & Burt, I
19    represented what was then known as Catholic Healthcare
10:43:17   20    West and their system of hospitals.  I also worked for
21    what I call the Banner hospitals, but before that were the
22    Good Samaritan hospitals.  And then I had my nursing home
23    companies, large nursing home companies.
24        Q.    Would those come through insurance companies or
10:43:45   25    direct representation or both?

```
          1        A.    Both, but Life Care Centers of America was a
          2   self-insured.  Mariner -- boy, if Mariner did have
          3   insurance, the insurance company was not managing the
          4   litigation the way they usually do.  Mariner managed their
10:44:08  5   own litigation, so I'm not sure who actually -- I think
          6   Mariner was a self-insured.
          7        Q.    Is Mariner the name of a --
          8        A.    A nursing home company.
          9        Q.    -- a nursing home company.  Okay.  With more
10:44:19  10  than one location?
          11       A.    Lots --
          12       Q.    Lots?
          13       A.    -- of locations.
          14       Q.    Did this stable of clients continue up through
10:44:30  15  2007 when you were working at Fadell, Cheney & Burt?
          16       A.    I tried that case in '04 against Pat McGroder
          17  for three months.
          18             MR. GERMAN:  '05.
          19             THE WITNESS:  '05, I'm sorry.  Thank you.  Pat
10:44:55  20  McGroder was '04.  Pat McGroder was '04.
          21             MR. MATURA:  Tell your lawyer to shut up over
          22  there.  I'm kidding.
          23             MR. GERMAN:  I'm just seeing if you're paying
          24  attention.
10:45:09  25             THE WITNESS:  Being mean to an old lady like me.
```

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|          | 1  | That Pat McGroder trial was in '04.  It was |
|          | 2  | September through to Thanksgiving of '04.  I knew after |
|          | 3  | that trial that I was not performing at the level I needed |
|          | 4  | to perform to keep my practice going at the level I had |
| 10:45:39 | 5  | it. |
|          | 6  | In '05, I tried a case for Catholic Healthcare |
|          | 7  | West, got a defense verdict in December, and told the |
|          | 8  | client then, I'm done.  I can't do this anymore.  That |
|          | 9  | was -- compared to the McGroder trial a year earlier, the |
| 10:46:03 | 10 | '05 trial was an itty-bitty trial.  It was tried as a |
|          | 11 | short trial, and I was unable to do it on my own.  I had |
|          | 12 | to take an associate, which was difficult for me to |
|          | 13 | recognize that I just -- I couldn't track it. |
|          | 14 | So by '06, I was winding down, but I still had a |
| 10:46:30 | 15 | pretty good book of business by '06, and that's when I |
|          | 16 | started having associates do a lot of my work for me. |
|          | 17 | BY MR. MATURA: |
|          | 18 | Q.    Okay. |
|          | 19 | A.    And cutting down, declining cases, I started to |
| 10:46:47 | 20 | decline cases.  So by '07 -- by '07, I was pretty sick, |
|          | 21 | and so by '07 I think I had decimated my book of business |
|          | 22 | by then. |
|          | 23 | Q.    Let's talk about some of this in a little more |
|          | 24 | detail. |
| 10:47:04 | 25 | A.    Okay.  Sure.  I'm sorry to take so long with |

```
            1   that answer, but I'm trying to track.
            2       Q.    No, no apologies needed.  Anytime you want to
            3   hit your lawyer again, feel free.
            4             MR. GERMAN:  I object.
10:47:18    5   BY MR. MATURA:
            6       Q.    I'm kidding.  I'm kidding.
            7             Okay.  Ma'am, let me understand a little bit
            8   more, and let's approach it first this way.  Fadell,
            9   Cheney & Burt, we have Fadell, we have you --
10:47:32   10       A.    Yes.
           11       Q.    -- and we have Burt.
           12       A.    Who retired in '04.
           13       Q.    Were there other lawyers who are part of that
           14   firm as partners?
10:47:42   15       A.    Junior partners.
           16       Q.    And did lawyers -- some lawyers come and go over
           17   time?
           18       A.    Sure.
           19       Q.    Right.  So I want to pick a time frame for you
10:47:53   20   that we can talk about the structure of the firm.  So what
           21   I'd like to do is focus on the 2004, '05, '06, '07 time
           22   frame.  Okay?  So your big trial in 2004, your short trial
           23   in 2005, that time frame, okay?
           24       A.    Uh-huh.
10:48:13   25       Q.    How many associates were there at Fadell, Cheney
```

```
 1  & Burt during that two- or three-year period, if you
 2  remember?
 3      A.    In '04 we were big --
 4      Q.    What does "big" mean?
 5      A.    -- for us.  I think we had a payroll of over 50
 6  people.  I think we had one, two -- I think we had 10
 7  lawyers.  We had half a dozen full-time nurse consultants
 8  and some part-time nurse consultants, paralegals.
 9      Q.    All right.
10      A.    Non-nurse paralegals.
11      Q.    Was 2004 with 50 on the payroll, as you
12  described, was that the peak or the biggest that the firm
13  grew?
14      A.    I think that's right.  That's my best estimate,
15  of course.
16      Q.    Fair enough.
17            And some of those 10 lawyers were associates?
18      A.    Yes, all were either associates or junior
19  partners.
20      Q.    What did a "junior partner" mean in your firm?
21      A.    They weren't what we call an equity partner.
22      Q.    Okay.  And there were three named partners?
23      A.    Correct.
24      Q.    Now, did you have associates who were solely
25  assigned to you for your cases?
```

```
          1      A.    That's not how we ever operated.  It may have,

          2  in fact, turned out that way, but it was not how we

          3  operated.

          4      Q.    So anyone could help anyone is how you operated?

10:49:49  5      A.    Yes.

          6      Q.    When you tried your three-month long trial in

          7  2004 against Pat McGroder, did you have any associates

          8  help you --

          9      A.    I did.

10:50:03  10     Q.    -- with the trial?

          11     A.    I had a very senior associate help me, Melody

          12  Emmert.

          13     Q.    In 2005, when you had the short trial, did you

          14  have an associate help you with that trial?

10:50:17  15     A.    Yes.

          16     Q.    Do you remember who that was?

          17     A.    Yes, Blaine Gadow.

          18     Q.    Short trial was over how many days?

          19     A.    Five.

10:50:24  20     Q.    Done in a summary fashion before a jury?

          21     A.    Yes.

          22           Are you going to ask me if I won?

          23     Q.    If you won?  You won the 2005 trial, right?  Do

          24  you want to tell me about the result of the Pat McGroder

10:50:45  25  trial?
```

|  |  |  |
|---|---|---|
|  | 1 | A.    Settled with the jury out. |
|  | 2 | Q.    Okay.  All right.  That can be both good and |
|  | 3 | incredibly frustrating at the same time, right?  Gone that |
|  | 4 | far, you want to know what the finish line is? |
| 10:50:59 | 5 | A.    Oh, no, I did not want to know what the finish |
|  | 6 | line was.  I wanted the case to settled. |
|  | 7 | Q.    I had a case recently at trial that settled |
|  | 8 | while the jury was out for a dollar -- you know, a dollar |
|  | 9 | value, and the judge still wanted to hear what the jury |
| 10:51:15 | 10 | said and read it in open court, even though it was not |
|  | 11 | binding because we had settled the case.  So we can share |
|  | 12 | war stories later, I guess.  So I had that happen once, |
|  | 13 | which was crazy. |
|  | 14 | Anyway, your short trial, you represented |
| 10:51:36 | 15 | Catholic Healthcare West? |
|  | 16 | A.    Yes. |
|  | 17 | Q.    In Maricopa County? |
|  | 18 | A.    Yes. |
|  | 19 | Q.    Superior court? |
| 10:51:42 | 20 | A.    Yes. |
|  | 21 | Q.    Your judge, do you remember? |
|  | 22 | A.    I'm sorry.  I do not. |
|  | 23 | Q.    That's all right.  If I were to look on the case |
|  | 24 | docket, would your client name "Catholic Healthcare West" |
| 10:52:03 | 25 | or was that just how you know it, but it had a different |

```
 1    actual client name?

 2         A.    I believe it was St. Joseph's Hospital.

 3         Q.    Do you remember what the plaintiff's name was?

 4         A.    Yes.

 5         Q.    What was it?

 6         A.    Amy Pischke, like the deli in Scottsdale.

 7         Q.    What was the issue in the case?

 8         A.    She claimed that a PACU nurse had given her an

 9    injection improperly and caused her permanent nerve

10    damage.

11         Q.    During the short trial, you presented witnesses

12    and arguments just like any other trial, but in a summary

13    fashion?

14         A.    Yes.

15         Q.    And when I say "summary fashion," let's make

16    sure we're both using the same phraseology for a short

17    trial.   It's my understanding that, for a short trial, the

18    parties will agree and the judge will mandate, you know,

19    streamlining the process of admitting evidence and dealing

20    with objections and, you know, that can take so much time

21    during a traditional trial.   When you say "short trial" to

22    me, though, what -- what -- what process, what does that

23    mean to you?   What does that mean in the case of your 2005

24    trial?

25         A.    It was short trial under the Rules of Civil
```

10:52:15 — line 5
10:52:38 — line 10
10:52:54 — line 15
10:53:13 — line 20
10:53:27 — line 25

|          | 1  | Procedure in Maricopa County, which is exactly as you say, |
|          | 2  | summarily submitted evidence, very limited witnesses.  As |
|          | 3  | I recall, we gave notebooks to the jurors so that they |
|          | 4  | could simply read it themselves, so we didn't have to |
| 10:53:52 | 5  | parade a lot of witnesses, and I didn't have to do a lot |
|          | 6  | of examinations and cross-examinations.  I can't |
|          | 7  | remember -- I don't think I did the opening.  I think |
|          | 8  | Blaine did the opening and I did the closing. |
|          | 9  | Q.    Did you do the jury selection, the voir dire? |
| 10:54:08 | 10 | A.    I'm sure Blaine and I did that together.  Plus |
|          | 11 | our -- we had both a nurse and a paralegal assist us. |
|          | 12 | Q.    Do you remember how many live witnesses you |
|          | 13 | presented? |
|          | 14 | A.    I don't.  It might have only been one, our |
| 10:54:31 | 15 | nurse. |
|          | 16 | Q.    The nurse who was -- who the issue was |
|          | 17 | involving? |
|          | 18 | A.    I believe that's true.  We only did one witness. |
|          | 19 | Q.    Did you handle her direct examination? |
| 10:54:43 | 20 | A.    I don't remember. |
|          | 21 | Q.    I assume the plaintiff testified live? |
|          | 22 | A.    Yes. |
|          | 23 | Q.    Did you handle her cross-examination? |
|          | 24 | A.    I think Blaine did, because he was a former |
| 10:55:01 | 25 | Maricopa County prosecutor.  I think Blaine did it. |

|   |   |
|---|---|
| 1 | Q.    Did you handle the closing? |
| 2 | A.    I think I did the closing.  I'm sorry.  These |
| 3 | are guesses. |
| 4 | Q.    That's okay.  The best of your recollection.  If |
| 10:55:21  5 | you don't remember, that's also an answer, that you don't |
| 6 | remember. |
| 7 | A.    Okay. |
| 8 | Q.    Do you need another break? |
| 9 | A.    No, I'm okay.  Thanks. |
| 10:55:29  10 | Q.    Are you doing all right? |
| 11 | A.    I'm doing a little better, so that's good. |
| 12 | Q.    All right.  Now, let me take a look at my notes |
| 13 | here, streamline from the screen. |
| 14 | You had an active practice in, let's say, 2004 |
| 10:56:32  15 | when the firm had 10 lawyers.  Did you consider yourself |
| 16 | to have an active practice at that point in time? |
| 17 | A.    It was a very good practice. |
| 18 | Q.    Okay.  Do you know how many lawyers -- well, |
| 19 | sometimes lawyers will speak in -- Oh, I can keep one |
| 10:56:48  20 | lawyer busy.  I can keep two lawyers busy.  My practice is |
| 21 | so busy, I need five people to help me.  And I don't know |
| 22 | if that's how you sometimes file things, too, but my |
| 23 | question is, when you say you had an active, busy |
| 24 | practice, how many lawyers could your practice support? |
| 10:57:03  25 | MR. GERMAN:   Form. |

```
 1              THE WITNESS:  My personal practice as opposed to
 2    the whole firm?
 3    BY MR. MATURA:
 4        Q.   Correct, your practice, your relationship with
 5    your clients, your practice.
 6        A.   Again, we tried to make sure that everybody
 7    worked with each of the senior partners so that everything
 8    was exposed to the three different styles.  But I had at
 9    least -- if I had to bunch it all together, I would say
10    that I was keeping three lawyers full-time busy.
11        Q.   Do you remember what year you had the highest
12    receivables from your practice in terms of revenue?
13        A.   No.
14        Q.   And I know sometimes, you know, revenue can take
15    a while to come in the door.  Do you have any idea what
16    year the number of billable hours would have been the
17    highest?
18        A.   Meaning not only my hours, but the hours
19    generated by others?
20        Q.   On your work?
21        A.   On my work.
22        Q.   Yeah, on your files, if you will, your clients.
23        A.   I paid so little attention to the business side
24    of our practice that, no, I -- I really can't say.
25        Q.   The defense work that you did -- and, by the
```

10:57:09
10:57:34
10:57:53
10:58:06
10:58:23

1    way, did you -- have you ever worked as a plaintiff's

2    attorney?

3        A.    Jim Broening made me work on one plaintiff's

4    medical malpractice case that went to trial, not with me.

10:58:49   5        Q.    Is that the only one?

6        A.    I think that's the only one, because my partner

7    Gary always wanted to bring in a few plaintiffs' cases and

8    I fought him tooth and nail on it, because I thought it

9    would send a terrible message to our defense clients.

10:59:06   10        Q.    So, as part of your defense work, most cases

11    resolve before trial; is that your experience?

12        A.    Yes, especially in my particular practice.

13        Q.    Either through settlement or court ruling,

14    right, that's how cases end?

10:59:27   15        A.    Correct.

16        Q.    And there's some statistics out there that I've

17    read that say that 98 percent of cases resolve short of a

18    trial.  I don't know if that's a true statistic or not.

19    But, in your experience, based upon your practice, can you

10:59:41   20    give me a sense of what -- how many of your cases actually

21    resulted in a trial as opposed to being resolved in some

22    other way?

23        A.    Medical malpractice cases, generally, in

24    Maricopa County, get tried at a rate of about one in 10.

10:59:57   25        Q.    Okay.

```
              1     A.    Because my practice was so heavily hospital
              2   based, the upside potential loss for my clients was much
              3   greater than a physician with maybe a 1 million or
              4   $2 million risk exposure from MICA, my clients didn't
  11:00:25    5   really have any top limit on what side of a verdict they
              6   could pay; and, therefore, one of the reasons my
              7   particular client base liked me is that I was pretty good
              8   at getting cases settled where they wanted them settled.
              9   So, in my practice, I don't think I've had 12 jury trials
  11:00:45   10   in my practice.
             11     Q.    So let's talk about since 1997, when you started
             12   Fadell, Cheney & Burt.  Do you know how many jury trials
             13   you did under that firm name?  Can you give me a fair
             14   estimate?
  11:01:03   15     A.    So you don't want the ones I did before then at
             16   Broening?
             17     Q.    Let's just for now, let's just talk about
             18   1997 --
             19     A.    Okay.
  11:01:11   20     Q.    -- you know, through, I guess, present.
             21     A.    Then at Broening -- I mean, after Broening at
             22   our own firm, maybe seven.
             23     Q.    Spread out evenly over the 20 or so years since
             24   you started the firm -- well, strike that.  That's a bad
  11:01:32   25   question.
```

| | | |
|---|---|---|
| | 1 | You told me you started to wind down your |
| | 2 | practice in 2006. |
| | 3 | A.    '05 was my last trial, and I knew it. |
| | 4 | Q.    Okay.  So '05 was your last trial? |
| 11:01:42 | 5 | A.    Right. |
| | 6 | Q.    So you had, approximately, seven trials from |
| | 7 | 1997 to 2005? |
| | 8 | A.    I think that's probably right. |
| | 9 | Q.    And that would be a percentage of what of your |
| 11:01:56 | 10 | practice?  How would you estimate that? |
| | 11 | MR. GERMAN:  Form. |
| | 12 | BY MR. MATURA: |
| | 13 | Q.    Can you -- do you even know how many cases you |
| | 14 | handled from '97 through 2005? |
| 11:02:08 | 15 | A.    I don't. |
| | 16 | Q.    Okay.  You would characterize that as an active |
| | 17 | practice during that time frame; is that fair? |
| | 18 | A.    Very. |
| | 19 | Q.    You would think you probably handled over, '97 |
| 11:02:18 | 20 | to 2005, oh, a hundred plus cases?  Do you have any idea? |
| | 21 | A.    Oh, way more. |
| | 22 | Q.    Way more?  I was going to start with a hundred |
| | 23 | and work up.  I didn't want to start with a big number, |
| | 24 | but way more than a hundred cases? |
| 11:02:33 | 25 | A.    Yes, I usually carried a cabinet of at least 35. |

|          | 1  | Q.    At all times? |
|----------|----|---------------------|
|          | 2  | A.    I think so.  But the elder abuse cases also, the |
|          | 3  | reason I brought in the elder abuse work was because the |
|          | 4  | nursing homes could not afford to go to trial, and the |
| 11:03:02 | 5  | verdicts were coming in very high on those cases. |
|          | 6  | Q.    So those were also cases that you would settle |
|          | 7  | before trial, if possible? |
|          | 8  | A.    Right. |
|          | 9  | Q.    Did you try any elder abuse cases before a jury? |
| 11:03:14 | 10 | A.    Yes. |
|          | 11 | Q.    How many? |
|          | 12 | A.    I can't think of more than one. |
|          | 13 | Q.    So you can think of one, but just one; is that |
|          | 14 | what you're saying? |
| 11:03:39 | 15 | A.    I think I can only think of the one. |
|          | 16 | Q.    So one of the seven that you tried from '97 to |
|          | 17 | '05 was an elder abuse case? |
|          | 18 | A.    I think that's right.  Your ability to make |
|          | 19 | plaintiffs think you can beat them at trial is an |
| 11:03:58 | 20 | important aspect of getting the cases settled. |
|          | 21 | Q.    I want to talk about -- I think I understand |
|          | 22 | what it means to be a litigation lawyer, at least I hope I |
|          | 23 | do, but -- and I know your client -- your lawyer certainly |
|          | 24 | knows what it means to be a litigation attorney, but I |
| 11:04:25 | 25 | want to make sure that your experience is not different |

