# EXHIBIT 27

UNITED DISTRICT COURT

DISTRICT OF ARIZONA

CYNTHIA CHENEY, an
individual,

        Plaintiff,

          vs.          No. 2:17-cv-00004-DGC

THE UNITED STATES LIFE
INSURANCE COMPANY IN THE CITY
OF NEW YORK, a foreign
insurance company; AMERICAN
GENERAL LIFE INSURANCE COMPANY
d/b/a AIG BENEFIT SOLUTIONS
CONNECTICUT CLAIM CENTER, a
foreign business entity; DOES
I-10; ROES I-X,

        Defendants.

**THE DEPOSITION OF ELLEN LOUISE CAMPBELL**

Scottsdale, Arizona
May 7, 2018
9:13 a.m.

(ORIGINAL)
**PREPARED FOR:**

DISTRICT COURT

**REPORTED BY:**
Herder & Associates
Marty Herder, CCR, CSR
Certified Court Reporter
AZ-CR No. 50162

2

1                              **I N D E X**

2     Examination By:                                    Page:

3     Mr. Matura                                            4

4

5

6                            **E X H I B I T S**

7
      No. 1     Declaration of Ellen Campbell, dated
8               May 19, 2015                                36

9

10
                            * * * *
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          THE DEPOSITION OF ELLEN LOUISE CAMPBELL,

2    Taken at 10:00 a.m., on May 7, 2018 at the Law Offices of

3    BARRETT & MATURA, P.C,  8925 E. Pima Center Parkway, Suite

4    100, Scottsdale, Arizona 85258, before Marty Herder,

5    Certified Court Reporter, pursuant to the Rules of Civil

6    Procedure.

7

8    **COUNSEL APPEARING:**

9    For the Plaintiff:

10   ADELMAN GERMAN, P.L.C.
     BY:  Steven J. German, Esq.
11   8245 North 85th Way
     Scottsdale, Arizona 85258
12

13

14   For the Defendants:

15   BARRETT & MATURA, P.C.
     BY: Jeffrey C. Matura, Esq.
16   8925 East Pima Center Parkway
     Suite 100
17   Scottsdale, Arizona 8525

18

19

20

21

22

23

24

25

4

```
1                                        Scottsdale, Arizona
                                              May 7, 2018
2                                             10:00 a.m.

3

4                        ELLEN LOUISE CAMPBELL,

5     called as a witness herein, having been first duly sworn,

6     was examined and testified as follows:

7

8                        E X A M I N A T I O N

9

10    BY MR. MATURA:

11         Q.   Good morning, ma'am.

12         A.   Good morning.

13         Q.   Can you give us your full name, please.

14         A.   Ellen Louise Campbell.  And I usually sign El and

15    L or, people do it different ways, but it's Ellen Louise

16    Campbell, and that's C-A-M-P-B-E-L-L, like the soup.

17         Q.   Have you ever had your deposition taken before?

18         A.   Yes.

19         Q.   Approximately how many times?

20         A.   Oh my God.  I worked in risk management for many

21    years, so I don't have a clue.

22         Q.   You're now retired?

23         A.   I are retired.  Thank you.

24         Q.   Last time you had your deposition taken would be

25    when?
```

1    A.    Good grief.  Retired in 2011.  I don't even want

2    to guess, because I've done this, I mean, I was in clinical

3    practice, and then here in the Valley in different hospitals

4    in risk management.  It's been a long time.

5          I don't even want to guess.

6    Q.    That's fine.  You understand the oath you took to

7    tell the truth carries the same weight as if we were sitting

8    in front of a judge and jury, the fact that we're sitting in

9    a conference room in my office doesn't mean, in any way,

10   lessen that oath?

11   A.    I do understand.

12         I will do nothing but tell the truth.

13   Q.    If you want to take a break at any time, that's

14   fine.  It doesn't matter, we won't be here that long today,

15   but if you want to take a break for some reason today, just

16   let me know, I'm happy to do it, okay?

17   A.    Thank you.

18   Q.    Have you ever been convicted of a crime?

19   A.    No.

20   Q.    Tell me a little bit about yourself in terms of

21   your educational background?

22   A.    Well, I am a registered nurse who graduated from

23   Philadelphia General Hospital School of Nursing, called The

24   Blockley Almshouse.

25   Q.    In what year?

```
 1        A.    In 1962.

 2              It was a three-year diploma program.  Worked

 3    Philadelphia General which was the city hospital in

 4    Philadelphia for all the poor people who came from

 5    everywhere.  It is right next door to the University of

 6    Pennsylvania, and I went to the University of Pennsylvania

 7    and completed my Bachelor of Science in Nursing in 1969.

 8              And then I began to, I worked at Philly General,

 9    and now I went to Mercy Catholic Medical Center in

10    Philadelphia.  I was at Philly General, and I guess, what

11    year did I leave?  I graduated in '62, went on to Penn and

12    worked there that whole time.

13              And I may have gone to Mercy Catholic Medical

14    Center when I finished my bachelors at Penn.

15        Q.    In 1969?

16        A.    Yeah.  And I was there until around 1975.

17              And then I had an opportunity, Desert Samaritan

18    Hospital in Mesa, Arizona was just built and opened in 1973.

19    So I had a call and said would you like to come out and help

20    us with a new hospital.  And it was a great opportunity for

21    me, so I did.

22              And I was at Dessert '75 to '87.

23        Q.    I'm sorry, let me interrupt you and we'll continue

24    the time line in a second here.

25              You worked as a registered nurse at Mercy Catholic
```

```
 1   in Pennsylvania?
 2        A.   Yes, as a registered nurse, and I was also a
 3   nursing director.
 4        Q.   What did nursing director mean at the hospital?
 5        A.   Say again?
 6        Q.   What duties did you have as a nursing director?
 7        A.   As a nursing director you handled the nurses in
 8   the hospital.  It was interviewing staff --
 9        Q.   So, like a supervisory role?
10        A.   Yes.  Yes.  And I did the same thing when I came
11   to Desert Samaritan Hospital.  It was still Samaritan.
12        Q.   Desert Samaritan Hospital, when you joined them in
13   1975, you worked as a registered nurse; is that correct?
14        A.   I was an RN who was a clinical director of
15   nursing.
16             They all have different titles.
17        Q.   What were your job duties as clinical director at
18   Dessert Samaritan?
19        A.   Basically interviewing staff, hiring staff.  It
20   was a new hospital.
21             And helping them get it up and running.
22        Q.   Were there other clinical directors?
23        A.   Yes.
24        Q.   You were one of how many, do you think?
25        A.   I have no idea.
```

8

```
1              Maybe two or three.
2       Q.    When you say interviewing, hiring staff, are you
3   talking about other nurses?
4       A.    Yes.  Any nursing staff, and nursing staff can
5   include registered nurses, licensed practical nurses,
6   nursing assistants, that type of thing, bedside people,
7   let's put it that way.
8       Q.    You also worked as a registered nurse at Desert
9   Samaritan?
10      A.    Basically, I didn't do bedside care.  I was too
11  busy hiring people to do that.  But I was a registered
12  nurse, and you had to be a clinical nurse director.
13      Q.    Were you a clinical director at Desert Samaritan
14  the entire time you were there?
15      A.    Yes.
16      Q.    Which I think you told me when you were going
17  through your time line was from 1975 to 1987?
18      A.    Correct.
19      Q.    Did you provide bedside care at any point in time
20  during your tenure at Desert Samaritan?
21      A.    No, not unless it was a emergency and necessary.
22            I certainly could do it.
23      Q.    You had to be a registered nurse to be a clinical
24  director; is that correct?
25      A.    Correct.
```

1     Q.    In terms of your, the time spent at Desert
2    Samaritan, the vast majority of your time would be as the
3    clinical director of services as opposed to providing
4    bedside care as a registered nurse?
5         A.    Correct.  And during that time we started the Risk
6    Management Department at Samaritan Health Service.
7              Prior to that we used -- Travelers Insurance.
8    Because Samaritan became self-insured.  You may not be aware
9    of that, but Travelers, and we usually had people who worked
10   for the insurance company, Larry Riggs and Ann Stoltz were
11   the two people I dealt with.
12        Q.    You say Samaritan Health Service, is that the same
13   as Desert Samaritan?
14        A.    Desert Samaritan Hospital was part of Samaritan
15   Health Service.  Good Samaritan, Desert Samaritan,
16   Thunderbird, they were throughout the Valley.
17        Q.    Your location was Desert Samaritan hospital?
18        A.    Correct.
19        Q.    Did you work at other hospital systems within
20   Samaritan Health Service?
21        A.    No.
22        Q.    Then what happened in 1987?
23        A.    I had a call from St. Luke's Health System.  And
24   they, they were in long-term debt difficulty.  And they were
25   looking for someone for risk management, and they knew I had

10

```
 1    risk management experience at Desert.  So they called, and
 2    they were, at that point, possibly going to merge with
 3    St. Joe's.
 4              That never did occur, but I did go there.  And
 5    then they were purchased by a for-profit company.
 6         Q.   So did you go to St. Luke's Health System in 1987?
 7         A.   It was probably '87, '88, yes.
 8         Q.   And what were you hired on as?
 9         A.   Risk Management.
10         Q.   Was that your title, you were a risk manager?
11         A.   I was a risk manager, correct.
12         Q.   And what were your functions as a risk manager?
13         A.   Well, to hopefully keep us out of trouble, and
14    look at cases if there were lawsuits.
15              We were covered initially by Farmers, and we had
16    two Farmers' reps, as far as insurance was concerned, Bud
17    Moore and Bill Mitchell.
18              And if things came up I would report to them.
19    They would hire counsel.  That type of thing.
20              So I would assist in the preparation of the cases.
21    And the review of the cases.
22         Q.   How many risk managers were there?
23         A.   One.
24         Q.   Just you?
25         A.   Yes.
```

11

1    Q.    So you were the, in terms of communications with
2    attorneys, threatened or pending legal claims, that would go
3    through you?
4    A.    No, it would go through Farmers.  Farmers was our
5    malpractice insurance carrier.
6    Q.    So what role did you play -- let me ask this way.
7          Give me an example of the role you would play if
8    the hospital received a letter from a lawyer threatening a
9    lawsuit?
10   A.    The first thing we would do, the letter would come
11   to medical records usually.  It didn't usually threaten
12   suits until they had the record and reviewed it.
13         And medical records would call and say attorneys
14   so and so requested the record.  I would say fine, make sure
15   its complete, et cetera.
16         Then I would notify Bud or Bill.
17   Q.    At Farmers?
18   A.    At Farmers, correct.
19         And then I would review that record to make sure
20   it was a complete record that counsel was getting.
21         And then at that point, Bud or Bill would be
22   looking at it, discuss it with me, and hire counsel.
23   Q.    Who made the decision on who to hire as counsel?
24   A.    Well, we did it as a collaborative thing.  You
25   know, if there was someone they worked with and they liked,

12

1   they would hire them.  If it was someone I worked with and I

2   thought they could handle this type of case.

3           You've got to know your counsel, even at Desert,

4   you knew who was doing what, so it was collaborative.

5       Q.   Is it the same process if a lawsuit was served

6   upon the health system?

7       A.   Yep, would notify the carrier immediately.

8       Q.   And the same process of selecting counsel --

9       A.   Correct.

10      Q.   -- and meeting the two representatives from

11  Farmers?

12      A.   Correct.

13      Q.   How long you were at St. Luke's Health System?

14      A.   Oh, my.  Let me think.

15          I went back to Banner.  Samaritan then became

16  Banner.  I want to say -- I would stand corrected on the

17  dates, because I retired and I don't have it in my brain

18  anymore, but, I did go to the corporate office of Banner.

19  They called and said, would you like to -- I said, hey, that

20  would be nice.

21          And I had the for-profit experience when St.

22  Luke's became a for-profit.  It had been bought and sold

23  like four times in however many years.

24          So I was happy to go back to Banner.

25          And I went back to the Risk Management Department

13

```
 1   as a risk management consultant, a nurse consultant.
 2           And there were different people for the different
 3   hospitals within the Banner Health System.
 4       Q.   Here's what I'm trying to figure out.
 5           Did you work with Cynthia Cheney when you were as
 6   a risk manager at St. Luke's Health System?
 7       A.   I began to work with Cynthia, yes, because they
 8   did a lot of Farmers work.  Exactly, I met Cynthia while I
 9   was at St. Luke's.
10       Q.   How did you meet her?
11       A.   Through Bud and Bill.
12           They would hire counsel, and we had them all over
13   the city.
14           Cynthia had worked at Broening, Oberg & Woods.
15           And then they went into -- the firm was Fadell,
16   Cheney & Burt.
17           And that's how I began for work with that firm.
18       Q.   Do you know whether Farmers had an approved list
19   of attorneys that could receive work?
20       A.   I would just call Bud and Bill, and they would
21   tell me who counsel would be.
22       Q.   So you didn't play any role in selecting or
23   approving attorneys to be put on a list that could receive
24   work?
25       A.   I didn't even think of a list.
```

14

```
 1              Because, they had so many different hospitals.
 2    And I just never even thought of a list.
 3              I just knew they knew the attorneys they were
 4    hiring.
 5              And I wouldn't -- I never objected to any that
 6    they gave me.
 7         Q.   So did you meet Cynthia Cheney because she was
 8    appointed as counsel for a pending issue when you were at
 9    St. Luke's?
10         A.   Oh, Farmers would use her, yes, she new Bud and
11    Bill.
12         Q.   Is that how you knew her?
13         A.   Yes.
14         Q.   It's not an issue where you met her at some other
15    social event or something like that?
16         A.   No.
17         Q.   When you first started working with Ms. Cheney she
18    was at Broening, Oberg & Wood, is that your recollection?
19         A.   Yes, that's my recollection.
20         Q.   But you also worked with her when you were at St.
21    Luke's, but Ms. Cheney started her own firm --
22         A.   Faddell, Cheney & Burt.
23         Q.   -- is that right?
24         A.   Yes.  Yes.
25         Q.   Ms. Cheney started her own firm in -- Steve, is it
```

15

1    1997?

2            MR. GERMAN:  Yes, I believe so.  I think it's

3    around that time, yeah.

4    BY MR. MATURA:

5        Q.   I don't know if that helps you when you were at

6    St. Luke's?

7        A.   Exactly.

8        Q.   Because if we know Ms. Cheney started her own firm

9    in about 1997?

10       A.   She was with Fadell, Cheney & Burt.

11       Q.   If you can just wait for me to finish my question.

12       A.   Okay.  Because when you say her own firm, she was

13   part of a firm, but it wasn't her firm.

14            But, okay.

15       Q.   Let's make sure, I do this all the time too, let's

16   make sure we talk one at a time so that our transcript reads

17   appropriately.

18       A.   Uh-hmm.

19       Q.   Ms. Cheney started with others at Fadell, Cheney &

20   Burt in about 1997.

21       A.   Okay.

22       Q.   When you were at St. Luke's you worked with or had

23   cases for which Fadell, Cheney & Burt handled, correct?

24       A.   Correct.

25       Q.   So that tells me you were at St. Luke's at least

16

1    up through 1997.  Does that recollect with you?

2         A.    It seems later, because I went from there back to

3    Banner.

4         Q.    And you may have been at St. Luke's longer than

5    1997.  But it seems to me you were there at least through

6    '97?

7         A.    That could be correct.  I have no recollection of

8    the date.

9         Q.    Do you have any recollection of how many files Ms.

10   Cheney was assigned to when you were at St. Luke's?

11        A.    I have no idea.

12        Q.    Do you recall whether the types of files that Ms.

13   Cheney handled while you were at St. Luke's --

14              I know you can probably say they were medical

15   malpractice issues.  But do you have any more detail than

16   that, whether they were regulatory lawsuits, administrative;

17   do you have any recollection?

18        A.    Not specific.  Obviously, they were lawsuits,

19   records were requested by attorneys, but I never kept any

20   listing of that, because the insurance carrier that was

21   paying for that would have.

22        Q.    When you were at St. Luke's do you recall going to

23   any trials at which Ms. Cheney was the attorney?

24        A.    Yes.

25        Q.    When you were at St. Luke's?

1    A.    Yes.

2        Q.    Tell me what you recall.

3        A.    At least two, maybe -- at least two.

4             The very first one we had I recall, I can't recall

5    the case, but it was in the court in Mesa.  Which was nice

6    for me because I live in Mesa.

7        Q.    What year would that have been.  Do you have any

8    recollection?

9        A.    None at all.

10       Q.    You just remember there was a trial in the Mesa

11   courthouse at which Ms. Cheney was the attorney; is that

12   right?

13       A.    Yes.

14       Q.    And did you attend that as a client

15   representative?

16       A.    Yes, I always, I would always go to depos and to

17   court with counsel.  Whoever they were.

18       Q.    Let's just talk about Cynthia Cheney and talk

19   about this one trial that you recall being in Mesa.

20            Before we get to a trial, as you all know sitting

21   here today, attorneys will conduct depositions, right?  Do

22   you understand that?

23       A.    Correct.

24       Q.    Would you attend the depositions in person?

25       A.    Yes.

18

1       Q.   All of them or --

2       A.   When I had the time to do that, yes.

3       Q.   Did you attend depositions that Ms. Cheney took?

4       A.   Oh, yes.

5       Q.   And depositions where Ms. Cheney would be

6   defending a witness?

7       A.   Yes.

8       Q.   And you had confidence, I assume, in Ms. Cheney's

9   ability to take and defend depositions?

10      A.   Absolutely.

11      Q.   Did you attend court hearings with Ms. Cheney?

12      A.   Yes.

13      Q.   I don't mean trial but some other reason to be

14  before the judge?

15      A.   Yes.

16      Q.   And you had confidence in Cynthia Cheney to handle

17  those hearings without any issues?

18      A.   Absolutely.

19           I was happy to have her, she was very competent

20  and very smart, and did the work.

21      Q.   What about meeting with the client, whether it's a

22  doctor, or a health facility, would you attend those

23  meetings with Ms. Cheney?

24      A.   I'm trying to think.

25           Yes, I know I attended many meetings, because most

1   of the docs who would have been involved, I knew them very

2   well too, because they worked at the hospital.

3        Q.   So what type of meetings do you remember attending

4   with Ms. Cheney, describe some for me?

5        A.   Good Lord.

6             Well, I would set up, especially for the nurses, I

7   would set up the meetings for them to meet with counsel and

8   discuss a case, what their part, what they did, that type of

9   thing.

10            So I met, any time the employees met with our. . .

11       Q.   So if there's a nurse who either was a defendant

12  in the lawsuit or involved in patient care that was the

13  subject of a lawsuit, you would schedule a time and place

14  for Ms. Cheney to meet with that nurse?

15       A.   Correct.

16       Q.   And you would attend as well?

17       A.   Correct.

18       Q.   And do you even have a recollection of how many

19  times you would attend a meeting with an employee or client

20  representative with Ms. Cheney?