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | with respect to the practice that you had.  Okay?  So let    |
|          | 2  | me just ask you some questions to confirm, in my mind,       |
|          | 3  | that your life as a litigation defense attorney is what I    |
|          | 4  | think it was.                                                |
| 11:04:52 | 5  |            You'd receive assignments from your client; is    |
|          | 6  | that correct?                                                |
|          | 7  | A.    Yes.                                                   |
|          | 8  | Q.    After receiving a new file from a client, would        |
|          | 9  | you speak to that client?                                    |
| 11:05:03 | 10 | A.    Yes.                                                   |
|          | 11 | Q.    Either in person or on the phone?                      |
|          | 12 | A.    Yes.                                                   |
|          | 13 | Q.    If it's a lawsuit that was sent to you, you'd          |
|          | 14 | review the complaint?                                        |
| 11:05:12 | 15 | A.    Yes.                                                   |
|          | 16 | Q.    And would your client then send you some initial       |
|          | 17 | set of documents?                                            |
|          | 18 | A.    Yes.                                                   |
|          | 19 | Q.    And you'd review those?                                |
| 11:05:21 | 20 | A.    Generally, we would make a request for documents       |
|          | 21 | because we knew what we wanted, and then we would receive    |
|          | 22 | those.                                                       |
|          | 23 | Q.    The request, would it include, I assume,               |
|          | 24 | applicable medical records --                                |
| 11:05:32 | 25 | A.    Yes.                                                   |

```
 1      Q.    -¬ of the claimant or plaintiff who filed the
 2    lawsuit?
 3      A.    Yes.
 4      Q.    Perhaps policies and procedures of the
 5    institutional client that you might be representing; is
 6    that fair?
 7      A.    Yes.
 8      Q.    Or the clinic or healthcare center that you
 9    might be representing?
10      A.    Yes.
11      Q.    What other, you know, standard set of documents
12    would you request on the front end, other than the medical
13    records, policies and procedures, what else?
14      A.    Personnel files --
15      Q.    Okay.
16      A.    -- in the event of specific personnel that we
17    wanted to review, discipline that may have been involved,
18    some peer-review documents, but not all, on a case-by-case
19    basis, insurance information, if it was insurance or not.
20      Q.    Okay.  And as these documents are coming in,
21    you're reviewing and analyzing them to understand the
22    issues of that particular case?
23      A.    Yes.
24      Q.    If necessary, you're researching the law,
25    statutes particular to the issue in that case?
```

11:05:42
11:05:48
11:05:57
11:06:21
11:06:32

|            |    |                                                                            |
|------------|----|----------------------------------------------------------------------------|
|            | 1  | A.    Yes.                                                                 |
|            | 2  | Q.    Eventually, you get to a point where you                             |
|            | 3  | understand the issues and the claims being alleged, and                    |
|            | 4  | you would draft an answer --                                               |
| 11:06:43   | 5  | A.    Yes.                                                                 |
|            | 6  | Q.    -- or a motion to submit, if necessary, right?                       |
|            | 7  | A.    Yes.                                                                 |
|            | 8  | Q.    Whatever the case might be for that particular                       |
|            | 9  | situation?                                                                 |
| 11:06:49   | 10 | Are you corresponding with your client early in                            |
|            | 11 | this process about the status, whether it's an answer or                   |
|            | 12 | motion to submit, are you sending information back to your                 |
|            | 13 | client?                                                                    |
|            | 14 | A.    Yes.                                                                 |
| 11:07:01   | 15 | Q.    Communicating with opposing counsel?                                 |
|            | 16 | A.    Yes.                                                                 |
|            | 17 | Q.    Assuming the case survives the early stages;                         |
|            | 18 | meaning, it's not dismissed on a motion to dismiss, you're                 |
|            | 19 | then beginning the process of discovery?                                   |
| 11:07:18   | 20 | A.    First, I have to do an initial disclosure                            |
|            | 21 | statement.                                                                 |
|            | 22 | Q.    Fair enough.  Go ahead.                                              |
|            | 23 | A.    And, in our practice, because it's mostly                            |
|            | 24 | hospitals, I'm going to probably want to do at least a few                 |
| 11:07:32   | 25 | interviews of nursing personnel or other hospital                          |

```
           1   personnel before I prepare my first disclosure statement.
           2        Q.    So the answer is filed -- using a situation
           3   where it's filed and not dismissed, an answer is filed.
           4   At that point in time, you're seeking out the appropriate
11:07:50   5   personnel to interview so you can better understand the
           6   issues and the facts and the events before you prepare
           7   your initial disclosure statement?
           8        A.    Yes.
           9        Q.    Is that right?
11:08:00  10              You're then drafting and submitting your initial
          11   disclosure statement, correct?
          12        A.    Yes.
          13        Q.    And receiving the other side's initial
          14   disclosure statement; is that right?
11:08:09  15        A.    Yes.
          16        Q.    At that point in time, you develop what you
          17   believe to be an appropriate discovery plan?
          18        A.    Yes.
          19        Q.    For whatever the issues in that particular case
11:08:18  20   are?
          21        A.    Yes.
          22        Q.    More complex cases, more involved discovery
          23   plan; less complex, less involved.  Is that fair?
          24        A.    Yes.  We have pretrial conference mandatory in
11:08:31  25   medical malpractice.
```

| | |
|---|---|
| 1 | Q.   And you also have different disclosure |
| 2 | obligations in medical malpractice, correct? |
| 3 | A.   Correct. |
| 4 | Q.   All right.  You have an affirmative obligation, |
| 11:08:42  5 | both sides do -- both sides have an affirmative obligation |
| 6 | to expedite the exchange of medical records, correct? |
| 7 | A.   Yes. |
| 8 | Q.   And then there's a more stringent obligation to |
| 9 | have the pretrial conference with the judge; is that |
| 11:08:55  10 | correct? |
| 11 | A.   And the preparation of a joint statement to the |
| 12 | judge for how discovery is going to go. |
| 13 | Q.   And that would be part of your standard process |
| 14 | of how you handle your cases? |
| 11:09:05  15 | A.   Yes. |
| 16 | Q.   And then you have the telephonic, typically, |
| 17 | perhaps sometimes in person, but doesn't matter.  You have |
| 18 | the pretrial conference with the judge where you discuss |
| 19 | the issues of the case and the scheduling order is signed |
| 11:09:18  20 | off on by the judge, correct? |
| 21 | A.   Yes. |
| 22 | Q.   At that point in time, now you're free to |
| 23 | conduct discovery; is that right? |
| 24 | A.   Yes. |
| 11:09:24  25 | Q.   And that's where you would develop your |

```
 1   discovery plan, if you haven't already developed one?
 2        A.    Yes.
 3        Q.    Is your discovery the same as any other
 4   discovery?  Meaning, you're going to identify witnesses to
 5   depose; is that -- is that right?  Or strike that.  Let me
 6   back up.
 7             You're going to depose the other party, if it's
 8   an individual?
 9        A.    Yes.
10        Q.    You would issue subpoenas to third parties --
11        A.    Yes.
12        Q.    -- whether it's the plaintiff, medical
13   providers, employer, whoever it might be, right?
14        A.    Yes.
15             MR. GERMAN:  And you're talking -- these are all
16   state court cases, for the most part?
17             MR. MATURA:  That's a fair point.
18             THE WITNESS:  For the most part.  I had a
19   handful of federal cases over the years, but almost all
20   state court.
21   BY MR. MATURA:
22        Q.    Almost all state court.  Okay.
23             And was the most common claim that you're
24   handling was a negligence claim for malpractice or did it
25   vary?
```

Time stamps (left margin):
11:09:34 (line 5), 11:09:44 (line 10), 11:09:58 (line 15), 11:10:10 (line 20), 11:10:19 (line 25)

|           |    |                                                           |
|-----------|----|-----------------------------------------------------------|
|           | 1  | A.    We get wrongful death, we get medical               |
|           | 2  | malpractice, and then I had my elder abuse.               |
|           | 3  | Q.    Sure, all right, fair enough.                        |
|           | 4  |       So you're conducting discovery as a litigation       |
| 11:10:32  | 5  | attorney.  Meaning, depositions, subpoenas, written       |
|           | 6  | discovery to the other side; is that right?               |
|           | 7  | A.    Yes.                                                 |
|           | 8  | Q.    Responding to their discovery requests; is that     |
|           | 9  | right?                                                     |
| 11:10:39  | 10 | A.    Yes.                                                 |
|           | 11 | Q.    You're not only conducting depositions, but         |
|           | 12 | you're defending the depositions of your client and client|
|           | 13 | representatives?                                           |
|           | 14 | A.    Yes.                                                 |
| 11:10:50  | 15 | Q.    As the discovery process -- well, if there's an     |
|           | 16 | issue with respect to disclosures or withholding of       |
|           | 17 | documents, you would file motions with the Court to       |
|           | 18 | address those issues?                                      |
|           | 19 | A.    If necessary.                                        |
| 11:11:07  | 20 | Q.    If necessary.  You can't work it out with           |
|           | 21 | opposing counsel, you know, their rules give you the right |
|           | 22 | to file a motion to compel with the judge and it's        |
|           | 23 | addressed by a judge; is that what you would do?          |
|           | 24 | A.    Yes.                                                 |
| 11:11:18  | 25 | Q.    Hopefully, you can work it out with opposing        |

```
         1  counsel, but that doesn't always happen for a variety of
         2  reasons, right?
         3      A.    (No oral response.)
         4      Q.    And, then, in the context of the types of cases
11:11:34 5  that you handle, would the Court have periodic status
         6  conferences?
         7      A.    Yes.
         8      Q.    That you would attend either by phone or in
         9  person?
11:11:43 10     A.    Yes.
        11      Q.    Eventually, as you get through the discovery
        12  process, you get to the stage on the scheduling -- or not
        13  the stage, the time frame on the scheduling order where
        14  you can file dispositive motions, if you want to; is that
11:11:58 15 right?
        16      A.    That's correct.
        17      Q.    Okay.  Your answer tells me that I skipped
        18  something that you want to talk about.  Go ahead.
        19      A.    You skipped something kind of big in medical
11:12:10 20 malpractice.
        21      Q.    Tell me.
        22      A.    The selection/retention/preparation of experts.
        23      Q.    Of course.  You're absolutely right.  It's an
        24  important part of a lot of cases but, certainly, medical
11:12:21 25 malpractice cases.  You're right.
```

```
 1              Before we finish discovery, we have a very
 2    important process of expert witnesses, right?
 3         A.    Yes.
 4         Q.    And so you have identified the issues in your
 5    case consistent with the deadline set forth in the
 6    scheduling order to select an expert witness or more than
 7    one?
 8         A.    A stable of them.
 9         Q.    Both a standard of care expert witness and a
10    causation expert witness?
11         A.    Maybe looking at standard of care for nursing
12    and standard of care for medicine, perhaps for different
13    specialties of medicine as well.
14         Q.    So a typical case of yours could have multiple
15    expert witnesses?
16         A.    Correct.
17         Q.    And your process with respect to expert
18    witnesses is, number one, identifying the area that
19    requires expert opinion testimony?
20         A.    That's required to be disclosed in our pretrial
21    conference.
22         Q.    Right.  It's upfront.  You've done that
23    analysis.  And then -- and, then, once you've identified
24    the areas of expert opinion testimony, the next step for
25    you is to identify the potential expert witness, the
```

Timestamps:
11:12:30 (line 5)
11:12:45 (line 10)
11:12:58 (line 15)
11:13:14 (line 20)
11:13:28 (line 25)

```
 1   person, correct?

 2       A.    Yes.

 3       Q.    And did you have a -- you know, a list or

 4   stable, if you will, of individuals that you would

 5   typically go to for expert witness opinions, or did it

 6   just vary?

 7       A.    I didn't like to reuse experts.  I don't like

 8   the way that looks in front of a jury.  I like academic

 9   people who have not testified a lot.

10       Q.    So, to the extent possible, you're looking for

11   someone new with respect to each case that you need an

12   exert witness for?

13       A.    Yes, it's more work, but it's worth it.

14       Q.    Okay.  Pays off in the end, in your opinion?

15       A.    Absolutely in front of a jury, it does.

16       Q.    Right.

17             Now, so you're doing that analysis as well

18   behind the scenes.  You're working a case up.  You're

19   trying to find -- identify who -- I have my area of expert

20   witness testimony.  Now I need to find my person.  I don't

21   want to use someone I used last year or before, so you're

22   trying to do the analysis of who you can identify; is that

23   right?

24       A.    Right.

25       Q.    Of course, you then identify the individual and
```

11:13:41 (line 5)
11:13:55 (line 10)
11:14:06 (line 15)
11:14:20 (line 20)
11:14:28 (line 25)

```
 1   you provide them with the information on the case, and
 2   that leads to the development of their expert opinions --
 3        A.    Correct.
 4        Q.    -- which are then, of course, disclosed to the
 5   other side?
 6        A.    Fully.
 7        Q.    Fully.
 8              And the other side discloses their experts to
 9   you, correct?
10        A.    Yes.
11        Q.    Then you can engage in expert witness
12   depositions, right?
13        A.    Yes.
14        Q.    As well as rebuttal opinions, if necessary.  You
15   complete the entire expert witness process, true?
16        A.    Yes.
17        Q.    Then we get to the point in time in the
18   scheduling order where discovery -- both fact witness
19   discovery and expert witness discovery is completed; and,
20   typically, although not always but, typically, the next
21   step in the scheduling order is dispositive motions.  Is
22   that your experience?
23        A.    When discovery is completed, we go to
24   dispositive motions.
25        Q.    So whatever it is, 36(B), whatever the time
```

Timestamps (left margin):
11:14:40 — line 5
11:14:45 — line 10
11:14:56 — line 15
11:15:09 — line 20
11:15:19 — line 25

```
          1   frame the judge sets, days later, if you believe
          2   appropriate, you'd draft and file a dispositive motion?
          3        A.    Yes.
          4        Q.    After the dispositive motion's filed and -- to
11:15:39  5   be abundantly clear, I know you know this as well, the
          6   other side might file dispositive motions, too, right?
          7        A.    They might.
          8        Q.    They might.  And you defend against it?
          9        A.    True.
11:15:46 10        Q.    The other side or both file dispositive motions,
         11   was it your experience that, typically, the judge would
         12   hold an oral argument on those motions?
         13        A.    At some point in time, yes, earlier or on the
         14   day of trial.
11:15:58 15        Q.    Up to the judge's discretion.  Was it your
         16   experience that most of your cases, when you had
         17   dispositive motions, would be -- would have an oral
         18   argument as opposed to a ruling without an oral argument
         19   on dispositive motions?
11:16:12 20        A.    Usually.
         21        Q.    Okay.  And, as we've discussed earlier, the
         22   substantial majority of your cases were resolved short of
         23   trial sometimes through a settlement process?
         24        A.    Yes.
11:16:29 25        Q.    Which would -- was your experience, in terms of
```

|          | 1  | settlement process, let's talk about that.  There are |
|          | 2  | different ways a case can settle.  It can be through |
|          | 3  | private medication.  It can be just the lawyers talking on |
|          | 4  | the phone.  It can be, you know, a judge pro tem assigned |
| 11:16:47 | 5  | by the court.  There are variety of ways that a case can |
|          | 6  | settle. |
|          | 7  |         What -- did you get involved in all of the |
|          | 8  | above? |
|          | 9  | A.    All of the above. |
| 11:16:56 | 10 | Q.    So, if appropriate in your mind, you would |
|          | 11 | decide this case is appropriate and I'm going to recommend |
|          | 12 | to my client we participate in private mediation, for |
|          | 13 | example? |
|          | 14 | A.    Well, in medical malpractice, you understand, we |
| 11:17:07 | 15 | are required to use a mediator.  I never liked that, |
|          | 16 | because I was pretty good at settling cases on my own.  I |
|          | 17 | liked doing it old school. |
|          | 18 | Q.    On the phone with a lawyer? |
|          | 19 | A.    Yeah, or at lunch or over a cocktail in the old |
| 11:17:25 | 20 | days.  I thought it was very -- I was good at it.  I was a |
|          | 21 | settling lawyer.  I was good at it. |
|          | 22 | Q.    But the rules required you to participate in |
|          | 23 | mediation? |
|          | 24 | A.    Yes. |
| 11:17:38 | 25 | Q.    Private mediation, right?  I mean, both sides |

```
 1    pick someone, you split the fee maybe?
 2         A.    Early -- yes, we did a lot of those toward the
 3    end.  But, earlier, in the ADR wave, we went to Judge Dan
 4    Mastro, who was a sitting superior court judge, and
 5    occasionally, we would have settlement conferences with
 6    the sitting judge.  I never liked using the presiding
 7    judge as the settlement judge.
 8         Q.    No, I always found that to be a tricky situation
 9    myself as well.
10         A.    Especially in the outer counties, they do that a
11    lot.
12         Q.    So a case would settle for you through -- most
13    usually, through mediation process?
14         A.    Toward the end of my practice through a
15    mediation process, yes.
16         Q.    Did you ever have cases that the parties would
17    agree?
18         A.    Sorry.  After the rule change --
19         Q.    Certainly.
20         A.    -- we had to go to mediation.
21         Q.    And the rule change occurred when; do you
22    remember?
23         A.    I don't.
24         Q.    Okay.
25               MR. MATURA:  Do you know?  I don't know.
```

11:17:59 (line 5)
11:18:13 (line 10)
11:18:26 (line 15)
11:18:35 (line 20)
11:18:41 (line 25)

```
 1              MR. GERMAN:  I think '91, '92, somewhere in
 2    there.
 3              MR. MATURA:  Okay.
 4              MR. GERMAN:  Zlaket.
 5              THE WITNESS:  Zlaket.
 6    BY MR. MATURA:
 7        Q.    All right.
 8        A.    I guess -- so that's even before we started our
 9    law firm.  That's when I was practicing medical
10    malpractice defense with the Broening Law Firm.
11        Q.    Did you have cases that the parties would
12    stipulate to resolve through arbitration?
13        A.    Occasionally.
14        Q.    Okay.  And so, occasionally -- and you're giving
15    me a look that tells me that was pretty rare?
16        A.    Pretty rare.  Most of the plaintiffs' medical
17    malpractice lawyers count on their ability to ring the
18    bell in front of a jury in a way that they would not in
19    front of an arbitration panel, so it didn't happen often.
20    As defendants, I was delighted to take my defendants to
21    arbitration instead.
22        Q.    Certainly, certainly.
23        A.    But it was rare we could get a plaintiff's
24    lawyer to do that.
25        Q.    On those rare occasions where you agreed to
```