21       A.   I haven't a clue.

22       Q.   Too many to count?

23       A.   Yes.

24       Q.   Did you receive copies of legal filings from

25  Ms. Cheney or on a case -- strike that.

1          Let me start over.

2          Did you receive copies of legal filings from any

3    cases that Ms. Cheney was involved in?

4      A.    We kept records of everything that the attorneys

5    did for us.  They would send us whatever they had.  If we

6    had to send them something.  There were always files on

7    those cases.

8      Q.    So, for example, if Cynthia Cheney filed a motion

9    with the court in a case that she was handling, would her

10   office send you a copy?

11     A.    Yes, and they may have, she may have even, and on

12   this I don't know, because I didn't know what the insurance

13   carrier would keep.

14          The carrier was always up to snuff.

15          Counsel always made sure they were.

16          And of course we were always, because then I would

17   be meeting with my administrators to update them on the

18   case.

19     Q.    Did you review the legal filings as they came to

20   your office?

21     A.    Oh, yes.

22     Q.    Did you ever have any concerns with the written

23   product of Cynthia Cheney?

24     A.    No.

25          MR. GERMAN:  Objection; form.

```
 1              I might object once in a while, just. . .
 2   BY MR. MATURA:
 3       Q.   You can ignore him unless he tells you not to
 4   ignore him.
 5       A.   No, I never had a question.  She was very
 6   thorough.  She was very smart, and she knew her cases.
 7              And the staff got to no her extremely well.
 8       Q.   What do you mean by that?
 9       A.   Well they knew to be one hundred percent worse. .
10   .
11       Q.   When you say staff, you mean the employees of the
12   hospital?
13       A.   The employees that she would interview to discover
14   what occurred in this case.  She would meet the staff.  She
15   met a person one at a time, obviously, and would go over the
16   case with them, she would ask them questions, and she had a
17   very good reputation because she did that so well.
18              And the staff felt comfortable.
19       Q.   If a lawsuit were filed against the health system,
20   for which Cynthia Cheney was assigned as defense counsel,
21   would you meet with Ms. Cheney at that point in time to
22   discuss the issues in the case?
23       A.   Oh, yes.
24       Q.   And then it sounds like, but correct me if I'm
25   wrong, but it sounds like you were pretty heavily involved
```

22

1    in terms of participation from the very beginning of a

2    lawsuit being filed, through a trial?

3        A.    Correct.

4        Q.    Because some risk managers are very hands off.

5              Others are very hands on, it sounds like you were

6    more toward the hands on side of the spectrum, attending

7    hearings, attending meetings, attending depositions; is that

8    fair?

9        A.    That's fair.  For me it was for everybody's best

10   interest.

11             I could have a list of the nurses that counsel

12   would have to talk to who had direct involvement.  Because I

13   knew the case, because I could review a chart and no exactly

14   what was going on.

15       Q.    Would Cynthia Cheney send you drafts of proposed

16   motions that she was thinking of filing for review and

17   comment, or just final copies?

18       A.    I don't recall receiving drafts.

19       Q.    How about correspondence exchanged between Cynthia

20   Cheney and the attorney for the plaintiff, would you get

21   copies of that?

22       A.    Yes.

23       Q.    Did Cynthia Cheney provide status reports to you?

24       A.    Oh, yes.

25       Q.    Would those be written to you or written to

1    Farmers with a copy to you; do you remember?

2        A.    Probably to both.

3        Q.    Probably to both?

4        A.    Because we would meet with our Farmers people.    I

5    saw their carrier all the time.

6        Q.    From the filing of a complaint for which

7    Ms. Cheney is assigned, up through handling trial, did you

8    ever raise any concern with Ms. Cheney's work product from

9    start to finish?

10           MR. GERMAN:   Objection; form.

11    BY MR. MATURA:

12        Q.    Does that make sense?

13        A.    From the time I started at St. Luke's?

14        Q.    Yes, sorry.

15        A.    I never had difficulty with her work.

16        Q.    Did you ever call anyone at Farmers and say I

17    don't think Ms. Cheney should handle depositions because she

18    doesn't do a good job or anything like that?

19        A.    No.   Never had a need to do that.

20        Q.    We were talking about the trial in Mesa.

21           Was that a jury trial?

22        A.    Yes.

23        Q.    Do you remember how long?

24        A.    Maybe a week.

25        Q.    You don't remember the year though?

24

1    A.    No, I do not.

2    Q.    You mentioned that you recalled at least two

3    trials that you attended with Ms. Cheney, the one in Mesa.

4    Do you recall where the other one was?

5         MR. GERMAN:  Objection; form.

6         THE WITNESS:  I don't recall at all.  I just

7    recall the Mesa one, because that was the first trial I had

8    gone to in Mesa.

9    Q    (By Mr. German) Jeff, just so you're talking about

10   different periods in time?

11        THE WITNESS:  Right.

12        MR. GERMAN:  So you're still at St. Luke's.

13        MR. MATURA:  Right.

14        MR. GERMAN:  I just wanted to make sure that when

15   we're reading the transcript, it's that period.

16        MR. MATURA:  Yes, we'll move on to Banner

17   afterward in a second.

18   BY MR. MATURA:

19   Q.    You mentioned, let's just make sure we're clear.

20   You mentioned that you recall two trials, with Cynthia

21   Cheney.

22        Were those both while you were at St. Luke's?

23   A.    I believe so.

24   Q.    And all you remember about one is that it was in

25   Mesa, a jury trial about a week?

25

```
 1        A.    Yes.
 2        Q.    You don't recall the date or the location of the
 3   other trial?
 4        A.    No.   Not at all.
 5        Q.    Do you recall whether Cynthia Cheney tried those
 6   cases on her own or had another lawyer helping her?
 7        A.    The one in Mesa she did on her own.   She ran that
 8   trial.
 9              I just have no recollection of the others.
10              I think the first one was the one you remembered
11   most.
12        Q.    Was Farmers the malpractice carrier for the entire
13   time that you were at St. Luke's?
14        A.    Probably up until the time when I mentioned that
15   they were looking to partner with somebody.
16              Once the for-profits came in that changed.
17        Q.    When did that happen?
18        A.    See. . ..
19        Q.    You don't remember?
20        A.    No, not at all.
21        Q.    How did it change?
22        A.    Well, they had their own carriers.
23              They came and met with everybody.   I mean that
24   type of transition from going from a not-for-profit to a
25   for-profit was quite different.
```

1          And St. Luke's in those years, I forget how many,

2    but I think we probably had four different for-profit

3    companies.  Orlando was the first one.

4          I remember Tenet was one of the for-profits.

5          I'm blocking.

6          I know there were, there was at least another one.

7    Orlando, Tenet, Iasis

8          And they may have been the last one before I left.

9    Q.    Did Ms. Cheney continue to represent the health

10   system through these different ownership changes?

11   A.    As I recall, yes.  As I recall she did.

12         Because they pretty much were coming new to town

13   from other places, Tennessee or whatever.  So they pretty

14   much counted on my experience at St. Luke's.

15   Q.    And did your relationship with Ms. Cheney remain

16   consistent through these different ownership changes?

17   A.    Yes.

18   Q.    You then go back to Banner, Desert Samaritan now,

19   at that point in time Banner, right?

20   A.    It was the Banner corporate office in risk

21   management.

22   Q.    Where was the corporate office located?

23   A.    Twelfth Street.

24   Q.    And Camelback?

25   A.    No, no, right across the street from Good Sam.

27

```
 1            It was the corporate office there.  It has moved,
 2   I think, several times.  Of course, I've been retired for a
 3   while now.
 4       Q.   I understand.
 5            And you worked in the risk management department
 6   of the corporate office?
 7       A.   Yes.
 8       Q.   As a risk manager?
 9       A.   Yes.
10       Q.   Do you know how many other risk managers there
11   were?
12       A.   Many.  We, the different hospitals were divided.
13            I basically took over the Lutheran facilities in
14   Mesa.
15       Q.   How many facilities was that?
16       A.   It was Mesa Lutheran Hospital, Banner Baywood, and
17   then the Heart Hospital, Banner Heart.
18       Q.   Performing the same functions as you performed at
19   St. Luke's as a risk manager?
20       A.   Correct.
21       Q.   How long you were at Banner, do you remember, in
22   that position?
23       A.   I retired from the corporate office covering
24   Banner, the Mesa hospitals in 2011.
25       Q.   You retired from Banner?
```

28

1    A.    Yes.

2    Q.    And you worked with Ms. Cheney while you were at

3    Banner?

4    A.    Yes.

5    Q.    Do you know whether her firm was already doing

6    work for Banner before you joined them?

7    A.    Yes, I'm sure they were.

8          Because I recall one of the first meetings I went

9    to at the corporate office, because we had to meet as a

10   group with people covering the Banner Hospitals, Brian Burt

11   was the attorney on a case.  And I happened to know Brian

12   from there, so, yes.

13   Q.    Did you continue to be an active participant in

14   lawsuits that were filed against your three facilities at

15   Banner?

16   A.    Oh, yes.

17   Q.    Meaning attend depositions, hearings trials?

18   A.    Get the charts ready, send them to counsel, that

19   type of thing, yes.  It was very consistent with risk

20   management.

21   Q.    The same process you described to me about your

22   involvement when you were at St. Luke's is what you did

23   while you were at Banner?

24   A.    Correct.

25   Q.    Do you know how many lawsuits Ms. Cheney was

29

```
 1    assigned to when you were at Banner, could you even give a
 2    number?
 3         A.    Not a clue.
 4         Q.    Too many to count?
 5         A.    I don't know that it was too many to count.  I
 6    just don't have a clue.
 7         Q.    You attended depositions and hearings with
 8    Ms. Cheney when you were at Banner?
 9         A.    Correct.
10         Q.    Was the same process used when you were at Banner
11    in terms of receiving copies of motions that were filed and
12    correspondence with opposing counsel?
13         A.    Yes.
14         Q.    Do you recall whether you attended any trials with
15    Ms. Cheney when you worked at Banner?
16         A.    I have no recall that there were any while you was
17    with Banner.
18               I may have been at the courthouse for different
19    reasons but I don't recall.
20         Q.    Sure.  You may have been at the courthouse to
21    attend a hearing, for example?
22         A.    Yeah, that type of thing.
23               We did a lot of mediations also that she was
24    involved in.
25         Q.    We're going to talk about mediations in just a
```

30

```
 1    second.

 2         A.    Right.

 3         Q.    Let me just make sure its clear.

 4               You don't recall attending a trial with Ms. Cheney

 5    while you were at Banner?

 6         A.    I don't.

 7         Q.    As you just noted, lawsuits can resolve in a

 8    variety of ways.

 9               One of them is through a mediation.

10               You're familiar with the mediation process?

11         A.    Correct.

12         Q.    As part of your role as a risk manager for Banner

13    you attended mediations?

14         A.    Yes.

15         Q.    Did you also attend mediations when you were at

16    St. Luke's?

17         A.    Yes.

18         Q.    Part of your hands-on approach as a risk manager;

19    is that fair?

20         A.    Oh, yes.

21         Q.    Did you attend mediations when you were at Banner

22    with Cynthia Cheney?

23         A.    Yes.

24         Q.    How would you describe her abilities with respect

25    to mediation?
```

31

1           MR. GERMAN:  Objection; form.

2           THE WITNESS:  She knew her cases, she had them

3    down pat, she knew them very well.

4    BY MR. MATURA:

5       Q.   Did you ever have any concerns about her ability

6    or participating in mediation while you were at Banner?

7       A.   No.

8       Q.   Who was the malpractice carrier for Banner?

9       A.   Banner was self-insured.

10      Q.   Always, for the time that you were there?

11      A.   Oh, yeah.

12      Q.   So as a self-insured entity, did you have any

13   greater involvement in the selection of defense counsel?

14      A.   Greater involvement?

15      Q.   In other words, when you were at St. Luke's,

16   Farmers Insurance would ultimately select the attorney, if I

17   understood your prior testimony the correct way; is that

18   fair?

19      A.   Yes.

20      Q.   When you're at Banner and a lawsuit comes in, what

21   ability did you have to say I want this lawsuit to go to

22   this lawyer versus this lawyer?

23      A.   Through the Banner system.

24           We still had that ability.

25           Because there was a whole risk management

1    department.

2         Q.   And do you recall whether you had occasion to

3    select Cynthia Cheney as the attorney?

4         A.   I'm sure I did.

5              I mean, I'm sure I did.  Because she represented

6    Banner in cases, I'm sure.

7         Q.   Would you describe Ms. Cheney as an attorney who

8    was actively involved in her case from start to finish?

9         A.   Yes.

10        Q.   Have you ever had any concerns about her ability

11   to understand the issues that were raised in a lawsuit?

12             MR. GERMAN:  Objection; form.

13             THE WITNESS:  She never seemed to have

14   difficultly.

15   BY MR. MATURA:

16        Q.   Did you ever have any concerns about her ability

17   to understand the medicine or medical records involved in a

18   practice case?

19             MR. GERMAN:  Objection; form.

20             THE WITNESS:  She was a nurse to begin with.

21   BY MR. MATURA:

22        Q.   So did you have any concerns with that?

23        A.   No.

24        Q.   Did you ever have any concerns with her ability to

25   handle depositions when you were at Banner?

33

```
 1              MR. GERMAN:  Objection; form.
 2              THE WITNESS:  No.  Off the top of my head I can't
 3    think of any -- I knew we got old together.  Over those
 4    years of my time in Arizona.
 5              And obviously I retired.  It was time.  And we
 6    spent many long hours doing cases.
 7              And her role, well any attorney that Banner had, I
 8    mean, that was a huge responsibility.
 9    BY MR. MATURA:
10        Q.   Describe that for me.  What did you expect Cynthia
11    Cheney to do?
12        A.   In the sense, they had to know their case, they
13    had to know their people, they had to be ready to talk to
14    the people prior to depos.
15              And you have to remember, a hospital is a 24-hour
16    a day, seven days a week operation.  So you got pulled in at
17    different times to accommodate handling the suit, but also
18    the nurse who might have to be on duty.
19              So that toward the end of my time there, that was
20    very difficult.
21        Q.   Do you recall attending meetings with Ms. Cheney
22    and staff members at off hours, meaning after work, or early
23    in the morning?
24        A.   Yeah, we were always at work.
25              We were always on the ability to do interviews
```

34

```
 1   with staff to find out what happened in the case.

 2             And that could be 8:00 o'clock at night.  That,

 3   you know, as we, as I said, we got old doing this.

 4             That became very difficult.

 5        Q.   But it was something that Ms. Cheney participated

 6   in?

 7        A.   Oh, she was always there.  But, there were times

 8   that I got concerned because she just was beat.

 9        Q.   Just from the long hours?

10        A.   Oh, yeah, and myself.  It was like, are we going

11   to make it?  And we did.

12        Q.   If you are dissatisfied with an attorney's

13   performance, any attorney, their performance with respect to

14   handling of the litigation matter for Banner, did you have

15   the ability to have them removed from the case?

16        A.   Never had to do that.

17        Q.   Okay.

18        A.   But why have certainly gone to the person I

19   reported to and said, hey, you know, this isn't working.

20        Q.   Who did you report to?

21        A.   Cathy Chester was in charge of the nurse

22   consultants.

23        Q.   What was her title?

24        A.   I don't know, she may have been the director of

25   the risk management department.  She was a nurse and also an
```

35

1   attorney.

2          And then we reported -- they reported to Dale

3   Schultz, who was in charge.

4       Q.   Did you ever go to Cathy, what was her last name?

5       A.   Chester.

6       Q.   Chester.

7          Did you ever go to Cathy Chester and raise any

8   complaints or concerns about Cynthia Cheney's performance?

9       A.   No.

10      Q.   You submitted a declaration on Ms. Cheney's behalf

11   with respect to her claim for disability benefits; do you

12   remember that?

13      A.   I do.

14      Q.   Have you ever reviewed Cynthia Cheney's disability

15   policy?

16      A.   No.

17      Q.   Have you reviewed the complaint that she filed in

18   this case?

19      A.   No.

20      Q.   Have you ever spoken to anyone on Ms. Cheney's

21   behalf from the disability insurance carrier or anyone

22   associated with the disability insurance carrier?

23      A.   No.

24      Q.   Have you ever, ever attended any appointments that

25   Ms. Cheney had with any of her medical providers?

36

1       A.    No.

2       Q.    I'm going to mark as Exhibit 1 to your deposition

3    a copy of your declaration, and then we'll look at it

4    together.

5             (Deposition Exhibit No. 1 was marked for

6    identification by the reporter.)

7    BY MR. MATURA:

8       Q.    Ms. Campbell, this is a copy of the declaration

9    that we received.

10            Is that your signature on the last page?

11      A.    Yes.

12      Q.    It's dated May 19th, 2015, just to give you a time

13   frame, okay?

14      A.    Yes.

15      Q.    Do you know who drafted this declaration?

16      A.    I obviously had some part in it, since I'm, it's

17   indicating where I worked and everything I've just told you.

18      Q.    Have you seen this before?  You saw it because you

19   signed it, I guess.

20      A.    Yeah.

21      Q.    Have you reviewed it in preparation for today's

22   deposition?

23      A.    No.

24      Q.    Do you recall who typed this declaration?

25      A.    I have no clue.

37

```
1       Q.    It wasn't you?

2       A.    No, I didn't type it.  I would have obviously

3    given the information, if asked.

4             I mean, let me continue.  Let me first --

5       Q.    Yeah, if you want, we're going to walk through it

6    paragraph by paragraph?

7       A.    Okay, let's do that then.

8       Q.    It's up to you.  If you want to read it all first,

9    that's okay too.

10      A.    It goes through about 20 years, and as I said,

11   getting old together here, because we went by mid 2012.

12      Q.    We'll go through it together --

13      A.    Okay, let's do that.

14      Q.    -- and work our way through it.  But before we get

15   to the details of the declaration, do you recall what the

16   purpose of this declaration was for, if you knew?

17      A.    I'm just trying to --

18            MR. GERMAN:  You can take your time and read

19   through it.  Do you want to take a little break?

20            MR. MATURA:  Let's do that.

21            (Brief recess taken.)

22   BY MR. MATURA:

23      Q.    Mrs. Campbell you had a chance to review your

24   declaration during the break?

25      A.    I did.
```

```
 1        Q.    Did it bring back any memories to you about
 2   whether you understood what the purpose of this declaration
 3   was?
 4        A.    It didn't bring back many memories.  As I went
 5   through it, I kept thinking of the years and, you know, the
 6   things that we did and how we did them, and that type of
 7   thing.
 8        Q.    I have some questions about some provisions in
 9   this declaration.  Let's just go through them together?
10        A.    Okay.
11        Q.    On the first page, paragraph two, about three
12   quarters of the way down there's a sentence that says, "I
13   went to trial with Cynthia as lead counsel at least two
14   times that I can recall..."  Do you see that sentence?
15        A.    Yes.
16        Q.    And that's consistent with what you told us
17   earlier --
18        A.    Right.
19        Q.    -- two trials, correct?
20        A.    Correct.
21        Q.    So if we put what you told us earlier with what's
22   stated in your declaration, we now know that those two
23   trials that you attended with Cynthia Cheney where she was
24   lead counsel occurred when you were at St. Luke's health
25   system; is that fair?
```

39

1           MR. GERMAN:  Objection; form.

2           THE WITNESS:  Yes.

3   BY MR. MATURA:

4       Q.   You say in the two sentences later, paragraph two

5   you say, "I valued her as counsel as much for her ability to

6   get cases settled as for her courtroom skills and she got

7   those good settlements in part because the plaintiffs

8   attorneys knew she would be a tough opponent in the

9   courtroom."