11:18:53
11:19:02
11:19:18
11:19:38
11:19:48

```
            1   arbitration, you know, was it through the AAA?  Was it
            2   just through an agreement of the parties to find an
            3   arbitrator or an arbitration panel?  Did it vary?  I mean,
            4   can you describe that for me?
 11:20:02   5        A.    The plaintiffs would pick an arbitrator, the
            6   defendants would pick an arbitrator, and the two
            7   arbitrators would pick a third.
            8        Q.    Were they binding decisions?
            9        A.    Yes.  If we're going to arbitration, everybody
 11:20:14  10   agreed we would want it to be over with no further appeals
           11   and confidentiality.
           12        Q.    Did you handle any cases that were a low enough
           13   dollar value that they were subject to compulsory
           14   arbitration?  I think these days it's $50,000.  I'm not
 11:20:34  15   sure how it's changed over time.  Do you remember anything
           16   like that?
           17        A.    I don't think cases that small would have been
           18   sent to me.  I don't mean to be bragging, but I didn't get
           19   cases of that size once my career took off.
 11:20:53  20        Q.    Okay.
           21        A.    I had some slip-and-falls in hospital lobbies in
           22   1990 because I was new, but after that, I really got
           23   bigger cases than that.
           24        Q.    So if a case doesn't settle and it's not
 11:21:10  25   dismissed on dispositive motion by the Court, then the
```

|  | 1 | next step in the process would be a trial? |
|---|---|---|
|  | 2 | A.    Yes. |
|  | 3 | Q.    Of the seven trials that you handled between '97 |
|  | 4 | and 2005, were they all jury trials as opposed to bench |
| 11:21:28 | 5 | trials? |
|  | 6 | A.    I don't know that I ever did a bench trial, no. |
|  | 7 | And, again, the plaintiffs' medical malpractice bar is not |
|  | 8 | inclined to such things, not that I would have been |
|  | 9 | opposed to it, but ... |
| 11:21:41 | 10 | Q.    No, I suspect you would not have been opposed to |
|  | 11 | it as a defense attorney. |
|  | 12 | MR. GERMAN:  And, Jeff, when you said the next |
|  | 13 | step is, you go to trial, you have all the final pretrial, |
|  | 14 | motions in limine. |
| 11:21:55 | 15 | MR. MATURA:  Just going to get to that.  Just |
|  | 16 | getting to that right now.  Yep, just getting to that. |
|  | 17 | BY MR. MATURA: |
|  | 18 | Q.    So that's exactly my next question. |
|  | 19 | You know, the next date on the schedule where it |
| 11:22:05 | 20 | might be trial this date on this year, but there's a lot |
|  | 21 | that goes into between a ruling, you know, finishing |
|  | 22 | discovery, dispositive motions, and trial.  So let's talk |
|  | 23 | about that briefly, about what you did and what your |
|  | 24 | process was. |
| 11:22:23 | 25 | And you've had some fairly substantial trials, |

```
          1   it sound like, in your career --
          2       A.    Yes.
          3       Q.    -- both in terms of complexity of issues and
          4   length of time.
11:22:31  5       A.    Yes.
          6       Q.    Tell me, in your own words, then, rather than me
          7   asking you a question on this, just tell me what your
          8   process was for -- well, strike that.  Strike that.  Let's
          9   do it this way.
11:22:47 10            The process involves identifying trial
         11   witnesses, correct?
         12       A.    Yes.
         13       Q.    Identifying exhibits to be used at trial?
         14       A.    Yes.
11:22:57 15       Q.    And when I say "trial witnesses," we're not only
         16   talking about clients.  You have third-party trial
         17   witnesses, correct?
         18       A.    Those experts.
         19       Q.    Including experts and other third parties
11:23:11 20   whether it's employers, neighbors, relatives, whoever it
         21   might be, right?
         22       A.    Correct.
         23       Q.    Typically, one of the early steps in a trial
         24   process is the submission of a pretrial, you know,
11:23:29 25   statement.  I think judges call them different things
```

|  |  |
|---|---|
|  | 1 | these days, but it's the joint filing by the parties to |
|  | 2 | identify the issues in the case, the documents to be |
|  | 3 | presented, the witnesses to be presented with a summary of |
|  | 4 | their proposed testimony with respect to exhibits and |
| 11:23:46 | 5 | identifying of stipulated, objected to, you know, the |
|  | 6 | evidentiary issues? |

                    MR. GERMAN:  Depositions.

BY MR. MATURA:

        Q.    Deposition, citations, thank you, right?
Citations from deposition experts, if you will, whatever
they're called these days.  All that goes into one big,
thick, long document that gets submitted to the judge.  Is
that your experience?

        A.    That's my experience.

        Q.    And then the judge reviews it, deals with any
issues, and ultimately uses that as almost the roadmap, if
you will, the rule book for those issues in the trial.  Is
that your experience?

        A.    Yes.

        Q.    And that's just what you submit to the judge.
Behind the scenes, though, in your office, you're thinking
about exhibits, demonstrative exhibits that you need; is
that right?

        A.    Yes.

        Q.    You're thinking about, you know, evidentiary

```
 1   issues, how you're going to get certain evidence into the
 2   record; is that right?
 3       A.    Yes.
 4       Q.    You're thinking about jury selection, voir dire
 5   questions, and that whole jury process, correct?
 6       A.    Yes.
 7       Q.    Did you use jury consultants for any of your
 8   trials?
 9       A.    A few.
10       Q.    Did you ever find them helpful?
11       A.    Frankly, no.
12       Q.    I knew you were going to say that.  I think we
13   all have our own opinions on that.  Okay.
14       A.    Because jury consultants come in to do things,
15   not only to predict for you what's going to happen, but
16   they are supposed to be able to prepare your witnesses,
17   and I never found one that could prepare my nurses for the
18   terrifying experience of testifying at trial the way I
19   could.
20       Q.    Yeah, okay.
21       A.    I mean, I could tell them all to wear pink
22   blouses.  I really didn't need someone at $400 an hour to
23   suggest pink blouses.
24       Q.    You have the -- once filings for the court are
25   done and you're getting closer to the day of trial, you --
```

11:24:41  5
11:24:46  10
11:25:03  15
11:25:20  20
11:25:41  25

```
          1   I assume you have that -- and I know it depends on the
          2   complexity of the trial, but you have that last-minute
          3   kind of ramp-up, we have trial on Monday, you know, the
          4   week or two weeks before, I mean, your -- was your
11:25:58  5   practice that you're in both feet, you're solely focused
          6   on the trial, it's starting in the next week or two, if
          7   you will?
          8        A.    Yes, because we haven't talked about preparing
          9   your direct examination, preparing your cross-examination.
11:26:10 10        Q.    That's where I was going.  That's where I was
         11   going.  So part of preparing for trial, of course, is, as
         12   you're thinking about witnesses, the first day of trial,
         13   and the first witnesses and you've got your order, you
         14   think -- well, you're the defense attorney, so you think
11:26:22 15   you know what the plaintiff is going to call.
         16        A.    You're making my heart beat fast.
         17        Q.    Are you okay?
         18        A.    Yes, yes.  All those things in the last
         19   three weeks before.
11:26:31 20        Q.    You have that adrenaline rush that kicks in.
         21   You think, Holy-moly, I've got to really block in here,
         22   and you're hoping plaintiff's counsel doesn't switch the
         23   order of witnesses on you because that will create
         24   complete chaos.
11:26:44 25        A.    And we have all these experts and their
```

```
         1  schedules are impossible.

         2           MR. GERMAN:   In medical, they're mostly out of

         3  state.

         4           THE WITNESS:   And they're all out of state.

11:26:52 5  BY MR. MATURA:

         6      Q.   All right.  I'm with you.

         7           So then was it your process, then, to prepare

         8  outlines for your cross-examination of the plaintiff's

         9  witnesses and direct examinations of your witnesses?

11:27:05 10     A.   Yes.

         11     Q.   I know different lawyers do it differently.  I

         12 don't think the details much matter, but you would have

         13 some form of an outline that you'd prepare before trial

         14 starts for your witnesses?

11:27:14 15     A.   In our practice, my clients all required us to

         16 use Trial Director.

         17     Q.   Okay.

         18     A.   Do you know what that is?

         19     Q.   I do know what it is, but tell me about it, how

11:27:23 20 you used it.

         21     A.   We used Trial Director because our hospital

         22 clients -- my hospital clients, in particular, really

         23 believed in the effectiveness of the Trial Director

         24 program in terms of putting up a smooth, professional,

11:27:43 25 organized presentation of documents, charting, diagrams,
```

|          |    |                                                                |
|----------|----|----------------------------------------------------------------|
|          | 1  | reports, diagnostic reports, pieces of deposition              |
|          | 2  | testimony, and so all those slides have to be prepared and     |
|          | 3  | coordinated with the nurse consultant, the paralegal who's     |
|          | 4  | going to run the machine while I'm talking.                    |
| 11:28:06 | 5  | Q.   Okay.  All that work is now done.  You're ready           |
|          | 6  | for the first day of trial.  And, then, of course, you         |
|          | 7  | conduct the trial.  You're there each day, right?              |
|          | 8  | A.   Yes.                                                      |
|          | 9  | Q.   Of the seven trials that you completed at your            |
| 11:28:22 | 10 | last firm, did you first chair all seven?                      |
|          | 11 | A.   Yes.  Not fair.  I co-chaired or first-chaired.           |
|          | 12 | Q.   How many did you co-chair and what -- well,               |
|          | 13 | start with that.  Do you recall how many you co-chaired?       |
|          | 14 | A.   Co-chair means one of you does the opening and            |
| 11:28:42 | 15 | one of you does the closing.  That's all.                      |
|          | 16 | I know that I had Blaine do either the opening                 |
|          | 17 | or close in the '05 trial.  I know I had Melody do the         |
|          | 18 | opening in the '04 trial against McGroder.  I                  |
|          | 19 | solo-chaired -- all I can do is remember them by               |
| 11:29:06 | 20 | plaintiffs' lawyers.  I'm sorry to look away from you,         |
|          | 21 | but --                                                         |
|          | 22 | Q.   You're fine.                                              |
|          | 23 | A.   -- it's helping me.  I solo-chaired -- I think I          |
|          | 24 | solo- -- oh, Gary and I did trials co-chair at Broening,       |
| 11:29:25 | 25 | 'cause we both came from the same firm, and then I think I     |

1   solo-chaired everything else.

2       Q.    Okay.   Things happen during the trial that are

3   unexpected, that require filings by the lawyers, whether

4   it's motions in limine, trial briefs, whatever the issue

11:29:52   5   might be.   Was that your experience?

6       A.    Yes.

7       Q.    Things happen unpredictable in trial.   Witness

8   says something the judge has ruled they can't say,

9   whatever -- whatever the issue might be?

11:30:00   10      A.    Plaintiffs do something sneaky, yes.

11      Q.    I can't imagine that would ever happen, but as

12  an example -- was that your experience, too?

13      A.    Yes.

14      Q.    All right.   And then you get a verdict, and

11:30:16   15  there's a process with that, verdict forms, and other

16  filings that you, typically, make with the court towards

17  the end of a trial to settle jury instructions.   Is that

18  your experience?

19      A.    Yes.

11:30:32   20      Q.    Are you okay?

21          MR. GERMAN:   We should -- do you want to take a

22  break in a little bit?

23          THE WITNESS:   At your convenience.

24  BY MR. MATURA:

11:30:39   25      Q.    You want to give me two more minutes of this --

|  | | |
|---|---|---|
| 1 | A. | Sure, sure, that's fine. |
| 2 | Q. | -- and we'll be done? |
| 3 | A. | Done, done? |
| 4 | Q. | No, I apologize.  We'll take a break.  Give me |

two minutes and I promise we'll take a break.

A.    I'm fine.

Q.    After trial, verdict's rendered, and then we have potentially post-trial filings, correct?  Whether it's a motion for a new trial, set aside the -- whatever it might be?

A.    Yes.

Q.    And, then, you know, final judgment is entered and 30 days to appeal?

A.    Yes.

Q.    Some of your cases were appealed?

A.    Very rare.

Q.    Did you handle -- you, as a lawyer -- handle appeals?

A.    Yes, but not very many.  If I lost, we settled.

Q.    If you lost, you settled.  If you won, plaintiff's counsel might appeal?

A.    Right, and that was the only appeals I ever did.

Q.    You had seven trials.  During the time frame we're talking, were any of those appealed, or does your appeal work predate your formation of the firm?

```
 1    A.    I believe my appeal work predates the firm

 2  taking me back to Broening.

 3    Q.    During this entire process of being a litigation

 4  attorney, we started with a new assignment from a client

 5  and we've ended with an appeal and we covered a lot in

 6  between those two points in time.  But during that

 7  process, if you have an associate who's working with you,

 8  you would -- would you supervise that associate --

 9    A.    Yes.

10    Q.    -- in their work?

11          Would that also include the paralegal --

12    A.    Yes.

13    Q.    -- and the nurse consultant?

14    A.    Yes.

15    Q.    And would that supervision be true both at the

16  front end when a complaint comes in?  I'd like you to --

17  Mr. and Mrs. So and So, I'd like you to help me with this

18  case, all the way through, you know, the trial and appeal?

19    A.    Yes.

20    Q.    Okay.  And how did you typically staff your

21  cases?  Was it an attorney, a paralegal, and nurse

22  consultant, or did it vary?

23    A.    That was the usual.

24    Q.    And let me be more clear.  So you, as the lead

25  attorney, plus one associate --
```

11:32:13 (line 5)
11:32:27 (line 10)
11:32:33 (line 15)
11:32:46 (line 20)
11:33:02 (line 25)

|         |    |    |                                                          |
|---------|----|----|----------------------------------------------------------|
|         | 1  | A. | Yes.                                                     |
|         | 2  | Q. | -- plus one paralegal --                                 |
|         | 3  | A. | Yes.                                                     |
|         | 4  | Q. | -- plus one nurse consultant?                            |

11:33:07  5    A.   Yes, especially after the elder abuse cases came
       6  in.  Before that, I was disinclined to use an associate,
       7  but once I had all that elder abuse work, I had to have
       8  help.
       9    Q.   Was that a function of the volume of work that
11:33:21 10  you had?
      11    A.   Yes.
      12    Q.   You just needed physical manpower help?
      13    A.   Yes.
      14    Q.   Okay.  And the elder abuse cases start coming in
11:33:29 15  when?  How soon after you formed the firm; do you
      16  remember?
      17    A.   I don't.
      18    Q.   Okay.  Whenever --
      19    A.   Early, though, I think.
11:33:39 20    Q.   So early in the process, elder abuse cases start
      21  coming in.  You're a very busy lawyer.
      22    A.   In fact, I had elder abuse cases while I was
      23  still at the Broening Law Firm.  I remember that now.  So
      24  my book of business from there started to develop prior to
11:33:56 25  '97.

```
 1      Q.    Uh-huh.  All right.
 2      A.    And I just thought of something, a prior answer.
 3   I worked on some Amicus briefs.  I don't think that's what
 4   you're interested in, but when you said about my appeals
 5   work, I did work on some Amicus briefs on issues
 6   concerning healthcare in hospitals over the years.
 7      Q.    I appreciate you telling me that.
 8            Did you do any filing of Amicus briefs at your
 9   last firm at Fadell, Cheney & Burt?
10      A.    I can't remember which firm it was at.  It's
11   been a long time ago.  It was certainly not -- it was
12   certainly not during those last few years of my practice
13   when it was all I could do to hang onto my files.  It
14   would have been before that.
15            MR. MATURA:  Let's take a break.
16            MR. GERMAN:  Great.  Thank you.
17            (Recess taken from 11:34 to 12:06 p.m.)
18   BY MR. MATURA:
19      Q.    Before we took our break, Ms. Cheney, we were
20   talking about the -- your job responsibilities and duties,
21   if you will, as a trial lawyer.  Do you remember that?
22      A.    Yes.
23      Q.    And I shouldn't -- let me change my question.
24            We were talking about your responsibilities and
25   duties as a lawyer, 'cause not every case goes to trial,
```

1  right?

2          MR. GERMAN:  Form.

3          THE WITNESS:  Every litigated case is a

4  potential trial, and everything about litigating a case is

12:06:51  5  about what will happen at trial.

6  BY MR. MATURA:

7     Q.    Yeah, I couldn't agree with you more.  Let me

8  ask it this way then.

9          We walked through a long list of duties.  In

12:07:05  10  your practice, was that process and those duties that we

11  outlined before the break the same regardless of whether

12  you thought that case was going to trial, not going to

13  trial; you assume every case was going to trial?

14          MR. GERMAN:  Form.

12:07:22  15          THE WITNESS:  I needed every plaintiffs' lawyer

16  that I was up against to believe that I absolutely would

17  be ready to try their case, no matter what.

18  BY MR. MATURA:

19     Q.    So would you handle the defense of a lawsuit

12:07:36  20  that was assigned to you the same with respect to the

21  duties that we outlined before the break?  Was that your

22  standard practice of how would you defend against a case?

23          MR. GERMAN:  Form.

24          THE WITNESS:  I don't know exactly how to answer

12:07:54  25  that because there are some cases that would never go to

1    litigation that I would need to get settled.  I hate to

2    tell you, but there were awful, awful things that would

3    come to me to get settled without litigation, and then

4    there were some cases that we would think we could try in

12:08:16    5    the beginning that would take an uncomfortable turn and

6    need to be very suddenly settled.  So I guess I can't say

7    they were all exactly the same that way.

8    BY MR. MATURA:

9        Q.    Let's talk about assignments that you would

12:08:36    10    receive from clients pre-litigation.

11        A.    Yes.

12        Q.    Tell me more about that.

13        A.    Well, there were two categories.  There was a

14    case -- it embarrasses me that I cannot tell you the name

12:08:54    15    of the case.  But there was a case about whether hospital

16    lawyers in-house could direct investigations in potential

17    litigation matters, and the Appellate Court found against

18    the hospitals and said that, if you're an in-hospital

19    lawyer in-house, you cannot direct a privileged

12:09:18    20    investigation.

21            When that case came down, it became necessary,

22    when an incident would occur that made the hospital

23    believe they might be about to get sued for something, a

24    bad outcome of some kind, they would notify us

12:09:34    25    pre-litigation and ask us to open what we would call

1    "precautionary" files and send directional letters into
2    the hospital to conduct an investigation so that the
3    product of that investigation could be covered under the
4    attorney/client privilege.  We were talking mostly about
5    interviews with staff.

6        Q.    Uh-huh, uh-huh.

7        A.    So that's one category of pre-litigation
8    matters, and those may or may not proceed to litigation
9    and then be defended by me.

10              The other category is cases where liability is
11   so clear from the minute the incident happens, that the
12   hospital wants to resolve it without letting it go into
13   litigation, and so I would handle them there.  That was,
14   in fact, kind of a specialty of mine, too.

15       Q.    "Specialty" meaning you would be able to handle
16   and settle claims before -- potential lawsuits before they
17   became a lawsuit?

18       A.    Particularly if it involved -- yes, particularly
19   if it involved dealing with the family, is that I was good
20   at dealing with a family and with their lawyers and if it
21   would calm the water about whatever the loss had been, you
22   can get them settled.

23       Q.    What percent of your practice involve handling
24   pre-litigation matters, as you've described them, either
25   of the two components that you described?

```
        1     A.    I did a lot of precautionaries that never went
        2  anywhere, because they were required for the hospital to
        3  do an investigation.
        4     Q.    And so --
12:11:25 5     A.    But that wasn't much work.
        6     Q.    But when you say -- just so I understand.  When
        7  you say "precautionary," that's the process by which you
        8  would interview staff involved in some incident thereby
        9  covering it under the attorney/client privilege?
12:11:38 10    A.    Yes.
       11     Q.    When you say you did a lot of precautionaries --
       12     A.    That's just sending a letter, so it wasn't much
       13  work.
       14     Q.    But you have to interview people first, right?
12:11:47 15    A.    No, I don't do those interviews.  Those are done
       16  by in-house -- I sent the letter to the hospital's
       17  in-house legal department and instruct their staff to go
       18  and do those interviews.
       19     Q.    You're not doing the interview, though?
12:12:00 20    A.    No.  For me, that's not a lot of work.  It's
       21  just the sending of the letter, knowing enough about the
       22  case to send the letter and direct them who to interview
       23  and that.
       24           In terms of cases, usually, those pre-litigation
12:12:14 25  cases are big cases.  They're not going to ask me to try
```

1   and settle a case where somebody lost their dentures.  But
2   if we have, you know, a fetal demise, an intraoperative
3   death, those are very big deals because somebody's not
4   supposed to die in the operating room, die later in the
5   ICU.  I would always get several of those a year.
6       Q.    Several a year?
7       A.    Yeah.  Ones where the hospital would be very
8   highly motived not to have that become a matter of record.
9       Q.    And what would your process be, if you had a
10  standard process -- if not, just tell me you didn't have
11  one.  But what would your process be to handle and resolve
12  one of those cases where liability is clear and the
13  hospital wants you to settle it?
14      A.    It wouldn't feel as standard probably as
15  describing the process that is litigation.  It would
16  depend entirely on the circumstances, and the hospital
17  would look to me to say, How do we go about this?  What do
18  we have to do?  What questions are we going to have to be
19  able to answer for this family for them to fairly consider
20  settling it without litigation?
21          We have to consider representation.  I have had
22  cases where we have suggested to the family the actual
23  names of lawyers that they should go to because we don't
24  want to try and settle with them without them properly
25  represented.  So that would be highly variable.