10          Do you see that sentence?

11      A.   I do.

12      Q.   How would you describe for me Ms. Cheney's ability

13  to get cases settled?  What does that mean?

14      A.   For me it meant, and getting to know the

15  plaintiff's attorneys, because I knew them all very well,

16  they had, they seemed to have great regard for her skills.

17          She was very open, she was very honest.

18          I remember sitting in on mediations, that type of

19  thing.

20          And there was a mutual respect, between the

21  plaintiff and the defense.  And they just worked well

22  together.

23      Q.   When you're talking about her ability to get cases

24  settled, are you referring to through a mediation process?

25      A.   Yes.

1      Q.   Did you also have cases with Ms. Cheney that would

2  settle without mediation?  Just an offer made, settlement

3  reached between the attorneys, the parties?

4      A.   I'm sure that did happen.

5           I know it did, but I certainly have no absolute

6  facts for you, but, yes.

7      Q.   Paragraph three, last two sentences, you say "we,"

8  that means you and Ms. Cheney?

9      A.   Correct.

10     Q.   "We would meet individually and with pertinent

11  witnesses to our cases and discuss strategy for the most

12  effective handling of the cases we were working on together.

13          I also frequently attended depositions with her."

14  Do you see that?

15     A.   Yes.

16     Q.   And that's consistent with the hands on approach

17  that you described to me, right?

18     A.   Absolutely.

19          See, we met so often about those cases, you know

20  what it's like to do that and meet with people.

21          We did, we discussed everything.

22     Q.   All right.

23     A.   That's why, I think I was, I know that the contact

24  gave me a good foundation to describe the impact that her

25  type one diabetes had on her, because that was one-to-one

```
 1    time.
 2         Q.    In paragraph four you say, "In approximately 2006
 3    I began to witness Cynthia Cheney's health decline where she
 4    was having difficulty handling the stress time, work and
 5    mental requirements necessary to handle medical malpractice
 6    cases."  Do you see that?
 7         A.    Um-hmm.
 8         Q.    Yes?
 9         A.    Yes.
10         Q.    In the next sentence you say, "Medical malpractice
11    defense is very demanding work and I could see it was
12    starting to affect her physical, emotional and mental
13    health."  Do you see that?
14         A.    Yes.
15         Q.    What did you observe in respect to Ms. Cheney's
16    physical, mental and emotional health?
17         A.    I think what I said to you earlier today, we had
18    to be available to interview nurses, it could be at night,
19    et cetera.  That's the type of thing that I was referring to
20    there.  When you're not getting the right amount of sleep,
21    you're under stress; you're trying to get all the things
22    that you need to get in done, and basically, you could see,
23    Cynthia, you knew she was half dead, she was tired, because
24    we worked until 8:00 o'clock, 9:00 o'clock, maybe had to get
25    up for a 7:00 o'clock interview with a nurse.
```

42

```
 1         Q.    So the impact that you're describing was the
 2   nature of the schedule in representing the hospital system
 3   and meeting nurses at off hours?
 4         A.    Yeah, absolutely.  Because that's what I said to
 5   you, it's a 24-hour a day, seven day a week operation.  And
 6   you have patients all that time, and different things occur.
 7              But again, and I do recall this, it was difficult
 8   for her, but she, she always performed at a high level of
 9   skill.
10              You knew she was half dead, but I knew that, but,
11   you know, if it was just the two of us, we would know it,
12   but everybody around her didn't know that.
13         Q.    It sounds like you were half dead as well?
14              MR. GERMAN:  Objection; form.
15              THE WITNESS:  It took a little bit more to get
16   half dead being Irish.
17   BY MR. MATURA:
18         Q.    Is sounds like what you're describing though is
19   that the hours were long?
20         A.    Yes.
21         Q.    And you may have been at the hospital until
22   midnight the night before and you got to be back at
23   7:00 a.m. the next day; is that what your describing?
24         A.    Yeah that type of thing.  And you probably face it
25   in your own practice.
```

43

1            And some days you feel better than others.

2       Q.   And you say in that same paragraph towards the

3   bottom that Ms. Cheney continued to perform at a high level

4   of skill?

5       A.   Uh-hmm.

6       Q.   And that's accurate?

7       A.   Absolutely.  And I obviously indicated that as a

8   nurse, I'm diabetic myself, and we're both type one

9   diabetics.

10           And you begin to know yourself whether you can

11   handle it or not.

12           And I will tell you, I proudly feel like I could

13   handle it now.

14           But diabetics are different.

15      Q.   Did you talk to Ms. Cheney about her type one

16   diabetes?

17      A.   Yeah.

18      Q.   It's something that you shared in common?

19      A.   Oh, we shared very much.

20           I mean, her situation is a little different than

21   mine, but I actually was diagnosed in 2003 and was in coma

22   for several days.

23           So that was something very much to share.

24      Q.   Knowing what it's like to have type one diabetes,

25   were you impressed with Ms. Cheney's ability to perform at a

```
 1   high level of skill?
 2            MR. GERMAN:  Objection; form.
 3            THE WITNESS:  She never gave up.
 4   BY MR. MATURA:
 5        Q.   She never gave up, is that what you said?
 6        A.   Yes, she never gave up.
 7        Q.   Did she ever come to you when you were at Banner
 8   and say, Helen I just can't do it anymore, you assigned me
 9   this case and I can't take it, anything like that?
10        A.   Not that I recall.
11            I recall looking at her maybe and saying, you look
12   like, is it a tough day, because cases run differently.  One
13   may go smooth as ever, and the other you're beating your
14   head against the wall.
15            But we did discuss it, because she clearly was
16   very proud professional women.
17        Q.   But she didn't refuse work that was assigned to
18   her?
19        A.   Not that I have any recollection.
20            I never had her refuse work.
21            That's when we -- I think when -- if we're still
22   on four and five, that's when we discussed, because we had
23   many mediations that we did.
24            Judge Nastro was someone we used a great deal.
25   There were several, Scott Downing, I can't think of his last
```

45

```
 1   name, but anyway, we had some really good mediation people.
 2   And I said to Cynthia, you could do that and do it very
 3   well.
 4        Q.    And if you turn the page to the top of the third
 5   page, the last sentence of paragraph five, it would be --
 6        A.    Okay.
 7        Q.    You say that Cynthia began to do mediation for
 8   Banner.  Is that what your describing now?
 9        A.    Correct.
10        Q.    Tell me a little bit more about that?
11        A.    Well, when we talked about it, and we knew what
12   was happening with the type one diabetes, it's a dreadful
13   disease of which there's no cure, but you know to see people
14   function as well as we do is very good.
15              And clearly she began, we had something to do to
16   be done and said well, we can use Cynthia Cheney for
17   mediations.
18              And one of the people that I spoke to and who
19   really used her, I don't know if you knew attorney Ken
20   Clancy, he's dead now.
21        Q.    Doesn't sound familiar?
22        A.    It was Leonard and Clancy.  I had to think of it.
23   Jim Leonard.
24              And I can remember saying to Cynthia, you know
25   there's plenty of mediation work.
```

46

```
 1              And more and more mediations were being done at
 2     that time.
 3              And she fell right into it rather nicely --
 4         Q.   And so --
 5         A.   -- and did some mediations.
 6         Q.   For Banner?
 7         A.   See, that I don't recall.  I don't recall.
 8              I know that Ken Clancy, she was doing a good bid
 9     of work for Ken.
10         Q.   Meaning a good bit of mediation work?
11         A.   Yes.  Yes.
12         Q.   Did you ever hire her as a mediator?
13         A.   See, that I don't recall.
14         Q.   You just don't know?
15         A.   Because that would have -- that would have been
16     the person I reported to, making that decision.
17              But I'm trying to think, did she do any of the
18     mediations.
19              I just have no recall.
20         Q.   Do you recall -- I guess you don't recall going to
21     a mediation where Cynthia Cheney was the mediator going from
22     room to room?
23         A.   Now I know I did.
24              And it probably was a case of Ken Clancy's, and
25     I'm just trying to remember.
```

47

1      Q.   And he worked where, Ken Clancy?

2      A.   Leonard and Clancy was downtown on, where was

3  their office, Seventh Street.

4           MR. GERMAN:  He passed away.

5           THE WITNESS:  And I do recall being at a mediation

6  that Cynthia was doing.  And I recall Ken being there, Ken

7  Clancy.

8  BY MR. MATURA:

9      Q.   Do you recall whether you had to sign any type of

10  conflict waiver --

11     A.   No I don't recall.

12     Q.   -- to use Cynthia Cheney?

13     A.   No I don't recall signing anything like that.

14          But it's the one mediation that I can remember,

15  because I knew Ken was using her.

16     Q.   What time frame did this occur, if you remember?

17     A.   Not a clue.

18     Q.   Any idea?

19     A.   Not a clue.

20     Q.   Sometime when you were at Banner though,

21  obviously?

22     A.   Yeah, it had to be.

23     Q.   So sometime before 2011 before you retired, right?

24     A.   Right.  Right.

25     Q.   How many do you recall?  Just one in your mind, or

1    were there more?

2          A.    That's the one as I'm talking and looking at you

3    and reading this, there was just that one that I recall.

4                There may have been others.

5                I just have no independent recollection.

6                And in some of those, I'm just thinking there may

7    have been, like a bad baby case, or that type of thing.  But

8    I have no recall.

9          Q.    You don't remember if that was a Cynthia Cheney

10   mediation?

11         A.    It was one Cynthia did.

12         Q.    As a mediator or as a lawyer?

13         A.    No, as a mediator.

14               And it was a Ken Clancy case, as I recall.

15               We used to tease Leonard and Clancy.

16         Q.    Is that the mediation that you're talking about,

17   or is that a different mediation?

18         A.    See I don't remember.

19         Q.    Fine.  Fair enough?

20         A.    I just know that we did that mediation.

21         Q.    How did Cynthia Cheney perform as a mediator for

22   that one mediation that you do recall?

23         A.    She always did well.

24               It's quite different.

25         Q.    What do you mean?

49

```
 1        A.    In terms of timing.

 2              You can set it up and have the right people.

 3              Sometimes the mediations were difficult,

 4   especially with young kids, with children.

 5              But, no, she did okay.  She did okay.

 6        Q.    Is she someone that you would recommend as a

 7   mediator?

 8        A.    Oh, yes.  Yes.

 9        Q.    In the next paragraph, number six, you say, "I

10   have been informed that the last litigation matter that I

11   referred to Cynthia on behalf of Banner Health was in

12   January, 2007."  Do you see that?

13        A.    Yeah, I see that.

14        Q.    Do you know who informed you of that fact?

15        A.    See, now I'm wondering if that's not the mediation

16   that Ken Clancy gave her.

17              Because it seems to be the only one that is in my

18   mind at this point.

19              And that may have been the last one.  I just can't

20   recall that.  Maybe one in the same.

21        Q.    In paragraph seven you say, "In approximately

22   2006, and into 2007, I recall having conversations with

23   Cheney about transitioning into an arbitration/mediation

24   practice."  Do you see that?

25        A.    Yes.
```

1       Q.    That's consistent with what we've been talking

2    about, correct?

3       A.    Absolutely.

4       Q.    Do you recall any other conversations about that

5    topic that you have not discussed thus far?

6       A.    No.

7       Q.    At the end of paragraph you say that you had no

8    hesitation recommending Cynthia to act as a mediator in

9    medical malpractice cases.  That's consistent with what

10   you've said; is that right?

11      A.    Yes.

12      Q.    If you look at paragraph eight, it turns over to

13   the last page.  The first full sentence of the last page,

14   you say, I witnessed.  It's at the very top.

15      A.    On several occasions?

16      Q.    Yes.  So the sentence says, "I witnessed on

17   several occasions that Cynthia was struggling because she

18   was physically fatigued and mentally foggy as a result of

19   either high or very low sugars."  Do you see that?

20      A.    Yes.

21      Q.    What is the time frame of that?  Do you have any

22   recollection?

23      A.    God no.

24            I just know as that began to happen, it's the type

25   of thing for diabetics that truly scares you.  It's very

1    dangerous with very high or very low blood sugars.

2            And she was having dramatic drops.

3        Q.   You don't recall the time period of this though?

4        A.   No.

5            I do recall that she was being followed closely by

6    her physician.

7        Q.   How about frequency?  Do you have any recollection

8    of whether this was one time you witnessed this, whether it

9    was every time you were with her you witnessed it, anything?

10   Any recollection?

11       A.   No.

12           You can kind of tell, being a diabetic, sitting

13   here telling you through this, you begin to know it

14   yourself.  This is why I always have orange juice with me.

15           So, and that's when, if you knew me more and saw

16   me more, you would know, I may hit that point.  But she

17   struggled with that.  And she was having those dramatic

18   drops and her doctor, I am sure changed, you know, what they

19   could do to help her with that.  Because diabetics, you have

20   no way of knowing it.

21       Q.   You didn't witness that impacting her workability,

22   did you?

23       A.   No.  No.

24           And that could well be that she was working with

25   her doctor in trying to get that stabilized.  Either through

52

```
1    diet or her insulin, that type of thing.
2         Q.   Stabilized so that she could still perform her
3    work?
4         A.   Correct.  Correct.
5         Q.   Do you still keep in touch request with Cynthia
6    Cheney today?
7         A.   Yes.
8         Q.   For instance, when is the last time you spoke with
9    her?
10        A.   Okay.  Oh my.
11             It may have been -- Oh, yes, I do know when it
12   was.  I had to think for a minute.  She texted me, I think.
13             I can't recall if she called or texted, when Tony
14   Palumbo died.  And we were, you know, there were many of us
15   worked together, knew Tony, and were going to be getting to
16   the funeral.
17             She did inform me of that death.
18        Q.   Do you see her at social settings, go out to
19   dinner, stuff like that?
20        A.   We haven't done that for a while.
21        Q.   But you have done that?
22        A.   Yeah.  Yeah.  Every now and then we would meet on
23   a Sunday for brunch.  Because she's coming from Phoenix, I'm
24   coming from Mesa.
25        Q.   Has she discussed this lawsuit with you?
```

53

1      A.    Not the lawsuit.  I knew she was, because I knew

2   when I signed this.  And I knew that it was being looked at,

3   let's put it that way.

4      Q.    She hasn't discussed the lawsuit since it was

5   filed with you?

6      A.    I have no idea, right.

7      Q.    I don't have any more questions for you.

8      A.    What's your company name again?

9      Q.    The name of my company?

10     A.    Yeah.

11     Q.    It's called Barrett & Matura.  Okay, gotcha.

12           I didn't have the name, but when I came in today

13   the lovely young lady, she said, are you Ellen Campbell, and

14   I said yes, and I am very early.

15           MR. GERMAN:  You have the option to read and sign,

16   you don't have to.  It's entirely up to you.

17           THE WITNESS:  I don't need anything more.

18           MR. GERMAN:  Waived.

19           (Whereupon, the deposition concluded at 11:25

20   a.m.)

21                              (Signature waived.)

22                              ELLEN LOUISE CAMPBELL

23

24                  *  *  *  *  *

25

54

1    STATE OF ARIZONA      )
                            )  SS
2    COUNTY OF MARICOPA    )

3                    C E R T I F I C A T E

4        BE IT KNOWN that the foregoing proceedings were taken
     before me; that the witness before testifying was duly
5    sworn by me to testify to the whole truth; that the
     foregoing pages are a full, true and accurate record of the
6    proceedings, all done to the best of my skill and ability;
     that the proceedings were taken down by me in shorthand and
7    thereafter reduced to print under my direction.

8        I CERTIFY that I am in no way related to any of the
     parties hereto nor am I in any way interested in the
9    outcome hereof.

10
         [ ]  Review  and  signature was requested.
11       [X]  Review  and  signature was waived.
         [ ]  Review  and  signature not required.
12
         I CERTIFY that I have complied with the ethical
13   obligations set forth in ACJA 7-206.

14            Dated this 17th day of May, 2018,
              Scottsdale, Arizona.
15

16

17            _____
              C. Martin Herder, CSR, CCR
18            Certified Reporter
              Arizona CCR No. 50162
19

20       It is FURTHER CERTIFIED that Herder & Associates,
     Registered Reporting Firm, has complied with the ethical
21   obligations set forth in ACJA 7-206.