12:12:39
12:12:56
12:13:13
12:13:33
12:13:50

1    Q.    All right.

2    A.    And sometimes -- I'm sorry.

3    Q.    No, no, please.  Go ahead.

4    A.    On occasion, fortunately rare, we are dealing

12:14:03    5  with matters that are not just civil.  Occasionally, we're

6    dealing with matters that have potential criminal obl- --

7    exposure for the healthcare providers, and those require a

8    different set of strategies, a different set of plans for

9    how to try to get the civil aspect resolved in the face of

12:14:35   10  a criminal investigation.

11    Q.    Can you give me a sense, if you received -- I

12    think you said several of these assignments a year, we're

13    talking about where liability is clear and the hospital

14    wants you to settle the case, and I understand that

12:14:52   15  there's not a standard cookie-cutter process to handle

16    these.  By definition, the facts are unique and the issues

17    are unique.

18        But having said that, can you give me a sense of

19    how much time does it take to resolve one of these?  You

12:15:07   20  know, if you consider yourself a busy layer with a busy

21    practice, how much of that practice and time is involved

22    in resolving these cases where the hospital's told you, Go

23    resolve it before the lawsuit's filed?

24        MR. GERMAN:  Form.

12:15:19   25        THE WITNESS:  Highly variable.

```
         1   BY MR. MATURA:
         2       Q.   Okay.  Just depends on the complexity of the
         3   issue and other factors?
         4       A.   Weeks to months.
12:15:28 5       Q.   Weeks to months?
         6            Okay.  Let's go back to the precautionary --
         7       A.   Uh-huh.
         8       Q.   -- letters.  Is that the right terminology?
         9       A.   Yes.
12:15:41 10      Q.   I'm not sure it clicked in my mind exactly what
        11   that meant.  I thought I understood it, but I think I was
        12   wrong.  I want to better understand what you did.  So --
        13   so can you just tell me -- tell me again.  What did you do
        14   on the precautionaries?
12:15:54 15      A.   At the beginning, we would be notified by the
        16   hospital that they have had an incident, and they would
        17   give us the background on the incident.  I wish I could
        18   remember the name of that case.  It was a Good Sam case.
        19   It was an anesthesia case.  It was the death of a child,
12:16:21 20  and the in-house lawyers had directed the in-house nurses
        21   to go do interviews of everybody in the operating room and
        22   they did.  And a top flight plaintiffs' law firm wanted
        23   those witness statements, and the hospital refused to hand
        24   them over because they were covered by privilege, 'cause a
12:16:45 25  lawyer had directed it, and the Court said, No, we don't
```

```
           1   think so.

           2          So it was, then, our job to do what the in-house

           3   lawyers do, which is to look at the case enough to direct

           4   and an investigation, and then the actual investigation --

12:17:03   5   then the pre-litigation investigation is conducted by

           6   hospital staff.

           7   Q.    So when you say "look at the case," we don't

           8   have a route yet, right?

           9   A.    Right.

12:17:11  10   Q.    So when you say "case," do you mean the medical

          11   incident?

          12   A.    Correct.

          13   Q.    So you would -- you, Cynthia Cheney, as the

          14   lawyer -- outside counsel, would receive a copy of the

12:17:25  15   documents relevant to that medical incident, whether it's

          16   medical records or whatever it might be, correct?

          17   A.    Correct.

          18   Q.    And then you would review them to understand the

          19   issue at hand enough so that you would then write a letter

12:17:37  20   to who?

          21   A.    To whom.

          22   Q.    To whom.  I so appreciate that.  That's one of

          23   my pet peeves, so I'm glad you caught me on that.

          24   A.    I'm sorry.

12:17:46  25   Q.    No, I love the fact you said that, because I
```

```
 1   would say the same thing to -- not to you, because I would
 2   be more respectful, but you know what I mean.
 3       A.    At most of the hospitals, we would be dealing
 4   with non-lawyer claims handling staff, and we would send
 5   the letter to them.
 6       Q.    You receive the records, documents relevant to
 7   the issue, with the understanding that you're reviewing
 8   them to be able to send a letter to the claims management
 9   personnel.  The purpose of that letter and the content of
10   that letter says, You should open an investigation and go
11   interview these people on these issues.  Is that fair?
12       A.    Yes, yes, outline the issues, outline the staff,
13   and then they can go from there.
14       Q.    And you send that letter directing the
15   investigation.  After the letter is sent, you don't
16   conduct the investigation, right?
17       A.    We do not conduct the investigation.
18       Q.    You're not interviewing the witnesses?
19       A.    Infrequently, we might be involved in
20   interviewing the witnesses; again, cases where the loss is
21   potentially very large.
22       Q.    Absent those situations, you're not conducting
23   any interviews?
24       A.    In most situations, my firm and I are not
25   conducting the interviews.
```

1    Q.    Do you have any more involvement in that

2  precautionary process other than reviewing the documents

3  and sending the letter?

4    A.    Depends on the case.

12:19:20    5    Q.    Okay.  After the investigation is conducted by

6  the whoever in the hospital conducts the investigation,

7  does it come back to you for a final report?  Does it come

8  back to you for -- what?  What does it come back to you

9  for?

12:19:33    10    A.    Oh, if there was some kind of consultation with

11  the hospital as to what they want to do next, we

12  participate in telling them what we think they ought to

13  do, if anything, and we wait, most of the time.  On very

14  unusual occasions, we might actually contact a patient or

12:19:57    15  a patient's family to try to resolve the issue.

16    Q.    When you say "we wait," what you mean is, we

17  wait to see if the patient files a lawsuit?

18    A.    Correct.

19        Many of the precautionaries are, in fact, not

12:20:13    20  associated with negligence.  They were bad outcomes

21  without negligence.

22    Q.    Do you have any idea how many incidents in which

23  you were asked to provide a precautionary letter resulted

24  in a lawsuit?

12:20:44    25        MR. GERMAN:  Form.

```
         1          THE WITNESS:  I can't give you a good estimate.
         2  It feels to me like fewer than 50 percent become lawsuits.
         3  BY MR. MATURA:
         4     Q.    Now, between -- let me start over.
12:21:24 5          During the time you were at your firm, Fadell
         6  Cheney & Burt, were you asked by the court system to serve
         7  as a judge pro tem for cases?
         8     A.    No.
         9     Q.    Were you ever identified -- I think, if you've
12:21:41 10 been practicing five years, 10 years, I can't remember the
         11 number.  I think it's five -- but you might be randomly
         12 selected to serve as an arbitrator for a case that's
         13 subject to compulsory arbitration; do you do that?
         14    A.    Oh, yes.
12:21:53 15    Q.    Seems like the whole firm gets hit on the same
         16 day or something, but ...
         17    A.    And every two years there's a new one.
         18    Q.    There's a new one, a pink slip comes in the mail
         19 and you know what it is.  Did you do that?
12:22:02 20    A.    Yes.
         21    Q.    And you were required to do it by the Court,
         22 right?
         23    A.    Yes.
         24    Q.    And lawyers, I believe, can request a petition
12:22:11 25 to be excused from that responsibility.  Did you ever do
```

```
 1  that, get excused from it?
 2         MR. GERMAN:  Form.
 3         THE WITNESS:  I don't think so.  There were a
 4  couple of them in more recent years where I said, Can we
 5  just try to settle this instead?
 6  BY MR. MATURA:
 7     Q.   So let's talk about prior to 2007.  Do you
 8  remember being appointed as an arbitrator for a case
 9  subject to compulsory arbitration like we talked about?
10     A.   I'm sorry.  I have no memory, one way or the
11  other, of that.
12     Q.   Of the time frame?
13     A.   Of the time frame.
14     Q.   But have you conducted an arbitration hearing?
15     A.   Oh, yeah, yes.
16     Q.   Okay.  All right.  Would it have been -- I use
17  2007 as my gauge, but after you formed your firm, do you
18  remember doing that?
19     A.   Yes.
20     Q.   Do you remember the last time you did it?
21     A.   I think I've done some not too long ago.
22     Q.   'Cause you're still an active member of the bar?
23     A.   I'm an active member the bar.
24     Q.   So your name's on the list to be selected?
25     A.   I think my name's at the top of the list from as
```

1   frequently as I get them, but I do.  I had one involving
2   washing machines.
3       Q.   Have you done one in the last year or, let's
4   say, 2017, did you do one; do you remember?
12:23:32  5       A.   I think my washing machines were in 2017.
6       Q.   And it was -- that was a case that you held an
7   arbitration hearing?
8       A.   I did not hold a hearing.
9       Q.   Did it settle?
12:23:46  10      A.   Instead, I tried to mediate them into a
11  settlement and, in fact, they did settle.
12           I did one that was a car accident side-swipe on
13  the 101 that might have been in the last four years.
14      Q.   That was the arbitration hearing you remember?
12:24:07  15      A.   That's the last one I remember.
16      Q.   Within the last four years?
17      A.   'Cause I think I've only done -- an actual
18  hearing?  I think I've only done two.
19      Q.   So the arbitration hearing that involved a car
12:24:20  20  accident within the last four years -- sorry.  Strike
21  that.
22           That's a dispute that you handled as the
23  arbitrator?
24      A.   Yes, the court-appointed mandatory arbitration.
12:24:32  25      Q.   And --

```
         1    A.    And they're under $50,000.  They have to be
         2  small, you know.
         3    Q.    And the parties presented arguments of witnesses
         4  to you?
12:24:40 5    A.    Yes.
         6    Q.    And you issued a written decision?
         7    A.    I believe I did.
         8    Q.    I think you're required to by the rules.  Does
         9  that sound right?
12:24:47 10   A.    Yes, I understand it to be written.  I don't
        11  think it has to be much of a decision, I think.  As I
        12  recall, the car accident, I denied liability.  Found -- I
        13  don't know.  I found no liability.
        14   Q.    Did the parties submit pre-arbitration
12:25:14 15  statements to you?
        16   A.    I believe so.  That would have been my
        17  requirement.
        18   Q.    Do you remember that if included copies of
        19  exhibits they intended to introduce?
12:25:22 20   A.    I don't remember.
        21   Q.    There were live witnesses presented to you,
        22  though; is that right?
        23   A.    At least one, the plaintiff.
        24   Q.    Do you remember how long that hearing lasted?
12:25:48 25   A.    No.
```

```
          1    Q.   An hour or two?

          2    A.   Not even an hour.

          3    Q.   They're usually pretty short, about an hour is

          4  pretty standard, I think.  But you remember less than an

12:25:56  5  hour?

          6    A.   I think it might have been an hour, solely

          7  because the plaintiff was not English-speaking and we were

          8  working with a interpreter, and it was not going smoothly;

          9  otherwise, I think it would have been over in 15 minutes.

12:26:10 10         When I do those, I do have people brief them for

         11  me, because that way I can take my time to get through

         12  those pleadings and know what the facts are and the

         13  arguments are when I get in there.  It's just much easier

         14  for me.  My speed of processing is not what it used to be.

12:26:29 15    Q.   Did you have someone brief those issues for you?

         16    A.   No, I had the parties brief them.

         17    Q.   Oh, okay.  Thank you.

         18         You send out a letter to the attorneys

         19  requesting that they submit a brief to you ahead of the

12:26:42 20  arbitration hearing date outlining the issues?

         21    A.   Yes.

         22    Q.   And the legal --

         23    A.   And also -- I'm sorry.

         24    Q.   No, no, go ahead.

12:26:48 25    A.   I insist that they first send me a list of
```

```
 1  disputed and undisputed facts, because I am not going to
 2  try to deal with a bunch of undisputed facts.
 3         Then, when they tell me what the disputed facts
 4  are, then I have them file something that we used to call
 5  trial memorandum, which is, give me your case.  Tell me
 6  what the facts are.  Tell me what the damages are.
 7     Q.   The law?
 8     A.   The law, if you're going to make me talk about
 9  law.  So that, really, I have the whole case before I
10  actually have people there, and then I make a decision
11  about who gets to testify, because if I don't think I need
12  to hear them testify, they don't testify.
13     Q.   Do you review everything they send you before
14  you walk into the arbitration hearing?
15     A.   I do, because I can take my time and look it
16  over.  I'm not good every day, Jeff.  I'm not good when I
17  have lows.  I'm not good when I have highs.  So I have to
18  have time in advance to get ready for things like that.
19     Q.   And is this the process that you used with this
20  arbitration hearing within the last four years that you
21  talked about, car accident?
22     A.   The car accident, yes.
23     Q.   Had there been other arbitrations hearings that
24  you can recall at this point in time?
25     A.   Honestly, as I sit here, all I can remember is
```

```
              1   the Vietnamese car accident and the washing machines.
              2        Q.    But the washing machine settled?
              3        A.    And the washing machines, I made them settle.
              4        Q.    Did you talk to the lawyers in that case?
   12:28:18   5        A.    Yeah.
              6        Q.    And how did you help them settle?
              7        A.    I mediated in my standard way.  Put them in
              8   separate rooms and made arguments to both.
              9        Q.    Sorry.  I didn't mean to cut you off.
   12:28:30  10        A.    Yeah.
             11        Q.    Did you propose, rather than an arbitration, a
             12   mediation?
             13        A.    'Cause I did it for them for free.
             14        Q.    So just to finish off real quick on the
   12:28:47  15   arbitration hearing.  I understand that you said you
             16   request disputed/undisputed facts, you request they submit
             17   what you call the trial memo, which outlines the issues,
             18   the facts, the damages; to the extent necessary, the law
             19   as well, is that correct?
   12:29:00  20        A.    Correct.
             21        Q.    And, after you review all that prior to the
             22   arbitration hearing, you then make a ruling as the
             23   arbitrator of who can testify?
             24        A.    Yes.
   12:29:07  25        Q.    If you don't think they're relevant, you don't
```

```
 1   need to hear from them?
 2        A.    Correct.
 3        Q.    Is this something you issue ahead of time, or do
 4   you just make the decision during the hearing?
 5        A.    No, I give them advanced notice.
 6        Q.    Send them a letter; is that right?
 7        A.    I'm more of a telephone kind of a person but,
 8   usually we have a joint telephone call to talk about how
 9   it's going to go.
10        Q.    You'll have a conference call with the
11   attorneys?
12        A.    Conference call, that's the word.
13        Q.    That's okay.
14              You'll have a conference call with the attorneys
15   before the arbitration hearing to discuss the process
16   that's going to occur at the hearing?
17        A.    Yes.
18        Q.    Including who can testify and who can't?
19        A.    Yes.
20        Q.    And, then, after you hear the evidence at the
21   hearing, you issue a written -- I think I used the word
22   "decision" before, but you have to do something in writing
23   at the end, correct?
24        A.    Arbitration award, I believe it is called.
25        Q.    Thank you.
```

Timestamps: 12:29:17 (5), 12:29:27 (10), 12:29:34 (15), 12:29:42 (20), 12:29:56 (25)

```
        1      A.     But I always take them under consideration.  I
        2   don't tell them what I've decided until after they're
        3   gone.
        4      Q.     So after hearing the evidence at the arbitration
12:30:30  5   hearing, you take it under advisement, not making any
        6   decision on the spot, correct?
        7      A.     Correct.
        8      Q.     And then you issue -- and you used the right
        9   word I was thinking of earlier -- you issue an arbitration
12:30:38 10   award?
       11      A.     Correct.
       12      Q.     And then your process is done?
       13      A.     Yes.
       14      Q.     But do you remember, during the arbitration
12:30:44 15   hearing, if one of the parties submit a proposed judgment
       16   to you?
       17      A.     I don't remember.
       18      Q.     I know that arbitrators have the right -- and
       19   I'm saying arbitrators in the context of being assigned as
12:31:05 20   a compulsory arbitrator like we're talking about here.
       21   They have the right to request the file from the Court to
       22   review the pleadings.
       23      A.     Yes.
       24      Q.     Did you do that with respect to the case you
12:31:14 25   handled with the car accident four years ago?
```

```
 1        A.    I don't remember, but it would be my custom and
 2   practice to ask one of the paralegals at the firm to get
 3   that chart for me if I thought I was going to need it.
 4        Q.    Do you remember specifically whether you
 5   reviewed the pleadings for this arbitration matter from
 6   the court file?
 7        A.    I do not remember.  My best recollection is, I
 8   usually ask the parties to give me the stuff they think
 9   makes their case.  I still love to read other people's
10   medical records.
11        Q.    That, you enjoy?
12        A.    I love it.
13        Q.    Why is it?
14        A.    I still can't believe I had a career where I got
15   paid to read other people's medical records.
16        Q.    What do you find fascinating about it?
17        A.    I love medicine, I love nursing, and the
18   different ways that the human body reacts to different
19   factors.  I -- I had the perfect career for me.
20        Q.    And how do you fill that need now?
21        A.    I still read the medical literature, JAMA and
22   those things.  I miss it.  I still have Gary tell me about
23   his cases.
24        Q.    And you can talk to him about his cases and
25   maybe get paid?
```

12:31:41   (line 5)
12:32:09   (line 10)
12:32:17   (line 15)
12:32:44   (line 20)
12:33:11   (line 25)

```
 1    A.    No.
 2    Q.    Okay.  But in all seriousness, sometimes that
 3  feeds your desire for the medical records, right?
 4    A.    Well, the fact of the matter is, my partner
 5  Gary, who is a very dear man, when the insurance company
 6  didn't pay my benefits like I thought it was going to,
 7  Gary created jobs for me.  He picks out depositions in
 8  multiple-defendant cases where he can send me to cover
 9  those depositions for him.  I don't have to ask any
10  questions.  I don't have to defend.  I don't have to take.
11  All I've got to do is take a few notes.  And even if my
12  notes aren't good, I'll have the transcript so that we can
13  send a report.  So he has paid me, and he's paid me to --
14          MR. MATURA:  Pause for a minute.  We'll go off
15  the record for a minute.
16          (Recess taken from 12:34 to 12:35 p.m.)
17  BY MR. MATURA:
18    Q.    Ms. Cheney, before our very quick break to get
19  some food and drinks in here, you were telling me about
20  situations where Gary, your husband [sic] --
21    A.    No, no.
22    Q.    I'm sorry.  Excuse me.  I apologize.
23          Gary, your law partner -- I'm sorry.  Gary,
24  your -- Gary Fadell, your law partner, will send you to
25  sit for a deposition in cases involving multiple
```

```
         1   defendants?
         2        A.    Correct.
         3        Q.    When was the last time that you did that, then?
         4        A.    Very recently.
12:36:32 5        Q.    What does that mean?  In the last month, six
         6   months?
         7        A.    Within the last month.
         8        Q.    December of 2017?
         9        A.    I believe I did one in January.
12:36:47 10       Q.    January of 2018?
        11        A.    Yes.
        12        Q.    So this month, Gary contacted you and said, Do
        13   you want to go sit for this deposition?
        14        A.    Correct.
12:37:00 15       Q.    Is that how it works?
        16        A.    That's how it works.
        17        Q.    And you agreed to go and you sat for the
        18   deposition?
        19        A.    Yes.
12:37:05 20       Q.    How long did it last?  Was it a long day?
        21        A.    No.
        22        Q.    Okay.
        23        A.    It was maybe 90 minutes, maybe two hours.
        24        Q.    It was a multiple-defendant case?
12:37:19 25       A.    Yes.
```