22

23            _____
24            Registered Reporting Firm
              Arizona RRF No. R1145
25

| | | | |
|---|---|---|---|
| '62 [1] 6/11 | accommodate [1] 39/12 | attended [3] 18/25 24/8 29/7 29/14 | |

'62 [1] 6/11
'75 [1] 6/22
'87 [2] 6/22 10/7
'88 [1] 10/7
'97 [1] 16/6

**1**

10 [1] 1/11
100 [2] 3/4 3/16
10:00 [2] 3/2 4/2
11:25 [1] 53/19
17th [1] 54/14
19 [1] 2/8
1962 [1] 6/1
1969 [2] 6/7 6/15
1973 [1] 6/18
1975 [3] 6/16 7/13 8/17
1987 [3] 8/17 9/22 10/6
1997 [5] 15/1 15/9 15/20 16/1 16/5
19th [1] 36/12

**2**

20 [1] 37/10
2003 [1] 43/21
2006 [2] 41/2 49/22
2007 [2] 49/12 49/22
2011 [3] 5/1 27/24 47/23
2012 [1] 37/11
2015 [2] 2/8 36/12
2018 [4] 1/18 3/2 4/1 54/14
206 [2] 54/13 54/21
24-hour [2] 33/15 42/5
2:17-cv-00004-DGC [1] 1/6

**3**

36 [1] 2/8

**5**

50162 [2] 1/24 54/18

**7**

7-206 [2] 54/13 54/21
7:00 [1] 41/25
7:00 a.m [1] 42/23

**8**

8245 [1] 3/11
8525 [1] 3/17
85258 [2] 3/4 3/11
85th [1] 3/11
8925 [2] 3/3 3/16
8:00 [2] 34/2 41/24

**9**

9:00 [1] 41/24
9:13 [1] 1/19

**A**

a.m [5] 1/19 3/2 4/2 42/23 53/20
abilities [1] 30/24
ability [14] 18/9 31/5 31/21 31/24 32/10 32/16 32/24 33/25 34/15 39/5 39/12 39/23 43/25 54/6
about [32] 5/20 8/3 15/9 15/20 17/18 17/19 18/21 22/19 23/20 24/9 24/24 24/25 28/21 29/25 31/5 32/10 32/16 35/8 37/10 38/1 38/8 38/11 39/23 40/19 43/15 45/10 45/11 48/16 49/23 50/2 50/4 51/7
absolute [1] 40/5
absolutely [6] 18/10 18/18 40/18 42/4 43/7 50/3

accurate [2] 43/6 54/5
ACJA [2] 54/13 54/21
across [1] 26/25
act [1] 50/8
active [1] 28/13
actively [1] 32/8
actually [1] 43/21
ADELMAN [1] 3/10
administrative [1] 16/16
administrators [1] 20/17
affect [1] 41/12
after [1] 33/22
afterward [1] 24/17
again [3] 7/5 42/7 53/8
against [3] 21/19 28/14 44/14
AIG [1] 1/10
all [18] 6/4 7/16 13/12 15/15 17/9 17/20 18/1 23/5 24/6 24/24 25/4 25/20 37/8 39/15 40/22 41/21 42/6 54/6
Almshouse [1] 5/24
already [1] 28/5
also [9] 7/2 8/8 14/20 29/23 30/15 33/7 34/25 40/1 40/13
always [13] 17/16 17/16 20/6 20/14 20/15 20/16 31/10 33/24 33/25 34/7 42/8 48/23 51/14
am [5] 5/22 51/18 53/14 54/8 54/8
AMERICAN [1] 1/9
amount [1] 41/20
Ann [1] 9/10
another [2] 25/6 26/6
any [43] 5/9 5/13 8/4 8/19 13/22 14/5 16/9 16/15 16/17 16/19 16/23 17/7 18/17 19/10 20/2 20/22 23/8 29/14 29/16 31/5 31/12 32/10 32/16 32/22 32/24 33/3 33/7 34/13 35/7 35/24 35/25 38/1 44/19 46/17 47/9 47/18 50/4 50/21 51/7 51/10 53/7 54/8 54/8
anymore [2] 12/18 44/8
anyone [3] 23/16 35/20 35/21
anything [5] 23/18 44/9 47/13 51/9 53/17
anyway [1] 45/1
APPEARING [1] 3/8
appointed [1] 14/8
appointments [1] 35/24
approach [2] 30/18 40/16
appropriately [1] 15/17
approved [1] 13/18
approving [1] 13/23
approximately [3] 4/19 41/2 49/21
arbitration [1] 49/23
arbitration/mediation [1] 49/23
are [10] 4/23 8/2 22/4 22/5 34/10 34/12 39/24 43/14 53/13 54/5
ARIZONA [12] 1/2 1/18 3/4 3/11 3/17 4/1 6/18 33/4 54/1 54/14 54/18 54/24
around [3] 6/16 15/3 42/12
as [66]
ask [2] 11/6 21/16
asked [1] 37/3
assigned [6] 16/10 21/20 23/7 29/1 44/8 44/17
assist [1] 10/20
assistants [1] 8/6
associated [1] 35/22
Associates [2] 1/22 54/20
assume [1] 18/8
at [112]
attend [11] 17/14 17/24 18/3 18/11 18/22 19/16 19/19 28/17 29/21 30/15 30/21

attending [6] 19/3 22/6 22/7 22/7 30/4 33/21
attorney [11] 16/23 17/11 22/20 28/11 31/16 32/3 32/7 33/7 34/13 35/1 45/19
attorney's [1] 34/12
attorneys [11] 11/2 11/13 13/19 13/23 14/3 16/19 17/21 20/4 39/8 39/15 40/3
available [1] 41/18
aware [1] 9/8
away [1] 47/4
AZ [1] 1/24
AZ-CR [1] 1/24

**B**

baby [1] 48/7
Bachelor [1] 6/7
bachelors [1] 6/14
back [8] 12/15 12/24 12/25 16/2 26/18 38/1 38/4 42/22
background [1] 5/21
bad [1] 48/7
Banner [42] 12/15 12/16 12/18 12/24 13/3 16/3 24/16 26/18 26/19 26/20 27/16 27/17 27/21 27/24 27/25 28/3 28/6 28/10 28/15 28/23 29/1 29/8 29/10 29/15 29/17 30/5 30/12 30/21 31/6 31/8 31/9 31/20 31/23 32/6 32/25 33/7 34/14 44/7 45/8 46/6 47/20 49/11
BARRETT [3] 3/3 3/15 53/11
basically [4] 7/19 8/10 27/13 41/22
Baywood [1] 27/16
be [32] 4/24 5/14 8/12 8/23 8/23 9/2 9/8 11/21 12/20 13/21 13/23 16/7 18/5 18/13 20/17 21/9 22/25 28/13 33/13 33/18 34/2 39/8 41/18 41/18 42/22 45/5 45/16 47/22 49/17 51/24 52/15 54/4
beat [1] 34/8
beating [1] 44/13
became [4] 9/8 12/15 12/22 34/4
because [45] 5/2 9/8 12/17 13/7 14/1 14/7 15/8 15/12 16/2 16/20 17/6 18/25 19/2 20/12 20/16 21/17 22/4 22/12 22/13 23/4 23/17 24/7 26/12 28/8 28/9 31/25 32/5 34/8 36/18 37/11 39/7 39/15 40/25 41/23 42/4 44/12 44/15 44/22 46/15 47/15 49/17 50/17 51/19 52/23 53/1
bedside [4] 8/6 8/10 8/19 9/4
been [20] 4/5 5/4 5/18 12/22 16/4 17/7 19/1 26/8 27/2 29/18 29/20 34/24 42/21 46/15 48/4 48/7 49/10 49/19 50/1 52/11
before [13] 3/4 4/17 17/20 18/14 26/8 28/6 36/18 37/14 42/22 47/23 47/23 54/4 54/4
began [7] 6/8 13/7 13/17 41/3 45/7 45/15 50/24
begin [3] 32/20 43/10 51/13
beginning [1] 22/1
behalf [3] 35/10 35/21 49/11
being [9] 17/19 22/2 42/16 46/1 47/5 47/6 51/5 51/12 53/2
believe [2] 15/2 24/23
BENEFIT [1] 1/10
benefits [1] 35/11
best [2] 22/9 54/6
better [1] 43/1
between [3] 22/19 39/20 40/3
bid [1] 46/8
Bill [6] 10/17 11/16 11/21 13/11 13/20 14/11
bit [4] 5/20 42/15 45/10 46/10

**B**

blocking [1] 26/5
Blockley [1] 5/24
blood [1] 51/1
both [4] 23/2 23/3 24/22 43/8
bottom [1] 43/3
bought [1] 12/22
brain [1] 12/17
break [4] 5/13 5/15 37/19 37/24
Brian [2] 28/10 28/11
Brief [1] 37/21
bring [2] 38/1 38/4
Broening [2] 13/14 14/18
brunch [1] 52/23
Bud [6] 10/16 11/16 11/21 13/11 13/20
14/10
built [1] 6/18
Burt [6] 13/16 14/22 15/10 15/20 15/23
28/10
business [1] 1/11
busy [1] 8/11
but [45] 4/15 5/12 5/15 8/11 9/9 10/4
12/18 14/20 14/21 15/13 15/14 16/5
16/15 16/19 17/5 18/13 21/24 21/25
26/2 29/19 33/17 34/5 34/7 34/18 37/14
40/5 40/6 42/7 42/8 42/10 42/10 42/12
43/14 43/21 44/15 44/17 45/1 45/13
46/17 47/14 48/7 49/5 51/16 52/21
53/12

**C**

C-A-M-P-B-E-L-L [1] 4/16
call [5] 6/19 9/23 11/13 13/20 23/16
called [6] 4/5 5/23 10/1 12/19 52/13
53/11
came [7] 6/4 7/10 10/18 20/19 25/16
25/23 53/12
Camelback [1] 26/24
CAMPBELL [10] 1/15 2/7 3/1 4/4 4/14
4/16 36/8 37/23 53/13 53/22
can [14] 4/13 8/4 15/11 16/14 21/3 30/7
37/18 38/14 43/10 45/16 45/24 47/14
49/2 51/12
can't [7] 17/4 33/2 44/8 44/9 44/25 49/19
52/13
care [4] 8/10 8/19 9/4 19/12
carrier [10] 11/5 12/7 16/20 20/13 20/14
23/5 25/12 31/8 35/21 35/22
carriers [1] 25/22
carries [1] 5/7
case [21] 12/2 17/5 19/8 19/25 20/9
20/18 21/14 21/16 21/22 22/13 28/11
32/8 32/18 33/12 34/1 34/15 35/18 44/9
46/24 48/7 48/14
cases [21] 10/14 10/20 10/21 15/23 20/3
20/7 21/6 25/6 31/2 32/6 33/6 39/6
39/13 39/23 40/1 40/11 40/12 40/19
41/6 44/12 50/9
Catholic [3] 6/9 6/13 6/25
Cathy [3] 34/21 35/4 35/7
CCR [3] 1/23 54/17 54/18
CENTER [5] 1/10 3/3 3/16 6/9 6/14
certainly [3] 8/22 34/18 40/5
Certified [4] 1/23 3/5 54/18 54/20
CERTIFY [2] 54/8 54/12
cetera [2] 11/15 41/19
chance [1] 37/23
change [1] 25/21
changed [2] 25/16 51/18
changes [2] 26/10 26/16
charge [2] 34/21 35/3
chart [1] 22/13

charts [1] 28/18
Cheney [6] 18/7 20/10 24/24 24/25
Cheney's [10] 18/8 23/8 35/8 35/10
35/14 35/20 39/12 41/3 41/15 43/25
Chester [4] 34/21 35/5 35/6 35/7
children [1] 49/4
city [3] 1/8 6/3 13/13
Civil [1] 3/5
claim [2] 1/10 35/11
claims [1] 11/2
Clancy [9] 45/20 45/22 46/8 47/1 47/2
47/7 48/14 48/15 49/16
Clancy's [1] 46/24
clear [2] 24/19 30/3
clearly [2] 44/15 45/15
client [3] 17/14 18/21 19/19
clinical [8] 5/2 7/14 7/17 7/22 8/12 8/13
8/23 9/3
closely [1] 51/5
clue [7] 4/21 19/21 29/3 29/6 36/25
47/17 47/19
collaborative [2] 11/24 12/4
coma [1] 43/21
come [3] 6/19 11/10 44/7
comes [1] 31/20
comfortable [1] 21/18
coming [3] 26/12 52/23 52/24
comment [1] 22/17
common [1] 43/18
communications [1] 11/1
companies [1] 26/3
company [7] 1/8 1/9 1/9 9/10 10/5 53/8
53/9
competent [1] 18/19
complaint [2] 23/6 35/17
complaints [1] 35/8
complete [2] 11/15 11/20
completed [1] 6/7
complied [2] 54/12 54/20
concern [1] 23/8
concerned [2] 10/16 34/8
concerns [7] 20/22 31/5 32/10 32/16
32/22 32/24 35/8
concluded [1] 53/19
conduct [1] 17/21
conference [1] 5/9
confidence [2] 18/8 18/16
conflict [1] 47/10
CONNECTICUT [1] 1/10
consistent [6] 26/16 28/19 38/16 40/16
50/1 50/9
consultant [2] 13/1 13/1
consultants [1] 34/22
contact [1] 40/23
continue [4] 6/23 26/9 28/13 37/4
continued [1] 43/3
conversations [2] 49/22 50/4
convicted [1] 5/18
copies [5] 19/24 20/2 22/17 22/21 29/11
copy [4] 20/10 23/1 36/3 36/8
corporate [7] 12/18 26/20 26/22 27/1
27/6 27/23 28/9
correct [30] 7/13 8/18 8/24 8/25 9/5 9/18
10/11 11/18 12/9 12/12 15/23 15/24
16/7 17/23 19/15 19/17 21/24 22/3
27/20 28/24 29/9 30/11 31/17 38/19
38/20 40/9 45/9 50/2 52/4 52/4
corrected [1] 12/16
correspondence [2] 22/19 29/12
could [17] 8/22 12/2 12/19 13/23 16/7
22/11 22/13 29/1 34/2 41/11 41/18
41/22 43/12 45/2 51/19 51/24 52/2
counsel [21] 3/8 10/19 11/20 11/22

11/23 12/3 12/8 13/12 13/21 14/8 17/17
19/7 20/6 21/20 22/18 28/18 29/12
31/13 38/13 38/24 39/5
count [3] 19/22 29/4 29/5
counted [1] 26/14
COUNTY [1] 54/2
course [2] 20/16 27/2
court [8] 1/1 1/23 1/23 3/5 17/5 17/17
18/11 20/9
courthouse [3] 17/11 29/18 29/20
courtroom [2] 39/6 39/9
covered [1] 10/15
covering [2] 27/23 28/10
CR [1] 1/24
crime [1] 5/18
CSR [2] 1/23 54/17
cure [1] 45/13
cv [1] 1/6
CYNTHIA [39] 1/4 13/5 13/7 13/8 13/14
14/7 17/18 18/16 20/8 20/23 21/20
22/15 22/19 22/23 24/20 25/5 30/22
32/3 33/10 35/8 35/14 38/13 38/23 41/3
41/23 45/2 45/7 45/16 45/24 46/21 47/6
47/12 48/9 48/11 48/21 49/11 50/8
50/17 52/5

**D**

d/b/a [1] 1/10
Dale [1] 35/2
dangerous [1] 51/1
date [2] 16/8 25/2
dated [3] 2/7 36/12 54/14
dates [1] 12/17
day [6] 33/16 42/5 42/5 42/23 44/12
54/14
days [3] 33/16 43/1 43/22
dead [5] 41/23 42/10 42/13 42/16 45/20
deal [1] 44/24
dealt [1] 9/11
death [1] 52/17
debt [1] 9/24
decision [2] 11/23 46/16
declaration [12] 2/7 35/10 36/3 36/8
36/15 36/24 37/15 37/16 37/24 38/2
38/9 38/22
decline [1] 41/3
defend [1] 18/9
defendant [1] 19/11
Defendants [2] 1/12 3/14
defending [1] 18/6
defense [4] 21/20 31/13 39/21 41/11
demanding [1] 41/11
department [5] 9/6 12/25 27/5 32/1
34/25
depos [2] 17/16 33/14
deposition [8] 1/15 3/1 4/17 4/24 36/2
36/5 36/22 53/19
depositions [11] 17/21 17/24 18/3 18/5
18/9 22/7 23/17 28/17 29/7 32/25 40/13
describe [6] 19/4 30/24 32/7 33/10
39/12 40/24
described [2] 28/21 40/17
describing [4] 42/1 42/18 42/23 45/8
Desert [14] 6/17 7/11 7/12 8/8 8/13 8/20
9/1 9/13 9/14 9/15 9/17 10/1 12/3 26/18
Dessert [2] 6/22 7/18
detail [1] 16/15
details [1] 37/15
DGC [1] 1/6
diabetes [4] 40/25 43/16 43/24 45/12
diabetic [2] 43/8 51/12
diabetics [4] 43/9 43/14 50/25 51/19
diagnosed [1] 43/21

**D**

did [82]
didn't [11]  8/10 11/11 13/22 13/25 20/12
37/2 38/4 42/12 44/17 51/21 53/12
died [1]  52/14
diet [1]  52/1
different [19]  4/15 5/3 7/16 13/2 13/2
14/1 24/10 25/25 26/2 26/10 26/16
27/12 29/18 33/17 42/6 43/14 43/20
48/17 48/24
differently [1]  44/12
difficult [4]  33/20 34/4 42/7 49/3
difficultly [1]  32/14
difficulty [3]  9/24 23/15 41/4
dinner [1]  52/19
diploma [1]  6/2
direct [1]  22/12
direction [1]  54/7
director [11]  7/3 7/4 7/6 7/7 7/14 7/17
8/12 8/13 8/24 9/3 34/24
directors [1]  7/22
disability [4]  35/11 35/14 35/21 35/22
discover [1]  21/13
discuss [5]  11/22 19/8 21/22 40/11
44/15
discussed [5]  40/21 44/22 50/5 52/25
53/4
disease [1]  45/13
dissatisfied [1]  34/12
DISTRICT [3]  1/1 1/2 1/23
divided [1]  27/12
do [81]
docs [1]  19/1
doctor [3]  18/22 51/18 51/25
does [4]  1/11 16/1 23/12 39/13
doesn't [4]  5/9 5/14 23/18 45/21
doing [6]  12/4 28/5 33/6 34/3 46/8 47/6
don't [33]  4/21 5/1 5/5 12/7 15/5 18/13
20/12 22/18 23/17 23/25 24/6 25/2
25/19 29/5 29/6 29/19 30/4 30/6 34/24
45/19 46/7 46/7 46/13 46/14 46/20
47/11 47/13 48/9 48/18 51/3 53/7 53/16
53/17
done [7]  5/2 41/22 45/16 46/1 52/20
52/21 54/6
door [1]  6/5
down [3]  31/3 38/12 54/6
Downing [1]  44/25
downtown [1]  47/2
drafted [1]  36/15
drafts [2]  22/15 22/18
dramatic [2]  51/2 51/17
dreadful [1]  45/12
drops [2]  51/2 51/18
duly [2]  4/5 54/4
during [3]  8/20 9/5 37/24
duties [2]  7/6 7/17
duty [1]  33/18

**E**

earlier [3]  38/17 38/21 41/17
early [2]  33/22 53/14
East [1]  3/16
educational [1]  5/21
effective [1]  40/12
eight [1]  50/12
either [3]  19/11 50/19 51/25
El [1]  4/14
ELLEN [8]  1/15 2/7 3/1 4/4 4/14 4/15
53/13 53/22
emergency [1]  8/21
emotional [2]  41/12 41/16

employee [1]  19/19
employees [3]  19/10 21/11 21/13
end [2]  33/19 50/7
enough [1]  48/19
entire [2]  8/14 25/12
entirely [1]  53/16
entity [2]  1/11 31/12
especially [2]  19/6 49/4
Esq [2]  3/10 3/15
et [2]  11/15 41/19
et cetera [2]  11/15 41/19
ethical [2]  54/12 54/20
even [8]  5/1 5/5 12/3 13/25 14/2 19/18
20/11 29/1
event [1]  14/15
ever [18]  4/17 5/18 20/22 23/8 23/16
31/5 32/10 32/16 32/24 35/4 35/7 35/14
35/20 35/24 35/24 44/7 44/13 46/12
every [2]  51/9 52/22
everybody [2]  25/23 42/12
everybody's [1]  22/9
everything [3]  20/4 36/17 40/21
everywhere [1]  6/5
exactly [3]  13/8 15/7 22/13
Examination [1]  2/2
examined [1]  4/6
example [3]  11/7 20/8 29/21
exchanged [1]  22/19
Exhibit [2]  36/2 36/5
expect [1]  33/10
experience [3]  10/1 12/21 26/14
extremely [1]  21/7