123

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | Q.    Did you ask any questions?                             |
|          | 2  | A.    No.                                                    |
|          | 3  | Q.    Prior to going to that deposition, do you              |
|          | 4  | educate yourself on the issues?                              |
| 12:37:28 | 5  | A.    I read the status letter, yes.                         |
|          | 6  | Q.    The status letter that Gary sends to his client?       |
|          | 7  | A.    Yes.                                                   |
|          | 8  | Q.    Do you review any other documents in the file?         |
|          | 9  | A.    Not usually.  Gary is a pretty good reporter.          |
| 12:37:42 | 10 | Q.    So you're reviewing the status letters, and his        |
|          | 11 | status letters are written in such a way that you're able    |
|          | 12 | to understand the factual legal issues --                    |
|          | 13 | A.    Yes.                                                   |
|          | 14 | Q.    -- as well as why the individual's being               |
| 12:37:54 | 15 | deposed?                                                     |
|          | 16 | A.    Yes.                                                   |
|          | 17 | Q.    After this deposition in January of 2018, do you       |
|          | 18 | provide a status back to Gary?                               |
|          | 19 | A.    I give my notes to Gary, and he prepares a             |
| 12:38:20 | 20 | status letter.                                              |
|          | 21 | Q.    So are you, literally, sitting around the table        |
|          | 22 | take notes while the witness testifies; is that --          |
|          | 23 | A.    Yes.                                                   |
|          | 24 | Q.    And, then, in order to know what information to        |
| 12:38:37 | 25 | write down as a note, is that based upon your review of      |

```
             1    the status letters and what the issues are in the case you
             2    can pick up on what's relevant --
             3         A.    Yes.
             4         Q.    -- what you're doing?  Okay.  Fair enough.
12:38:49     5               And, then, do you and Gary talk about the
             6    deposition, or does he just review your notes?
             7         A.    Usually just reviews the notes.  If he needs the
             8    information for additional depositions or oral arguments
             9    that are coming up, I call him and tell him what happened.
12:39:07    10    I did in this particular case.
            11         Q.    The one that was in January of '18?
            12         A.    Yes, because there was something coming up where
            13    he needed to know what the doctor had said at her
            14    deposition.
12:39:17    15         Q.    Did you know about it ahead of time?  Were you
            16    listening for something in particular, or is this an issue
            17    that arose after the deposition?
            18         A.    No, it was more just -- she was plaintiff's
            19    expert, and he just needed to know, basically, what her
12:39:31    20    theory of the case was.
            21         Q.    So it was an expert deposition that you attended
            22    in January 2018?
            23         A.    Yes.
            24         Q.    And after the deposition, in addition to
12:39:41    25    reviewing your notes, Gary called you and asked you a
```

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|          | 1  | particular question about the testimony?                   |
|          | 2  |     A.    No.  I think I called him, just to tell him what |
|          | 3  | the results were, 'cause there was something else coming   |
|          | 4  | up in the case where I wanted him -- oh, I know.  It's      |
| 12:39:55 | 5  | coming for mediation, and it was important for him to know |
|          | 6  | what this particular plaintiff's expert had as a theory on |
|          | 7  | the case.  Causation is a huge issue in the case.          |
|          | 8  |         So, yes, that's how I get my medical fix. |
|          | 9  |     Q.    Gary pays you to attend these depositions? |
| 12:40:18 | 10 |     A.    He did. |
|          | 11 |     Q.    At an hourly rate? |
|          | 12 |     A.    No. |
|          | 13 |     Q.    What's the structure for payment? |
|          | 14 |     A.    At the end of the year, we look at how much |
| 12:40:32 | 15 | collections I have, and then we split it 50/50, whatever   |
|          | 16 | the collections are over the work I did on his files.      |
|          | 17 |     Q.    So you bill your time? |
|          | 18 |     A.    Yes. |
|          | 19 |     Q.    Okay.  I understand. |
| 12:40:46 | 20 |         So if the deposition in January of 2018 -- I |
|          | 21 | think you said it was -- well, how long was it; do you     |
|          | 22 | remember?                                                  |
|          | 23 |     A.    It wasn't more than two hours. |
|          | 24 |     Q.    Let's just say two hours for the sake of our |
| 12:41:00 | 25 | conversation.  A fair estimate for you?                    |

```
 1            You would -- you would bill two hours of time to
 2   attend that deposition?
 3        A.   Correct.
 4        Q.   Do you bill any prep time?
 5        A.   Yes.
 6        Q.   Okay.  Do you bill for the phone call to Gary
 7   afterwards?
 8        A.   No.
 9        Q.   Prep time would be reviewing the status letters?
10        A.   Correct.
11        Q.   And do you bill for anything else with respect
12   to that deposition that we haven't talked about?
13        A.   Travel, if I have to travel out of the town of
14   Phoenix.
15        Q.   Okay.  Do you travel ever out of state to cover
16   a deposition?
17        A.   Occasionally.
18        Q.   Okay.  Let's just focus on the one that was in
19   January 2018 for a bit more.  Was that local?
20        A.   No, that one was out of state.
21        Q.   Where was it?
22        A.   Orange County, California.
23        Q.   So did you fly in the day before?
24        A.   Yes.
25        Q.   And spent the night in a hotel, right?
```

| | | |
|---|---|---|
| | 1 | A.    No, I stayed with friends. |
| | 2 | Q.    Okay.  Spent the night somewhere? |
| | 3 | A.    Yes. |
| | 4 | Q.    At a friend's house.  The deposition's the next |
| 12:42:02 | 5 | day? |
| | 6 | A.    Yes. |
| | 7 | Q.    And then do you fly home that same day? |
| | 8 | A.    No.  When I do these, I have to have a day to |
| | 9 | travel, a day for the deposition, and a day to travel |
| 12:42:13 | 10 | home. |
| | 11 | Q.    Okay.  So it was a three-day trip? |
| | 12 | A.    Yes.  Travel is very hard on my blood sugar. |
| | 13 | Q.    So, as I understand your testimony, then, in |
| | 14 | January 2018, you flew to Orange County, the next day you |
| 12:42:30 | 15 | attended the two-hour deposition of a plaintiff's expert |
| | 16 | in that case, and then the following day flew back home to |
| | 17 | Phoenix? |
| | 18 | A.    That's correct, and I actually flew into the |
| | 19 | Burbank airport. |
| 12:42:45 | 20 | Q.    And you billed the client for the prep time, |
| | 21 | reviewing the status letters, correct? |
| | 22 | A.    Yes. |
| | 23 | Q.    Attending the deposition? |
| | 24 | A.    Yes. |
| 12:42:54 | 25 | Q.    And travel cost? |

|  |  |  |
|---|---|---|
| | 1 | A.   Travel cost. |
| | 2 | Q.   Right.  Airline ticket? |
| | 3 | A.   Correct. |
| | 4 | Q.   You know, meals, rental car, that kind of stuff? |
| 12:43:03 | 5 | A.   Right. |
| | 6 | Q.   Do you charge for travel time? |
| | 7 | A.   Yes, but it's according to a formula that I |
| | 8 | don't even know what it is. |
| | 9 | Q.   That's between the client and Gary? |
| 12:43:15 | 10 | A.   Yes. |
| | 11 | Q.   So you enter -- you tell Gary your travel time, |
| | 12 | and then the formula figures out how much gets billed; is |
| | 13 | that right? |
| | 14 | A.   Yes, exactly right. |
| 12:43:25 | 15 | Excuse me while I get a mint. |
| | 16 | Q.   Then, in terms of what you're paid, as I |
| | 17 | understand your prior testimony, at the end of the year, |
| | 18 | Gary looks at the collections for -- let use this |
| | 19 | January 2018 deposition as an example. |
| 12:44:01 | 20 | A.   Uh-huh. |
| | 21 | Q.   If that's the only deposition you handled in |
| | 22 | that case, at the end of the year, Gary will look at the |
| | 23 | collections for that case and see that, Okay, Cynthia, you |
| | 24 | had two hours of, you know, attending this deposition, and |
| 12:44:17 | 25 | we collected X amount of dollars for that, plus whatever |

```
         1   other time was billed for you to prepare for it, and then
         2   you split it 50/50; is that right?
         3       A.    It's whatever collections come in as opposed to
         4   what might be billed, 'cause they aren't always the same.
12:44:33 5       Q.    Absolutely.  So looking at revenue in the door
         6   gets split 50/50?
         7       A.    Yes, after my small overhead.  I have a little
         8   overhead for dental and vision insurance, and I have --
         9   well, I run my phone through the firm.
12:44:46 10      Q.    Okay.
        11       A.    So those have to come off.  Oh, and my bar dues.
        12       Q.    So overhead paid first?
        13       A.    Uh-huh.
        14       Q.    And then dollars in the door after overhead are
12:44:58 15  paid as split 50/50 between the firm and you?
        16       A.    Yes.  And that may not happen at the end of the
        17  year.  If there's actually going to be some cash, I may
        18  try to get it during the year.
        19       Q.    All right.  Do you handle multiple depositions
12:45:17 20  for the same case?
        21       A.    Sometimes.
        22       Q.    Is the process the same as we've just described
        23  when you attend a deposition?  Meaning, you'll review the
        24  status letters, you'll attend, you'll take notes; if
12:45:36 25  necessary, you'll call Gary afterwards; is that process
```

130

```
          1   the same?
          2        A.    Pretty much.
          3        Q.    And --
          4        A.    I might, now and again, call a fellow defense
12:45:49  5   lawyer to ask a question.
          6        Q.    About an issue in that case?
          7        A.    Yes, or to ask them if their client is going to
          8   dump on mine.
          9        Q.    Okay.  Just to talk strategy or -- or not
12:46:02 10   strategy.  I guess strategy is not the right word.
         11        A.    I wouldn't call it strategy.  I'm just trying to
         12   get a head's up as to what they think the testimony is
         13   going to be.
         14        Q.    To be prepared?
12:46:11 15        A.    Uh-huh.
         16        Q.    Have you ever asked a question during one of
         17   these depositions?
         18        A.    I've asked non-substantive ques- -- I've asked
         19   questions where I didn't understand a previous answer, and
12:46:29 20   I've asked a question as to whether the expert has
         21   anything negative to say about my client, when I know the
         22   answer's going to be "no," and that's it.
         23        Q.    Have you attended non-expert witness depositions
         24   on behalf of Gary?
12:46:56 25        A.    A few damages witnesses, lay witnesses.
```

```
         1     Q.    How about party depositions?
         2     A.    Oh, Gary is -- Gary would not send me to a party
         3  deposition.
         4     Q.    So he would send you to lay witnesses and
12:47:19 5  experts?
         6     A.    Yeah, experts who aren't against us or for our
         7  particular defendant.  They're experts for the other
         8  defendants, or -- I do not take depositions.  I do not
         9  defend depositions.  I wish I could, but I can't.
12:47:40 10    Q.    How many depositions has Gary sent you to on
        11  average over a year time frame?  Do you know how many you
        12  did in 2017?
        13    A.    I'm going to say between six and 12.
        14    Q.    And has that been consistent since you wound
12:48:06 15 down your practice in 2006, I believe you testified to
        16  earlier?
        17    A.    No, I didn't do any -- I didn't do any of that.
        18  That came about from Gary's generosity.  When the
        19  insurance company denied me disability benefits, he
12:48:24 20 created this as a shelter employment.
        21    Q.    So when did this start?  What year, to your
        22  recollection, did this start?
        23    A.    I think it was 2013.  I really have to look at
        24  records to be sure of when.
12:48:54 25    Q.    That's okay.
```

```
             1              It appears that the final determination from the
             2    case manager at American General was July of 2015, if I
             3    remember correctly, just to help you with some dates.  So
             4    assuming that what I said is accurate, then it would have
12:49:47     5    been after that that Gary started or is it before that?
             6              MR. GERMAN:  Form.  Form as to -- she said that
             7    when the insurance company wouldn't pay her claim --
             8              MR. MATURA:  Okay.
             9              MR. GERMAN:  -- so I think that's a --
12:50:02    10              MR. MATURA:  Earlier?
            11              MR. GERMAN:  Well, maybe.  I don't know.
            12              THE WITNESS:  I think -- I think it was earlier,
            13    because I remember a discussion with Gary where I said I
            14    haven't -- he kept saying, When are you going to get your
12:50:20    15    benefits?  When are you going to get your benefits?  And I
            16    said, Well, they're not paying them yet.
            17    BY MR. MATURA:
            18         Q.   Okay.
            19         A.   So this was his idea, an act of generosity for
12:50:30    20    me, because money was really, really tight.
            21         Q.   That's fine.
            22              And, then, just based upon your recollection --
            23         A.   Uh-huh.
            24         Q.   -- the application for benefits, again, if it
12:50:40    25    helps you, is January of 2014, at least according to my
```

|          |    |                                                         |
|----------|----|---------------------------------------------------------|
|          | 1  | records.  But putting that all aside, just your best    |
|          | 2  | independent memory and recollection would be -- when did|
|          | 3  | this start?  When did Gary start sending you to         |
|          | 4  | depositions?                                            |
| 12:50:59 | 5  | A.   It still feels to me, like, 2013.                  |
|          | 6  | Q.   That's fine.  I just want your independent --      |
|          | 7  | your best recollection.                                 |
|          | 8  | A.   Because, at that point, I -- you know, 2012, I     |
|          | 9  | finally gave it up.  Okay.  I had kept thinking all this|
| 12:51:19 | 10 | time I was going to fix this.  I was going to power      |
|          | 11 | through this.  I was going to build another career.  I was|
|          | 12 | I was going to get well.  And, in 2012, is when I retained|
|          | 13 | Steve and said, You know what?  I need help --          |
|          | 14 | Q.   And --                                             |
| 12:51:39 | 15 | A.   -- and I'm not going to be able to earn this       |
|          | 16 | income again.  I'm not going to be able to do that.     |
|          | 17 | Q.   And it was after that -- shortly after that that   |
|          | 18 | Gary created this opportunity for you to send you to lay |
|          | 19 | witness and expert depositions, as you've discussed?    |
| 12:51:56 | 20 | A.   That's how I recall it.  It may not be exactly     |
|          | 21 | right, but I think that's the right time frame.         |
|          | 22 | Q.   And you told me earlier that you -- that you       |
|          | 23 | cover between six and 12 depositions a year.  Has that   |
|          | 24 | been consistent since the beginning?                    |
| 12:52:10 | 25 | A.   No.  It started out much smaller than that,        |

1    because he and I were both very concerned about whether I
2    could actually do it and what would happen.
3        Q.    When did the volume increase to six to 12 a
4    year?
12:52:21  5        A.    In the last year.
6        Q.    Okay.  "Last year" meaning 2017 or 2016?
7        A.    2017.  Before that, it was probably six.
8        Q.    So six a year for the first few years,
9    approximately?
12:52:37  10        A.    Roughly.
11        Q.    Okay.  I understand it's an estimate.
12              And then within the last year, meaning 2017, the
13    volume increased to as much as perhaps 12 --
14        A.    Yes.
12:52:52  15        Q.    -- approximately?
16        A.    Approximately.
17        Q.    Signifying that Gary's comfortable with you
18    handling these depositions?
19        A.    He's more comfortable that I'm not going to get
12:53:04  20    there and completely screw it up, yes.  I can sit through
21    them.  I can behave myself.  I can take reasonably legible
22    notes.
23        Q.    He wouldn't send you if you were a liability to
24    the case, obviously?
12:53:14  25        A.    Exactly, or if I was going to be so ill I

```
         1   couldn't attend --
         2      Q.   Right.
         3      A.   -- because that was our big worry from the
         4   beginning about the mediations and the depositions, is
12:53:25 5   that my health from day-to-day was so erratic that he
         6   would count on me to be there to make this appearance and
         7   then I wouldn't show up.
         8      Q.   Right.  And these are multi-party cases with
         9   lots of lawyers involved, right?
12:53:42 10     A.   Exactly.  And then here he would be having made
        11   plans to attend to something else on a different case, and
        12   the appearance he was counting on me to make for his
        13   client wouldn't get made, 'cause I'd be too sick, and that
        14   would be -- that's not the way we want to run our
12:53:59 15  practice.
        16     Q.   And the increase in volume to, approximately, 12
        17   a year is indicative of the dependability upon you showing
        18   up, too, right?
        19     A.   Having my pump has made me more dependable,
12:54:12 20  'cause now I know when I'm bad.
        21     Q.   Are you doing okay?
        22     A.   And I'm doing okay.  Thank you for asking.
        23     Q.   Now, how frequently of these six to 12 that
        24   you've covered over the years --
12:54:42 25    A.   Uh-huh.
```

```
 1    Q.   -- for Gary -- I understand the volume's
 2  increased over the last year.  How many of those involved
 3  travel out of state?  Can you give me a sense?
 4    A.   Well, I was going to say not very many, but when
 5  you're only talking about six or 12, I'm not sure what
 6  that is.  A few.
 7    Q.   You've gone to Orange County for the deposition
 8  in January, correct?
 9    A.   Yes.
10    Q.   Can you tell me the other locations you've been
11  for covering depositions?
12    A.   Well, the only time I went a long way -- they're
13  almost always California or Oregon, 'cause they're close.
14  I did go a long way one time to New York, again, where
15  Marty Dean took the deposition and Mark somebody defended
16  the deposition.  I did agree to go to New York, 'cause I
17  wanted to visit friends.
18         (Cell phone interruption.)
19         THE WITNESS:  That's my phone.  I'm very sorry.
20         MT. MATURA:  Oh, no, I wanted to make sure it
21  wasn't your -- I thought maybe an alarm was going off.
22         THE WITNESS:  Oh, no.  The medical device is
23  much more ...
24  BY MR. MATURA:
25    Q.   So you went to New York to cover a deposition.
```

12:55:00    5

12:55:14    10

12:55:38    15

12:55:54    20

12:56:07    25

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | A.    One time.                                          |
|       | 2  | Q.    When was that?                                     |
|       | 3  | A.    I think it might have been last fall.  I can't    |
|       | 4  | remember now if it was last fall or a year from last fall. |
| 12:56:19 | 5  | Q.    So either the fall of 2016 or 2017?            |
|       | 6  | A.    Yes, and I stayed five days so that I could rest  |
|       | 7  | and -- and visit friends.  It was nice for me.  I haven't |
|       | 8  | gotten to travel much for financial reasons, and I love to |
|       | 9  | travel, so -- but, otherwise, they're either local, video |
| 12:56:42 | 10 | conference, or Southern California.                  |
|       | 11 | Q.    Or Oregon, you said, also?                        |
|       | 12 | A.    I have had one in Oregon in the summer, and I     |
|       | 13 | did get one in Oregon.                                  |
|       | 14 | Q.    Last summer?                                      |
| 12:56:55 | 15 | A.    No.                                            |
|       | 16 | Q.    Two years ago?                                    |
|       | 17 | A.    Uh-huh, at least -- at least a year and a half    |
|       | 18 | ago.                                                    |
|       | 19 | Q.    Okay.                                             |
| 12:57:00 | 20 | A.    Maybe two and a half.                           |
|       | 21 | Q.    Do you know if you have any more scheduled        |
|       | 22 | depositions to cover coming up?                         |
|       | 23 | A.    Oh, you don't want me to probably look at my      |
|       | 24 | calendar.                                               |
| 12:57:14 | 25 | Q.    Just if you remember.                           |

|          |    |    |                                                           |
|----------|----|----|-----------------------------------------------------------|
|          | 1  | A. | I cannot think of any.                                    |
|          | 2  | Q. | How much advance notice do you typically get?             |
|          | 3  | A. | Oh, weeks.                                                |
|          | 4  | Q. | Okay.                                                     |
| 12:57:21 | 5  | A. | 'Cause I have to prepare.  It takes -- I have to          |

have some time, and I have to prepare, and I have to plan
my meals and ...