**F**

face [1]  42/24
facilities [2]  27/13 27/15 28/14
facility [1]  18/22
fact [2]  5/8 49/14
facts [1]  40/6
Faddell [1]  14/22
Fadell [4]  13/15 15/10 15/19 15/23
fair [6]  22/8 22/9 30/19 31/18 38/25
48/19
familiar [2]  30/10 45/21
far [2]  10/19 50/5
Farmers [14]  10/15 11/4 11/4 11/17
11/18 12/11 13/8 13/18 14/10 23/1 23/4
23/16 25/12 31/16
Farmers' [1]  10/16
fatigued [1]  50/18
feel [2]  43/1 43/12
fell [1]  46/3
felt [1]  21/18
figure [1]  13/4
filed [7]  20/8 21/19 22/2 28/14 29/11
35/17 53/5
files [3]  16/9 16/12 20/6
filing [2]  22/16 23/6
filings [3]  19/24 20/2 20/19
final [1]  22/17
find [1]  34/1
fine [4]  5/6 5/14 11/14 48/19
finish [3]  15/11 23/9 32/8
finished [1]  6/14
firm [11]  13/15 13/17 14/21 14/25 15/8
15/12 15/13 15/13 28/5 54/20 54/24
first [12]  4/5 11/10 14/17 17/4 24/7
25/10 26/3 28/8 37/4 37/8 38/11 50/13
five [2]  44/22 45/5
foggy [1]  50/18
followed [1]  51/5
follows [1]  4/6
for-profit [5]  10/5 12/21 12/22 25/25 26/2

for-profits [2]  25/16 26/4
foregoing [2]  54/4 54/5
foreign [2]  1/8 1/11
forget [1]  26/1
form [10]  20/25 23/10 24/5 31/1 32/12
32/19 33/1 39/1 42/14 44/2
forth [2]  54/13 54/21
foundation [1]  40/24
four [4]  12/23 26/2 41/2 44/22
frame [3]  36/13 47/16 50/21
frequency [1]  51/7
frequently [1]  40/13
front [1]  5/8
full [3]  4/13 50/13 54/5
function [1]  45/14
functions [2]  10/12 27/18
funeral [1]  52/16
FURTHER [1]  54/20

**G**

gave [6]  14/6 40/24 44/3 44/5 44/6
49/16
GENERAL [5]  1/9 5/23 6/3 6/8 6/10
GERMAN [2]  3/10 3/10
get [13]  7/21 17/20 22/20 28/18 37/14
39/6 39/13 39/23 41/21 41/22 41/24
42/15 51/25
getting [5]  11/20 37/11 39/14 41/20
52/15
give [4]  4/13 11/7 29/1 36/12
given [1]  37/3
go [16]  10/4 10/6 11/2 11/4 12/18 12/24
17/16 21/15 26/18 31/21 35/4 35/7
37/12 38/9 44/13 52/18
God [2]  4/20 50/23
goes [1]  37/10
going [12]  8/16 10/2 16/22 22/14 25/24
29/25 34/10 36/2 37/5 46/20 46/21
52/15
gone [3]  6/13 24/8 34/18
good [14]  4/11 4/12 5/1 9/15 19/5 21/17
23/18 26/25 39/7 40/24 45/1 45/14 46/8
46/10
got [8]  12/3 21/7 33/3 33/16 34/3 34/8
39/6 42/22
gotcha [1]  53/11
graduated [2]  5/22 6/11
great [3]  6/20 39/16 44/24
greater [2]  31/13 31/14
grief [1]  5/1
group [1]  28/10
guess [5]  5/2 5/5 6/10 36/19 46/20

**H**

had [59]
half [4]  41/23 42/10 42/13 42/16
handle [7]  12/2 18/16 23/17 32/25 41/5
43/11 43/13
handled [3]  7/7 15/23 16/13
handling [6]  20/9 23/7 33/17 34/14
40/12 41/4
hands [5]  22/4 22/5 22/6 30/18 40/16
hands-on [1]  30/18
happen [3]  25/17 40/4 50/24
happened [3]  9/22 28/11 34/1
happening [1]  45/12
happy [3]  5/16 12/24 18/19
has [3]  27/1 52/25 54/20
hasn't [1]  53/4
have [84]
haven't [2]  19/21 52/20
having [5]  4/5 41/4 49/22 51/2 51/17
he [3]  21/3 47/1 47/4

**H**

he's [1] 45/20
head [2] 33/2 44/14
health [18] 9/6 9/12 9/15 9/20 9/23 10/6
12/6 12/13 13/3 13/6 18/22 21/19 26/9
38/24 41/3 41/13 41/16 49/11
hearing [1] 29/21
hearings [5] 18/11 18/17 22/7 28/17
29/7
Heart [2] 27/17 27/17
heavily [1] 21/25
Helen [1] 44/8
help [2] 6/19 51/19
helping [2] 7/21 25/6
helps [1] 15/5
her [61]
Herder [5] 1/22 1/23 3/4 54/17 54/20
here [6] 5/3 5/14 6/24 17/21 37/11 51/13
Here's [1] 13/4
herein [1] 4/5
hereof [1] 54/9
hereto [1] 54/8
hesitation [1] 50/8
hey [2] 12/19 34/19
high [5] 42/8 43/3 44/1 50/19 51/1
him [2] 21/3 21/4
hire [6] 10/19 11/22 11/23 12/1 13/12
46/12
hired [1] 10/8
hiring [4] 7/19 8/2 8/11 14/4
his [1] 44/25
hit [1] 51/16
hmm [3] 15/18 41/7 43/5
honest [1] 39/17
hopefully [1] 10/13
hospital [20] 5/23 6/3 6/18 6/20 7/4 7/8
7/11 7/12 7/20 9/14 9/17 9/19 11/8 19/2
21/12 27/16 27/17 33/15 42/2 42/21
hospitals [6] 5/3 13/3 14/1 27/12 27/24
28/10
hour [2] 33/15 42/5
hours [5] 33/6 33/22 34/9 42/3 42/19
how [23] 4/19 7/24 10/22 12/13 13/10
13/17 14/12 16/9 19/18 22/19 23/23
25/21 26/1 27/10 27/15 27/21 28/25
30/24 38/6 39/12 47/25 48/21 51/7
however [1] 12/23
huge [1] 33/8
hundred [1] 21/9

**I**

I'm [21] 5/16 6/23 13/4 18/24 21/24 26/5
28/7 32/4 32/5 32/6 36/2 36/16 37/17
40/4 43/8 46/17 46/25 48/2 48/6 49/15
52/23
I've [3] 5/2 27/2 36/17
I-10 [1] 1/11
I-X [1] 1/11
Iasis [1] 26/7
idea [4] 7/25 16/11 47/18 53/6
identification [1] 36/6
if [34] 5/7 5/13 5/15 10/14 10/18 11/7
11/25 12/1 12/5 15/5 15/8 15/11 19/11
20/5 20/8 21/19 21/24 31/16 34/12 37/3
37/5 37/8 37/16 38/21 42/11 44/21 45/4
45/19 47/16 48/9 49/15 50/12 51/15
52/13
ignore [2] 21/3 21/4
immediately [1] 12/7
impact [2] 40/24 42/1
impacting [1] 51/21
impressed [1] 43/25

in [131]
include [1] 8/5
independent [1] 48/5
indicated [1] 43/7
indicating [1] 36/17
individual [1] 1/4
individually [1] 40/10
inform [1] 52/17
information [1] 37/3
informed [2] 49/10 49/14
initially [1] 10/15
instance [1] 52/8
insulin [1] 52/1
insurance [12] 1/8 1/9 1/9 9/7 9/10
10/16 11/5 16/20 20/12 31/16 35/21
35/22
insured [3] 9/8 31/9 31/12
interest [1] 22/10
interested [1] 54/8
interrupt [1] 6/23
interview [3] 21/13 41/18 41/25
interviewing [3] 7/8 7/19 8/2
interviews [1] 33/25
into [4] 13/15 46/3 49/22 49/23
involved [7] 19/1 19/12 20/3 21/25 29/24
32/8 32/17
involvement [4] 22/12 28/22 31/13 31/14
Irish [1] 42/16
is [39] 6/5 7/13 8/24 9/12 12/5 14/12
14/18 14/23 14/25 17/11 22/7 23/7
24/24 28/22 30/9 30/19 31/17 33/15
36/8 36/10 38/25 41/11 42/18 42/18
42/23 43/20 44/5 44/12 45/8 45/14
48/16 48/17 49/6 49/17 50/10 50/21
51/14 52/8 54/20
isn't [1] 34/19
issue [2] 14/8 14/14
issues [4] 16/15 18/17 21/22 32/11
it [103]
it's [21] 4/15 5/4 14/14 15/2 18/21 24/15
36/12 36/16 37/8 40/20 42/5 43/18
43/24 45/12 47/14 48/24 50/14 50/24
50/25 53/11 53/16
its [2] 11/15 30/3

**J**

January, [1] 49/12
January, 2007 [1] 49/12
Jeff [1] 24/9
Jeffrey [1] 3/15
Jim [1] 45/23
job [2] 7/17 23/18
Joe's [1] 10/3
joined [2] 7/12 28/6
judge [3] 5/8 18/14 44/24
juice [1] 51/14
jury [3] 5/8 23/21 24/25
just [40] 5/15 6/18 10/24 13/20 14/2
14/3 15/11 17/10 17/18 21/1 22/17 24/6
24/9 24/14 24/19 25/9 29/6 29/25 30/3
30/7 34/8 34/9 36/12 36/17 37/17 38/9
39/21 40/2 42/11 44/8 46/14 46/19
46/25 47/25 48/3 48/5 48/6 48/20 49/19
50/24

**K**

keep [3] 10/13 20/13 52/5
Ken [10] 45/16 46/8 46/9 46/24 47/1
47/6 47/6 47/15 48/14 49/16
kept [3] 16/19 20/4 38/5
kids [1] 49/4
kind [1] 51/12
knew [26] 9/25 12/4 14/3 14/3 14/12

19/1 21/6 21/9 22/13 31/2 31/3 33/3
37/16 39/8 39/15 41/23 42/10 42/10
45/11 45/19 47/15 51/15 52/15 53/1
53/1 53/2
know [47]  5/16 11/25 12/3 13/18 15/5
15/8 16/14 17/20 18/25 20/12 20/12
26/6 27/10 28/5 28/11 28/25 29/5 33/12
33/13 34/3 34/19 34/24 36/15 38/5
38/22 39/14 40/5 40/19 40/23 42/11
42/11 42/12 43/10 45/13 45/19 45/24
46/8 46/14 46/23 48/20 49/14 50/24
51/13 51/16 51/18 52/11 52/14
knowing [2] 43/24 51/20
KNOWN [1] 54/4

**L**

lady [1] 53/13
Larry [1] 9/10
last [12] 4/24 26/8 35/4 36/10 40/7
44/25 45/5 49/10 49/19 50/13 50/13
52/8
later [2] 16/2 39/4
Law [1] 3/2
lawsuit [12] 11/9 12/5 19/12 19/13 21/19
22/2 31/20 31/21 32/11 52/25 53/1 53/4
lawsuits [6] 10/14 16/16 16/18 28/14
28/25 30/7
lawyer [5] 11/8 25/6 31/22 31/22 48/12
lead [2] 38/13 38/24
least [7] 15/25 16/5 17/3 17/3 24/2 26/6
38/13
leave [1] 6/11
left [1] 26/8
legal [4] 11/2 19/24 20/2 20/19
Leonard [4] 45/22 45/23 47/2 48/15
lessen [1] 5/10
let [8] 5/16 6/23 11/6 12/14 20/1 30/3
37/4 37/4
let's [10] 8/7 15/15 15/15 17/18 24/19
37/7 37/13 37/20 38/9 53/3
letter [2] 11/8 11/10
level [3] 42/8 43/3 44/1
licensed [1] 8/5
LIFE [2] 1/7 1/9
like [21] 4/16 6/19 7/9 12/19 12/23 14/15
21/24 21/25 22/5 23/18 34/10 40/20
47/13 48/7 52/19
liked [1] 11/25
line [2] 6/24 8/17
list [5] 13/18 13/23 13/25 14/2 22/11
listing [1] 16/20
litigation [2] 34/14 49/10
little [5] 5/20 37/19 42/15 43/20 45/10
live [1] 17/6
located [1] 26/22
location [2] 9/17 25/2
long [9] 5/4 5/14 9/24 12/13 23/23 27/21
33/6 34/9 42/19
long-term [1] 9/24
longer [1] 16/4
look [4] 10/14 36/3 44/11 50/12
looked [1] 53/2
looking [5] 9/25 11/22 25/15 44/11 48/2
Lord [1] 19/5
lot [2] 13/8 29/23
LOUISE [6] 1/15 3/1 4/4 4/14 4/15 53/22
lovely [1] 53/13
low [2] 50/19 51/1
Luke's [27] 9/23 10/6 12/13 12/22 13/6
13/9 14/9 14/21 15/6 15/22 15/25 16/4
16/10 16/13 16/22 16/25 23/13 24/12
24/22 25/13 26/1 26/14 27/19 28/22

**L**

Luke's... [3] 30/16 31/15 38/24
Lutheran [2] 27/13 27/16

**M**

ma'am [1] 4/11
made [3] 11/23 20/15 40/2
majority [1] 9/2
make [9] 11/14 11/19 15/15 15/16 23/12 24/14 24/19 30/3 34/11
making [1] 46/16
malpractice [7] 11/5 16/15 25/12 31/8 41/5 41/10 50/9
management [13] 4/20 5/4 9/6 9/25 10/1 10/9 12/25 13/1 26/21 27/5 28/20 31/25 34/25
manager [8] 10/10 10/11 10/12 13/6 27/8 27/19 30/12 30/18
managers [3] 10/22 22/4 27/10
many [22] 4/19 4/20 7/24 10/22 12/23 14/1 16/9 18/25 19/18 19/22 26/1 27/10 27/12 27/15 28/25 29/4 29/5 33/6 38/4 44/23 47/25 52/14
MARICOPA [1] 54/2
mark [1] 36/2
marked [1] 36/5
Martin [1] 54/17
Marty [2] 1/23 3/4
matter [3] 5/14 34/14 49/10
Matura [5] 2/3 3/3 3/15 3/15 53/11
may [22] 1/18 2/8 3/2 4/1 6/13 9/8 16/4 20/11 20/11 26/8 29/18 29/20 34/24 36/12 42/21 44/13 48/4 48/6 49/19 51/16 52/11 54/14
May 19th [1] 36/12
maybe [6] 8/1 17/3 23/24 41/24 44/11 49/20
me [39] 5/16 5/20 6/21 6/23 8/16 11/6 11/7 11/22 12/14 13/21 14/6 15/11 15/25 16/5 17/2 17/6 19/4 20/1 21/24 22/9 28/21 30/3 33/10 37/4 37/4 39/12 39/14 40/7 40/24 44/8 45/10 51/14 51/15 51/16 52/12 52/17 54/4 54/5 54/6 mean [13] 5/2 5/9 7/4 18/13 21/8 21/11 25/23 32/5 33/8 37/4 39/13 43/20 48/25
meaning [3] 28/17 33/22 46/10
means [1] 40/8
meant [1] 39/14
mediation [20] 30/9 30/10 30/25 31/6 39/24 40/2 45/1 45/7 45/25 46/10 46/21 47/5 47/14 48/10 48/16 48/17 48/20 48/22 49/15 49/23
mediations [12] 29/23 29/25 30/13 30/15 30/21 39/18 44/23 45/17 46/1 46/5 46/18 49/3
mediator [7] 46/12 46/21 48/12 48/13 48/21 49/7 50/8
medical [10] 6/9 6/13 11/11 11/13 16/14 32/17 35/25 41/5 41/10 50/9
medicine [1] 32/17
meet [11] 13/10 14/7 19/7 19/14 21/14 21/21 23/4 28/9 40/10 40/20 52/22
meeting [5] 12/10 18/21 19/19 20/17 42/3
meetings [7] 18/23 18/25 19/3 19/7 22/7 28/8 33/21
members [1] 33/22
memories [2] 38/1 38/4
mental [3] 41/5 41/12 41/16
mentally [1] 50/18
mentioned [4] 24/2 24/19 24/20 25/14
Mercy [3] 6/9 6/13 6/25

Mesa [15] 6/18 17/5 17/6 17/10 17/19 23/20 24/3 24/7 24/8 24/25 25/7 27/14 27/16 27/24 52/24
met [7] 13/8 14/14 19/10 19/10 21/15 25/23 40/19
mid [1] 37/11
midnight [1] 42/22
might [2] 21/1 33/18
mind [2] 47/25 49/18
mine [1] 43/21
minute [1] 52/12
Mitchell [1] 10/17
Moore [1] 10/17
more [11] 16/15 22/6 42/15 45/10 46/1 46/1 48/1 51/15 51/16 53/7 53/17
morning [3] 4/11 4/12 33/23
most [3] 18/25 25/11 40/11
motion [1] 20/8
motions [2] 22/16 29/11
move [1] 24/16
moved [1] 27/1
Mr [1] 2/3
Mrs. [1] 37/23
Mrs. Campbell [1] 37/23
Ms [17] 14/17 14/21 14/25 15/8 15/19 16/9 16/12 16/23 17/11 18/3 18/5 18/8 18/11 18/23 19/4 19/14 19/20
Ms. Campbell [1] 36/8
Ms. Cheney [21] 19/25 20/3 21/21 23/7 23/17 24/3 26/9 26/15 28/2 28/25 29/8 29/15 30/4 32/7 33/21 34/5 35/25 40/1 40/8 43/3 43/15
Ms. Cheney's [6] 23/8 35/10 35/20 39/12 41/15 43/25
much [5] 26/12 26/14 39/5 43/19 43/23
mutual [1] 39/20
my [18] 4/20 5/9 6/7 6/14 12/14 12/17 14/19 15/11 20/17 26/14 33/2 33/4 33/19 49/17 52/10 53/9 54/6 54/7
myself [2] 34/10 43/8

**N**

name [6] 4/13 35/4 45/1 53/8 53/9 53/12
Nastro [1] 44/24
nature [1] 42/2
necessary [2] 8/21 41/5
need [3] 23/19 41/22 53/17
never [13] 10/4 14/2 14/5 16/19 21/5 23/15 23/19 32/13 34/16 44/3 44/5 44/6 44/20
new [5] 1/8 6/20 7/20 14/10 26/12
next [4] 6/5 41/10 42/23 49/9
nice [2] 12/20 17/5
nicely [1] 46/3
night [3] 34/2 41/18 42/22
no [56]
None [1] 17/9
nor [1] 54/8
North [1] 3/11
not [20] 8/21 9/8 14/14 16/18 21/3 24/1 25/4 25/20 25/24 29/3 41/20 43/11 44/10 44/19 47/17 47/19 49/15 50/5 53/1 54/11
not-for-profit [1] 25/24
noted [1] 30/7
nothing [1] 5/12
notify [2] 11/16 12/7