Q.   And, obviously, if you have to travel, you have
to plan that as well?

12:57:33   A.   Absolutely.  And I never travel and do a
deposition on the same day.

Q.   Other than covering depositions, has Gary asked
you to complete any other work on his cases?

A.   No -- oh, the only other work I have done is,
12:57:57   there was at least one case and maybe two where he had
defended clients who were not good candidates for
litigation, if you know what I'm saying, and they needed
someone to sit and talk with them about how to be a nice
person on the witness stand, and that was my job.

12:58:20   Q.   So Gary had a difficult client who was not going
to present well as a witness?

A.   Exactly.

Q.   And he asked you to come and speak to the client
about how to present better as a witness?

12:58:32   A.   Yes.

|          |    |    |                                                        |
|----------|----|----|--------------------------------------------------------|
|          | 1  | Q. | How to testify, how to appear?                         |
|          | 2  | A. | I think that happened twice.                           |
|          | 3  | Q. | When?                                                  |
|          | 4  | A. | Oh, it's been a long time ago.  Maybe more than        |
| 12:58:51 | 5  | three years ago, less than five -- three to five years |
|          | 6  | ago.  He goes to trial a lot.                          |
|          | 7  | Q. | Three to five years ago.  Okay.  Three to five         |
|          | 8  | years ago -- I mean, 2013, 2015, roughly, time frame.  Was |
|          | 9  | it -- you met with two witnesses?                      |
| 12:59:12 | 10 | A. | No, it was a different cases.                          |
|          | 11 | Q. | Different cases, okay.                                 |
|          | 12 | A. | A defendant in two separate cases.                    |
|          | 13 | Q. | Different person?                                      |
|          | 14 | A. | Yes.                                                   |
| 12:59:21 | 15 | Q. | Okay.  Two defendants, two separate cases, they        |
|          | 16 | both occurred three to five years ago, and Gary asked you |
|          | 17 | to come in and help, what, educate these defendants on how |
|          | 18 | to testify?                                            |
|          | 19 | A. | I'm sure you've heard the expression                   |
| 12:59:37 | 20 | "sandpaper."                                           |
|          | 21 | Q. | Yeah.                                                  |
|          | 22 | A. | Yes.                                                   |
|          | 23 | Q. | All right.                                             |
|          | 24 | A. | To smooth out some rough edges in the way they         |
| 12:59:43 | 25 | presented.                                             |

```
            1      Q.    Did you -- in preparing for that meeting with
            2   Gary's client, did you review the file, understand what
            3   the issues were, any type of prep work?
            4      A.    Gary would just tell me what the problems were
12:59:56    5   and what the issues were, and that's all I would need.
            6      Q.    Did Gary pay you for that time -- or strike
            7   that.
            8            Did you bill for that time?
            9      A.    I usually do not.  That would be just in the
01:00:16   10   realm of chatting with Gary, but if he billed for me, I'm
           11   unaware of it.
           12      Q.    Did you then attend the trial to see how the
           13   individual testified?
           14      A.    No.
01:00:29   15      Q.    See if he followed any of your advice?
           16      A.    My blood sugar is -- is so tied to adrenaline
           17   and norepinephrine and all those other hormones of
           18   excitement, stress, and fear that, if I go in the
           19   courtroom, my blood sugars just go crazy.  So, no, I do
01:00:52   20   not go down to the courthouse.
           21      Q.    Any other work that Gary has asked you to assist
           22   with?
           23      A.    No, I think I've been really thorough with you.
           24      Q.    Okay.  How about any other lawyers, whether it's
01:01:06   25   at Gary's firm, your firm, or some other firm in town?
```

```
        1   Any lawyers ask you to come in and provide assistance to
        2   them along the lines of what we've talked with here?
        3       A.   Other than what I've told you about explaining
        4   medical issues to my husband, who is a lawyer.
01:01:23  5       Q.   Nothing else, though, besides what we've talked
        6   about?
        7       A.   Not that I can recall.
        8       Q.   Now, as you wound down your trial practice in
        9   2006, my understanding is that you ramped up a mediation
01:01:48 10   practice or at least tried to ramp-up a mediation
       11   practice; is that fair?
       12       A.   It was my hope that I could replace my career --
       13   my litigation career with that.
       14       Q.   So did you go -- did you take any classes on
01:02:07 15   becoming a mediator --
       16       A.   No.
       17       Q.   -- or obtain any State Bar issued certifications
       18   on becoming a mediator?
       19       A.   Nope.
01:02:17 20       Q.   By the way, were you a State Bar specialist?
       21       A.   In personal injury, no.
       22       Q.   Okay.  That was my exact question.
       23           So describe for me the process by which you
       24   developed or tried to develop a mediation practice.
01:02:36 25       A.   Well, I was introduced to the idea of being a
```

```
         1   mediator by a plaintiff's attorney name Ken Clancy, and
         2   the head of claims for the Banner Hospitals, Kathy
         3   Chester, when they asked me to mediate a case for them.
         4   And I didn't have any training other than having watched
01:03:02 5   Dan Mastro for many, many years and many, many mediations.
         6   So after I did that one for them, I told them I'd like to
         7   do more, and so Banner started to send me a few, but I had
         8   a practice -- an active practice to deal with.
         9       Q.   When was this, the one that you handled for Ken
01:03:32 10  and Kathy?
        11       A.   I don't even remember.
        12       Q.   Was it before you started to wind down your
        13  practice?
        14       A.   Yes.
01:03:41 15      Q.   Because had you an active practice?
        16       A.   Yes, 'cause this was something that I just kind
        17  of said to them, Well, you know, I can do this again,
        18  'cause it was fun.  It was all that medicine that I loved
        19  and, yet, it was over in one day.
01:03:59 20           So then after '05 -- so it must have been
        21  '04/'05 that I did that first one.  So after that Pischke
        22  trial in '05, I remember saying to Kathy, You know, I'm
        23  going to have more time coming up.  I'd like to do more
        24  mediations, and she said, Great.  So that was kind of how
01:04:25 25  I got it started.
```

```
         1    Q.    That was the start of it?

         2    A.    Uh-huh.

         3    Q.    Okay.  So, then, when you -- as we move forward

         4   in time a little bit, 2006, 2007, are you still getting

01:04:36 5   mediation referrals from Banner?  I shouldn't say

         6   "mediation referrals."  Are you being hired as a mediator

         7   from Banner?

         8    A.    I'm not sure.  I'd almost have to look at my

         9   billing records to know that.  In '07, I wasn't doing

01:04:58 10  anything.  I had surgery in '07, and I remember turning

         11  down anything for '07.  I had two surgeries in '07.  So my

         12  recollection is that I did a handful in '06.  I'm sure it

         13  wasn't more than that.  I'll bet I didn't do any in '07.

         14   Q.    How about 2008?  Did things big pick up again

01:05:41 15  after 2007?

         16   A.    I don't think so.

         17   Q.    Okay.

         18   A.    After the surgeries, I never came back.  I

         19  really never was good again.  And, then, so '07, '08, and

01:05:56 20  '09, I was pretty sick.  I don't remember them picking

         21  back up again until at least 2010.

         22   Q.    How did they pick back up?  Was it referrals

         23  from old clients?

         24   A.    I think it was me letting the clients know and

01:06:17 25  the plaintiffs' bar, 'cause they -- for whatever reason,
```

|        |    |                                                           |
|--------|----|-----------------------------------------------------------|
|        | 1  | they trusted me.  I tried not to lie to them a lot.  And |
|        | 2  | they just started to come in.  A lot of it was Banner.   |
|        | 3  | Q.    How busy did your mediation practice get after     |
|        | 4  | 2010?                                                     |
| 01:06:41 | 5 | A.    Oh, I wouldn't even call it busy.  Maybe --      |
|        | 6  | maybe one a month.                                        |
|        | 7  | Q.    Okay.                                               |
|        | 8  | A.    I would think one a month would be max, because    |
|        | 9  | that would be 12 a year, and I don't think I was getting  |
| 01:06:58 | 10 | 12 a year.                                             |
|        | 11 | Q.    Do you still do mediations today?                   |
|        | 12 | A.    I do still do some mediations.                      |
|        | 13 | Q.    How is the volume today?                            |
|        | 14 | A.    Very low.  And I have to make sure that Gary's      |
| 01:07:09 | 15 | in the office to help me, because there's so many things I |
|        | 16 | just can't do anymore -- economic damages, structured    |
|        | 17 | settlement, procedural issues, rules of evidence, I have  |
|        | 18 | to have Gary there to back me up and help me work those.  |
|        | 19 | I run down the hall and have him help me work out the     |
| 01:07:26 | 20 | issues as to who's right and who's wrong on them.       |
|        | 21 | Q.    Do you conduct your mediations at Gary's office?    |
|        | 22 | A.    Yes, that's still my office.                        |
|        | 23 | Q.    Still your office.                                  |
|        | 24 |       Do you actually have a physical office there        |
| 01:07:38 | 25 | still?                                                   |

|          | 1  | A.    I do not.  Gary rented it out to a judge. |
|          | 2  | Q.    Do you know how many mediations you did in 2017? |
|          | 3  | A.    Oh, my best estimate is six. |
|          | 4  | Q.    How successful are you at settling cases? |
| 01:08:10 | 5  | A.    Good. |
|          | 6  | Q.    Tell me your process.  What do you do?  How do |
|          | 7  | you get cases settled?  How do you handle a mediation? |
|          | 8  | Walk me through that. |
|          | 9  | A.    It's not a lot of law.  It's a lot more of |
| 01:08:25 | 10 | nursing communication.  I meet with plaintiffs first -- |
|          | 11 | well, first of all, you know they send me memoranda.  So |
|          | 12 | they send me memoranda, and I study those. |
|          | 13 | Q.    The memos -- well, let's back up.  Sorry.  I |
|          | 14 | didn't mean to stop your answer there.  But before we get |
| 01:08:45 | 15 | to the process, you're a mediator which means one of the |
|          | 16 | parties contacts you, correct? |
|          | 17 | A.    Correct. |
|          | 18 | Q.    And says, Hey, Cynthia, we'd like you to mediate |
|          | 19 | our case.  Is that -- are you interested, right? |
| 01:08:57 | 20 | A.    Right. |
|          | 21 | Q.    And run a conflicts check? |
|          | 22 | A.    Right. |
|          | 23 | Q.    Assuming you're interested and the conflicts |
|          | 24 | check clears, do you send out a mediation agreement or an |
| 01:09:12 | 25 | engagement letter or anything to formalize the |

```
 1   relationship?
 2        A.    I do.   Frequently, there are waivers to be had,
 3   because my partner, Gary, is still so active in that
 4   community, and so frequently -- and, frequently, I have
 5   parties that I used to represent.  So that engagement
 6   letter includes the waivers and, yes, there's an
 7   engagement letter --
 8        Q.    All right.
 9        A.    -- once we have a date.
10        Q.    So communication is made to you about serving as
11   a mediator, you run a conflicts check, it comes back
12   clear, you express your interest to mediate the dispute, a
13   date is picked at that point in time?
14        A.    Usually.
15        Q.    Usually.  Okay.
16              A formal engagement letter is sent out by you to
17   the respective lawyers, which includes the necessary
18   waiver language to cover the issues that you've mentioned
19   with respect to your prior involvement and Gary's prior
20   involvement or current involvement, correct?
21        A.    Yes.
22        Q.    You also have a fee that you're going to charge?
23        A.    Yes.
24        Q.    And what do you charge for a mediation?
25        A.    Three hundred an hour.
```

01:09:26 (5)
01:09:37 (10)
01:09:55 (15)
01:10:10 (20)
01:10:16 (25)

|          |    |                                                                  |
|----------|----|------------------------------------------------------------------|
|          | 1  | Q.   Okay.  Is there a minimum?                                  |
|          | 2  | A.   I've never asked for one.                                   |
|          | 3  | Q.   So $300 an hour.                                            |
|          | 4  |      Do you have the lawyers sign the engagement                 |
| 01:10:28 | 5  | agreement and send it back to you?                               |
|          | 6  | A.   I don't.                                                    |
|          | 7  | Q.   Okay.  After the engagement agreement is sent               |
|          | 8  | out or the letter is sent out, do you send a different           |
|          | 9  | communication at that point in time saying, I'd like to          |
| 01:10:42 | 10 | receive mediation memos by a certain date?                       |
|          | 11 | A.   Usually goes in the engagement letter.                      |
|          | 12 | Q.   All right.  And, then, is there, typically, any             |
|          | 13 | other work that you do as a mediator between sending the         |
|          | 14 | engagement letter and receiving the mediation memorandum?        |
| 01:10:58 | 15 | A.   No.                                                         |
|          | 16 | Q.   You receive the memorandum from both sides at               |
|          | 17 | whatever date everyone's agreed to, correct?                     |
|          | 18 | A.   Yes.                                                        |
|          | 19 | Q.   Do you tell them what to put in the mediation               |
| 01:11:05 | 20 | memorandum?                                                      |
|          | 21 | A.   No.                                                         |
|          | 22 | Q.   You receive it and you review it, right?                    |
|          | 23 | A.   Yes.                                                        |
|          | 24 | Q.   You review the mediation memorandum; and, then,             |
| 01:11:17 | 25 | it's your practice to, at that point in time, pick up the        |

```
 1  phone and reach out to plaintiff's counsel or either
 2  counsel?
 3      A.    We usually have a conference call where I find
 4  out things, like, does anybody want to bring a structured
 5  settlement broker?  Do we have lien issues that we need to
 6  talk about?  Are you going to bring the lienholders with
 7  you?  Do we have discovery issues?  I get them to fill me
 8  in on what they see as what motivates settlement, what
 9  impedes settlement, and just to kind of fill me in and see
10  if there are any problems.
11      Q.    Let me back up just half a step here.
12            The mediation memos that you receive, they
13  include a summary of the facts?
14      A.    I'm dealing with people that do medical
15  malpractice all the time.  They know how to do these
16  memorandums and, yes, they ...
17      Q.    Tell me -- tell me what's typically in them.
18      A.    They give me factual background, they give me
19  legal arguments, they tell me discovery disputes.  There
20  might be causation issues.  There might be damages issues,
21  and they tell me what the status of settlement
22  conference -- settlement negotiations have been.
23      Q.    Is part of the memo, typically, a discussion of
24  the medical records or issues?
25      A.    Yes, and sometimes they send me records.
```

01:11:39 (line 5)
01:11:59 (line 10)
01:12:16 (line 15)
01:12:29 (line 20)
01:12:43 (line 25)

|  | 1 | Q.   All right.  Are all of your mediations in the |
| | 2 | field of -- well, strike that. |
| | 3 | Do they all involve medical issues? |
| | 4 | A.   They all involve medical issues, whether that's |
| 01:12:58 | 5 | medical malpractice or adult protective services -- adult |
| | 6 | protective -- APSA or elder abuse. |
| | 7 | Q.   And these individuals are coming to you because |
| | 8 | of your expertise in the medical field? |
| | 9 | A.   Yes, in the medical malpractice field. |
| 01:13:15 | 10 | Q.   Sure, medical malpractice field, sure. |
| | 11 | But not -- the cases that you're mediating don't |
| | 12 | all involve medical malpractice.  There's non-medical |
| | 13 | malpractice disputes that you mediate? |
| | 14 | A.   The elder abuse. |
| 01:13:30 | 15 | Q.   For example, right. |
| | 16 | A.   Well, I don't have any others. |
| | 17 | Q.   Okay. |
| | 18 | A.   No, I don't get anything that doesn't involve |
| | 19 | either elder abuse or medical malpractice. |
| 01:13:39 | 20 | Q.   Okay.  Okay.  And how does it break down, do you |
| | 21 | know, percentage-wise, in terms between medical |
| | 22 | malpractice and elder abuse? |
| | 23 | A.   I'm going to say 50/50. |
| | 24 | Q.   Do the attorneys typically attach copies of |
| 01:13:54 | 25 | medical records to the mediation memo? |

1    A.    Some of the plaintiffs' lawyers will send me

2    medical records or, occasionally, I will ask for a record

3    if it hasn't been provided, but I rely heavily on the

4    memos.

01:14:11    5    Q.    If records are attached or you requested them, I

6    assume you review them before the mediation hearing?

7    A.    It depends on if I feel that's going to add

8    anything.  A well-done memorandum isn't going to need me

9    to look at the medical records.

01:14:27   10    Q.    You then have -- you told me earlier, you then

11   have a conference call with the attorneys to discuss

12   whatever issues might be pending in the case?

13   A.    Not every time, but frequently.

14   Q.    Okay.  Does anything else happen after that

01:14:41   15   conference call before the mediation hearing?

16   A.    No.

17   Q.    Do you have individual calls with the lawyers?

18   A.    Occasionally, but not usually.

19   Q.    The mediation then occurs at your office?

01:14:54   20   A.    Usually, but not always.

21   Q.    Sometimes at one of the other attorney's

22   offices?

23   A.    Yes, particularly if the plaintiffs themselves

24   have mobility issues, it's sometimes more comfortable for

01:15:06   25   them to be at their own attorney's office.

1    Q.    Okay.  And, then, what is your process once you
2    get to the mediation?
3    A.    I start with the plaintiffs.
4    Q.    Meaning, you start -- you separate them into
01:15:16   5    different rooms?
6    A.    I do.  And we do not do any kind of opening
7    statements or meeting like that.  That's so
8    counterproductive.
9    Q.    Gotcha.
01:15:24   10   A.    And I don't think anybody does it that way
11   anymore.
12          And I start with plaintiffs because everybody
13   involved in the mediation is a professional except for the
14   plaintiff, so that's the person that I want to make
01:15:38   15   comfortable as soon as I can, develop some rapport with as
16   soon as I can.  To me, that's the most important person at
17   the mediation, so I start there.
18          I usually spend a good hour with plaintiffs
19   before I even go down and see defendants.  And then I
01:16:02   20   usually have -- will have an opening demand from
21   plaintiffs that then I'll go down, talk to defendants, and
22   I do a shortened diversion of that with defendants,
23   particularly if it's insurance carriers or lawyers that I
24   haven't worked with before, 'cause my style's a little
01:16:22   25   different than many mediators.