43/13 45/8 45/20 46/23 49/15 52/22
number [2] 29/2 49/9
nurse [18] 5/22 6/25 7/2 7/13 8/8 8/12 8/12 8/23 9/4 13/1 19/11 19/14 32/20 33/18 34/21 34/25 41/25 43/8
nurses [8] 7/7 8/3 8/5 8/5 19/6 22/11 41/18 42/3
nursing [10] 5/23 6/7 7/3 7/4 7/6 7/7 7/15 8/4 8/4 8/6

**O**

o'clock [4] 34/2 41/24 41/24 41/25
oath [2] 5/6 5/10
Oberg [2] 13/14 14/18
object [1] 21/1
objected [1] 14/5
Objection [10] 20/25 23/10 24/5 31/1 32/12 32/19 33/1 39/1 42/14 44/2
obligations [2] 54/13 54/21
observe [1] 41/15
obviously [7] 16/18 21/15 33/5 36/16 37/2 43/7 47/21
occasion [1] 32/2
occasions [2] 50/15 50/17
occur [3] 10/4 42/6 47/16
occurred [2] 21/14 38/24
off [4] 22/4 33/2 33/22 42/3
offer [1] 40/2
office [11] 5/9 12/18 20/10 20/20 26/20 26/22 27/1 27/6 27/23 28/9 47/3
Offices [1] 3/2
often [1] 40/19
Oh [16] 4/20 12/14 14/10 18/4 20/21 21/23 22/24 28/16 30/20 31/11 34/7 34/10 43/19 49/8 52/10 52/11
okay [15] 5/16 15/12 15/14 15/21 34/17 36/13 37/7 37/9 37/13 38/10 45/6 49/5 49/5 52/10 53/11
old [3] 33/3 34/3 37/11
on [35] 3/2 6/11 10/8 11/23 12/16 13/23 19/25 20/6 20/11 20/17 22/5 22/6 22/14 24/16 25/6 25/7 26/14 28/11 30/18 33/18 33/25 35/10 35/20 36/10 38/11 39/18 40/12 40/16 40/25 44/22 47/2 49/11 50/15 50/16 52/22
once [2] 21/1 25/16
one [39] 7/24 10/23 15/16 17/4 17/19 21/9 21/15 24/3 24/4 24/7 24/24 25/7 25/10 25/10 26/3 26/4 26/6 26/8 28/8 30/9 40/25 40/25 40/25 43/8 43/15 43/24 44/12 45/12 45/18 47/14 47/25 48/2 48/3 48/11 48/22 49/17 49/19 49/20 51/8
one-to-one [1] 40/25
only [1] 49/17
open [1] 39/17
opened [1] 6/18
operation [2] 33/16 42/5
opponent [1] 39/8
opportunity [2] 6/17 6/20
opposed [1] 9/3
opposing [1] 29/12
option [1] 53/15
or [33] 4/15 8/1 11/2 11/16 11/21 13/22 14/15 15/22 18/1 18/22 19/12 19/19 19/25 22/17 22/25 23/18 25/2 25/6 26/13 31/6 32/17 33/22 35/8 35/21 43/11 47/25 48/7 48/12 48/17 50/19 51/1 52/1 52/13
orange [1] 51/14
ORIGINAL [1] 1/21
Orlando [2] 26/3 26/7

other [12] 7/22 8/3 9/19 14/14 18/13 24/4 25/3 26/13 27/10 31/15 44/13 50/4
others [5] 15/19 22/5 25/9 43/1 48/4
our [6] 11/4 15/16 19/10 23/4 37/14 40/11
out [5] 6/19 10/13 13/4 34/1 52/18
outcome [1] 54/9
over [6] 13/12 20/1 21/15 27/13 33/3 50/12
own [8] 14/21 14/25 15/8 15/12 25/6 25/7 25/22 42/25
ownership [2] 26/10 26/16

## P

P.C [2] 3/3 3/15
P.L.C [1] 3/10
page [7] 2/2 36/10 38/11 45/4 45/5 50/13 50/13
pages [1] 54/5
Palumbo [1] 52/14
paragraph [12] 37/6 37/6 38/11 39/4 40/7 41/2 43/2 45/5 49/9 49/21 50/7 50/12
Parkway [2] 3/3 3/16
part [7] 9/14 15/13 19/8 30/12 30/18 36/16 39/7
participant [1] 28/13
participated [1] 34/5
participating [1] 31/6
participation [1] 22/1
parties [2] 40/3 54/8
partner [1] 25/15
passed [1] 47/4
pat [1] 31/3
patient [1] 19/12
patients [1] 42/6
paying [1] 16/21
pending [2] 11/2 14/8
Penn [2] 6/11 6/14
Pennsylvania [3] 6/6 6/6 7/1
people [16] 4/15 6/4 8/6 8/11 9/9 9/11 13/2 23/4 28/10 33/13 33/14 40/20 45/1 45/13 45/18 49/2
percent [1] 21/9
perform [4] 43/3 43/25 48/21 52/2
performance [3] 34/13 34/13 35/8
performed [2] 27/18 42/8
Performing [1] 27/18
period [2] 24/15 51/3
periods [1] 24/10
person [4] 17/24 21/15 34/18 46/16
pertinent [1] 40/10
Philadelphia [4] 5/23 6/3 6/4 6/10
Philly [2] 6/8 6/10
Phoenix [1] 52/23
physical [2] 41/12 41/16
physically [1] 50/18
physician [1] 51/6
Pima [2] 3/3 3/16
place [1] 19/13
places [1] 26/13
plaintiff [4] 1/5 3/9 22/20 39/21
plaintiff's [1] 39/15
plaintiffs [1] 39/7
play [3] 11/6 11/7 13/22
please [1] 4/13
plenty [1] 45/25
point [7] 8/19 10/2 11/21 21/21 26/19 49/18 51/16
policy [1] 35/15
poor [1] 6/4
possibly [1] 10/2
practical [1] 8/5
practice [4] 5/3 32/18 42/25 49/24
preparation [2] 10/20 36/21
PREPARED [1] 1/22
pretty [3] 21/25 26/12 26/13
print [1] 54/7
prior [3] 9/7 31/17 33/14
probably [8] 10/7 16/14 23/2 23/3 25/14 26/2 42/24 46/24
Procedure [1] 3/6
proceedings [3] 54/4 54/6 54/6
process [6] 12/5 12/8 28/21 29/10 30/10 39/24
product [2] 20/23 23/8
professional [1] 44/16
profit [6] 10/5 12/21 12/22 25/24 25/25 26/2
profits [2] 25/16 26/4
program [1] 6/2
proposed [1] 22/15
proud [1] 44/16
proudly [1] 43/12
provide [2] 8/19 22/23
providers [1] 35/25
providing [1] 9/3
provisions [1] 38/8
pulled [1] 33/16
purchased [1] 10/5
purpose [2] 37/16 38/2
pursuant [1] 3/5
put [4] 8/7 13/23 38/21 53/3

## Q

quarters [1] 38/12
question [2] 15/11 21/5
questions [3] 21/16 38/8 53/7
quite [2] 25/25 48/24

## R

R1145 [1] 54/24
raise [2] 23/8 35/7
raised [1] 32/11
ran [1] 25/7
rather [1] 46/3
reached [1] 40/3
read [3] 37/8 37/18 53/15
reading [2] 24/15 48/3
reads [1] 15/16
ready [2] 28/18 33/13
really [2] 45/1 45/19
reason [2] 5/15 18/13
reasons [1] 29/19
recall [50] 16/12 16/22 17/2 17/4 17/4 17/19 22/18 24/4 24/6 24/7 24/20 25/2 25/5 26/11 26/11 28/8 29/14 29/16 29/19 30/4 32/2 33/21 36/24 37/15 38/14 42/7 44/10 44/11 46/7 46/7 46/13 46/19 46/20 46/20 47/5 47/6 47/9 47/11 47/13 47/25 48/3 48/8 48/14 48/22 49/20 49/22 50/4 51/3 51/5 52/13
recalled [1] 24/2
receive [4] 13/19 13/23 19/24 20/2
received [2] 11/8 36/9
receiving [2] 22/18 29/11
recess [1] 37/21
recollect [1] 16/1
recollection [13] 14/18 14/19 16/7 16/9 16/17 17/8 19/18 25/9 44/19 48/5 50/22 51/7 51/10
recommend [1] 49/6
recommending [1] 50/8
records [5] 11/11 11/13 16/19 20/4 32/17
reduced [1] 54/7
referred [1] 49/11
referring [2] 39/24 41/19
refuse [2] 44/17 44/20
regard [1] 39/16
registered [11] 5/22 6/25 7/2 7/13 8/5 8/8 8/11 8/23 9/4 54/20 54/24
regulatory [1] 16/16
related [1] 54/8
relationship [1] 26/15
remain [1] 26/15
remember [18] 17/10 19/3 23/1 23/23 23/25 24/24 25/19 26/4 27/21 33/15 35/12 39/18 45/24 46/25 47/14 47/16 48/9 48/18
remembered [1] 25/10
removed [1] 34/15
report [2] 10/18 34/20
reported [5] 1/22 34/19 35/2 35/2 46/16
reporter [4] 1/23 3/5 36/6 54/18
Reporting [2] 54/20 54/24
reports [1] 22/23
represent [1] 26/9
representative [2] 17/15 19/20
representatives [1] 12/10
represented [1] 32/5
representing [1] 42/2
reps [1] 10/16
reputation [1] 21/17
request [1] 52/5
requested [3] 11/14 16/19 54/10
required [1] 54/11
requirements [1] 41/5
resolve [1] 30/7
respect [5] 30/24 34/13 35/11 39/20 41/15
responsibility [1] 33/8
result [1] 50/18
retired [9] 4/22 4/23 5/1 12/17 27/2 27/23 27/25 33/5 47/23
review [9] 10/21 11/19 20/19 22/13 22/16 37/23 54/10 54/11 54/11
reviewed [4] 11/12 35/14 35/17 36/21
Riggs [1] 9/10
right [20] 6/5 14/23 17/12 17/21 24/11 24/13 26/19 26/25 30/2 38/18 40/17 40/22 41/20 46/3 47/23 47/24 47/24 49/2 50/10 53/6
risk [24] 4/20 5/4 9/5 9/25 10/1 10/9 10/10 10/11 10/12 10/22 12/25 13/1 13/6 22/4 26/20 27/5 27/8 27/10 27/19 28/19 30/12 30/18 31/25 34/25
RN [1] 7/14
ROES [1] 1/11
role [6] 7/9 11/6 11/7 13/22 30/12 33/7
room [3] 5/9 46/22 46/22
RRF [1] 54/24
Rules [1] 3/5
run [1] 44/12
running [1] 7/21

## S

said [14] 6/19 12/19 12/19 34/3 34/19 37/10 41/17 42/4 44/5 45/2 45/16 50/10 53/13 53/14
Sam [1] 26/25
Samaritan [21] 6/17 7/11 7/11 7/12 7/18 8/9 8/13 8/20 9/2 9/6 9/8 9/12 9/13 9/14 9/14 9/15 9/15 9/17 9/20 12/15 26/18
same [10] 5/7 7/10 9/12 12/5 12/8 27/18

S

same... [4] 28/21 29/10 43/2 49/20
saw [3] 23/5 36/18 51/15
say [23] 7/5 8/2 9/12 11/13 11/14 12/16
15/15 16/14 21/11 23/16 31/21 39/4
39/5 40/7 41/2 41/10 43/2 44/8 45/7
49/9 49/21 50/7 50/14
saying [2] 44/11 45/24
says [2] 38/12 50/16
scares [1] 50/25
schedule [2] 47/13 42/2
School [1] 5/23
Schultz [1] 35/3
Science [1] 6/7
Scott [1] 44/25
Scottsdale [6] 1/18 3/4 3/11 3/17 4/1
54/14
second [3] 6/24 24/17 30/1
see [19] 25/18 38/14 39/10 40/14 40/19
41/6 41/11 41/13 41/22 45/13 46/7
46/13 48/18 49/12 49/13 49/15 49/24
50/19 52/18
seemed [2] 32/13 39/16
seems [3] 16/2 16/5 49/17
seen [1] 36/18
select [2] 31/16 32/3
selecting [2] 12/8 13/22
selection [1] 31/13
self [3] 9/8 31/9 31/12
self-insured [3] 9/8 31/9 31/12
send [5] 20/5 20/6 20/10 22/15 28/18
sense [2] 23/12 33/12
sentence [7] 38/12 38/14 39/10 41/10
45/5 50/13 50/16
sentences [2] 39/4 40/7
served [1] 12/5
Service [4] 9/6 9/12 9/15 9/20
services [1] 9/3
set [5] 19/6 19/7 49/2 54/13 54/21
settings [1] 52/18
settle [1] 40/2
settled [3] 39/6 39/13 39/24
settlement [1] 40/2
settlements [1] 39/7
seven [3] 33/16 42/5 49/21
Seventh [1] 47/3
several [5] 27/2 43/22 44/25 50/15
50/17
share [1] 43/23
shared [2] 43/18 43/19
she [73]
she's [1] 52/23
shorthand [1] 54/6
should [1] 23/17
side [1] 22/6
sign [3] 4/14 47/9 53/15
signature [5] 36/10 53/21 54/10 54/11
54/11
signed [2] 36/19 53/2
signing [1] 47/13
since [2] 36/16 53/4
sitting [5] 5/7 5/8 17/20 39/18 51/12
situation [1] 43/20
six [1] 49/9
skill [4] 42/9 43/4 44/1 54/6
skills [2] 39/6 39/16
sleep [1] 41/20
smart [2] 18/20 21/6
smooth [1] 44/13
snuff [1] 20/14
so [42] 4/21 6/19 6/21 7/9 10/1 10/6
10/20 11/1 11/6 11/14 11/14 12/4 12/24

13/20 14/1 14/11 15/2 15/16 15/25 19/5
19/10 19/11 20/8 21/17 24/9 24/12
24/23 26/13 28/12 31/12 32/22 33/16
33/19 38/21 40/19 42/1 43/23 46/4
47/23 50/16 51/15 52/2
social [2] 14/15 52/18
sold [1] 12/22
SOLUTIONS [1] 1/10
some [12] 5/15 14/14 18/13 19/4 22/4
36/16 38/8 38/8 43/1 45/1 46/5 48/6
somebody [1] 25/15
someone [5] 9/25 11/25 12/1 44/24 49/6
something [6] 14/15 20/6 34/5 43/18
43/23 45/15
sometime [2] 47/20 47/23
Sometimes [1] 49/3
sorry [2] 6/23 23/14
sound [1] 45/21
sounds [5] 21/24 21/25 22/5 42/13
42/18
soup [1] 4/16
specific [1] 16/18
spectrum [1] 22/6
spent [2] 9/1 33/6
spoke [2] 45/18 52/8
spoken [1] 35/20
SS [1] 54/1
St [27] 9/23 10/6 12/13 12/21 13/6 13/9
14/9 14/20 15/6 15/22 15/25 16/4 16/10
16/13 16/22 16/25 23/13 24/12 24/22
25/13 26/1 26/14 27/19 28/22 30/16
31/15 38/24
St. [1] 10/3
St. Joe's [1] 10/3
stabilized [2] 51/25 52/2
staff [12] 7/8 7/19 7/19 8/2 8/4 8/4 21/7
21/11 21/14 21/18 33/22 34/1
stand [1] 12/16
start [3] 20/1 23/9 32/8
started [7] 9/5 14/17 14/21 14/25 15/8
15/19 23/13
starting [1] 41/12
STATE [1] 54/1
stated [1] 38/22
STATES [1] 1/7
status [1] 22/23
Steve [1] 14/25
Steven [1] 31/9
still [6] 7/11 24/12 31/24 44/21 52/2 52/5
Stoltz [1] 9/10
strategy [1] 40/11
street [3] 26/23 26/25 47/3
stress [2] 41/4 41/21
strike [1] 19/25
struggled [1] 51/17
struggling [1] 50/17
stuff [1] 52/19
subject [1] 19/13
submitted [1] 35/10
sugars [2] 50/19 51/1
suit [1] 33/17
Suite [2] 3/3 3/16
suits [1] 11/12
Sunday [1] 52/23
supervisory [1] 7/9
sure [15] 11/14 11/19 15/15 15/16 20/15
24/14 24/19 28/7 29/20 30/3 32/4 32/5
32/6 40/4 51/18
sworn [2] 4/5 54/5
system [11] 9/23 10/6 12/6 12/13 13/3
13/6 21/19 26/10 31/23 38/25 42/2
systems [1] 9/19