1    Q.    What do you mean by that?

2    A.    I have been told that my style is more informal

3  and more interpersonal.  I think what they're telling me

4  is they don't seem to like to talk about the law very

01:16:44    5  much.  My mediations are very fact driven, very jury

6  driven.  I try to make everybody understand that this

7  isn't how you see your case.  This is how eight strangers

8  downtown are going to see your case.

9        And you can't get anywhere until everyone agrees

01:17:04   10  that what we're talking about is the risk of a jury trial.

11  I don't care what you think is fair.  I don't care what

12  you think justice requires.  I care what your risk is in

13  front of eight strangers in a jury trial.  And once I can

14  get both parties or all parties, in the event of multiple

01:17:23   15  defendants, to talk on that same plane and talk about

16  risks of trial and potential exposure, then we can

17  actually get the case settled.

18        In the plaintiffs' case, we also have to talk

19  about their needs and how the money is going to meet their

01:17:45   20  needs, and I've been told that that is a somewhat unusual

21  approach.

22    Q.    Some of the mediations you handle are

23  multi-defendant cases?

24    A.    Yes.

01:17:58   25    Q.    Some of your mediations last all day?

1   A.   I don't take them if they're going to be long

2   anymore.   The last really long one I did was in 2012, and

3   I was really sick.

4   Q.   What do you consider to be the typical time for

01:18:13   5   your mediation?   Half day?

6   A.   Four to six hours.

7   Q.   Four to six hours?   Okay.

8   A.   Yes.

9   Q.   So if you get to the point where you have a set

01:18:38   10   settlement, then you -- do you reduce that to writing at

11   the mediation?

12   A.   Yes, as required by rules.

13   Q.   Okay.   Do you have a standard form that you use

14   that you print out and fill in the names and blanks or how

01:18:53   15   do you do that?

16   A.   No, I make the parties do it.

17   Q.   Okay.   Sometimes, are they handwritten?

18   A.   Yep.

19   Q.   Those are always the best kind.

01:19:12   20        When it comes to issues like structured

21   settlements or alternative arrangements in conjunction

22   with an overall global settlement, those are -- are those

23   sometimes involved in your mediation?   I mean, do you have

24   cases that settle -- do they settle through a structured

01:19:30   25   settlement or through something other than just someone

```
 1   writing a check to someone else?
 2        A.    In medical malpractice, we have to deal with
 3   what is called the Medicare Set Aside.
 4        Q.    Right.
 5        A.    I leave that to the lawyers to figure out how
 6   they're going to do that in the final agreement, because I
 7   still don't understand it.  I know the basic terms of a
 8   settlement agreement:  Confidentiality, no admission of
 9   liability, and -- and then, also, there's the liens issue.
10   I leave that to the counsel to do, because if I have to
11   know something about that, I have to go down the hall and
12   ask Gary.
13        Q.    Okay.
14        A.    Usually, what we have is a little memorandum
15   that says we settled, for how much, standard terms to
16   apply, and then they go away separately and come up with
17   the final settlement agreement and release document.
18        Q.    All right.  Have you had mediations where the
19   parties reach an agreement at the mediation, they leave,
20   and then something comes up where they want to call you
21   again to resolve an issue?
22        A.    Yes.
23        Q.    Describe that for me.
24        A.    Well, I had one where plaintiff's counsel called
25   and said, We don't have a settlement, because his client,
```

01:19:41
01:20:00
01:20:10
01:20:32
01:20:53

            1   who had been appearing by phone, had decided that he did
            2   not like the settlement, and he would not take the
            3   settlement, things like that.
            4           Also, sometimes they'll call if there's a
01:21:15    5   dispute about the purchase of the structure, whether they
            6   want a structure.  A lot of plaintiffs don't want to make
            7   that decision at the same time they're settling the case,
            8   whether or not they want to take the structure or not in
            9   the large cases.
01:21:30   10       Q.    Have you ever been called to testify about the
           11   terms of a mediation settlement?
           12       A.    Not that I can recall.
           13       Q.    Okay.
           14       A.    No, I'd remember that, wouldn't I?  No, I've
01:21:44   15   never been called to testify.  The only one I can remember
           16   is, I had one years ago where there were some issues
           17   around court approval for an incapacitated person, but I
           18   don't think I testified.  That was a long time ago.  That
           19   was before Fadell, Cheney & Burt.  That was at Broening,
01:22:10   20   and you didn't care about those so much.  So ...
           21       Q.    Okay.
           22       A.    So, no, I've never had a dispute go that wrong.
           23       Q.    What about having to file something with the
           24   court so the judge knows what happened at mediation?
01:22:24   25       A.    You mean because of a dispute or just filing a

```
 1  notice of settlement?
 2       Q.    Well, that's a fair question.
 3             Let's take the easy one first, a notice of
 4  settlement.
 5       A.    I don't file those.  The parties do that.
 6       Q.    Exactly.  I think that's right.
 7             What about the more complex situation where
 8  there's some issue that came up and you, as the mediator,
 9  want to inform the judge about what happened?
10       A.    I don't believe so.  I think we've always
11  managed to get them resolved.
12       Q.    Have you had a situation where you start out as
13  the mediator for the parties and they request that you
14  become the arbitrator?
15       A.    Yes.
16       Q.    Tell me about that.
17       A.    I know it happened, but the arbitration never
18  went forward.  In the end, we did mediate it.  But we
19  arranged for me to be the arbitrator, because -- we tried
20  to mediate, didn't work.  They said, You will be our
21  arbitrator.  We set it up, and then we met one more time
22  and got it settled.
23       Q.    When was this?
24       A.    That's not too long ago.  I can remember who the
25  parties were.  Yeah, that was not too long ago.
```

01:22:33 (line 5)
01:22:46 (line 10)
01:23:01 (line 15)
01:23:29 (line 20)
01:23:44 (line 25)

```
          1    Q.    Within the last year or two?

          2    A.    Yeah, last year.

          3    Q.    Last year?

          4    A.    Uh-huh.

01:23:54  5    Q.    And just so I understand.  It started out as a

          6  mediation structure, the parties agreed and you agreed to

          7  do an arbitration instead, with you to be the arbitrator,

          8  and then it went back to mediation?

          9    A.    Slightly different than that.

01:24:07  10   Q.    Tell me.

          11   A.    The parties came to me to resolve a discovery

          12 dispute; and in resolving the discovery dispute, I said,

          13 Why don't we just mediate this case and get it over with?

          14 It's a case of clear liability.  The only issue is to

01:24:29  15 damages.  If we can settle the case, you won't have to do

          16 all this discovery.  Good idea.

          17         So we went to mediation, couldn't get it down.

          18 They said, Now we'll move to an arbitration.  Okay.

          19 Cynthia will be the arbitrator.  Everybody goes out, gets

01:24:43  20 permission from their clients to arbitrate in front of

          21 Cynthia.  And then we meet one more time -- I can't

          22 remember.  Somebody called me.  I think plaintiff's

          23 counsel.  And said, Oh, come on.  Let's just meet and see

          24 if we can't settle, and they did settle.

01:25:00  25         I'm sorry.  That was a long story for very
```

```
           1   little information.

           2        Q.    No, no, no, no, don't apologize.

           3             That was last year that happened?

           4        A.    I think that's been the last year.  I think that
01:25:10   5   was 2017.

           6        Q.    Any other mediations you've handled that try to

           7   convert to an arbitration?

           8        A.    I don't think so.

           9             MR. MATURA:  Okay.  Do you need a break?

01:25:38  10             THE WITNESS:  How much more have you got?

          11             MR. MATURA:  Let's take a break, and we'll talk

          12   about it.

          13             THE WITNESS:  Okay.

          14             MR. MATURA:  Off.

01:25:43  15             (Recess taken from 1:25 to 1:38 p.m.)

          16             MR. MATURA:  Ms. Cheney, my understanding is,

          17   we're going to keep going and we're going to see how you

          18   feel.  If you need to take another break or change things

          19   up, just let me know.

01:38:50  20             THE WITNESS:  One foot in front of the other.

          21   BY MR. MATURA:

          22        Q.    Okay.  I'm going to switch topics on you, and

          23   we're going to talk about your disability insurance.

          24             My understanding, ma'am, is that you applied for

01:39:15  25   the disability insurance policy that we're going to talk
```

```
 1   about now back in 1993.  Do you have any recollection of
 2   that?
 3        A.    I remember that it was through the American Bar
 4   Association, but I do not remember when it was.
 5        Q.    Okay.  And just to be technical about it, it's
 6   through the American Bar Endowment.  Does that name sound
 7   familiar to you?
 8        A.    Yes.
 9        Q.    And although you might not remember the year
10   that you applied for that policy, do you remember going
11   through the process of applying for it?
12        A.    Honestly, I don't.
13        Q.    Or why you applied for it?
14        A.    Just because it was good financial planning.
15        Q.    Okay.  I'm going to show you a copy of the
16   policy that was issued.  We'll mark this as Exhibit 1.
17              (Exhibit 1 marked.)
18   BY MR. MATURA:
19        Q.    Ms. Cheney, Exhibit 1 is a copy of your policy.
20   You can look through it if you want to.  I'm going to ask
21   you some questions about some of the specific language.
22              Have you seen this before?
23        A.    I don't recall.
24        Q.    Okay.  We have Bates numbers, which you of all
25   people probably know what Bates numbers are, right?
```

Timestamps (left margin): 01:39:31 (line 5), 01:39:46 (line 10), 01:39:57 (line 15), 01:40:36 (line 20), 01:40:48 (line 25)

```
 1      A.    I do.

 2      Q.    You were a member of the American Bar Endowment

 3   when you obtained this policy, correct?

 4      A.    I believe so.  I call it The Bar Association,

 5   but I think it's the same thing.

 6      Q.    That's fine.  Okay.  'Cause there are two ways

 7   that you -- someone can be covered under this policy; one

 8   is to be a member of the American Bar Association

 9   Endowment, the other is to be a spouse of someone who is.

10   But do you recall, ma'am, if you were a member?

11      A.    I was the member, yes.

12      Q.    If you turn to Bates page 1125, the very top, do

13   you see where it says in bold, Long-Term Disability

14   Benefits?

15      A.    Yes.

16      Q.    This is the language that sets forth when

17   benefits -- when you qualify for disability benefits.  I

18   want to look at this language together.

19            Do you see where it says, quote; if an insured

20   person becomes totally disabled and continues to be so

21   disabled past the waiting period, United States Life will

22   pay to him the benefits described below.

23            And then it says the waiting period's shown in

24   the schedule of benefits, end quote.  Do you see that

25   language?
```

161

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 01:42:46 | 5 |

              1    A.    I do.
              2    Q.    Okay.  Did you have any understanding, ma'am,
              3    when you applied for your disability benefits, that you
              4    had to be considered totally disabled?
   01:42:46   5    A.    I -- I don't think that was my understanding.
              6    Q.    Okay.
              7          MR. GERMAN:  Wait.  What was your question
              8    again?
              9    BY MR. MATURA:
   01:42:54  10    Q.    Sure.
             11          The question was, did you have any
             12    understanding, when you applied for disability benefits,
             13    that benefits were payable if you became totally disabled?
             14    A.    And I do not think that was my understanding.
   01:43:12  15    My understanding was that this was an own occupation
             16    policy that -- and that I only needed to be totally
             17    disabled from my own special -- specialty.
             18    Q.    Okay.  Where did you have that understanding
             19    from?
   01:43:27  20    A.    I have no idea.
             21    Q.    Do you remember if you ever read this policy
             22    language before?
             23    A.    I do not remember.
             24    Q.    If you look down from where we are, you see the
   01:43:40  25    bold word "Definitions"?

```
         1    A.    Yes.

         2    Q.    Okay.  These are the definitions sections of the

         3    policy.  If you look directly below the word

         4    "definitions," do you see, Total disability means?  Do you

01:43:53 5    see that language?

         6    A.    I'm sorry.  I lost you.  I'm not tracking.

         7    Q.    That's okay.  We have the definition title.

         8    A.    Oh, yes, there is it is.

         9    Q.    The first definition is total disability; do you

01:44:03 10   see that?

         11   A.    Yes.

         12   Q.    And it breaks it down between members and

         13   spouse.  So we'll look at the members language.  Okay?

         14   A.    Okay.

01:44:09 15   Q.    And it says for members -- let's just read this

         16   together.  Quote:  During the waiting period and the next

         17   60 months, the complete inability of the member to perform

         18   the material duties of his regular job, to include his

         19   specialty in the practice of law.  Specialty in the

01:44:31 20   practice of law means the specialty in the practice of law

         21   which the member was performing on the day before total

         22   disability began, end quote.

         23         That's the definition of "total disability."  Do

         24   you see that?

01:44:43 25   A.    I see it.
```

|  | 1 | Q.   Okay.  Did you have any understanding, when you |

1    Q.   Okay.  Did you have any understanding, when you
2    applied for disability benefits in 2014, that "total
3    disability" was defined as the complete inability to
4    perform the material duties of the regular job, to include
01:45:01    5    the specialty in the practice of law?
6    A.   I don't know.
7    Q.   If you look at the second bullet point:  Total
8    disability also means after such 60 months, the complete
9    inability of the member to perform the material duties of
01:45:25    10    any gainful job for which he is reasonably fit by
11    training, education, or experience; do you see that
12    language?
13    A.   Yes.
14    Q.   And then the definition continues and says,
01:45:42    15    quote:  The total disability must be a result of injury or
16    sickness.  To be considered totally disabled, a member
17    must also be under the regular care of a physician, end
18    quote.
19         Do you see that?
01:45:53    20    A.   Yes.
21    Q.   Do you believe, ma'am, that you suffered an
22    injury or sickness that resulted in your total disability?
23    A.   My understanding of my policy, when I purchased
24    it, was that if I had a total disability to practice my
01:46:21    25    occupation, which was medical malpractice defense

```
 1   litigation, that benefits would be awarded.

 2       Q.   Where did you get that understanding from when

 3   you applied for it?

 4       A.   I don't recall who I spoke to.  I don't

 5   recall -- I just don't recall.  I only know that somebody

 6   who sold me this policy told me this was an own occupation

 7   policy, and that's truly the limits of my recollection of

 8   what we talked about; and that if I couldn't do what I

 9   did, which was medical malpractice defense and litigation,

10   that I would get benefits.

11       Q.   Do you see the language that we're looking at

12   now, ma'am, the first bullet point in the definition of

13   "total disability" where it says, Complete inability of

14   the member to perform the material duties -- do you see

15   where I am?

16       A.   Yes, yes.

17       Q.   -- of his regular job, to include his specialty

18   in the practice of law.  Do you see that?

19       A.   Yes.

20       Q.   So it covers -- it has to be the complete

21   inability to perform the material duties of the regular

22   job, including specialty.  Do you see that language?

23       A.   Yes.

24       Q.   Your specialty was medical malpractice defense;

25   is that what you believe?
```

```
              1      A.    Yes.
              2      Q.    Okay.  Your regular job was an attorney,
              3   correct?
              4            MR. GERMAN:  Form, misstates the policy.
01:48:00      5   BY MR. MATURA:
              6      Q.    You're an attorney -- licensed attorney, right?
              7      A.    I was --
              8            MR. GERMAN:  Form.
              9            THE WITNESS:  -- a licensed attorney practicing
01:48:07     10   medical malpractice defense litigation, yes.
             11   BY MR. MATURA:
             12      Q.    Did you have a job at that point in time other
             13   than as an attorney?
             14      A.    No.
01:48:13     15      Q.    Now, when you look at -- if we go back down to
             16   the -- after the second bullet point where it says, The
             17   total disability must be a result of an injury or
             18   sickness; do you see that?
             19      A.    I do.
01:48:32     20      Q.    Stop there.
             21            Did you suffer an injury that you believe
             22   resulted in total disability?
             23      A.    A little tricky, because I have the sickness of
             24   diabetes because of an injury to my pancreas --
01:48:54     25      Q.    Okay.
```

```
        1      A.    -- but the disability is, in fact, the diabetes,
        2   which is an illness, not an injury.
        3      Q.    Fair enough.
        4      A.    Okay.
01:49:04 5      Q.    So we'll talk about the diabetes when we get to
        6   the word "sickness."
        7      A.    Okay.
        8      Q.    So let's go back to the word "injury."  Is there
        9   anything else that you believe -- any injury that you
01:49:12 10 believe you suffered that resulted in your total
       11   disability?
       12          MR. GERMAN:  Form.
       13          THE WITNESS:  I would not describe any of the
       14   diagnoses that I carry as injuries.
01:49:25 15 BY MR. MATURA:
       16      Q.    Let's go to the word "sickness" now.  Do you
       17   believe you have a sickness that resulted in your total
       18   disability?
       19      A.    Yes.
01:49:35 20     Q.    Okay.  And you mentioned diabetes.
       21      A.    Yes.
       22      Q.    Any other sicknesses that you believe you have
       23   that resulted in your total disability?
       24          MR. GERMAN:  Form.
01:49:47 25         THE WITNESS:  I have degenerative disease in my
```

|          |    |                                                                          |
|----------|----|--------------------------------------------------------------------------|
|          |  1 | neck and back and hands and feet that cause me significant               |
|          |  2 | pain without anti-inflammatory treatment, and I can no                   |
|          |  3 | longer take anti-inflammatories because they cause me                    |
|          |  4 | renal failure.                                                           |
| 01:50:17 |  5 | BY MR. MATURA:                                                           |
|          |  6 | Q.   Any other -- I'm sorry.                                             |
|          |  7 | A.   But it is only in the last year that I have                         |
|          |  8 | stopped taking anti-inflammatories for that arthritic                    |
|          |  9 | condition.                                                               |
| 01:50:32 | 10 | Q.   So when you were taking the anti-inflammatory                       |
|          | 11 | medication, it alleviated the pain?                                      |
|          | 12 | A.   It moderated the pain to where I was more                           |
|          | 13 | functional.                                                              |
|          | 14 | Q.   And you stopped taking that medication within                       |
| 01:50:47 | 15 | the last year because it leads to renal failure for you?                 |
|          | 16 | A.   My GFR dropped below normal, yes.                                   |
|          | 17 | Q.   You mentioned diabetes.  We're going to go back                     |
|          | 18 | and talk about that.  You mentioned a degenerative                       |
|          | 19 | condition with respect to your neck and back and hands and               |
| 01:51:06 | 20 | feet.  Any other sickness that you believe you have that                 |
|          | 21 | has resulted in your total disability?                                   |
|          | 22 | A.   I don't believe that the other conditions I have                    |
|          | 23 | relate to my inability to practice litigation.                          |
|          | 24 | Q.   Okay.  Let's talk about diabetes.  When did that                   |
| 01:51:34 | 25 | present itself in your life?                                             |

```
       1    A.     1999.

       2    Q.     And tell me about that.  Tell me what --

       3    A.     In 1997 or so, I was diagnosed with Hepatitis C.

       4 At the time, there was no treatment.

01:51:58  5    Q.     Was that the result of an incident that occurred

       6 when you were a nurse, stuck with a needle?

       7    A.     That seems most likely, because I had the type

       8 of Hepatis C that was not common in the United States.  I

       9 had a type that was common overseas.  I hadn't been

01:52:14 10 overseas, but all my patients had.

      11    Q.     Fair enough.  So the assumption is, that's how

      12 you became -- how the Hep C developed in your body?

      13    A.     Yes.

      14    Q.     Okay.  So continue.  Go ahead.  You were ...

01:52:26 15    A.     Over those couple of years, then, following

      16 1997, my liver enzymes got worse, and there was no

      17 treatment, but there were clinical trials available of

      18 Interferon and Ribavirin, which are now available for

      19 treatment, but at the time, the only way you could get

01:52:53 20 them was through a controlled trial.

      21            So in 1999, I signed up for the trial and

      22 received very large doses of the Interferon and Ribavirin.

      23 At the beginning of that study, they found that my sugars

      24 were high, and Hepatis C is known to cause pancreatic

01:53:22 25 damage in and of itself.  And, then, about halfway through
```

1    the treatment -- actually, it wasn't halfway.  Three

2    months -- three or four months into treatment, my pancreas

3    quit working completely; and, at that point in time, I

4    became a Type 1, sometimes called juvenile onset, but it

01:53:47    5    isn't always juvenile onset.  A Type 1 diabetic who makes

6    no insulin of my own at all, and the question remains

7    whether that was from the Hepatitis, from the Interferon,

8    or some combination of both.