T

take [6] 5/13 5/15 18/9 37/18 37/19 44/9
taken [6] 3/2 4/17 4/24 37/21 54/4 54/6
talk [7] 15/16 17/18 17/18 22/12 29/25
33/13 43/15
talked [1] 45/11
talking [7] 8/3 23/20 24/9 39/23 48/2
48/16 50/1
tease [1] 48/15
tell [8] 5/7 5/12 5/20 13/21 17/2 43/12
45/10 51/12
telling [1] 51/13
tells [2] 15/25 21/3
Tenet [2] 26/4 26/7
Tennessee [1] 26/13
tenure [1] 8/20
term [1] 9/24
terms [6] 5/20 9/1 11/1 22/1 29/11 49/1
testified [1] 4/6
testify [1] 54/5
testifying [1] 54/4
testimony [1] 31/17
texted [2] 52/12 52/13
than [4] 16/4 16/15 43/1 43/20
Thank [2] 4/23 5/17
that [226]
that's [20]  4/16 5/6 5/13 13/17 14/19
22/9 37/9 38/16 40/16 40/23 41/19 42/4
43/6 44/21 44/22 48/2 49/15 50/1 50/9
51/15
their [7]  19/8 23/5 25/22 33/12 33/13
34/13 47/3
them [21]  7/12 7/21 10/18 12/1 13/12
18/1 19/1 19/7 20/6 20/17 21/16 21/16
28/6 28/18 30/9 31/2 31/3 34/15 38/6
38/9 39/15
then [18]  5/3 6/8 6/17 9/22 10/5 11/16
11/19 11/21 12/15 13/15 20/16 21/24
26/18 27/17 35/2 36/3 37/7 52/22
there [33]  6/12 6/16 7/22 8/14 10/4
10/14 10/22 11/25 13/2 16/2 16/5 17/10
20/6 26/6 26/6 27/1 27/10 28/12 29/16
31/10 31/25 33/19 34/7 34/7 39/20
41/20 44/25 47/6 48/1 48/3 48/4 48/6
52/14
there's [4]  19/11 38/12 45/13 45/25
thereafter [1]  54/7
these [2]  26/10 26/16
they [51]  7/16 9/16 9/24 9/24 9/24 9/25
10/1 10/2 10/5 10/19 11/12 11/25 11/25
12/1 12/2 12/19 13/7 13/12 13/15 13/20
14/1 14/3 14/3 14/6 16/14 16/16 16/18
17/17 19/2 19/8 20/5 20/5 20/11 20/15
20/19 21/9 25/15 25/22 25/23 26/8
26/12 26/13 28/7 33/12 33/12 33/13
35/2 39/16 39/16 39/21 51/18
thing [15]  7/10 8/6 10/19 11/10 11/24
19/9 28/19 29/22 38/7 39/19 41/19
42/24 48/7 50/25 52/1
things [4]  10/18 38/6 41/21 42/6
think [19]  7/24 8/16 12/14 13/25 15/2
18/24 23/17 25/10 26/2 27/2 33/3 40/23
41/17 44/21 44/25 45/22 46/17 52/12
52/12
thinking [3]  22/16 38/5 48/6
third [1]  45/4
this [33]  5/2 11/6 12/2 15/15 17/19
20/12 21/14 31/21 31/22 31/22 34/3
34/19 35/18 36/8 36/15 36/18 36/24
37/16 38/2 38/9 42/7 44/9 47/16 48/3
49/18 51/3 51/8 51/8 51/13 51/14 52/25
53/2 54/14

thorough [1] 21/6
those [13] 18/17 18/22 20/7 22/25 24/22
25/5 26/1 33/3 38/22 39/7 40/19 48/6
51/17
though [4] 23/25 42/18 47/20 51/3
thought [1] 12/2 14/2
threaten [1] 11/11
threatened [1] 11/2
threatening [1] 11/8
three [5] 6/2 8/1 28/14 38/11 40/7
three-year [1] 6/2
through [22] 8/17 11/3 11/4 13/11 16/1
16/5 22/2 23/7 26/10 26/16 30/9 31/23
37/5 37/10 37/12 37/14 37/19 38/5 38/9
39/24 51/13 51/25
throughout [1] 9/16
Thunderbird [1] 9/16
thus [1] 50/5
time [41] 4/24 5/4 5/13 6/12 6/24 8/14
8/17 8/19 9/1 9/2 9/5 15/3 15/15 15/16
18/2 19/10 19/13 21/15 21/21 23/5
23/13 24/10 25/13 25/14 26/19 31/10
33/4 33/5 33/19 36/12 37/18 41/1 41/4
42/6 46/2 47/16 50/21 51/3 51/8 51/9
52/8
times [7] 4/19 12/23 19/19 27/2 33/17
34/7 38/14
timing [1] 49/1
tired [1] 41/23
title [2] 10/10 34/23
titles [1] 7/16
today [6] 5/14 5/15 17/21 41/17 52/6
53/12
today's [1] 36/21
together [8] 33/3 36/4 37/11 37/12 38/9
39/22 40/12 52/15
told [4] 8/16 36/17 38/16 38/21
Tony [2] 52/13 52/15
too [7] 8/10 15/15 19/2 19/22 29/4 29/5
37/9
took [4] 5/6 18/3 27/13 42/15
top [3] 33/2 45/4 50/14
topic [1] 50/5
touch [1] 52/5
tough [2] 39/8 44/12
toward [2] 22/6 33/19
towards [1] 43/2
town [1] 26/12
transcript [2] 15/16 24/15
transition [1] 25/24
transitioning [1] 49/23
Travelers [2] 9/7 9/9
trial [14] 17/10 17/19 17/20 18/13 22/2
23/7 23/20 23/21 24/7 24/25 25/3 25/8
30/4 38/13
trials [7] 16/23 24/3 24/20 28/17 29/14
38/19 38/23
tried [1] 25/5
trouble [1] 10/13
true [1] 54/5
truly [1] 50/25
truth [3] 5/7 5/12 54/5
trying [7] 13/4 18/24 37/17 41/21 46/17
46/25 51/25
turn [1] 45/4
turns [1] 50/12
Twelfth [1] 26/23
two [16] 8/1 9/11 10/16 12/10 17/3 17/3
24/2 24/20 38/11 38/13 38/19 38/22
39/4 39/4 40/7 42/11
type [22] 8/6 10/19 12/2 19/3 19/8 25/24

41/19 42/24 43/8 43/15 43/24 45/12
47/9 48/7 50/24 52/1
typed [1] 36/24
types [1] 16/12

**U**

Uh [2] 15/18 43/5
Uh-hmm [2] 15/18 43/5
ultimately [1] 31/16
Um [1] 41/7
Um-hmm [1] 41/7
under [2] 41/21 54/7
understand [6] 5/6 5/11 17/22 27/4
32/11 32/17
understood [2] 31/17 38/2
UNITED [2] 1/1 1/7
University [2] 6/5 6/6
unless [2] 8/21 21/3
until [5] 6/16 11/12 25/14 41/24 42/21
up [15] 7/21 10/18 16/1 19/6 19/7 20/14
23/7 25/14 37/8 41/25 44/3 44/5 44/6
49/2 53/16
update [1] 20/17
upon [1] 12/6
us [9] 4/13 6/20 10/13 20/5 20/5 38/16
38/21 42/11 52/14
use [3] 14/10 45/16 47/12
used [5] 9/7 29/10 44/24 45/19 48/15
using [1] 47/15
usually [4] 4/14 9/9 11/11 11/11

**V**

Valley [2] 5/3 9/16
valued [1] 39/5
variety [1] 30/8
vast [1] 9/2
versus [1] 31/22
very [29] 17/4 18/19 18/20 19/1 21/5
21/6 21/17 22/1 22/4 22/5 28/19 31/3
33/20 34/4 39/15 39/17 39/17 41/11
43/19 43/23 44/16 45/2 45/14 50/14
50/19 50/25 51/1 51/1 53/14

**W**

wait [1] 15/11
waived [3] 53/18 53/21 54/11
waiver [1] 47/10
walk [1] 37/5
wall [1] 44/14
want [9] 5/1 5/5 5/13 5/15 12/16 31/21
37/5 37/8 37/19
wanted [1] 24/14
was [153]
wasn't [2] 15/13 37/1
way [11] 3/11 5/9 8/7 11/6 31/17 37/14
38/12 51/20 53/3 54/8 54/8
ways [2] 4/15 30/8
we [67]
we'll [4] 6/23 24/16 36/3 37/12
we're [7] 5/8 24/15 24/19 29/25 37/5
43/8 44/21
we've [1] 50/1
week [4] 23/24 24/25 33/16 42/5
weight [1] 5/7
well [21] 5/22 10/13 11/24 19/2 19/6
19/16 21/7 21/9 21/17 25/22 31/3 33/7
39/15 39/21 42/13 45/3 45/11 45/14
45/16 48/23 51/24
went [11] 6/6 6/9 6/11 12/15 12/25
13/15 16/2 28/8 37/11 38/4 38/13
were [93]
what [48] 5/25 6/10 7/4 7/6 7/17 9/22

18/8 Page 164 [2] 17/2 17/7
18/21 19/3 19/8 19/8 20/12 21/8 21/14
22/14 28/22 31/20 33/10 34/1 34/23
35/4 37/15 38/2 38/16 38/21 39/13
40/20 41/15 41/17 42/4 42/18 42/23
43/24 44/5 45/8 45/11 47/16 48/25 50/1
50/9 50/21 51/18
what's [2] 38/21 53/8
whatever [2] 20/5 26/13
when [47] 4/25 6/14 7/10 7/12 8/2 8/16
12/21 13/5 14/8 14/17 14/20 15/5 15/12
15/22 16/10 16/22 16/25 18/2 21/11
24/14 25/14 25/17 28/22 29/1 29/8
29/10 29/15 30/15 30/21 31/15 31/20
32/25 38/24 39/23 41/20 44/7 44/21
44/21 44/22 45/11 47/20 51/15 52/8
52/11 52/13 53/2 53/12
where [10] 14/14 18/5 24/4 26/22 36/17
38/23 41/3 46/21 47/1 47/2
Whereupon [1] 53/19
whether [13] 13/18 16/12 16/16 18/21
25/5 28/5 29/14 32/2 38/2 43/10 47/9
51/8 51/8
which [9] 6/3 8/16 15/23 16/23 17/5
17/11 21/20 23/6 45/13
while [11] 13/8 16/13 21/1 24/22 27/3
28/2 28/23 29/16 30/5 31/6 52/20
who [20] 5/22 6/4 7/14 9/9 11/23 11/23
12/4 13/21 19/1 19/11 22/12 31/8 32/7
33/18 34/20 35/3 36/15 36/24 45/18
49/14
Whoever [1] 17/17
whole [3] 6/12 31/25 54/5
why [3] 34/18 40/23 51/14
will [3] 5/12 17/21 43/12
within [2] 9/19 13/3
without [2] 18/17 40/2
witness [5] 4/5 18/6 41/3 51/21 54/4
witnessed [4] 50/14 50/16 51/8 51/9
witnesses [1] 40/11
women [1] 44/16
won't [1] 5/14
wondering [1] 49/15
Wood [1] 14/18
Woods [1] 13/14
words [1] 31/15
work [22] 9/19 13/5 13/7 13/8 13/17
13/19 13/24 18/20 23/8 23/15 28/6
33/22 33/24 37/14 41/4 41/11 44/17
44/20 45/25 46/9 46/10 52/3
workability [1] 51/21
worked [22] 4/20 6/2 6/8 6/12 6/25 7/13
8/8 9/9 11/25 12/1 13/14 14/20 15/22
19/2 27/5 28/2 29/15 36/17 39/21 41/24
47/1 52/15
working [4] 14/17 34/19 40/12 51/24
worse [1] 21/9
would [67]
wouldn't [1] 14/5
written [3] 20/22 22/25 22/25
wrong [1] 21/25

**Y**

yeah [16] 6/16 15/3 29/22 31/11 33/24
34/10 36/20 37/5 42/4 42/24 43/17
47/22 49/13 52/22 52/22 53/10
year [5] 5/25 6/2 6/11 17/7 23/25
years [6] 4/21 12/23 26/1 33/4 37/10
38/5
Yep [1] 12/7
yes [77]
YORK [1] 1/8
you [328]

Y

you're [13]  4/22 24/9 24/12 30/10 31/20
39/23 41/20 41/21 41/21 42/1 42/18
44/13 48/16
you've [2]  12/3 50/10
young [2]  49/4 53/13
your [33]  4/13 4/17 4/24 5/21 7/17 8/17
8/20 9/1 9/2 9/17 10/10 10/12 12/3
14/18 20/20 26/15 28/14 28/21 30/12
30/18 31/17 36/2 36/3 36/10 37/18
37/23 38/22 42/23 42/25 44/13 45/8
47/25 53/8
yourself [3]  5/20 43/10 51/14

# EXHIBIT 28

**DOT Job Description and Occupational Demands:**

Request was received and completed to review the claim information on file and provide Occupational Demands for the Member's Regular Occupation/ Specialty in the Practice of Law.

Based on the file information provided for review of the Member's Occupation/Specialty of Trial Attorney (Insured's Statement; Work & Education History Form; Attorney correspondence; and Coventry Onsite Report) the job duties would most closely correspond to the Dictionary of Occupational Titles (DOT) job description of Attorney, DOT Code: 110.107-010.

**Title: Lawyer/Attorney**
**DOT Code: 110.107-010**
Conducts criminal and civil lawsuits, draws up legal documents, advises clients as to legal rights, and practices other phases of law:

**Tasks**
1. Gathers evidence in divorce, civil, criminal, and other cases to formulate defense or to initiate legal action.
2. Conducts research, interviews clients and witnesses, and handles other details in preparation for trial.
3. Prepares legal briefs, develops strategy, arguments, and testimony in preparation for presentation of case.
4. Files brief with court clerk.
5. Represents client in court and before quasi-judicial or administrative agencies of government.
6. Interprets laws, rulings, and regulations for individuals and businesses.

**May Also Include:**
1. May confer with colleagues with specialty in area of lawsuit to establish and verify basis for legal proceedings.
2. May act as trustee, guardian, or executor.
3. May draft wills, trusts, transfer of assets, gifts, and other documents.
4. May advise corporate clients concerning transactions of business involving internal affairs, stockholders, directors, officers, and corporate relations with general public.
5. May supervise and coordinate activities of subordinate legal personnel.
6. May prepare business contracts, pay taxes, settle labor disputes, and administer other legal matters.
7. May teach college courses in law.
8. May specialize in specific phase of law.

**Alternate Titles:**  Advocate; Attorney; Counselor; Counselor-At Law

**SPECIFIC VOCATIONAL PREPARATION (SVP)**

**Level 8:** Over 4 years up to 10 years.
Skilled Work. The usual amount of time spent by the typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job. Includes vocational education, apprenticeship, in-plant training, on-the-job training, and essential experience gained on other jobs.

## GENERAL EDUCATIONAL DEVELOPMENT (GED)

**Reasoning Development - Level 6:**
Apply principles of logical or scientific thinking to a wide range of intellectual and practical problems. Deal with nonverbal symbolism (formulas, scientific equations, graphs, musical notes, etc.) in its most difficult phases. Deal with a variety of abstract and concrete variables. Comprehend the most abstruse classes of concepts.

**Mathematical Development - Level 4:**
Algebra: Real number systems; linear, quadratic, rational, exponential, logarithmic, angle and circular functions, and inverse functions; related algebraic solution of equations and inequalities; limits and continuity and probability and statistical inference.
Geometry: Deductive axiomatic geometry, plane and solid, and rectangular coordinates.
Shop Math: Practical application of fractions, percentages, ratio and proportion, measurement logarithms, practical algebra, geometric construction, and essentials of trigonometry.

**Language Development - Level 6:**
Reading: Read literature, books and play reviews, scientific and technical journals, abstracts, financial reports, and legal documents.
Writing: Write novels, plays, editorials, journals, speeches, manuals, critiques, poetry, and songs.
Speaking: Conversant in the theory, principles and methods of effective and persuasive speaking, voice and diction, phonetics, and discussion and debate.

## PHYSICAL REQUIREMENTS

**Strength:  Sedentary Work -** Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body.  Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time.  Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

Occasionally – Occupation requires this demand up to 33% of the time (0-2.5 hrs/day)
Frequently – Occupation requires this demand 33%-66% of the time (2.5-5.5 hrs/day)
Constantly – Occupation requires this demand more than 66% of the time (5.5+ hrs/day)

Reaching:  Frequently
Extending hand(s) or arm(s) in any direction.

AmGen (Cheney)000154

**Handling:  Frequently**
> Seizing, holding, grasping, turning, or otherwise working with hand or hands.
> Fingers are involved only to the extent that they are an extension of the hand, such
> as to turn a switch or shift automobile gears.

**Fingering:  Frequently**
> Picking, pinching, or otherwise working primarily with fingers rather than with
> the whole hand or arm as in handling.

**Talking:  Constantly**
> Expressing or exchanging ideas by means of the spoken word to impart oral
> information to clients or to the public and to convey detailed spoken instructions
> to other workers accurately, loudly, or quickly.

**Hearing:  Constantly**
> Perceiving the nature of sounds by ear.

**Near Acuity:  Frequently**
> Clarity of vision at 20 inches or less.

**Accommodation:  Occasionally**
> Adjustment of lens of eye to bring an object into sharp focus. This factor is
> required when doing near point work at varying distances from the eye.

## WORKING CONDITIONS (Environment)

**Noise Intensity Level :  Level 3 - Moderate**
> Such as a business office; department store; grocery store; light traffic.

## WORK SITUATIONS (Temperaments)

**Performing a variety of duties.**
> Work situations that involve frequent changes of tasks using different techniques,
> procedures, or degrees of attentiveness without loss of efficiency or composure.

**Dealing with people.**
> Work situations that involve interpersonal relationships in a job setting beyond
> giving and receiving work instructions.

**Influencing people in their opinions, attitudes, judgments.**
> Work situations where writing, demonstrating, or speaking to persuade and
> motivate people to change their attitudes or opinions, participate in a particular
> activity, or purchase a specific commodity or service.

**Making judgments and decisions.**
> Work situations that involve solving problems, making evaluations, or reaching
> conclusions based on subjective or objective criteria, such as the five senses,
> knowledge, past experiences, or quantifiable or factual data.

## DOT APTITUDES

**General Learning Ability:  Level 1 Extremely High Aptitude (Above 89th
Percentile)**
> The ability to "catch on" or understand instructions and underlying principles; the
> ability to reason and make judgments. Closely related to doing well in school.

**Verbal Aptitude:  Level 1 Extremely High Aptitude (Above 89th Percentile)**

AmGen (Cheney)000155

The ability to understand meanings of words and to use them effectively; to comprehend language, understand relationships between words and to understand meanings of whole sentences and paragraphs.

**Numerical Aptitude:** Level 1 Extremely High Aptitude (Above 89th Percentile)
The ability to perform arithmetic operations quickly and accurately.

**Spatial Aptitude:** Level 4 Below Average Aptitude (11th-33rd Percentile)
The ability to think visually of geometric forms & to comprehend two dimensional representations of three-dimensional objects. The ability to recognize the relationships resulting from the movement of objects in space.

**Form Perception:** Level 4 Below Average Aptitude (11th-33rd Percentile)
The ability to perceive pertinent detail in objects or in pictorial or graphic material. Ability to make visual comparisons and discriminations and see slight differences in shapes and shadings of figures and widths and lengths of lines.

**Clerical Aptitude:** Level 3 Average Aptitude (34th-66th Percentile)
The ability to perceive detail in verbal or tabular material. Ability to observe differences in copy, to proofread words and numbers, and to avoid perceptual errors in arithmetic computation.

**Motor Coordination:** Level 4 Below Average Aptitude (11th-33rd Percentile)
The ability to coordinate eyes and hands or fingers rapidly and accurately in making precise movements with speed. Ability to make movement response accurately and swiftly.

**Finger Dexterity:** Level 4 Below Average Aptitude (11th-33rd Percentile)
The ability to move fingers, and manipulate small objects with fingers, rapidly or accurately.

**Manual Dexterity:** Level 4 Below Average Aptitude (11th-33rd Percentile)
The ability to move hands easily and skillfully. The ability to work with hands in placing and turning motions.

**Eye-Hand-Foot Coordination:** Level 5 Very Low Aptitude (Below 11th Percentile)
The ability to move the hand and foot coordinately with each other in accordance with visual stimuli.

**Color Discrimination:** Level 5 Very Low Aptitude (Below 11th Percentile)
The ability to match or discriminate between colors in terms of hue, saturation, and brilliance, identify a particular color or color combination from memory and be able to perceive harmonious or contrasting color combinations.

## CRITICAL OAP APTITUDES

**General Learning Ability:** Above Average (67-74th Percentile) Low 1/3 of DOT Level 2
The ability to "catch on" or understand instructions and underlying principles; the ability to reason and make judgments. Closely related to doing well in school.