9         Q.    I apologize.  You just said this, but you

01:54:07    10    received the diagnosis of Type 1 diabetes in 1999?

11         A.    2000.

12         Q.    2000.  Okay.

13         A.    March 2000, as I recall, 'cause my treatment in

14    the -- with the Interferon was supposed to extend from

01:54:22    15    December 1st of '99 to December 1st of 2000, but when my

16    pancreas shut down, they removed me from the

17    investigation.

18         Q.    So after being diagnosed with Type 1 diabetes in

19    March of 2000, what is the treatment plan for you?

01:54:42    20         A.    Well, I have to get all my insulin

21    extrinsically.

22         Q.    So, back then, how was that administered to you?

23         A.    I was given insulin in bottles and in pens, and

24    I was also given the Glucophage that we discussed earlier

01:55:03    25    to help the insulin get the sugar into my cells where it

```
 1   needs to be.
 2        Q.    You were injecting yourself, right?
 3        A.    Yes, eight to 10 times a day.
 4        Q.    And, then, how -- at what point in time does the
 5   treatment mechanism change for you as opposed to injecting
 6   yourself eight to 10 times a day?  Was it the development
 7   of the pump?  Was it the --
 8        A.    I started on the pump.  It was either late 2012
 9   or early 2013.  Oh, I hope that's right.
10        Q.    Up until the point in time that you started on
11   the pump, were you still injecting yourself multiple times
12   a day?
13        A.    Yes.
14        Q.    The pump --
15              MR. GERMAN:  Are you doing okay.
16              THE WITNESS:  (No oral response.)
17   BY MR. MATURA:
18        Q.    Did the pump help?
19        A.    The pump helped a lot.
20        Q.    How does the pump change things for you?
21        A.    The pump helped by giving me a background
22   insulin, more like a real pancreas would, which is that
23   there's a little insulin coming out of it all the time.
24   The more important part of the pump for me is the sensor,
25   because I fall into the category of Type 1 diabetic, I'm
```

01:55:26
01:55:57
01:56:10
01:56:17
01:56:38

1    not at all like a Type 2 diabetic, and I'm not at all like

2    many Type 1 diabetics.  I'm a brittle Type 1 diabetic.

3         Q.    What does that mean?

4         A.    It means that my sugars can move extremely

01:56:55    5    rapidly to very, very high or life-threateningly low, and

6    I can't always predict that just based on what I have

7    eaten and how much insulin I have taken, because blood

8    sugar is managed by lots of different chemicals in your

9    body.  Adrenaline, in particular, can change your blood

01:57:20   10    sugar pretty fast.  Having the sensor, I now have some

11    warning if I'm going too high or I'm going too low.

12         Q.    Is the sensor tied to the pump?

13         A.    Yes.  Without the sensor, I used to have to go

14    on either stopping everything around me and taking a blood

01:57:40   15    sample, testing my blood, or on my symptoms.  And because

16    my blood sugar moves so fast, by the time I could do

17    either one of those, I would be another 30 or 50 points

18    off.

19         Q.    So the pump gives you advance notice, if you

01:58:03   20    will, of how your blood sugar levels are, whether they're

21    increasing too fast or decreasing too fast?

22         A.    Correct.

23         Q.    And the pump -- describe for me how the pump --

24    you're going to show me the pump, right?

01:58:18   25         A.    I'm going to show you the pump.

```
            1         The pump has two components.  It has the insulin
            2   delivery component, which is in this little guy, which I
            3   fill every two to three days out of a bottle of insulin.
            4       Q.   That you keep in your refrigerator?
01:58:39    5       A.   I do keep it in the refrigerator, although it
            6   doesn't matter if you do anymore.  They actually do pretty
            7   well at room temperature.
            8       Q.   So you fill the canister that goes into the
            9   pump.
01:58:50   10       A.   Right.  And it is programmed to give me a
           11   background or what they call basal.  See the word "basal"
           12   there.
           13       Q.   B-a-s-a-l?
           14       A.   Right.  That's a baseline insulin, so that I
01:59:02   15   don't just climb up high.  And, then, when I eat
           16   carbohydrate, I have to give myself a bolus.  See the word
           17   "bolus" there.
           18       Q.   B-o-l-u-s.
           19       A.   Right.
01:59:15   20       Q.   Okay.
           21       A.   All I have to do is tell the pump how many grams
           22   of carbohydrate I'm going to eat, and then it has a little
           23   thing it calls "bolus wizard," and I put in my blood
           24   glucose there and then how many grams of carbohydrates
01:59:32   25   there and it calculates it for me.  It's super.  And then
```

```
 1   I check it, make sure that I think that that amount is all
 2   right, and then it gives me the bolus to cover the
 3   carbohydrate.
 4        Q.    Okay.
 5        A.    And, then, this is attached -- I won't go so far
 6   as to actually show you.  But this is attached to a tiny
 7   little plastic needle under my skin on my abdomen where
 8   this runs to.
 9        Q.    Right.
10        A.    And that's how the insulin gets under my skin
11   and into my body.
12              And then I have another item, which is actually
13   a little radio transmitter, with another also plastic
14   needle that is my sensor.  And what it's doing is -- it's
15   not the same as a blood glucose, because it only slides
16   under my skin far enough to get what's called
17   "interstitial fluid," which is the fluid that's in your
18   skin that's not actually running in a vein or an artery.
19   And it can tell me what my interstitial fluid sugar is.
20   It's not the same as the blood, but it's a pretty good
21   indication.  It's enough to work from to give me an idea
22   of where I'm going.
23              And the new sensor and pump that I'm hoping for
24   is supposed to be so accurate that I'll actually be able
25   to give myself insulin without testing my blood.  I'll be
```

```
 1  able to trust what this guy tells me enough to actually
 2  give myself insulin safely.
 3      Q.   And when are you supposed to get that new pump?
 4      A.   I'm on the list for it.  I'm hoping next month,
 5  but ...
 6      Q.   So this -- so this pump changed things for you
 7  how?  Going from self-injections to a pump.
 8      A.   That my highs are not as high, and my lows are
 9  not as low.  They can't do anything about the fact that my
10  particular diabetes is so brittle.  It can't change that,
11  but it can give me a warning so that I can drink a little
12  juice or take some more insulin.
13      Q.   How do you take the insulin?
14      A.   I tell it what my blood sugar is, and then I go
15  to bolus and I put the blood sugar in there, put it in
16  there, and then I just -- if I'm not going to eat, all I
17  have to do is tell it what my blood sugar is, hit "next,"
18  and it will calculate what I need to try and bring me
19  down.
20          Now, if it won't come down -- and, again, the
21  type of diabetic I am, it's not what people usually
22  expect.  Okay?  I can give myself insulin, and it won't
23  move; and I can pump again, and it won't move, and I can
24  bolus it again, and it won't move.  So then I have to
25  raise my basal and, usually, I have to raise mine by
```

02:01:22  02:01:37  02:02:00  02:02:20  02:02:44

175

| | | |
|---|---|---|
| | 1 | 100 percent, up to 200 percent of whatever my basal is and |
| | 2 | drink lots of water, and then move myself from wherever I |
| | 3 | am and what I'm doing, and hope it starts to come down. |
| | 4 | Then I have to check my urine to make sure I'm |
| 02:03:06 | 5 | not spilling ketones; and if that still doesn't bring it |
| | 6 | down, I have to go to the hospital. |
| | 7 | Q.   So you administer yourself insulin straight from |
| | 8 | the pump? |
| | 9 | A.   Yes. |
| 02:03:19 | 10 | Q.   And you've had the pump since, you said, 2012, |
| | 11 | 2013.  So we're five, six years? |
| | 12 | A.   Yeah, not this pump. |
| | 13 | Q.   You had a pump? |
| | 14 | A.   I had a pump that really does not compare -- |
| 02:03:35 | 15 | Q.   Well -- |
| | 16 | A.   -- to this pump. |
| | 17 | Q.   -- it's like an iPhone.  Every year, it's much |
| | 18 | better, right? |
| | 19 | A.   Yeah. |
| 02:03:41 | 20 | Q.   But you have whatever the newest version of your |
| | 21 | pump is today -- |
| | 22 | A.   Pump and sensor. |
| | 23 | Q.   Pump and sensor. |
| | 24 | A.   'Cause it's an important combination, yeah. |
| 02:03:50 | 25 | Q.   Okay. |

```
           1      A.    My original pump and sensor from five years ago
           2   really can't hold a candle to this one or the new one I
           3   have coming.
           4      Q.    Now --
02:04:12   5            THE WITNESS:  I think, when you're at a breaking
           6   point, we'd probably better finish for today.
           7            MR. MATURA:  Okay.
           8            MR. GERMAN:  Are you sure?
           9            THE WITNESS:  Let's go -- let's finish your
02:04:20  10   section here and then --
          11            MR. MATURA:  A few more questions?
          12            THE WITNESS:  Is that okay?  Let's do it that
          13   way.
          14            MR. MATURA:  Absolutely okay.  Whatever makes
02:04:26  15   you the most comfortable.
          16            MR. GERMAN:  We can take a break and --
          17            THE WITNESS:  No, I'd rather -- let's do what we
          18   can.
          19   BY MR. MATURA:
02:04:31  20      Q.    And few more questions on this topic and then
          21   we'll end.
          22      A.    Is that all right?
          23      Q.    Of course, it's all right.
          24      A.    That would be great.  Thank you.
02:04:37  25      Q.    Of course, it's all right.
```

1          You very completely -- that's not the right

2     word.  You, helpfully, described the pump for me and how

3     that assists with your treatment of Type 1 diabetes.

4          What else do you do to treat your Type 1

02:05:04     5     diabetes?

6          A.    Okay.  I have a series of medications that all

7     relate to the diabetes.

8          Q.    That we talked about earlier.

9          A.    The Metformin --

02:05:17    10          Q.    Right.

11          A.    -- which helps that come in.

12          As you know, Type 1 diabetics like myself are

13    very high risk for stroke and cardiovascular disease,

14    heart attack, so I take a cholesterol medication.

02:05:30    15          Q.    Right.

16          A.    We're also prone to kidney disease, and my

17    kidney function at this point in time is barely above

18    normal, but it is above normal since I went off the

19    anti-inflammatories.  So I take the Losartan to keep my

02:05:47    20    blood pressure down.

21          Q.    Okay.

22          A.    In addition, the high blood sugars over time

23    have given me arteriosclerosis in my brain.  They found

24    that -- after that car accident and they did a CT scan of

02:06:04    25    my head, they found that there was arteriosclerosis

|         |    |                                                          |
|---------|----|----------------------------------------------------------|
|         | 1  | throughout my brain, there was a volume loss of          |
|         | 2  | 15 percent, my brain has shrunk by 15 percent.  That can |
|         | 3  | be the diabetes, that can be normal aging, but it is not |
|         | 4  | benign.  If you lose brain cells, your brain does not work |
| 02:06:32 | 5  | as well anymore.  And they found I had had a stroke.     |
|         | 6  | Q.   This was during the exam after the car accident?    |
|         | 7  | A.   Correct.  The stroke was not from the car           |
|         | 8  | accident.  It was actually an older stroke.              |
|         | 9  | Q.   They found evidence of a prior stroke?              |
| 02:06:45 | 10 | A.   They found that prior stroke.                       |
|         | 11 | So those are -- that's the Losartan, that's              |
|         | 12 | regular exercise, that's trying to keep my weight as low |
|         | 13 | as I can, that's avoiding stress, that's avoiding anything |
|         | 14 | that might give me another stroke.  So that's the renal  |
| 02:07:12 | 15 | function and the brain function and the heart and all    |
|         | 16 | those are all part of the diabetes because of the high   |
|         | 17 | risk that I'm at.  So lifestyle, I guess you would call  |
|         | 18 | it.                                                      |
|         | 19 | Q.   Okay.                                               |
| 02:07:22 | 20 | A.   I try to live a good, healthy lifestyle.            |
|         | 21 | Q.   Eat right?                                          |
|         | 22 | A.   I do eat right.  I eat well.                        |
|         | 23 | Q.   How often do you exercise?                          |
|         | 24 | A.   Every single day.                                   |
| 02:07:32 | 25 | Q.   What is your exercise regimen?                      |

```
         1      A.    It's walking or swimming.
         2      Q.    Is there a certain amount of time you want to
         3   walk each day or a distance you want to walk or ...
         4      A.    I want to walk at least three and preferably
02:07:46 5   four miles every single day.
         6      Q.    That's great.
         7      A.    Well, but I'm cheating.  I'm including all the
         8   walking back and forth to the kitchen.  Okay?  So -- and
         9   the swimming I can do in the summer with the laps.
02:08:00 10  Exercise is difficult because of the arthritis.  If I'm
         11  not -- I can't lift weights anymore.  I used to lift
         12  weights, but I have a 15-pound weight-lifting limitation
         13  because of my neck and back.
         14     Q.    And we talked -- I think we talked about this a
02:08:16 15  little bit ago before we dug into the diabetes.  This is
         16  the neck, back, hands and feet?
         17     A.    Yes, the neck and the back, in particular, make
         18  weight lifting just --
         19     Q.    Right.
02:08:25 20     A.    -- counterproductive, which hurts the
         21  osteoporosis.
         22     Q.    So and you -- you told me that you stopped
         23  taking the anti-inflammatory last year --
         24     A.    Yes.
02:08:36 25     Q.    -- and so that negatively impacted your ability
```

1    to lift weights and exercise?

2        A.    But those cause me daily pain.  I'm having to

3    learn to live with -- I didn't realize how much everything

4    hurt until I had to quit taking that drug -- those drugs.

02:08:50    5        Q.    And because the drugs were having a negative

6    impact upon you otherwise?

7        A.    They had -- they had started me -- my

8    rheumatologist had moved me to a med called Feldene, and

9    it worked really good for the inflammation and pain; and

02:09:06    10   within three months of starting the Feldene, my GFR

11   crashed.  That's the kidney function.  So he pulled me off

12   of them and the kidney function came back again.  I'm only

13   at about 60 percent, and that's from the diabetes, but I

14   had crashed down there.  So when he pulled them off and it

02:09:28    15   came back up, I said, So I can have my pills back?  And he

16   said, No, you're never going to take anti-inflammatories

17   again.

18       Q.    That was my next question.  Are you trying a new

19   anti-inflammatory or ...

02:09:39    20       A.    He says, Once this happens, no

21   anti-inflammatories for you again ever.  So I'm stuck at

22   Tylenol, opioids, and steroid injections.

23       Q.    Are you taking any of those?

24       A.    I'm not doing the steroid injections, and I'm

02:09:56    25   not doing the opioids.  I do a lot of Tylenol, 'cause it's

        1   not an inflammatory.  I can't do ibuprofen, Aleve,
        2   aspirin.  Oh, you know what?  I do take aspirin.  I take a
        3   baby aspirin to keep my blood thin.  I left that out
        4   earlier.  I'm sorry.
02:10:24  5             MR. MATURA:  Well, ma'am, I certainly want to
        6   respect your -- how you're feeling today, and you've done
        7   a great job of hanging through on what's been a long day
        8   already.  So we'll go ahead and stop now.  I'll work with
        9   Steve and we'll work something out where we can finish up
02:10:38 10   on another day that's convenient to everyone's schedule.
       11   I appreciate you hanging in there for so long today.
       12             THE WITNESS:  Thank you.  You've been very kind.
       13             MR. MATURA:  How do you want to handle this?
       14   Read and sign this portion?  Do you want to close it out
02:10:51 15   or do you want to just ...
       16             MR. GERMAN:  I prefer to wait until the whole
       17   thing is done for the read and sign.
       18             MR. MATURA:  That's fine.
       19             MR. GERMAN:  But ...
02:11:00 20             MR. MATURA:  We'll get copies.
       21             MR. GERMAN:  Yes, yeah, we can get a copy.
       22             MR. MATURA:  Okay.  So we'll just -- we'll leave
       23   the deposition open to be completed at a later date agreed
       24   upon by the parties.
02:11:11 25             THE WITNESS:  Thank you.

1        MR. MATURA:   Thanks for your time.

2    (Order requests taken on the stenographic record.)

3        MR. MATURA:   Standard order.

4        MR. GERMAN:   E-trans.

5                     (2:13 p.m.)

6

7

8

9                   _____
                    CYNTHIA CHENEY
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

183

```
 1   STATE OF ARIZONA        )
                             )  ss.
 2   COUNTY OF MARICOPA      )

 3        BE IT KNOWN that the foregoing proceedings were
     taken before me; that the witness before testifying was
 4   duly sworn by me to testify to the whole truth; that the
     foregoing pages are a full, true and accurate record of
 5   the proceedings, all done to the best of my skill and
     ability; that the proceedings were taken down by me in
 6   shorthand and thereafter reduced to print under my
     direction.
 7
          I CERTIFY that I am in no way related to any of the
 8   parties hereto nor am I in any way interested in the
     outcome hereof.
 9
          [X]  Review and signature was requested.
10        [ ]  Review and signature was waived.
          [ ]  Review and signature not required.
11
          I CERTIFY that I have complied with the ethical
12   obligations set forth in ACJA 7-206(F)(3) and ACJA
     7-206(J)(1)(g)(1) and (2).  Dated at Phoenix, Arizona,
13   this 8th day of February, 2018.

14

15

16

17        _____
                  SHELLEY E.D. PEARCE, RPR
18          Arizona Certified Reporter No. 50301

19        I CERTIFY that HERDER & ASSOCIATES, has complied
     with the ethical obligations set forth in ACJA 7-206
20   (J)(1)(g)(1) through (6).

21

22

23

24        _____
                      HERDER & ASSOCIATES
25          AZ Registered Reporting Firm No. R1145
```