**Verbal Aptitude:** Average (46-54th Percentile) Mid 1/3 of DOT Level 3
The ability to understand meanings of words and to use them effectively; to comprehend language, understand relationships between words and to understand meanings of whole sentences and paragraphs.

**Numerical Aptitude:** Average (56-66th Percentile) Top 1/3 of DOT Level 3

AmGen (Cheney)000156

The ability to perform arithmetic operations quickly and accurately.

**WORK FUNCTIONS (Data-People-Things)**

**Data:** 1 Coordinating

Determining time, place or sequence of operations or activities on the basis of analysis of data; executing determinations or reporting on events.

**People:** 0 Mentoring

Dealing with individuals in terms of their total personality in order to advise, counsel, or guide them with regard to problems that may be resolved by legal, scientific, clinical, spiritual, or other professional principles.

**Things:** 7 Handling

Using body members, handtools, or special devices to work, move or carry objects or materials. Involves little or no latitude for judgment with regard to attainment of standards or in selecting appropriate tool, object, or material.

**WORK FIELDS**

**Litigating (272)**

Carrying out legal procedures, such as prosecuting and defending by pleading case, presenting evidence, debating in court, drawing up legal papers, and interpreting statutes.

**MATERIALS, PRODUCTS, SUBJECT MATTER, AND SERVICES**

**Legal Services (932)**

AmGen (Cheney)000157

# EXHIBIT 29

Case 2:17-cv-00004-DGC Document 94-2 Filed 09/14/18 Page 77 of 84

Donna J. ROOT, Plaintiff, v. TEMPE ST. LUKE'S..., 2007 WL 4435586...

2007 WL 4435586 (D.Ariz.) (Trial Filing)
United States District Court, D. Arizona.

Donna J. ROOT, Plaintiff,

v.

TEMPE ST. LUKE'S HOSPITAL; Iasis Healthcare; James R. Nichols, MD, Defendants.

No. CV05-2834-PHX-SRB.
October 5, 2007.

**Rule 26 Joint Meeting Report**

Donna J. Root, Plaintiff, Pro Per, 2343 W. Main Street, Apt. 2103, Mesa, AZ 85201, (480) 343-4125.

**TO THE HONORABLE SUSAN R. BOLTON**:

On Thursday, September 20, 2007, at 1:00PM, Plaintiff (ProPer) met with Defendants' Counsel for the purposes of complying with this Court's order of August 31, 2007 in the conference room at Prince of Peace Lutheran Church, 3641 N. 56th St., Phoenix, Arizona.

Meeting participants were introduced as follows:

Cynthia Cheney was present representing Defendants Tempe St. Luke's Hospital and IASIS Healthcare; Sara Sato-Brown representing Defendant James R. Nichols, MD; Plaintiff Donna J. Root, representing herself, Richard I. Root and Shirley Fitzgerald, as note taker.

Review of the Court's Order and points were discussed with the following conclusions:

### 1. Nature of the Case

Plaintiff contends that Defendants had a duty to care and failed to treat her son in accordance with EMTALA and the Standard of Care resulting in his death.

Defendant Dr. Nichols contends that the nature of the claim as it pertains to him is a medical negligence case, based on the applicable Arizona Revised Statues. The issue as to Dr. Nichols is A) whether or not decedent Jason Schondelmeyer was his patient and B) whether or not he breached the standard of care with regard to medical care he provided or failed to provide to Mr. Schondelmeyer when Mr. Schondelmeyer was brought to the Tempe St. Luke's Emergency Department on August 15, 2003, and C) whether his acts or failure to act are a cause of plaintiff's alleged damages. This is in accordance with ARS 12-563.

There is no private right of action against Dr. Nichols for any alleged EMTALA violations. This is stated in the court's orders of May 1, 2007 and August 2, 2006.

Defendant Tempe St. Luke's Hospital contends that there was no violation of the Standard of Care or EMTALA by its employees or agents with respect to Plaintiff's decedent. Jason Schondelmeyer, a competent adult, was offered a screening examination, which he declined. He left Tempe St. Luke's Hospital of his own volition very soon after arriving and

Case 2:17-cv-00004-DGC   Document 94-2   Filed 09/14/18   Page 78 of 84

Donna J. ROOT, Plaintiff, v. TEMPE ST. LUKE'S..., 2007 WL 4435586...

declining the proffered screening exam. Tempe St. Luke's Hospital also contends that no acts of its agents or employees, not any failure to act, caused Jason Schondelmeyer's death.

## 2. Elements of Proof

Plaintiff must prove by a preponderance of the evidence that 1) a duty to care by defendants was established, 2) standard of care was breached by defendants, 3) EMTALA was applicable and violated by defendants, 4) Causation in that death was the result of these violations by defendants. Plaintiff relies on 42 USC §1395dd, ARS 12-542, ARS12-561, ARS 12-2604, ARS 36-3210, ARS 13-403, ARS 36-501 and ARS 12-566. Plaintiff reserves the right to supplement this document with additional statues and case precedents.

Defendant Dr. Nichols asserts that Plaintiff must prove the elements of a medical negligence claim in accordance with ARS 12-563. There is no private right of action against Dr. Nichols for any alleged EMTALA violations.

Defendant Tempe St. Luke's Hospital asserts that Plaintiff bears the burden of proof on both EMTALA violation and medical negligence as to the acts or omissions of any agent or employee of TSLH and must also prove that any alleged acts or omissions caused Plaintiff's decedent's death and the nature and extent of her damages.

## 3. Factual and Legal Issues Genuinely in Dispute

Plaintiff contends Defendants had a duty to care and did not provide even the most minimal care as required by EMTALA. Plaintiff does not believe that these issues can be narrowed by stipulation or motion.

Defendant Dr. Nichols contends the issues of fact as applicable to the claims against him are A) whether or not decedent Jason Schondelmeyer was his patient and B) whether or not he breached the Standard of Care with regard to any medical care that he provided or failed to provide to Mr. Schondelmeyer when Mr. Schondelmeyer was brought to the Tempe St. Luke's Emergency Department on August 15, 2003 and C) whether his acts or failure to act are a cause of Plaintiff's alleged damages.

TSLH contends that Schondelmeyer was a competent adult who refused a screening examination at TSLH and whose death was not caused by any negligent act or failure to act on the part of TSLH agents or employees. The disputed issues are whether the Standard of Care for a hospital emergency room was breached, whether EMTALA was violated and provides a basis for recovery of damages and whether the alleged negligence and breach of EMTALA caused Plaintiff's decedent's death. The nature and extent of Plaintiff's damages are also in dispute.

## 4. Jurisdictional Basis

Plaintiff contends that jurisdiction is properly placed with Judge Bolton due to the alleged violation of the Federal EMTALA Statue and Judge Bolton's prior order.

Defendants Drs. Nichols, Tempe St. Lukes and IASIS Healthcare do not dispute jurisdiction.

## 5. Parties who have not been served, or have failed to appear.

Plaintiff has no other parties to serve and Plaintiff agrees to dismiss the remaining fictitious parties were in reference to real parties already dismissed from this case.

Case 2:17-cv-00004-DGC  Document 94-2  Filed 09/14/18  Page 79 of 84

Donna J. ROOT, Plaintiff, v. TEMPE ST. LUKE'S..., 2007 WL 4435586...

No changes and/or additions.

### 6. Parties not subject to this Court's jurisdiction

Plaintiff acknowledges Judge Bolton's order dismissing Scottsdale Defendants et.al. from this case.

No changes and/or additions.

### 7. Legal Issues for which Pre-Trial Motions are contemplated

Plaintiff does not contemplate the need for any dispositive or partially dispositive pre-trial motions at this time.

Defendant Dr. Nichols asserts that he may file dispositive or partially dispositive motions including, but not limited to, a motion for Summary Judgment at a later date. Currently, Defendant anticipates he may file a motion to strike portions of the affidavit of Plaintiff's Expert, Dr. Wapen, based on the foundation for Dr. Wapen's opinions.

Defendant TSLH anticipates, at a minimum, a motion for Summary Judgment on the basis that Plaintiff has inadequate expert testimony to sustain her claim, on EMTALA violation or on medical negligence. TSLH also anticipates a motion to dismiss IASIS Healthcare as a defendant.

### 8. Suitability for Reference for Arbtration, to a Master, or to a United States Magistrate Judge

Plaintiff and Hospital Defendant agreed to meet with a court assigned mediator at the discretion and order of the court. According to Counsel, Defendant James R. Nichols, MD is not willing to meet for mediation.

All agreed to a jury trial with Judge Bolton presiding.

Defendant Dr. Nichols and Defendant TSLH agree that they will participate in a formal mediation with a mediator assigned through the court referral to the applicable alternative dispute resolution program. Should it be proposed, Defendants will consider participating in mediation before a mutually agreed upon private mediator. Defendants will not participate in any informal mediations or negotiations at this time.

### 9. Status of Related Cases

Plaintiff reports no ruling/status unknown on Maricopa County Superior Court Case # CV2005-092-952. Plaintiff questions the relevance and potential relationship of Case # CV-05-0766-PHX/LOA for the Violation of Federal False Claims Act as one of the parties to that litigation is also a defendant in this case and evidence necessary to link these cases is a subject of current discovery.

Defendant Dr. Nichols has no position on this issue.

TSLH requests that Plaintiff keep both Defendants and the Court apprised of the status of her claims in Maricopa County Superior Court so that discovery may be coordinated and not duplicated between the Federal and State Court actions, if feasible.

### 10. Suggested Changes in the timing, form or requirement for disclosures under 26A

Plaintiff hand-delivered Production Requests and Potential Witness List to Defendants on 9/20/07. Plaintiff does not anticipate the need for any deviations from the provisions of Rule 26A.

Defendants Dr. Nichols and TSLH agree that there is no need to propose any changes to the provision of FRCP 26 at this time.

### 11.A. Proposed deadlines for Disovery:

Plaintiff believes she can complete her discovery by November 15, 2007, if Defendants cooperate with Requests for Production and provide their Witness Lists according to the timeline set forth in this Court's order of 8/31/2007.

Defendants Dr. Nichols, Tempe St. Luke's Hospital and IASIS Healthcare propose a discovery completion date of April 30, 2008.

### 11.B. Proposed Date for Dispositive Motions

Plaintiff believes she can complete any dispositive motions that may become necessary by December 15, 2007.

Defendants Dr. Nichols, Tempe St. Luke's Hospital and IASIS Healthcare propose a dispositive motions deadline of May 30, 2008.

### 11.C. Disclosure of Expert Testimony

Plaintiff believes that Disclosure of All Expert Testimony 90 days before trial should be adequate.

Defendant's Dr. Nichols, Tempe St. Luke's Hospital and IASIS Healthcare propose a date for disclosure of expert testimony of January 15, 2008.

### 11.D. Pretrial Disclosures under Rule 26A(3)

Plaintiff expects to supplement her witness list with the remaining contact information on October 15, 2007.

Defendant's Dr. Nichols, Tempe St. Luke's Hospital and IASIS Healthcare propose a date for final pre-trial disclosures pursuant to FRCP26(A)(3) regarding witness and exhibits expected to be presented at trial by March 31, 2008.

### 11.E. Scheduling of Final Pre-Trial Conference

Plaintiff agrees to abide Judge Bolton's order in this regard.

Defendant's Dr. Nichols, Tempe St. Luke's Hospital and IASIS Healthcare propose a final pre-trial conference date of June 30, 2008.

### 12. Scope of Discovery

Plaintiff agrees discovery should be focused on Standard of Care including EMTALA, Causation, Damages and Cause of Death.

Defendant's Dr. Nichols, Tempe St. Luke's Hospital and IASIS Healthcare agree with Plaintiff's statement of the scope of discovery.

### 13. Suggested Changes in the limitations on Discovery imposed by the Federal Rules of Civil Procedure

Plaintiff agrees that no changes in the discovery rules should be necessary at this time and that it will not be necessary to conduct discovery in phases.

Defendant's Dr. Nichols, Tempe St. Luke's Hospital and IASIS Healthcare agree there is no need to propose any changes to FRCP limitations on discovery at this time.

### 14. Estimated Date that case will be Ready for Trial and Suggestions for Shortening the Trial

Plaintiff believes that she can be ready for trial by March 1, 2008.

Plaintiff believes she will need 3 days for her witnesses and one day for jury selection.

Plaintiff has no suggestions for shortening the trial at this time.

Defendant's Dr. Nichols, Tempe St. Luke's Hospital and IASIS Healthcare propose at trial date in September 2008. Defendants anticipate this trial will take 8 - 10 trial days, with some possibility to shorten trial with dispositive motions.

### 15. Request for Jury Trial

Plaintiff agrees to previously requested Jury Trial.

Defendant's Dr. Nichols, Tempe St. Luke's Hospital and IASIS Healthcare agree with the parties' previous request for a jury trial.

### 16. Prospects for Settlement

Plaintiff and Hospital Defendant agreed to meet with a court appointed mediator, however according to counsel for James R. Nichols, MD, he is not willing to do so and Plaintiff is unwilling to settle with less than all defendants.

Defendant Dr. Nichols will participate in a formal mediation with a mediator assigned through the Court's referral to the applicable alternative dispute resolution program. Should it be proposed, Defendant will consider participating in mediation before a mutually agreed upon private mediator. The likelihood of settlement of this claim is indeterminate at this point in time.

### 17. Class Action/Complex Tract

All agreed that this is not a class action litigation and does not require a Complex Tract.

Defendant's Dr. Nichols, Tempe St. Luke's Hospital and IASIS Healthcare agree with Plaintiff's statement that this is not a class action litigation and does not require referral to the complex tract.

### 18. Unusual, Difficult or Complex Problems or Issues

All agreed that there are no unusual, difficult or complex problems or issues in this case.

Defendant's Dr. Nichols, Tempe St. Luke's Hospital and IASIS Healthcare agree there are no notably unusual, difficult or complex problems in this case.

### 19. Any other matters that will aid the Court in resolving this matter in a just, speedy and inexpensive manner

Plaintiff is unaware of any other matters in this regard.

Defendant's Dr. Nichols, Tempe St. Luke's Hospital and IASIS Healthcare are unaware of any matters responsive to this issue.

**Dated this 4th day of October, 2007.**
**Jointly Prepared and Respectfully Submitted,**

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1292738 (Ariz.Super.) (Verdict and Settlement Summary)

Copyright (c) 2018 Thomson Reuters/West
WEST'S JURY VERDICTS - ARIZONA REPORTS

Defense Verdict in Wrongful Death Suit Against Anesthesiologist

Superior Court of Arizona, Maricopa County.

Hix v. Villares

**Type of Case:**
Wrongful Death • Adult

Medical Malpractice-Physicians & Health Professionals • Anesthesiologist

Medical Malpractice-Physicians & Health Professionals • General Surgeon

Medical Malpractice-Facility • Clinic/Center/Group

Medical Malpractice-Facility • Hospital

Vicarious Liability

**Specific Liability: Surgeon, anesthesiologist and employers failed to meet the standard of care for gastric bypass surgery, causing injuries to decedent's estate and surviving spouse**

**General Injury:** Death

**Jurisdiction:**
State: Arizona
County: Maricopa

**Related Court Documents:**
Plaintiffs' complaint: 2007 WL 7087495

Plaintiffs' trial memorandum re: admissibility of evidence: 2010 WL 1232012

Defendants Delisio and Red Mountain's requested jury instructions: 2010 WL 1232013

Case Name: Diana Hix, individually as surviving spouse of John Hix, decedent, and on behalf of all statutory beneficiaries, including S.H., D.H., N.H. and T.H., surviving minor children; Kayla Hix, surviving daughter; and James Hix, surviving parent of decedent v. Alexander Villares, MD, and Jane Doe Villares, husband and wife; Minimally Invasive Surgical Consultants PLLC, an Arizona Corporation; Brian J. Delisio, MD, and Jane Doe Delisio, husband and wife; Red Mountain Anesthesiologists, an Arizona corporation; and Banner Heath System, d/b/a Banner Mesa Medical Center, an Arizona corporation

Hix v. Villares, 2010 WL 1292738 (2010)

<hr/>

**Docket/File Number:** CV2007-005171

**Verdict: Defendants Delisio and Red Mountain Anesthesiologists, $0**

**Verdict Range:** $0

**Verdict Date:** March 9, 2010

**Judge:** Emmet J. Ronan

**Attorneys:**

Plaintiff: Raymond J. Slomski and Samantha Butler, Raymond J. Slomski PC, Phoenix, Ariz.

Defendants (the Villareses): Neil C. Alden, Jardine, Baker, Hickman & Houston, Phoenix, Ariz.

Defendants (the Delisios and Red Mountain Anesthesiologists): Winn L. Sammons and Jim C. Goodwin, Sanders & Parks, Phoenix, Ariz.

Defendant (Banner Health System): Cynthia V. **Cheney**, Fadell, **Cheney** & **Burt**, Phoenix, Ariz.

Defendant (Minimally Invasive Surgical Consultants): *Pro per*

**Trial Type: Jury**
**Breakdown of Award:**
**$0**

**Summary of Facts:**

John Hix was seen Oct. 3, 2005, by Alexander Villares, MD, a bariatric surgeon with Minimally Invasive Surgical Consultants, for a surgical consult. Villares recommended gastric bypass surgery and admitted Hix to Banner Mesa Medical Center several months later, May 16, 2006. Villares performed the operation the same day.

Complications allegedly developed and Villares performed a second surgery May 18.

Further complications developed and Villares reportedly performed two additional surgeries, May 19 and May 20, respectively.

Hix was discharged from Banner Mesa May 20 and was transported to Maricopa Medical Center. Shortly after arrival, the patient was pronounced dead. He was survived by his wife, Diana, three minor children residing in Maricopa County, a minor son and adult daughter in Alabama and his father in Arkansas.

Throughout Hix's hospitalization, Villares was said to be responsible for the patient's surgical treatment and post-op care; and on May 16 and May 18, Brian Delisio, MD, with Red Mountain Anesthesiologists, was reportedly responsible for Hix's anesthesia services and post-op care.

Diana Hix, individually, as a surviving spouse and on behalf of all statutory beneficiaries, brought a lawsuit against Villares and wife Meaghan; Minimally Invasive Surgical Consultants; Delisio and wife Laura; Red Mountain Anesthesiologists; and Banner Heath System, d/b/a Banner Mesa Medical Center, in the Maricopa County Superior Court.

The plaintiff sought general and special damages for the alleged wrongful death of her husband, including emotional distress, loss of society and companionship and consortium.

The case proceeded to jury trial against Delisio and Red Mountain Anesthesiologists.

Jurors returned a verdict in favor of the defendants March 9, 2010.

Court: Superior Court of Arizona, Maricopa County.

<hr/>

End of Document        © 2018 Thomson Reuters. No claim to original U.S. Government Works.